1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X
                          :
HILDA L. SOLIS, Secretary,    09-CV-2212
Of Labor, United States
Department of Labor,
                          :
            Plaintiff,
                                 US Courthouse
       -against-          :  Central Islip, NY

SCA RESTAURANT CORP., d/b/a
LUIGI Q ITALIAN RESTAURANT,
a Corporation, and
LUIGI QUARTA, individually
and as Owner,
             Defendants.:  April 9, 2012
                           9:30 a.m.
- - - - - - - - - - - - - X

        TRANSCRIPT OF TRIAL
        BEFORE THE HONORABLE JOSEPH F. BIANCO
        UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:   US DEPARTMENT OF LABOR
                     Office of the Solicitor
                     201 Varick Street, Room 983
                     New York, New York 10014
                     BY:  DANIEL HENNEFELD, ESQ.
                          ELENA S. GOLDSTEIN, ESQ.


For the Defendant:   RAYMOND NARDO, ESQ.
                     129 Third Street
                     Mineola, New York 11501


Court Reporter:      Dominick M. Tursi, CM, CSR
                     US District Courthouse
                     1180 Federal Plaza
                     Central Islip, New York 11722
                     (631) 712-6108 Fax:  712-6124
                     DomTursi@email.com


        Proceedings recorded by mechanical stenography.
           Transcript produced by computer.

2

1          (Call to Order of the Court.  Appearances states

2     as indicated above.)

3          THE COURT:  As you know, we are here this

4     morning to begin the bench trial.

5          Are both sides ready to proceed?

6          MR. HENNEFELD:  Yes, your Honor.

7          MR. NARDO:  Yes, your Honor.

8          THE COURT:  Both sides agree, pursuant to a

9     pre-trial order, that this is in fact a bench trial,

10    correct?

11         MR. HENNEFELD:  Yes, your Honor.

12         MR. NARDO:  Yes, your Honor.

13         THE COURT:  Okay.  There was one issue that came

14    up on Friday.

15         Mr. Nardo, we tried to contact your office but

16    it was a holiday and we were unable to reach you.  I want

17    to address that before we get started.

18         I assume the government agrees we should address

19    that first.

20         MR. HENNEFELD:  Yes, your Honor.

21         THE COURT:  Okay.  The court did issue a TRO

22    enjoining the defendants from terminating the two

23    employees who are the subject of the application prior to

24    the court having a chance to address this issue with the

25    parties in person today.

3

1      So Mr. Nardo, do you want to address that issue?

2      MR. NARDO:  Yes, your Honor.

3      I spoke to my client about this and I would like

4  to address the papers, themselves, which I didn't see

5  until long after hours on Friday evening.

6      In the papers there's no declaration, there's no

7  affidavit from either of these employees.  Miss Vasquez

8  wrote that Mr. Chavez says that Enrique, Jeff, said, and

9  that the court has said, these statements.

10     And I submit to you that there is no firsthand

11 evidence of this so far.  And after discussing this with

12 my client, my client tells me that he simply asked these

13 employees if they were going to testify and, if so, he was

14 going to shut the restaurant down on Monday and that they

15 didn't have to come to work on Monday.

16     So there is no intent to terminate them, there's

17 no threat to terminate them, he's not terminating them and

18 he does not intend to terminate them.  So I think this is

19 not really relevant to what we are doing today.

20     THE COURT:  Okay.  Well, a couple of things.

21     First of all, the court is permitted to rely on

22 hearsay for purposes of these types of applications.

23 Obviously, it was done very quickly and I was assuming

24 that if there was a dispute about this that needed to be

25 resolved by the court, obviously we could hear firsthand

4

1    what the conversations were.

2            But let me hear from the Department of Labor.

3    The termination issue might be moot in light of what was

4    just said.

5            MR. HENNEFELD:  Your Honor, we believe the issue

6    is not moot because the two employees in question are here

7    to testify today and will be able to explain firsthand

8    what they were told and what the understanding was, that

9    it was a clear threat that they would be fired for

10   testifying.

11           And furthermore, we believe that the defendant

12   did not comply with the court's order subsequently, in

13   that further threats of discharge were made on Saturday to

14   these employees, the day after the court issued its order.

15           And just to note.  We undertook and did

16   personally serve the order on the defendant shortly after

17   the court issued it on Friday afternoon, to make sure that

18   he was aware of it as quickly as possible.  We're prepared

19   to provide your Honor a brief update on it, on what we

20   believe transpired.  And of course the employees are here

21   today despite these threats to testify as to these facts.

22           THE COURT:  What relief are you seeking with

23   respect to that?

24           Mr. Nardo I think is indicating that his client

25   understands -- first of all, is the restaurant in

5

1  operation today or is it not?

2          MR. NARDO:  He indicated he was not going to

3  open on Monday.  Then I spoke to him late in the day

4  Saturday.  He'd said that he had some reservations; he

5  might open.  So I'm not sure, judge.

6          THE COURT:  But your client understands that if

7  he were to retaliate against any of these individuals by

8  firing them or in any other way, that it would be a

9  violation of the law.  I'm sure you have explained that to

10  him.

11          MR. NARDO:  That is correct, your Honor.

12          THE COURT:  And what is his intention?  If he

13  opens today, does he intend on letting those employees

14  continue to work or not?

15          MR. NARDO:  Yes.  Yes, he does.  Well, not today

16  if they're here, but they're free to come back to work

17  after today.

18          THE COURT:  Okay.  So I guess, in light of that,

19  what remedy would you be seeking if you continue to

20  litigate this?  If there is an agreement, at least through

21  his attorney, that they're not going to be terminated, if

22  the restaurant continues to operate that they're going to

23  continue the work there, what would you seek from me this

24  morning, is my question?

25          MR. HENNEFELD:  Well, your Honor, first of all,

6

1    we're seeking permanent injunction for retaliation claimed

2    under Section 158.3.  Based on the facts to be presented,

3    we seek to amend our complaint to add a claim under

4    Section 158.3 and appropriate relief thereto.

5              But given that, we believe the defendant

6    continued the retaliatory threats after the TRO was

7    issued.  We believe consequently, further temporary relief

8    is needed until a permanent injunction can be adjudicated.

9              So we're requesting to convert the TRO into a

10   preliminary injunction until the permanent injunction can

11   be adjudicated, in order to stop the defendant from

12   continuing in this retaliatory conduct and threats.

13             THE COURT:  Mr. Nardo?

14             MR. NARDO:  Yes, judge.  Let me just say

15   something at the outset.

16             When I came to this court -- I will stand, as

17   opposed to sit down, to speak into the mic.  What do you

18   prefer?

19             THE COURT:  That is fine.

20             MR. NARDO:  Okay.  I just didn't want you to

21   interpret that as a sign of disrespect.

22             First of all, I don't know what these other

23   allegations are.  Mr. Hennefeld hasn't addressed them.

24             Second of all, amending this claim -- you know,

25   if they want to serve an amended complaint and we get time

7

1    to answer or make a motion, and we want to come back over

2    the summer, that is fine with us.

3         But I think we all want to get this resolved

4    here and now, judge.  And I don't think an amended

5    complaint is necessary for this.  And if there is, then

6    we're going to want time to answer and we're going to ask

7    for an adjournment, judge.

8         Otherwise, I think the simplest way to proceed,

9    judge, is to have these folks on the witness stand, you'll

10   hear their testimony, and wrap it all together as far as

11   the TRO application that is before you, instead of having

12   it piecemeal, doing the TRO and then doing the testimony

13   during the trial.

14        THE COURT:  I'm prepared to do that.  But I

15   guess I don't understand what the request for adjournment

16   would be.  You are asking me to adjourn if they're going

17   to amend, but then you cite the TRO as part of the trial.

18        MR. NARDO:  The TRO has already been decided,

19   but now they're asking for some sort of permanent

20   injunction for which they have to amend the complaint.

21   And if they're going to amend the complaint, then maybe we

22   want to make a motion.  We want time to answer.  They

23   could always bring a separate complaint, judge.

24        THE COURT:  Amending the complaint I think poses

25   some issues because we don't have the amended complaint.

8

1   They would, obviously, be entitled to consider whether

2   they want to ask for an adjournment or if they want

3   discovery in connection with any charge of retaliation.

4         So I'm a little bit concerned that the

5   Department of Labor is proposing to amend the complaint

6   when we're ready to begin.

7         MR. HENNEFELD:  Your Honor, I repeat, we would

8   need to amend the complaint to conform with the evidence

9   as related by the rules.  And obviously, if we had known

10   of the complaint going back sooner, we would have amended

11   this as soon as we knew of it.  But given that this

12   happened then on Friday and the facts will, we believe,

13   come out in court here today, we will seek to amend.

14         THE COURT:  Yes.  I understand, because,

15   obviously, this all happened two days ago.  I haven't had

16   a chance to look into all of this first before proceeding

17   on any amended complaints to address retaliation.

18         But I just go back to the relief.  It sounds

19   like they would consent to the fact that he was not

20   retaliating.  If your relief is to prevent them from

21   retaliating against any employees, it sounds like there

22   would be consent to that relief.

23         So I'm not sure what the purpose would be of

24   adding it in order to achieve a form of relief that I

25   think Mr. Nardo has stated his clients are willing to

9

1  consent to.

2          Am I correct or not?

3          MR. NARDO:  As I understand it, judge, the TRO

4  continues through April 10th, 2012.  I have explained it,

5  I have discussed the situation with my client, and he has

6  said that he is not terminating them, he didn't intend to

7  terminate them, and I don't believe there is any issue

8  about their termination, judge.

9          And he doesn't -- you have to realize that this

10  is a restaurant with three people in the kitchen.  This is

11  a very small restaurant, judge.  So if they were

12  terminated, he would have no operation, either.

13          But in any event, there is no intent to

14  terminate them.  They're free to come back to work

15  tomorrow, April 10.

16          THE COURT:  The bottom line is, Mr. Hennefeld,

17  if you are seeking to amend the complaint in any way, you

18  have to put it in writing.  We're not going to proceed on

19  an oral amendment to the complaint, in light of their

20  objection, if you are doing so at this point.

21          So I don't know how you want to proceed.  I'm

22  not faulting you, because obviously this came up on

23  Friday, but I don't think you can just orally amend the

24  complaint and say we're ready to go.

25          So I don't know what you want to do, whether you

10

1  want to take a few moments to discuss it with Mr. Nardo,

2  or how you want to proceed.

3         MR. HENNEFELD:  Could you give me one moment,

4  your Honor?

5         THE COURT:  Sure.

6         (There was a pause in the proceedings.)

7         MR. HENNEFELD:  Your Honor, we would like to

8  proceed and we will submit an amended complaint in

9  writing.  I just note that the amended complaint will be

10 to conform the evidence that is elicited today.  And I

11 have asked that your Honor reserve judgement as to how to

12 dispose of our request for continued relief based on the

13 evidence today.

14        MR. NARDO:  I don't believe that puts us in any

15 different position, your Honor.  The complaint is a

16 pleading.  That is something you do at the beginning of a

17 case to put the opposite party on notice.  And the

18 opposite party, the opposing party, reviews these

19 allegations, asks for discovery, if they want depositions.

20        These are allegations that were never before in

21 the complaint at all.  It is not as if this is a

22 continuation of something.  These are brand-new

23 allegations.

24        So, again, if they want to file and serve an

25 amended complaint, we're going to request an adjournment.

11

1          THE COURT:  Why don't I propose this.  This is,

2     I think, along the lines of the possibility you were

3     suggesting earlier.

4          I'm going to hear the claims that are currently

5     in the complaint which were the basis for the trial

6     proceeding today, because there is a pending TRO and

7     they're asking at a minimum that it be converted into a

8     preliminary injunction; that in conjunction with the

9     testimony of these employees today, I would hear the

10    evidence regarding what transpired over the weekend for

11    purposes of a preliminary injunction application, which

12    would be pending a potential motion to amend the complaint

13    at some future time.

14          So it wouldn't be part of the claim the court is

15    hearing today, with the exception of purposes of seeing if

16    I should continue an injunction to honor that a charge

17    that, I guess, would be the subject of a separate trial if

18    there was a retaliation complaint added.  If we were to go

19    forward, that potentially would be part of a separate

20    trial, but it would not be part of what the court would be

21    deciding for purposes of this case, at least at this

22    juncture.

23          Does that make sense or not?

24          MR. NARDO:  The only thing I'd say, your Honor,

25    they could just as easily file another complaint on these

12

1  facts and then they would not be connected with this trial

2  at all.

3           THE COURT:  I know, but in the meantime they

4  don't want any action taken against these employees.

5  That's why we just can't separate them out and say we will

6  deal with that at some later date.

7           The bottom line is, the TRO expires tomorrow,

8  and absent some type of preliminary injunction, they could

9  then be terminated, which they don't want.  So that is why

10 I thought at least hearing it for purposes of preliminary

11 injunction that they were seeking would make sense.

12 That's the issue we will deal with first.  We'll stop the

13 trial.  We don't have to go to the trial right now.  We'll

14 deal with the preliminary injunction, that they not be

15 fired, do that first.  If you want a judgment of that, I

16 think I would consider that, but that would be the first

17 thing we do this morning.

18           I'm just proposing that we wrap that issue up in

19 the trial testimony of these witnesses.

20           MR. NARDO:  Insofar as it is for the preliminary

21 injunction, at most.

22           THE COURT:  Yes.

23           MR. NARDO:  Okay.  All right.  That's fine, your

24 Honor.

25           THE COURT:  Is that acceptable to the Department

13

1   of Labor?

2           MR. HENNEFELD:  Yes, your Honor.

3           THE COURT:  Okay.

4           All right.  We're going to take a five-minute

5   break to take a criminal case I need to deal with first.

6   You can stay where you are.

7           I will ask the lawyers in the criminal matter to

8   come forward.

9           (A recess was taken.)

10          THE COURT:  We'll proceed with the bench trial

11  in conjunction with the motion for a preliminary

12  injunction to enjoin the defendants from terminating the

13  employees in retaliation.

14          Let's we will begin with the opening statements.

15  You don't have to give an opening if you don't wish, but I

16  will give each side an opportunity to do that, starting

17  the Department of Labor.

18          MR. HENNEFELD:  Your Honor, prior to an opening

19  statement, we wanted to propose to do some housekeeping on

20  exhibits.

21          THE COURT:  Go ahead.

22          MR. HENNEFELD:  Also, I want to introduce our

23  party representative for the US Department of Labor,

24  Miss Zorayda Vasquez, who is the investigator.

25          MS. VASQUEZ:  Good morning.

14

1          MR. HENNEFELD:  So, if I may, on the exhibits,

2    your Honor.

3          We have some exhibits where the defense made no

4    objections, and, again, some exhibits where there are

5    limited objections we can deal with during briefing.

6          THE COURT:  Okay.

7          MR. HENNEFELD:  So, your Honor, for Plaintiff's

8    Exhibit 1, the defendants made no objection in the

9    pretrial order, so we move to admit Plaintiff's Exhibit 1.

10   That is the US Department of Labor request for business

11   data form completed by the defendant.

12         THE COURT:  Mr. Nardo?

13         MR. NARDO:  No objection, judge.

14         THE COURT:  Okay.  Plaintiff's Exhibit 1 is

15   admitted.

16         (Plaintiff Exhibit 1 in evidence.)

17         MR. HENNEFELD:  Your Honor, we would prefer to

18   proceed numerically.

19         THE COURT:  Yes, I agree with that.  If you want

20   to do the ones that are in agreement that certain exhibits

21   will be admitted, you can just list those and then I'll

22   admit them all as a group, rather than doing each, one by

23   one.

24         MR. HENNEFELD:  All right, your Honor.

25         With respect to Exhibits 2 through 4, those are

15

1    all the payroll records of the defendants, Defendants made

2    no objection as to the authenticity or any other

3    objection, apart from relevance.

4           We are offering these exhibits as evidence of

5    the defendant's payable record-keeping practices.  We

6    certainly believe they're relevant in that they are

7    admissions of the defendant.

8           We move to admit Exhibits 2 through 4.

9           MR. NARDO:  Judge, I'm not sure it makes sense

10   to try to admit disputed --

11          THE COURT:  I agree.  I didn't realize this is

12   what you were doing.

13          I don't want to go through all the documents and

14   rule on them one by one.  At the appropriate time you

15   should offer them through the appropriate witness.  If

16   there is any objection on relevance or other grounds, then

17   I will hear you at that time rather than trying to decide

18   them all prior to the start of the trial.  I think it

19   makes sense to do it this way.

20          I thought that there was a large group of

21   exhibits that there were no objections to that both sides

22   would agree would be admitted at the start of the trial.

23   If that's not the case, we should just proceed.

24          MR. HENNEFELD:  Understood, your Honor.

25          There are a few other exhibits where there are

16

1   no objections.

2           THE COURT:  Okay.  Go ahead.

3           MR. HENNEFELD:  Plaintiff's Exhibit 8, New York

4   State Department of Labor Notice of Labor Law Violation.

5   This is a public document that is accompanied by a

6   declaration that is the basis for Rule 8038, Public

7   Records Offer.  The defendants objected to the declaration

8   but not to the underlying document of the exhibit.

9           THE COURT:  So you're just offering the

10  underlying document or you're offering both?

11          MR. HENNEFELD:  If the defendants don't object

12  to the underlying documents, we are happy to offer simply

13  the underlying documents.

14          MR. NARDO:  The underlying document is Exhibit

15  A, judge.  And we don't object to the Exhibit A.

16          THE COURT:  So we will call that 8A.  8A is

17  admitted then?

18          MR. NARDO:  Yes, your Honor.

19          THE COURT:  Okay.

20          (Plaintiff Exhibit 8A in evidence.)

21          MR. HENNEFELD:  And finally, there are two

22  depositions.  One is Plaintiff's Exhibit 12, which is

23  excerpts of the deposition of defendants.  And the

24  defendant's only objection is to the relevance of some

25  specific excerpts.  The defendants did not specify which

17

1   excerpts they were objecting to on relevance.

2           MR. NARDO:  My copy is highlighted.  I guess the

3   highlighted portions are what you're seeking to --

4           MR. HENNEFELD:  Yes.

5           MR. NARDO:  I would have to take a closer look

6   at that, judge.

7           THE COURT:  Why don't we hold off on that, then,

8   until you have had a chance to look at the highlighted

9   portions.

10          Is there one more?

11          MR. HENNEFELD:  Yes.

12          Finally, with respect to Plaintiff's Exhibit 13,

13  deposition of Isidro Banegas, plaintiff is offering

14  excerpts that defendant had also designated the

15  excerpts -- I think we're probably in agreement that that

16  deposition, generally, is admissible and that this is an

17  employee witness who is out of the country and unavailable

18  to testify.

19          MR. NARDO:  Judge, as long as our

20  counterdeposition designations, if we had anything going

21  in, or if not and he's out of the country we'd like to --

22  no, we have -- our counterdepositions are Exhibit G.

23          THE COURT:  So as long as Exhibit G comes in

24  with the highlighted portions of 13, you're okay with

25  that?

1          MR. NARDO:  Yes, your Honor.

2          THE COURT:  Is that acceptable?

3          MR. HENNEFELD:  Yes, your Honor.

4          We have a relevance objection to just one of the

5    defendant's designations.  That objection is listed in

6    defendant's exhibit list, to Defendant G.  So apart from

7    that, we're in accord.

8          THE COURT:  Well, is there one particular

9    passage that you have a relevance objection?

10          MR. HENNEFELD:  It is on Page 29, starting at

11    line 17, through Page 30, line 8.

12          THE COURT:  I'm going to allow it over the

13    relevance objection.  This is the basic educational

14    background.  How long he has been in the country.  Is that

15    the objection that you are referring to?

16          MR. HENNEFELD:  Yes, your Honor.

17          THE COURT:  It could have relevance in terms of

18    the conversations that he presumably had with other

19    people.  I'm going to allow it as basic information that

20    is always elicited from a witnesses.  I don't think it is

21    prejudicial in any way.

22          So I will overrule the relevance objection.

23    With that, Plaintiff's 13 and Defendant's Exhibit G are

24    admitted, correct?

25          MR. HENNEFELD:  Yes, your Honor.

Opening for Plaintiff/Ms. Goldstein

1      MR. NARDO:  Yes, your Honor.

2      (Plaintiff Exhibit 13 in evidence.)

3      (Defense Exhibit G in evidence.)

4      THE COURT:  Anything else?

5      MR. HENNEFELD:  That is all on exhibits, your

6   Honor.  Thank you.

7      THE COURT:  Is there anything you want to raise,

8   Mr. Nardo, before you start with the opening statements?

9      MR. NARDO:  No, your Honor.

10     THE COURT:  Okay.  The Department of Labor goes

11  first.

12     MS. GOLDSTEIN:  Good morning, your Honor.

13     THE COURT:  Good Morning.

14

15                OPENING FOR PLAINTIFF

16

17     MS. GOLDSTEIN:  My name is Elena Goldstein.

18         Together with my cocounsel, Daniel Hennefeld,

19  and Zorayda Vasquez, with the Wage/Hour Division of the U.

20  S. Department of Labor, we represent the plaintiffs in

21  this case.

22     THE COURT:  Take your time.  There's no rush.

23  Just slow down, okay?

24     MS. GOLDSTEIN:  And with Zorayda Vasquez, with

25  the Wage/Hour Division of the U. S. Department of Labor,

20

1   we represent the plaintiffs in this case.

2           This case involves an upscale Italian restaurant

3   that, nearly four years after the initial investigation of

4   this case and nearly three years after the complaint was

5   filed in this case, still refuses to comply with the

6   requirements of the Fair Labor Standards Act.

7           The evidence will show the defendant, SCA

8   Restaurant Corporation, doing business as Luigi Q's

9   Restaurant and Luigi's Bar and Grill, owe more than

10  $137,000 to 12 of their current and former employees, a

11  number that increases as the days go by because of

12  defendants simple failure to come into compliance with the

13  Act.

14          In this case the Secretary seeks those back

15  wages, an equal amount of liquidated damages, and an

16  injunction against future violations, given defendant's

17  continuing failure to come into compliance.

18          The requirements of the Fair Labor Standards Act

19  are straightforward.  Defendants have three basic

20  affirmative obligations.  They are required keep records

21  of hours worked and wages paid; required to pay certain

22  statutory required minimum wages for each house; and

23  required to pay time and a half overtime for hours worked

24  over 40.

25          The evidence will show that defendants have

21

1    failed on each of those counts.  They failed to keep

2    records of hours worked and wages paid and they paid

3    weekly salaries that did not and could not have given

4    overtime treatment.  And for some employees, when their

5    salaries are divided by the hours worked, did not even

6    equal the statutory required minimum wage.

7              The bulk of this case is not in dispute.  The

8    defendants do not dispute that the protection of the Fair

9    Labor Standards Act apply in this case.  They've admitted

10   that both SCA Restaurant Corp. and Luigi's Bar and Grill

11   are employers covered by the act and required to comply

12   with it.

13             They've admitted that the employees listed in

14   the Secretary's back wage computation are entitled to

15   protection from the Fair Labor Standards Act.  They've

16   even conceded that these 12 workers were, in fact, or are

17   in fact current or former employees of the restaurant.

18   They do not allege that any of these workers are exempt

19   from protection under the Act or otherwise outside of the

20   boundaries of the Fair Labor Standards.

21             They've also conceded the factual basis of the

22   violations here.  With respect to the record-keeping,

23   defendants have stipulated from June 2006 through May 2009

24   that they did not keep records of hours worked.  The

25   evidence will also show that from May 2009 through the

22

1    present, defendants have produced no records of hours

2    worked and no records of cash wages paid to employees.

3           The facts concerning the amount and the way in

4    which employees were paid are likewise largely not

5    contested.  Defendants have admitted that they paid, in

6    Mr. Quarta's words, a fixed weekly salary for hours

7    worked.  And the parties are generally in the same

8    ballpark with respect to the amount of work that has been

9    paid.

10          The main factual dispute in this case concerns

11   simply the number of hours worked.  And the evidence will

12   show that employees regularly and consistently worked

13   schedules that far exceeded 40 hours a week, working six

14   days each week.

15          The court will hear testimony from current and

16   former employees that will show that on weekdays,

17   employees worked pretty much the same schedule.  They

18   arrived at 10:30 in the morning, performed typical

19   preparation work that you would expect at a restaurant,

20   cleaning, preparing food.

21          The evidence will show that between 3:00 and

22   4:30, employees were scheduled to take a break, but that

23   because of the requirements of restaurant customers, some

24   employees were typically not allowed to take that full

25   hour-and-a-half break.

23

1        And employees will testify that they were

2   scheduled to depart, and usually did depart, between 9 and

3   10:30 in the evening, with one of them leaving first.  The

4   dishwasher, possibly, left.

5        The testimony will also show that on Saturdays,

6   employees arrived at work at 3 and worked without a break

7   until 10:00, 11, or sometimes even later in the evening.

8        The court will also hear about government

9   surveillance that was conducted of the restaurant, that

10  confirms the schedules that will be described by the

11  employees.  And, in sum, the evidence will show that

12  employees typically worked between 53 and 61 hours every

13  week.

14       The court will also hear evidence that the

15  defendants acted willfully in refusing to comply with the

16  law and in trying to cover up their violations with the

17  falsification of records and efforts to intimidate and

18  retaliate against witnesses as this trial progressed.  The

19  evidence will show that defendants were well aware of the

20  hours worked by the employees, that with Mr. Quarta's

21  near-constant presence at the restaurant, he was well

22  aware of the hours worked by his workers.

23       The evidence will also show that Mr. Quarta is

24  well aware of requirements of the Fair Labor Standards Act

25  because of his long-standing experience in the restaurant

24

1    industry.  And even in 2003, he was visited by the New

2    York State Department of Labor who explained those

3    requirements of wages and hours to him.

4          The Secretary will also show evidence of the

5    defendant's efforts to evade liability.  First, the

6    Secretary will show that, despite their stipulation, the

7    defendant kept no records between June 2006 and May 2009

8    of hours worked.  The defendant submitted false time

9    records for 2008.  Time records that showed that employees

10   worked only five days a week and worked only exactly 40

11   hours a week:  time records that faked compliance with the

12   law.

13         The court will also hear evidence concerning

14   retaliating against employees who planned to testify in

15   this case.  And the evidence will show that these

16   employees were threatened with termination and that those

17   threats continued even after the defendant was

18   individually served with a temporary restraining order by

19   this court.

20         In sum, the Secretary will show that the

21   defendant engaged in repeated and willful violation of the

22   requirements of the Fair Labor Standards Act and, when

23   caught, the defendant not only refused to comply but

24   attempted to evade liability through falsified records and

25   witnesses.

Opening for Defense/Mr. Nardo

25

1          Thank you, your Honor.

2          THE COURT:  Thank you, Ms. Goldstein.

3          Mr. Nardo?

4          MR. NARDO:  Thank you, your Honor.

5

6               OPENING FOR DEFENSE

7

8          MR. NARDO:  Your Honor, the evidence will show

9     that Luigi Q's is a struggling restaurant.  A restaurant

10    that lost $70,000 last year.  A small restaurant, with

11    approximately three to four employees in the kitchen.

12          I am privileged to handle these cases for both

13    plaintiffs and defendants, and on either side you can be

14    put into an uncomfortable situation.  Let me say the

15    uncomfortable situation I have when I'm representing

16    plaintiffs.

17          That situation is where you have a defendant or

18    defendants who are going to file for bankruptcy, or who

19    are insolvent, who threaten and actually do file for

20    bankruptcy, and where there is a threat of perhaps that,

21    as plaintiff's counsel we try to resolve a case because we

22    are trying to obtain money for the employees.  That is

23    what the statute entitles.

24          And any person who is constrained by a rational

25    analysis and is using a risk-versus-reward analysis of the

26

1    situation would try to settle a case in those

2    circumstances because you don't throw good money after

3    bad.  As you know, Luigi Quarta filed for bankruptcy and

4    did throw good money after bad in December of 2011.

5              The rational model I just described does not

6    apply, apparently, to the United States government.

7    They're trying to get, it's impossible in this case, to

8    get, money for these employees.  Mr. Quarta has no assets

9    and he has already been adjudicated bankrupt.  And

10   whatever the restaurant is worth, whatever the silverware

11   and glassware is worth, is going to be a very small amount

12   of money.

13             So, your Honor, this is an exercise in futility

14   because there will be no positive outcome for the

15   employees.

16             And I might tell you, it's the government that

17   is putting the employees in a difficult situation, and

18   this very small restaurant, by asking them to testify

19   against their employer.  And this is happening with a

20   government that has $15 trillion in debt.  The government

21   has to borrow hundreds of billions of dollars each month

22   to stay afloat, and here we see the investigators,

23   counsel, back office, all this energy being spent on this

24   small Italian restaurant in Hicksville, judge.

25             Eventually being under the boot of the

27

1  government, Luigi's restaurant will have to close at some

2  point as a result of this, and waiters, waitresses,

3  dishwashers, chefs, the busboys are all going to be

4  unemployed in one of the worst economies of their

5  lifetime, of our lifetime because of this Department of

6  Labor's lawsuit.

7          I would submit to you, judge, that you heard lot

8  of statements about what is admitted or conceded or

9  stipulated to as part of this litigation.  The purpose of

10 that is so that we don't have to go through proving those

11 facts.  So your Honor, when those facts come up, hopefully

12 we can just fast-forward at that point, because we don't

13 have to prove something that has already been stipulated

14 to.

15         I will submit to you that there is one issue

16 regarding exemption.  We believe that the head chef is

17 exempt from the Fair Labor Standards Act and there should

18 be no award for the head chef because of his duties,

19 because he is supervising, hires and fires and he assigns

20 the work.  So that is another issue that you will have

21 before you, your Honor.

22         Thank you.

23         THE COURT:  Okay.  Let's hear the first on --

24 yes?

25         MS. GOLDSTEIN:  Your Honor, if I may just raise

28

1    an issue with respect to the issue that Mr. Nardo raised

2    concerning that exemption.

3         Defendants did not raise exemption in their

4    answer to this case.  They did not raise it in the

5    pretrial order.  The parties listed things -- the

6    defendant -- it did not raise any issues of exemption in

7    their finding of facts or conclusions of the law.  They

8    have not raised this issue prior to trial.

9         The case law is well established that any

10   exemption defense is an affirmative defense.  It must be

11   pled in a party's answer.  And I can give the court case

12   law on that.

13        THE COURT:  No.

14        MS. GOLDSTEIN:  The exemption claim in this

15   defense is waived.  It should not be addressed in this

16   proceeding.

17        THE COURT:  Mr. Nardo, why wasn't that defense

18   raised earlier?

19        MR. NARDO:  I believe it was raised in

20   discussions.  Whether or not it's in the paperwork I don't

21   know.  But if they can amend the complaint, then we would

22   seek to amend the answer.

23        MS. GOLDSTEIN:  Your Honor, this is the

24   exemption that, to the extent it exists, the Secretary

25   does not believe that it does, the predicate to that fact

29

1  would have existed long ago.  That is in direct

2  contradiction to the issues concerning the proposed

3  amended complaint.

4         MR. NARDO:  Judge, if I can direct that.  It was

5  explored in depositions and I did ask questions about Mr.

6  Pastor, the head chef's authority, at depositions of the

7  employees here.

8         THE COURT:  Is that correct?  Were there

9  questions regarding his authority and duties?

10         MS. GOLDSTEIN:  Your Honor, I believe there were

11  some general questions as to what Mr. Pastor did and what

12  his authority was.

13         Mr. Pastor, himself, was never deposed in this

14  case.  Mr. Nardo did not further pursue, never indicated

15  that he intended to pursue the exemption defense.  And

16  certainly when the defendants filed their finding of facts

17  and conclusions law, they didn't know or raise this

18  exemption defense.  The Secretary certainly views that

19  proposed defense as waived.  It was not there.  There is

20  no support of this.

21         THE COURT:  On the issue of potential prejudice,

22  though, isn't this something that the witnesses you have

23  will be able to testify to in terms of factually whether

24  or not the exemption exists or not?  Or are there

25  different witnesses you would need for this?

30

1      MS. GOLDSTEIN:  Your Honor, I think that the

2  witnesses that we have certainly were as privy as anyone

3  else to the authority that Mr. Pastor, the head chef --

4  I'm sorry -- that this individual held in the kitchen.

5          However, it is very clear that the failure to

6  raise this defense anywhere constitutes that we had not

7  prepared for trial in anticipation of defendant's

8  proceeding on that.

9      MR. NARDO:  I could point you to the deposition

10  transcripts, if you want, your Honor.

11      THE COURT:  I understand that, but I guess I

12  don't understand why it wasn't explicitly raised.  Was it

13  an oversight or --

14      MR. NARDO:  It was an oversight, your Honor.

15          I would maintain it was raised at deposition.

16  To the extent it was not raised elsewhere, it was an

17  oversight, judge.

18      THE COURT:  Okay.  But again, if anyone wants a

19  waiver, wants an adjournment to look into that, let me

20  know.  I'm going to allow them.  If in fact the exemption

21  is a meritorious issue -- I don't know whether it is or

22  not, I'm not going to simply rely on the fact that they

23  are late in raising it, especially if it was something

24  that was covered during the deposition.  So it's up to you

25  as to what you want to do.

31

1          MS. GOLDSTEIN:  Your Honor, we will proceed.

2          Would the court like our proposed findings of

3    fact and conclusions of law with respect to the amendment?

4          THE COURT:  No.  You can add those later, after

5    the trial if you wish.  But obviously, you will have to

6    address that issue in the context of your presentation

7    here.  Okay?

8          MS. GOLDSTEIN:  Thank you, your Honor.

9          THE COURT:  Okay.  Are you going to call your

10   first witness?

11         My understanding is there is an interpreter here

12   that you will be utilizing.

13         Is that accurate?

14         MR. HENNEFELD:  Yes, your Honor.

15         We have brought to the court some

16   federally-certified interpreters, who will be trading off.

17         THE COURT:  Go ahead and have them take the

18   oath.

19         (Marcia Gotler was duly sworn to interpret

20   between English and Spanish.)

21         (Isolina Bernhardt was duly sworn to interpret

22   between English and Spanish.)

23         THE DEPUTY:  Please state your name and spell it

24   for the record.

25         THE INTERPRETER:  Marcia Gotler.

Torres - for the Plaintiff/Mr. Hennefeld

32

1          THE INTERPRETER:  Isolina Bernhardt.

2          THE COURT:  Good morning.

3          Call your first witness.

4          MR. HENNEFELD:  The secretary calls Alexander

5    Torres.

6          THE COURT:  Mr. Torres, would you step forward

7    please.

8          If you could, just come up to the witness chair.

9    Remain standing while they administer the oath.

10                    **EVIDENCE FOR PLAINTIFF**

11

12   **ALVIN ALEXANDER TORRES**

13          called by the plaintiff, having been first duly

14          sworn/affirmed, was examined and testified (through

15          the Spanish interpreters) as follows:

16          MR. HENNEFELD:  Your Honor, just in terms of our

17   exhibit binder, should we put a copy up on the witness

18   stand?

19          THE COURT:  Yes.

20

21   DIRECT EXAMINATION

22   BY MR. HENNEFELD:

23   Q.   Good morning, Mr. Torres.

24   A.   Good morning.

25   Q.   Mr. Torres, what is your primary language?

Torres - for the Plaintiff/Mr. Hennefeld

33

1    A.    Spanish.

2    Q.    Do you understand any English?

3    A.    No.

4    Q.    As you see, there is an interpreter here to translate

5    the questions and answers between English and Spanish.

6    Please wait until the interpreter finishes translating the

7    question into Spanish before you start to answer.  Please

8    give your answer only in Spanish.  Okay?

9    A.    Yes.

10   Q.    Mr. Torres, why did you come to court today?

11   A.    Because a note came to me.  Here it is.

12   Q.    Mr. Torres, let's discuss your employment.  Did you

13   ever work at Luigi Q's restaurant?

14   A.    Yes.

15   Q.    When did you start working there?

16   A.    I began working there in 2007.

17         No.  No.  I'm sorry.  2008.

18   Q.    What time of year in 2008 did you start working

19   there?

20   A.    February.

21   Q.    And do you still work at Luigi Q's restaurant?

22   A.    No.

23   Q.    When did you stop working there?

24   A.    September of 2009.

25   Q.    What was your job at Luigi Q's restaurant?

34

1   A.   Dishwasher.

2   Q.   Did you know Luigi Q?

3   A.   Yes.

4   Q.   Who was he?

5   A.   He was the owner of the restaurant.

6   Q.   Was there also a manager at the restaurant?

7   A.   No.

8   Q.   Did you know someone named Vinnie at the restaurant?

9   A.   Yes.

10  Q.   What did Vinnie do at the restaurant?

11  A.   He was the one who brought the orders to the cook.

12  Q.   And did Vinnie work at the restaurant the whole time

13  that you were there?

14  A.   No.  He left.

15  Q.   And who replaced -- did someone replace Vinnie after

16  he left?

17  A.   Yes.

18  Q.   What was his name?

19  A.   Omar.

20  Q.   How did you get the job at Luigi's restaurant?

21  A.   Through a cousin of mine who worked there.  He left

22  and he left the position to me.

23  Q.   What was your cousin's name?

24  A.   Johnny Diaz.

25  Q.   What was Johnny Diaz's job at the restaurant?

Torres - for the Plaintiff/Mr. Hennefeld

35

1    A.    Dishwasher.

2    Q.    Approximately how long did Johnny Diaz work there?

3    A.    I don't know.  Maybe three months or so.

4    Q.    Let's talk about your work schedule at Luigi's

5    restaurant.

6          When you started working at the restaurant,

7    which days of the week did you work?

8    A.    Mondays through Saturdays.

9    Q.    Was the restaurant open on Sundays?

10   A.    No.

11   Q.    Let's talk about the start of your workday.

12         On weekdays what time did you start work at the

13   restaurant?

14   A.    10:30.

15   Q.    On weekdays did you always start work at 10:30 in the

16   morning?

17   A.    That was the time I started from Mondays through

18   Fridays.

19   Q.    And why was that?

20         MR. NARDO:  Objection.

21         THE COURT:  Overruled.

22   A.    Because that was the time the restaurant was open.

23   BY MR. HENNEFELD:

24   Q.    Were you ever told to arrive for work later than

25   10:30 in the morning on a weekday?

Torres - for the Plaintiff/Mr. Hennefeld

36

1   A.   No.  Only on Saturdays.

2   Q.   What time did you start work on Saturdays?

3   A.   3 o'clock.

4   Q.   Was that 3 o'clock in the afternoon?

5   A.   Yes.

6   Q.   Were you ever told to arrive for work later than 3 in

7   the afternoon on a Saturday?

8   A.   No.

9   Q.   On weekdays did you take any breaks during the

10  workday?

11  A.   You mean like an hour off?

12  Q.   Yes.  Did you have any time off during the day on

13  weekdays?

14  A.   Yes.  I had 3 to 4:30 off.

15  Q.   And was that 3 to 4:30 in the afternoon?

16  A.   Yes.

17  Q.   And that was Monday through Friday?

18  A.   Yes.  Monday through Friday.

19  Q.   Were you ever told that you could take a longer break

20  than that?

21  A.   No.

22  Q.   Did you take any other breaks during the workday?

23  A.   No.

24  Q.   And on Saturdays did you have a break during the

25  workday?

Torres - for the Plaintiff/Mr. Hennefeld

37

1   A.   No.  Not on Saturdays.

2   Q.   Let's talk about the end of your workday.

3        Did you leave work from the restaurant at the

4   same time each night?

5   A.   No.

6   Q.   Why not?

7   A.   That would depend on how the people were as far as

8   customers go.

9   Q.   What was the range of times that you left at night?

10  A.   Well, from Mondays through Wednesdays, it was always

11  usually the regular time.  We almost -- we hardly ever

12  left after 9 o'clock from Mondays through Wednesdays.

13  Q.   And what about Thursdays through Saturdays?

14  A.   Then the time would change and I would get out later.

15  Q.   Okay.  So let's go through each night of the week.

16       On Monday through Wednesdays, what time did you

17  usually stop working for the night?

18       MR. NARDO:  Objection.  Asked and answered.

19       THE COURT:  No.  I will allow him to respond.

20  A.   From Monday through Wednesdays, I would get out

21  between 9 and 10 PM.

22  BY MR. HENNEFELD:

23  Q.   On Mondays through Wednesdays, were you ever able to

24  leave before 9 PM?

25  A.   No.  Hardly at all.

Torres - for the Plaintiff/Mr. Hennefeld

38

1   Q.   On Monday through Wednesdays, did you ever leave work

2   later than 10 PM?

3            MR. NARDO:  Objection, leading.

4            THE COURT:  Overruled.

5            THE WITNESS:  I can answer?

6            THE COURT:  Yes.

7   A.   Yes.  It was sometimes when I got out later, but

8   those were few times that I got out later.

9   BY MR. HENNEFELD:

10  Q.   And on Thursdays what time did you usually stop

11  working?

12  A.   10:30 or 11 at the earliest.

13  Q.   And on Fridays what time did you usually stop working

14  for the night?

15  A.   On Wednesdays I almost always worked until at least

16  11:30.  11 would be earliest.

17  Q.   Mr. Torres, you just answered about Wednesdays.  Just

18  to clarify, were you talking about Wednesdays or Fridays?

19           MR. NARDO:  Objection, judge.

20           THE COURT:  No.  Overruled.  I'm confused.

21           The question was Fridays and the answer was

22  Wednesdays, so I'm not sure what the witness means to

23  answer.

24  A.   You were asking me about Wednesday, not Friday.

25           MR. HENNEFELD:  May I repeat the question, your

39

1   Honor?

2            THE COURT:  Yes.

3   BY MR. HENNEFELD:

4   Q.    Mr. Torres, on Fridays what time did you usually stop

5   working at night?

6   A.    11:30.  From 11 until 11:30.

7   Q.    And on Saturdays what time did you usually stop

8   working at night?

9   A.    The same time also.  I practically always left around

10  that time.

11  Q.    So Fridays and Saturdays, were you ever able to leave

12  work before 11 at night?

13  A.    Yes, but I would only leave early by coincidence.

14  Q.    When you say by coincidence, can you explain what you

15  mean by that.

16  A.    That would be if I might get out on a Friday when

17  there weren't a lot of customers.

18  Q.    And approximately how often did that happen on

19  Fridays and Saturdays?

20  A.    Well, as I said, that would just be like one time

21  during a period of time.

22  Q.    The weekly schedule that you've just described, did

23  you work that same schedule every week at the restaurant?

24  A.    Yes.  Almost every week that same schedule.

25  Q.    Mr. Torres, how did you know when you could stop

40

1   working each night at the restaurant?

2   A.   Well, I was able to leave when there were no more

3   customers left.

4   Q.   Did you talk to anyone ever before leaving the

5   restaurant for the night?

6   A.   Yes.

7   Q.   Who did you speak with before leaving the restaurant

8   at night?

9   A.   Vinnie.

10   Q.   And what did you say to Vinnie before leaving the

11   restaurant at night?

12   A.   Well, I would ask him whether there were any more

13   customers, to find out if I could leave.

14   Q.   Mr. Torres, did your schedule of how many days per

15   week you worked ever change?

16   A.   Yes.

17   Q.   How did your schedule change?

18   A.   Well, there was one time when I was only given from

19   Monday -- well, I got a day off during the week.

20   Q.   When you say you got a day off during the week, do

21   you mean an additional day off besides Sunday?

22   A.   Yes.

23   Q.   You still had Sunday off?

24   A.   Yes.

25   Q.   When your schedule changed, what was your additional

41

1  day off?  Which day of the week?

2  A.    Sometimes I was given Tuesdays or else Wednesdays.

3  Q.    And when your schedule changed, did you otherwise

4  still work the same hours each day that you described for

5  us?

6  A.    Yes.

7  Q.    Approximately how much time was it between when you

8  first started working at the restaurant and when your

9  scheduled changed to get an extra day off?

10  A.    I don't remember.

11  Q.    Had you been working at the restaurant at least two

12  months when that happened?

13  A.    No.  I had been working there for longer than that.

14  Q.    And did you ever go back to work Monday through

15  Saturday with only Sunday off?

16  A.    Yes.

17  Q.    About how much time was it before you went back to

18  working Monday through Saturday again?

19  A.    I don't remember for how long I worked with an extra

20  day off during the week.  I don't remember.

21  Q.    Was it more than four months?

22  A.    No, it was less than four months.  It was a very

23  short period of time.

24  Q.    Let's talk about your pay at Luigi's restaurant.

25        How were you paid for your work at the

42

1    restaurant?

2    A.    Cash.

3    Q.    Who paid you at the restaurant?

4    A.    Luigi.

5    Q.    Were you paid every week at the restaurant?

6    A.    Yes.

7    Q.    How much were you paid?

8    A.    $400.

9    Q.    Is that $400 per week?

10   A.    Yes.

11   Q.    Did you receive exactly $400 every week or did the

12   amount change at all?

13   A.    No.  For the whole time.  During the time I was

14   working, I was given that every week.

15   Q.    How did you first find out that you would be paid

16   $400 per week?

17   A.    Well, when I started work there, I was not told how

18   much I was going to be paid.

19   Q.    When you first started working at the restaurant,

20   were you told anything about your pay?

21   A.    No.

22   Q.    When you first started working there, were you told

23   anything about minimum wage?

24             MR. NARDO:  Objection.

25             THE COURT:  Overruled.

Torres - for the Plaintiff/Mr. Hennefeld

43

1   A.   No.

2   BY MR. HENNEFELD:

3   Q.   When you first started work, there were you told

4   anything about overtime?

5   A.   No.

6   Q.   During all the time that you worked at the

7   restaurant, did anyone from the restaurant tell you

8   anything about minimum wage?

9   A.   No.

10  Q.   During all time you worked at the restaurant, did

11  anyone from the restaurant tell you anything about

12  overtime?

13  A.   No.

14  Q.   Did you ever get a raise in your pay?

15       MR. NARDO:  Objection.

16       THE COURT:  Overruled.

17  A.   No.

18  BY MR. HENNEFELD:

19  Q.   When your schedule changed to the extra day off, did

20  your pay change?

21  A.   Yes.

22  Q.   What did your pay change to during that time?

23  A.   I don't remember how much I was getting, but I was

24  being paid less than 400.

25  Q.   And when your schedule changed back to Monday through

Torres - for the Plaintiff/Mr. Hennefeld

44

1    Saturday again, did your pay change again?

2    A.    Yes.

3    Q.    What did your pay change to then?

4    A.    It went back to 400 again.

5    Q.    Were there any weeks when the restaurant was closed?

6    A.    Yes.  One week.

7    Q.    What time of year was that?

8    A.    I don't remember.  I think it was in August.

9    Q.    And was the restaurant closed for a week in both of

10   the years that you worked there?

11              MR. NARDO:  Objection, judge.  Mischaracterizes

12   the testimony.  The testimony was that he started in 2008

13   and left in 2009.

14              THE COURT:  September of 2009, right?

15              MR. NARDO:  Yes.

16              THE COURT:  So it was two Augusts.  The question

17   is, did it close for one week in August of 2008 and August

18   of 2009?

19              MR. HENNEFELD:  Yes, your Honor.

20   A.    Yes.

21   BY MR. HENNEFELD:

22   Q.    Were you paid for those weeks?

23   A.    No.

24   Q.    Let's talk about other employees at the restaurant.

25              Who else worked at the restaurant when you were

Torres - for the Plaintiff/Mr. Hennefeld

45

1    there?

2    A.    Pastor.  Jeffrey.  Juan Carlos.  And Alex.

3    Q.    What days of the week did the other employees work?

4    A.    The same.  They also worked six days a week.

5    Q.    What time did the other employees start work each

6    weekday?

7    A.    At the same time.

8    Q.    And what time was that?

9    A.    10:30.

10   Q.    10:30 in the morning?

11   A.    Yes.

12   Q.    What time did the other employees start work on

13   Saturdays?

14   A.    At 3 o'clock in the afternoon.

15   Q.    What time did the other employees end their break in

16   the afternoon?

17   A.    What do you mean?  The time off?

18   Q.    You testified that the other employees started their

19   break at 3 in the afternoon.  Correct?

20              THE COURT:  You were using the term *break*.

21              Why are you using the term break?  He said they

22   start their day at 3 o'clock.

23              MR. HENNEFELD:  My apologies, your Honor.

24   BY MR. HENNEFELD:

25   Q.    Mr. Torres, did the other employees take a break

Torres - for the Plaintiff/Mr. Hennefeld

46

1   during the weekdays?

2           THE INTERPRETER:  During the weekdays?

3           MR. HENNEFELD:  Yes.

4   A.   Yes.  They also had a hour and a half break, the same

5   time.

6   BY MR. HENNEFELD:

7   Q.   The same time, meaning 3 to 4:30 in the afternoon?

8   A.   Yes.

9   Q.   Did all the employees leave work together each night?

10  A.   No.

11  Q.   Who usually left first at night?

12  A.   Pastor.

13  Q.   What was Pastor's job at the restaurant?

14  A.   Well, he was what you call the chef.

15  Q.   And when did Pastor usually leave the restaurant for

16  the night?

17  A.   Well, he would leave earlier, sometime around 9

18  o'clock.

19  Q.   What about on Fridays and Saturdays?  What time did

20  Pastor usually leave for the night?

21  A.   He would leave later, but he would always leave

22  before me.

23  Q.   And who left next at night after Pastor?

24  A.   Jeffrey.

25  Q.   What was Jeffrey's job at the restaurant?

47

1   A.   Cook.

2   Q.   And when did Jeffrey usually leave for the night?

3   A.   Sometimes he would leave 45 minutes after Pastor.

4   Q.   And did Jeffrey work at the restaurant the whole time

5   that you worked there?

6   A.   Yes.

7   Q.   Who left next at night after Jeffrey?

8   A.   Sometimes Juan Carlos would leave next.

9   Q.   What was Juan Carlos's job at the restaurant?

10   A.   Salad man.

11   Q.   When did Juan Carlos usually leave for the night?

12   A.   Well, there were times when Juan Carlos would leave

13   at the same time when I would leave.

14   Q.   And who left next, after Juan Carlos, for the night?

15   A.   Myself.

16   Q.   You also mentioned an employee at the restaurant

17   named Alex.

18   A.   Yes.

19   Q.   Is that a different Alex than you?

20   A.   Yes.

21   Q.   That other Alex, what was his job at the restaurant?

22   A.   He was what you call a busboy.

23   Q.   And when did Alex the busboy usually leave for the

24   night?

25   A.   There were times when he would leave together with me

48

1   and there were times when he would stay behind.

2   Q.   When was Vinnie at the restaurant?

3   A.   He was at the restaurant the whole week.

4   Q.   When was Luigi at the restaurant?

5   A.   He would be there the whole week, as well.

6   Q.   Who opened the restaurant each day?

7   A.   Well, sometimes Luigi would arrive first or Vinnie

8   would arrive first.  They were the ones who would open the

9   restaurant.

10  Q.   After Vinnie was replaced by Omar, would Omar also

11  open the restaurant?

12  A.   Yes.

13  Q.   Then approximately what time did customers usually

14  start arriving for lunch?

15          MR. NARDO:  Objection.

16          THE COURT:  On what grounds?

17          MR. NARDO:  We're here, judge, because of the

18  hours that the employees allegedly worked.  When the

19  customers arrived for lunch, I don't think that's

20  relevant.

21          THE COURT:  What is the relevance of when the

22  customers arrived?

23          MR. HENNEFELD:  Just trying to provide

24  background on Mr. Torres's duties during the course of the

25  day.

Torres - for the Plaintiff/Mr. Hennefeld

49

1    THE COURT:  You can ask him what his duties are.

2    I don't think we need to know when the customers started

3    arriving.

4    MR. HENNEFELD:  I understand, your Honor.

5    BY MR. HENNEFELD:

6    Q.   Mr. Torres, before customers started arriving for

7    lunch, what did you do at the restaurant?

8    A.   Well, before the customers came in, what I did was to

9    wash the stuff that the cook made dirty.

10   Q.   And when customers started arriving for lunch, what

11   did you do then?

12   A.   Well, the very first thing that I did when I came in

13   was to clean the bathrooms inside.

14         And after I left the bathrooms, then I would

15   wash the things that the cooks had made dirty when they

16   were doing the prepping.

17   Q.   What did you do when the customers were there at

18   lunch?

19   A.   Well, I would be either washing glasses or cleaning

20   dirty areas, things of that sort.

21   Q.   And then after your break, when your break ended at

22   4:30, what did you do then?

23   A.   Well, sometimes they would have me clean the parking

24   lot or sometimes I would be watering some plants.

25   Q.   And when the customers were there eating dinner, what

Torres - for the Plaintiff/Mr. Hennefeld

50

1   did you then?

2   A.   Well, when the customers were there having dinner, I

3   would be either washing the glasses or their dishes all

4   the time.

5   Q.   If there weren't a lot of customers there during the

6   meal, what did you do?

7   A.   Well, sometimes there were times when I would clean

8   the fridges.  Or else, I would clean the walls where there

9   was a lot of oil on them.

10  Q.   Let's talk about records at the restaurant.  When you

11  first started working at Luigi's restaurant, were you

12  given any papers?

13  A.   No.

14  Q.   Were you given a pay stub with your pay?

15  A.   An envelope.

16  Q.   Was anything written on the envelope?

17  A.   No.  Just my name.

18  Q.   Did you ever punch in on a time clock at the

19  restaurant?

20  A.   No.

21  Q.   Did the restaurant have any time-keeping systems to

22  record your hours?

23  A.   No.

24  Q.   During all the time that you worked at the

25  restaurant, were you ever asked to sign any papers at the

51

1    restaurant?

2    A.   Yes.

3    Q.   Mr. Torres, if you could please turn to Plaintiff's

4    Exhibit 6 in the exhibit binder near your seat.

5         MR. HENNEFELD:  Your Honor, may the interpreter

6    assist the witness in finding the exhibit?

7         THE COURT:  Yes.

8         INTERPRETER:  I will be happy to.

9         THE COURT:  How much longer do you have on your

10   direct?

11        MR. HENNEFELD:  I'm almost done, your Honor.

12   BY MR. HENNEFELD:

13   Q.   Mr. Torres, please take a moment to locate the two

14   pages in Exhibit 6 in front of you.

15   A.   Okay.

16   Q.   Mr. Torres, do you recognize these papers in Exhibit

17   6?

18   A.   Yes.

19   Q.   What are these papers?

20   A.   This paper was taken to the office.

21        MR. NARDO:  Judge, I have an objection.  This

22   goes back to what I had said earlier about the

23   stipulations.

24        Stipulation No. 15 says during the period of

25   June 5, 2006, through at least May 21, 2009, the defendant

52

1   did not keep written records of the hours worked by their

2   employees.

3          We stipulated to that, and now the plaintiff is

4   offering written records of the hours worked by the

5   employees.  So we have a stipulation that there are none.

6   I don't see how the plaintiff can offer this evidence.

7          MR. HENNEFELD:  Your Honor, we intend to offer

8   this record as relevant to the willfulness and the

9   defendant's preparation and production of false records

10  despite their subsequent stipulation that they hadn't had

11  records.

12         THE COURT:  So your contention is that these

13  records are false records, right?

14         MR. HENNEFELD:  Yes, your Honor.

15         THE COURT:  The objection is overruled.  It goes

16  to the issue of willfulness.

17         MR. NARDO:  If I just may, judge.  The

18  stipulation says the defendant does not keep written

19  records of the hours worked by their employees.

20         THE COURT:  Right.  I assume that the

21  stipulation means *true* written records.  Correct?

22         MR. NARDO:  I think it means *any* written

23  records.  We didn't say true or false.

24         THE COURT:  Mr. Hennefeld?

25         Why is there a stipulation that there were no

53

1   records?

2          MR. HENNEFELD:  Your Honor, that is the

3   defendant's position, that as a practice they did not keep

4   time records; and there is an admission that as a practice

5   they did not.  But yet, contrary to that, they did make

6   and produce these false records and produced them to the

7   Department of Labor, we believe in perhaps a vague

8   compliance, to show compliance.

9          THE COURT:  I'm going to allow it despite the

10  stipulation.  Their evidence that false records were

11  submitted to the Department of Labor, certainly that would

12  go, at a minimum, to the issue of willfulness.  So I'm

13  going to allow it.

14  BY MR. HENNEFELD:

15  Q.   Mr. Torres, you testified that you saw these papers

16  in Exhibit 6 in the office.

17          What office do you mean?

18  A.   No.  I mean the kitchen.  In the kitchen.  Where you

19  cook.

20  Q.   The kitchen at Luigi's restaurant?

21  A.   Yes.

22  Q.   And then did you sign these papers in Exhibit 6?

23  A.   Yes.

24  Q.   When did you sign these papers?

25  A.   When I used to work there at the restaurant.

Torres - for the Plaintiff/Mr. Hennefeld

54

1   Q.   Did you understand these papers when you signed them?

2   A.   No.  Because these papers were given to Pastor.

3   Q.   Who gave these papers to Pastor?

4   A.   Well, it must have been Luigi because he was the

5   owner of the restaurant.

6            MR. NARDO:  Objection.

7            THE COURT:  Sustained.  I will strike that

8   response.

9   BY MR. HENNEFELD:

10  Q.   Mr. Torres, why did you sign these papers?

11  A.   Because Luigi told Pastor that we had to sign those

12  papers.

13           MR. HENNEFELD:  Your Honor, plaintiff moves to

14  admit Exhibit 6 into evidence.

15           MR. NARDO:  Judge, we will object based on the

16  stipulation that says, in relevant part, *the defendants*

17  *did not keep written records of the hours worked by their*

18  *employees.*  And once the plaintiff has stipulated to that,

19  your Honor, it is the defendant's position that the

20  plaintiff cannot then present written records of the hours

21  worked by the employees.

22           THE COURT:  Okay.  The objection is overruled on

23  that ground.

24           The court reads the stipulation to mean true

25  records of the hours worked by the employees.  And the

Torres - for the Plaintiff - Cross/Mr. Nardo

55

1   this evidence, the Secretary of labor submits, was false

2   evidence of hours worked that were submitted to the

3   Department of Labor.

4           Therefore, I'm going to allow it on the issue of

5   willfulness.  So Exhibit 6 is admitted.

6           (Plaintiff Exhibit 6 in evidence.)

7           MR. HENNEFELD:  No further questions for this

8   witness, your Honor.

9           THE COURT:  I want to take our morning break.

10  We will take a 10-minute break and then proceed with the

11  cross-examination.

12          (Recess taken from 11:20 am until 11:35 am.)

13          THE COURT:  When you are ready, Mr. Nardo.

14

15  CROSS-EXAMINATION

16  BY MR. NARDO:

17  Q.   Good morning, Mr. Torres.

18  A.   Good morning.

19  Q.   I'm going to ask you some questions, just like

20  Mr. Hennefeld just did.

21  A.   All right.

22  Q.   When you worked at Luigi Q's you didn't wear a wrist

23  watch.   Correct?

24  A.   No, I did not.

25  Q.   And did you keep any documents about the hours you

Torres - for the Plaintiff - Cross/Mr. Nardo

56

1    worked for Luigi Q's?

2    A.    No.

3    Q.    So when you testified about the hours you worked at

4    Luigi Q's, that is based on your memory.  Correct?

5    A.    Yes.

6    Q.    And you began working at Luigi Q's in February of

7    2008.  Is that right?

8    A.    Yes.

9    Q.    And do you recall that we have met before,

10   Mr. Torres?

11   A.    Yes.

12   Q.    Do you recall coming to my office on July 19, 2010,

13   for a deposition?

14   A.    Yes.

15   Q.    And do you recall being under oath at the time of

16   your deposition?

17   A.    Yes.  I answered all the questions.

18   Q.    And you were under oath at the time?

19   A.    Yes.

20   Q.    Do you recall being asked this question and giving

21   this answer?

22           Page 6, line 6.

23           *QUESTION:  When did you start working at Luigi*

24   *Q's Italian restaurant?*

25           Line 8.

Torres - for the Plaintiff - Cross/Mr. Nardo

57

1      *ANSWER:  I started working there in February of*

2      *2007.*

3           Do you recall that?

4           THE INTERPRETER:  Counsel, may I see the

5      question and answer, please?

6      BY MR. NARDO:

7      Q.   Were you asked that question and did you give that

8      answer?

9      A.   Yes.

10          But I think I was mistaken when I gave the

11     answer, because I stopped working there in 2008.

12     Q.   *Stopped*, did you say?

13     A.   No.  I said that I started working in 2008.  That's

14     when I made a mistake when I gave the answer.

15     Q.   And you were residing at 710 Jefferson Street, in

16     Westbury?

17     A.   I was living there.  Before, when I was working at

18     Luigi's, I lived there for a few days.

19     Q.   A few days?

20     A.   But -- yes.  But earlier, when I started working at

21     Luigi's, I was living at -- wait, wait.

22     Q.   Okay.  How long have you resided at 710 Jefferson

23     Street, in Westbury?

24     A.   No.  I don't remember how long I lived there because

25     I am no longer living there.

Torres - for the Plaintiff - Cross/Mr. Nardo

58

1   Q.   Okay.  Your testimony was that on Monday through

2   Wednesday you worked up until 9 PM.  Correct?

3            MR. HENNEFELD:  Objection.  Mischaracterizes the

4   testimony.

5            THE COURT:  I will let him answer.

6            THE WITNESS:  Between 9 and 10.

7   BY MR. NARDO:

8   Q.   Okay.  Did you testify that you never worked past

9   9 PM from Monday to Wednesday?

10            MR. HENNEFELD:  Objection.  Mischaracterizes his

11   testimony.

12            THE COURT:  Overruled.

13            THE WITNESS:  I did not.

14   BY MR. NARDO:

15   Q.   Okay.  And the chef, Pastor and Jeffrey, stopped

16   working before you.  Correct?

17   A.   Yes.

18   Q.   You never had conversations with Luigi Quarta.  Is

19   that correct?

20   A.   Yes.

21   Q.   And you had never complained to Luigi Quarta about

22   the wage you were receiving.  Is that correct?

23   A.   Yes.

24   Q.   You never saw Luigi Quarta preparing food in the

25   kitchen at Luigi Q's.  Correct?

Torres - for the Plaintiff - Cross/Mr. Nardo

59

1   A.   He would cook but only for himself.  When he wanted

2   to eat something, he would prepare it.

3   Q.   If you can, open up that deposition to Page 11.

4        Do you recall being asked this question and

5   giving this answer at your deposition?

6        Page 11, line 16.

7        *QUESTION:  Did you ever see Luigi Quarta*

8   *preparing food in the kitchen?*

9        Line 18.

10       *ANSWER:  No.*

11       Do you recall being asked that question and

12   giving that answer at your deposition?

13   A.   I don't remember anything from that, so I don't know.

14   But what I do know is that he would cook when he wanted to

15   have something.

16   Q.   That is a different answer than you gave at the

17   deposition, isn't it?

18   A.   Yes.  But I'm being clear, you understand.  I'm

19   saying he did cook, but he would cook after everyone left

20   when he wanted something for himself.

21   Q.   Why didn't you say that at your deposition when I

22   asked the same question?

23       MR. HENNEFELD:  Objection.

24       THE COURT:  Sustained.

25   BY MR. NARDO:

Case 2:09-cv-02212-JFB-ETB   Document 81   Filed 01/09/13   Page 60 of 168 PageID #: 1370

1    Q.    Pastor was in charge of the kitchen.  Correct?

2              MR. HENNEFELD:  Objection.  Beyond the scope.

3              THE COURT:  Overruled.

4              THE WITNESS:  Yes.

5    BY MR. NARDO:

6    Q.    And when you quit the restaurant, you told Pastor

7    that you were quitting.  Correct?

8    A.    I asked Pastor to tell Luigi that I was not working

9    there any more.

10   Q.    And Pastor would assign work to you in to the

11   kitchen.  Correct?

12             MR. HENNEFELD:  Objection.  Beyond the scope.

13             THE COURT:  Overruled.

14   A.    Pastor would receive the orders from the outside as

15   to what I was going to do inside the kitchen.  Pastor

16   would receive the order from the boss, right?

17   BY MR. NARDO:

18   Q.    Did Luigi Quarta speak Spanish?

19   A.    No.

20   Q.    Have you seen Luigi Quarta communicate with Pastor?

21   A.    Sometimes he would call him inside.

22   Q.    And if Luigi Quarta spoke with Pastor, they wouldn't

23   be speaking in Spanish.  Correct?

24             MR. HENNEFELD:  Objection.  Calls for

25   speculation.

61

1    THE COURT:  No.

2        If you observed them speaking to each other, you

3    can testify whether you saw them speaking in Spanish or

4    English.

5        THE WITNESS:  Well, because Luigi did not speak

6    Spanish.

7    BY MR. NARDO:

8    Q.   And what language did you observe Luigi Quarta

9    speaking to Pastor?

10   A.   It would have had to have been in English because

11   Pastor speaks English.

12   Q.   And Mr. Torres, you do not speak English.  Correct?

13   A.   Yes.

14   Q.   And you don't read English.

15   A.   No.

16   Q.   And you don't read Spanish, also.  Correct?

17   A.   Correct.

18   Q.   So if Mr. Quarta was speaking to Pastor, you don't

19   know, you couldn't interpret what they were talking about.

20   Correct?

21   A.   That's correct.

22   Q.   When Johnny Diaz, your cousin, recommended you for

23   employment at Luigi Q's, Johnny Diaz didn't complain about

24   any circumstances Luigi Q's, did he?

25   A.   That's true.

Torres - for the Plaintiff - Cross/Mr. Nardo

62

1   Q.    And you took the job.

2   A.    Yes.

3   Q.    And you have no idea how many hours you worked each

4   week at Luigi Q's.  Correct?

5   A.    Correct.

6   Q.    How did it come about that you complained to the

7   Department of Labor?

8          MR. HENNEFELD:  Objection.  Mischaracterizes

9   testimony.  Relevance.  Informant's privilege.

10         MR. NARDO:  Once he is on the witness stand, I

11  don't believe he has any informant's privilege anymore,

12  judge.

13         THE COURT:  What is the relevance?

14         MR. NARDO:  Well, I was just given a statement

15  by Mr. Hennefeld and I just want to ask about how the

16  statement came about.

17         THE COURT:  What are you talking about?

18         MR. NARDO:  When the informant gets on the

19  stand, the Department of Labor has given me a statement

20  from the informant that is signed by him.

21         THE COURT:  Signed by the witness?

22         MR. NARDO:  Yes.

23         THE COURT:  Okay.

24         MR. NARDO:  So I'm asking him how this statement

25  arose.  It is obviously a statement he gave in the

63

1   presence of the Department of Labor.

2          MR. HENNEFELD:  Your Honor, my objection is to

3   mischaracterizing this as a complaint by the witness.

4          What Counsel has is a statement from the witness

5   to the Department of Labor.

6          MR. NARDO:  Maybe it's not signed by the

7   witness.  Is that correct?  Is that what we're -- no, it

8   says signed.  It is signed.

9          MR. HENNEFELD:  I object to the characterization

10  of it as a complaint.  It is a statement.

11         MR. NARDO:  I can call it a statement, judge.

12         THE COURT:  I'm going to allow the question.  Go

13  ahead.

14  BY MR. NARDO:

15  Q.   Do you recall giving a statement in writing to the

16  Department of Labor?

17  A.   A statement in writing?

18  Q.   Yes.  In Spanish.

19  A.   Do you mean did I make a note or something?

20  Q.   Let me withdraw it.

21         Do you recall he do you recall signing a

22  statement in Spanish after you were interviewed by someone

23  at the United States Department of Labor?

24  A.   In Spanish, no.

25  Q.   Do you recall signing any statement for the

Torres - for the Plaintiff - Cross/Mr. Nardo

64

1   Department of Labor?

2   A.   Yes.

3   Q.   And do you recall meeting with Zorayda Vasquez from

4   the Department of Labor?

5          MR. HENNEFELD:  Objection.  Relevance.

6          THE COURT:  Overruled.

7   A.   Yes.

8   BY MR. NARDO:

9   Q.   How did it come about that you met with Ms. Vasquez

10  from the Department of Labor?

11  A.   I don't remember how it happened, but the honest

12  truth is that I went there after a note came telling me to

13  come to the offices where I met and gave my statement to

14  her.

15  Q.   Who gave you that note?

16  A.   That paper came to my house on 7 Jefferson.

17  Q.   Do you know who it was from?

18  A.   Well, supposedly it was from Mr. Nardo, the attorney.

19  Q.   Are you talking about your deposition?

20  A.   What do you mean?

21  Q.   Maybe I should show the witness this statement,

22  judge?

23          THE COURT:  Okay.  Does it have a Bates number

24  on it?

25          MR. NARDO:  No.

65

1    This is in your exhibits, right?

2          MR. HENNEFELD:  No.

3          MR. NARDO:  No.  And it is the only copy I have.

4    I just got it today, judge.  So I guess I should have it

5    marked.

6          THE COURT:  Yes.  Mark it as Defense Exhibit K.

7          MS. GOLDSTEIN:  I have another copy.

8          MR. NARDO:  Thank you.

9          THE COURT:  We will mark it as Defense

10   Exhibit K.

11         MR. NARDO:  Thank you, judge.

12   BY MR. NARDO:

13   Q.   I would like to show you what is marked as

14   Defendant's Exhibit K.  If you could, take a look at the

15   second page of that.

16   A.   But this is written in English?

17   Q.   If you take a look at where it says *Statement*, almost

18   halfway down the page, and you see it is written in

19   Spanish?

20   A.   The thing is, I cannot read this letter.

21         Interpreter correction.

22         I cannot read these kind of writing.  I can only

23   read these kind of letters, but not these kind of letters.

24   Q.   Do you see at the bottom right, does it have your

25   name?

Torres - for the Plaintiff - Cross/Mr. Nardo

66

1    A.    Yes.

2    Q.    Did you write your name there?

3    A.    Yes.

4    Q.    Do you recall meeting Ms. Vasquez in the parking lot

5    for the purpose of her taking a statement from you?

6    A.    Yes.

7    Q.    Was that on or around December 3 of 2008?

8    A.    No.  No.  I don't remember the date.

9    Q.    Did anyone tell you in advance that Ms. Vasquez would

10   be coming to the parking lot of Luigi Q's to talk to you?

11              MR. HENNEFELD:  Objection.  Relevance.

12              THE COURT:  Overruled.

13              THE WITNESS:  No.

14   BY MR. NARDO:

15   Q.    When was the first time you met Ms. Vasquez?

16   A.    I don't remember how long ago I met her.  I don't

17   remember how long ago.

18   Q.    Did you meet her before you signed this statement in

19   the parking lot?

20   A.    I don't -- I remember that someone came to that

21   parking lot at that time but I don't remember if that was

22   her because I only saw her one time then.  Later on I saw

23   her again in the office, in the office where he requested

24   me to go and make, and go and do that deposition in

25   Mineola.

67

1    Q.    Do you know who Francis Marchan is?

2    A.    Yes, I do.

3    Q.    Did you ever see Mr. Marchan in the parking lot at

4    Luigi Q's?

5    A.    I don't remember.  The thing is, I do know him, but I

6    don't remember if he was there.

7    Q.    And how do you know Mr. Marchan?

8    A.    Well, after I was subpoenaed to go there to that

9    meeting that day in Mineola, that's when I got to know

10   Mr. Marchan.

11   Q.    Did you ever discuss the case with Luigi Q's with any

12   other employees at Luigi Q's?

13   A.    No.

14   Q.    When was the first time you learned that the

15   Department of Labor was bringing a case against Luigi Q's

16   Italian Restaurant?

17   A.    When I found out was when I was told to go and make a

18   statement at his office in Mineola.

19   Q.    And that was in July of 2010.  Correct?

20   A.    I think so.

21   Q.    But before that you had signed a statement for the

22   United States Department of Labor.  Correct?

23   A.    No.

24   Q.    And if you look at that exhibit in front of you, I

25   think we said it is Exhibit K, isn't Exhibit K a statement

Torres - for the Plaintiff - Cross/Mr. Nardo

68

1    you signed and it's dated 12/3/08?

2    A.   Honestly, I don't remember.  Some questions were

3    asked of me but I don't know when it happened.

4    Q.   Who asked those questions?

5    A.   Well, it must have been Zorayda.

6    Q.   Do you see the second page of Defendant's Exhibit K?

7    Do you see the date at the top right, December 3, 2008?

8         MR. HENNEFELD:  Your Honor, the witness has

9    testified that he can't read English or Spanish.

10        THE COURT:  I understand.  I'm confused myself.

11   I want to hear the answer because I don't understand if he

12   signed there, if it was read to him or not read to him.  I

13   don't understand what the circumstances were of this

14   paper.

15        Before he signed it, *these words or not these*

16   *words*:  I'm confused as to what he is referring to.  He

17   could read parts of it.  He testified earlier he could not

18   read Spanish.  And I thought I'd heard him say *I can read*

19   *these words but not these words*.  So I'm not sure.

20        Did you read any of that statement before you

21   signed it?

22        THE WITNESS:  No.

23   BY MR. NARDO:

24   Q.   Do you recall signing this?

25   A.   Well, yes, but -- well, this is my signature.  I know

69

1    it is my signature.

2    Q.    Do you see, at the top right, the number 12/3/08

3    where it says date?

4          You can point that out to him, if you like.

5    A.    Yes, I'm looking at it.

6    Q.    Does that refresh your memory as to when you signed

7    this?

8    A.    Well, but if this is the date here, then that must be

9    the date that I signed it on.

10   Q.    Did Ms. Vasquez tell you that you would be able to

11   receive money from Luigi Q's Italian Restaurant if you

12   were paid incorrectly?

13   A.    No.

14   Q.    Were you ever aware of the fact that you could

15   receive money from Luigi Q's Italian Restaurant if you

16   weren't paid correctly?

17   A.    No.

18   Q.    And why are you here testifying, Mr. Torres?

19   A.    Because I was subpoenaed to come here and testify

20   about the time that I was working there and my schedule.

21   Q.    Did you receive a check with that subpoena?

22   A.    What do you mean?

23   Q.    When you received that -- withdrawn.

24          When did you receive that subpoena?

25   A.    The appointment to come here?

Torres - for the Plaintiff - Cross/Mr. Nardo

70

1   Q.   Yes.

2   A.   I don't remember what the date was.  The note came to

3   me last week.

4   Q.   Was there a check enclosed with that subpoena?

5   A.   No.

6   Q.   Before meeting with Ms. Vasquez in a parking lot, did

7   you ever give a statement to her by telephone?

8   A.   No.

9   Q.   All right.  I will ask you to look at the fourth page

10   of Defendant's Exhibit K.

11           MR. HENNEFELD:  Your Honor, clarification.  The

12   document we have is only two pages.  You said the forth

13   page.  Counsel said the fourth page.

14           THE COURT:  Is it a four-page document or a

15   two-page document?

16           MR. NARDO:  Mr. Hennefeld gave me a two-page

17   document earlier, saying this is his statement.

18   Ms. Goldstein just gave me a four-page document.

19           The four-page document contains two statements

20   from Mr. Torres.  One was by telephone.  The document I

21   previously got from Mr. Hennefeld contained two

22   statements, two pages, and only had one statement.

23           THE COURT:  So you are using this four-page

24   document that Ms. Goldstein gave you.  Correct?

25           MR. NARDO:  That's correct.

Torres - for the Plaintiff - Cross/Mr. Nardo

71

1      THE COURT:  You are asking him to look at

2   Page 4.

3      MR. NARDO:  Yes.  Which I don't have a copy of

4   so I may have to approach.

5      THE COURT:  Fine.

6   BY MR. NARDO:

7   Q.   Okay.  Do you see the date on that is 11/3/08?  In

8   the top right?

9   A.   Yes.

10  Q.   And you see it mentions your name on it?

11  A.   Yes.

12  Q.   And do you see it says *by telephone* in the top right

13  of that document?

14  A.   It says *telephone* here.  Right?

15  Q.   Yes.  Does that refresh your recollection as to

16  whether or not you had a phone call to Ms. Vasquez, of the

17  Department of Labor, on November 3, 2008?

18  A.   But I have not given any telephone statement.

19  Q.   Okay.

20      Judge, I would like to move Defendant's Exhibit

21  K into evidence.

22      MR. HENNEFELD:  Objection.  That is hearsay, an

23  out-of-court statement.  Hearsay by the witness which does

24  not meet any hearsay exception.

25      MR. NARDO:  Judge, this is the first, the second

Torres - for the Plaintiff - Cross/Mr. Nardo

72

1    page, I believe, of this exhibit is his signed statement

2    given to the Department of Labor, so it would at least be

3    a business record taken by the Department of Labor.  And

4    it was produced to us.  And the same with the four pages.

5             I would like to admit the entire exhibit.  If

6    not, I have further questions on it.

7             MR. HENNEFELD:  A foundation for business record

8    exception has not been established.

9             THE COURT:  Yes.  I don't think you can get it

10   in as a business record.  It could be a business record

11   with hearsay within the business record, so if there are

12   additional questions, you can question him additionally

13   with respect to it.  But I don't think the whole document

14   should come in.

15   BY MR. NARDO:

16   Q.   Do you recall -- I'm now referring to the second page

17   of Defendant's Exhibit K.

18   A.   Is it this same one?

19   Q.   Yes.  Do you see where it says statement -- judge,

20   can I read it in Spanish?

21            THE COURT:  Sure.

22   BY MR. NARDO:

23   Q.   (Begins reading in Spanish.)

24            THE INTERPRETER:  The Interpreter would like to

25   turn to the indicated page because the witness is still on

Torres - for the Plaintiff - Cross/Mr. Nardo

73

1   the fourth page.

2            MR. NARDO:  I'm sorry.  I apologize.

3            THE COURT:  I don't want it to be read to him in

4   Spanish, but I'm going to ask that it be translated into

5   English so I know what you are reading to him.  Okay?

6            MR. NARDO:  Okay.

7   BY MR. NARDO:

8   Q.   This is the page that has his signature at the

9   bottom.  Correct?

10  A.   Yes.

11  Q.   Do you see where it says (reading in Spanish) *I work*

12  *from Monday through Saturday*?

13  A.   Where?

14  Q.   Where it says *Monday through Saturday*.  Here.

15  A.   Yes.

16  Q.   And then do you see where it says (reading in

17  Spanish) *Monday, 10:30 AM to 10 PM?  Monday?*

18  A.   Yes.

19  Q.   And then *for the next four days* (reading in Spanish)

20  it has quotation marks for the -- I'm sorry.  Withdrawn.

21           And then for (reading in Spanish) *Tuesday,*

22  *Wednesday, Thursday 10:30 AM to 10 PM.*

23           Do you see where it says that?

24  A.   Yes.

25  Q.   And then it says Friday, 10:30 AM to 11 PM?

Torres - for the Plaintiff - Cross/Mr. Nardo

74

1   A.   Yes.

2   Q.   And then it says Saturday, 3 PM till 11 PM?

3   A.   Yes.

4          MR. NARDO:  If I may approach to look at the

5   other statement, judge.

6   Q.   And do you see, on the fourth page of Defendant's

7   Exhibit K, that the hours of work listed are different

8   than the hours on the second page of Defendant's Exhibit

9   K?

10  A.   Yes.

11  Q.   And your signature is on the second page of this

12  exhibit.  Correct?

13  A.   No.

14  Q.   Okay.  Your signature is not on that page you are

15  looking at now.  Correct?

16  A.   No, because that one, on the other one it was over

17  here and it's not here.

18  Q.   And this is the fourth page of the exhibit, dated

19  November 10, 2008.  Correct?

20  A.   Yes.  I can see that here, the date.

21  Q.   And this fourth page, dated November 10, 2008,

22  actually indicates you were working more hours when you

23  compare it to the second page, dated December 3, 2008,

24  which is signed by you.  Is that correct?

25          THE INTERPRETER:  The second page, dated

75

1   December 3, 2008?

2            MR. NARDO.  Right.

3            THE INTERPRETER:  Thank you.

4   A.   The schedule looks different.

5            MR. NARDO:  All right.  Judge, I have no further

6   questions.

7            THE COURT:  Okay.  Any redirect?

8            MR. HENNEFELD:  One brief moment, your Honor,

9   please.

10           MR. NARDO:  Judge, with everything that's going

11  on, you want me to leave this up?

12           THE COURT:  Yes.

13           MR. HENNEFELD:  No redirect, your Honor.

14           THE COURT:  You can step down, sir.  Thank you.

15  You're done.

16           THE INTERPRETER:  Thank you.

17           (The witness was excused.)

18           THE COURT:  We will take a break until 1:30.

19           (Lunch recess taken at 12:20 pm.)

20

21

22

23

24

25

Pastor - for the Plaintiff - Direct/Ms. Goldstein

76

```
1              A F T E R N O O N   S E S S I O N
2                         2:15 PM
3
4         THE COURT:  Please call your next witness.
5
6    SANTOS ALFARO PASTOR
7         called by the plaintiff, having been first duly
8         sworn/affirmed, was examined and testified (through
9         the Spanish interpreters) as follows:
10
11   DIRECT EXAMINATION
12   BY MS. GOLDSTEIN:
13   Q.   Good afternoon, Mr. Alfaro.
14   A.   Good afternoon.
15   Q.   What is your primary language?
16   A.   Spanish.
17   Q.   And do you understand any English?
18   A.   Very little.
19   Q.   There is an interpreter here to translate the
20   questions from Spanish into English and back again.  So I
21   would just ask that if you are asked a question, even if
22   you understand some of it, to wait until the translation
23   is finished and to answer in Spanish.
24   A.   Perfect.
25   Q.   Why did you come to court today, Mr. Alfaro?
```

Pastor - for the Plaintiff - Direct/Ms. Goldstein

77

1    A.    Because I received a letter saying that I had to come

2    to testify.

3    Q.    Did you ever work at Luigi Q Restaurant?

4    A.    Yes.

5    Q.    When did you start working there?

6    A.    That was in January of 2006.

7    Q.    And do you still work there?

8    A.    No.

9    Q.    When did you stop working at the restaurant?

10   A.    That was in July of 2010.

11   Q.    What kind of work did you do at Luigi Q's Restaurant?

12   A.    Cook.

13   Q.    And did you do the same job the whole time you worked

14   at the restaurant?

15   A.    Yes.

16   Q.    How did you get the job at the restaurant?

17   A.    That was through a friend.  He was working there and

18   so he recommended me.

19   Q.    Did anyone interview you before you started working

20   there?

21   A.    Yes.

22   Q.    Who interviewed you?

23   A.    Mr. Luigi.

24   Q.    And did Mr. Luigi tell you anything about the job

25   when you interviewed?

Pastor - for the Plaintiff - Direct/Ms. Goldstein

78

1   A.   Yes.  That he had a position available as a cook.

2   Q.   And what if anything did Mr. Luigi tell you about the

3   pay that you would receive?

4   A.   Well, at that moment he told me that he was able to

5   pay me the 750.  That was an agreement that we reached.

6   Q.   And that was $750 a week?  $750 dollars a day?

7   Something else?

8   A.   Oh, I'm sorry.  A week.

9   Q.   And what if anything did Mr. Quarta tell you about

10  the schedule that you would be working?

11          THE INTERPRETER:  Mr. Farka?

12          MS. GOLDSTEIN:  Mr. Quarta.

13  A.   He told me that six days a week were worked.  Because

14  when I first started there, he would close Mondays.

15  BY MS. GOLDSTEIN:

16  Q.   What if anything -- I'm sorry.  Just to clarify.

17          Do you know Mr. Luigi's last name?

18  A.   Quarta.

19  Q.   What if anything did Mr. Quarta tell you about the

20  time that you would start work?

21  A.   Well, the starting time on weekdays was 10:30.

22  Q.   Did he tell you the starting time of any other days?

23  A.   Weekdays -- and that was Tuesday through Friday

24  because he was closed Mondays -- the start time was 10:30.

25  Q.   What if anything did Mr. Quarta tell you about

Pastor - for the Plaintiff - Direct/Ms. Goldstein

79

1    overtime pay?

2    A.    No.  He never mentioned anything about overtime.

3    Q.    During the entire time that you worked at the

4    restaurant, did Mr. Quarta tell you anything about

5    overtime pay?

6              MR. NARDO:  Objection.

7              THE COURT:  Overruled.

8    A.    No.  He never mentioned it.

9    BY MS. GOLDSTEIN:

10   Q.    Who was your supervisor at the restaurant?

11   A.    Mr. Luigi Quarta.

12   Q.    And how did he supervise you?

13   A.    One instance.  If I am the cook and I submitted a

14   plate of food, he would always check it out to make sure

15   that the presentation was good.

16   Q.    Did you work with other people in the kitchen?

17   A.    Yes.

18   Q.    Who supervised the other kitchen workers?

19   A.    Mr. Luigi Quarta did.

20   Q.    And how did Mr. Quarta supervise the other kitchen

21   workers?

22   A.    One example, he would always check the time they

23   would come in and all of that.  And depending, if they

24   were cleaning, he would make sure that everything was all

25   right.

80

1    Q.    Did Mr. Quarta speak Spanish?

2    A.    He does not speak Spanish.  He says quite a few words

3    in Spanish; that's it.

4    Q.    So how did Mr. Quarta communicate with the other

5    kitchen workers?

6    A.    The truth is that I was the only one who understood a

7    little bit more of English, so he would tell me to tell

8    them what they have to do.

9    Q.    How often was Mr. Quarta at the restaurant?

10   A.    He's always there.

11   Q.    Were there ever any days when Mr. Quarta was not at

12   the restaurant?

13   A.    On two occasions he went on vacation.  Yes, he did.

14   Q.    Who was in charge of the restaurant when Mr. Quarta

15   was on vacation?

16   A.    The first occasion when he left, Mr. Vinnie was in

17   charge.

18   Q.    Who is Vinnie?

19   A.    I'm sorry.  Mr. Vinnie remained in charge.  I'm

20   sorry.

21   Q.    Who is Vinnie?

22   A.    Vinnie is, how do you call it, he's the person who

23   takes down the orders.  He's like the maître d'.

24   Q.    Who was in charge the second time Mr. Quarta took

25   vacation?

Pastor - for the Plaintiff - Direct/Ms. Goldstein

1   A.   A man by the name of Omar.

2   Q.   And what was Omar's job?

3   A.   The same job Vinnie had.  He replaced him.

4   Q.   Did Omar and Vinnie work the same schedule?

5   A.   Yes.

6   Q.   What time did the maître d' arrive in the morning?

7   A.   10:30.

8   Q.   And did the maître d' leave before you or after you

9   at night?

10  A.   After.

11  Q.   Let's talk about your work schedule now.

12        At the time you stopped working at the

13  restaurant, what days of the week did you work?

14  A.   Monday through Saturday.

15  Q.   Let's talk about when your workday started, and we

16  will start with weekdays.

17        What time did you arrive to work Monday through

18  Friday?

19  A.   10:30.

20  Q.   And did you always start at 10:30 in the morning on

21  weekdays?

22  A.   Yes.

23  Q.   Were you ever told to come into work later than 10:30

24  in the morning on a weekday?

25  A.   Never.

82

1   Q.   What time did you arrive to work on Saturdays?

2   A.   At 3 o'clock.

3   Q.   Did you always start at 3 o'clock on Saturdays?

4   A.   Yes.

5   Q.   Were you ever told to come in later than 3 o'clock on

6   a Saturday?

7   A.   No.

8   Q.   Let's talk about breaks during your workday.

9            On weekdays did you take any breaks during the

10  day?

11  A.   Yes.

12  Q.   What time did your break normally start?

13  A.   At 3 o'clock in the afternoon.

14  Q.   And what time did your break normally end?

15  A.   At 4:30.

16  Q.   Did you take any other breaks during the day on

17  weekdays?

18  A.   No.

19  Q.   Did you ever have to keep working past 3 pm on

20  weekdays?

21  A.   On some occasions, yes, I did.

22  Q.   What would happen on those occasions when you had to

23  work past 3 o'clock?

24  A.   Well, I usually had to take my break after I served a

25  plate of food.

Pastor - for the Plaintiff - Direct/Ms. Goldstein

83

1   Q.   And were there occasions when you had to serve plates

2   of food after 3 o'clock?

3   A.   Yes, on some occasions.

4   Q.   Approximately how many times in a normal week or a

5   normal month would you have to work past 3 o'clock?

6   A.   Some, three times a month, more or less.

7   Q.   Were you ever able to take a break before 3 o'clock

8   in the afternoon?

9   A.   No.

10  Q.   Was this your weekday break schedule the whole time

11  you worked at the restaurant?

12  A.   Yes.

13  Q.   On Saturday did you take any breaks during the day?

14  A.   No.  Usually you cannot take a break because you

15  start at 3 o'clock and there are a lot of things to

16  prepare.

17  Q.   Let's talk about when your workdays ended at the

18  restaurant.

19           MR. NARDO:  Judge, can I ask that counsel ask

20  questions and stop leading the witness by saying the

21  subject matter that counsel is going to question the

22  witness about?

23           THE COURT:  I really think it is just to

24  introduce what topic she is going to cover next.

25           But to deal with the objection, just refrain

Pastor - for the Plaintiff - Direct/Ms. Goldstein

84

1    from informing the witness what area you are about to

2    address.  Okay?

3              Ms. Goldstein:  Yes, sir.

4    BY MS. GOLDSTEIN:

5    Q.    On Mondays through Thursdays, did you stop working at

6    the same time or different time each night?

7    A.    Usually, it would be at the same time.

8    Q.    And what time did you usually stop working Monday

9    through Thursday?

10   A.    At 9 o'clock sharp.

11   Q.    Did you ever leave work before 9 o'clock, Monday

12   through Thursday?

13   A.    No.

14   Q.    Did you ever leave after 9 pm, Monday through

15   Thursday?

16   A.    On some occasions, I did.  For instance, usually I

17   would finish at 9, but if a customer arrives at, let's say

18   at ten till 9, then I would have to cook for that

19   customer.

20   Q.    How often would it occur that you would have to stay

21   past 9 o'clock, Monday through Thursday?

22   A.    On some occasions.  Not very frequently.  Let's say,

23   for instance, twice a month.

24   Q.    How did you know you could stop working at the end of

25   each night?

Pastor - for the Plaintiff - Direct/Ms. Goldstein

85

1    A.    Because Mr. Luigi Quarta told me about it:  If there

2    is nothing to do, you can leave at 9 o'clock sharp.

3    Q.    What time did you usually finish work on Friday?

4    A.    Between 10 and 10:30.

5    Q.    What times did you usually finish on Saturdays?

6    A.    Also between 10 and 10:30.

7    Q.    And why did you work later on Fridays and Saturdays?

8    A.    Because that's usual at restaurants, when customers

9    would go out to eat late on weekends.

10   Q.    And did you normally work this schedule the entire

11   time you worked at the restaurant?

12   A.    Yes.

13   Q.    At the beginning of your testimony, you mentioned

14   that your schedule was different when you were first

15   hired.  Is that correct?

16   A.    How so?  Because when I first started working, he

17   would close Mondays.  And then he changed and he would be

18   closed Sundays.

19   Q.    Approximately how long did you work at the restaurant

20   when the restaurant was closed on Mondays?

21   A.    For approximately seven months or so.

22   Q.    And when you worked on Sunday, what time did you

23   arrive on Sunday?

24   A.    At 2 o'clock.

25   Q.    And what time did you leave on Sundays?

Pastor - for the Plaintiff - Direct/Ms. Goldstein

1    A.    At 9 o'clock.

2    Q.    And did you take a break on Sundays?

3    A.    No.

4    Q.    Other than the time period where you were working

5    Tuesday through Sunday, did your schedule ever change

6    again?

7    A.    No.  It was always the same schedule.

8    Q.    Did you ever work a five-day-a-week schedule?

9    A.    Never.

10   Q.    When you first started, how were you paid?  Cash or

11   check or both?

12            MR. NARDO:  Objection.

13            THE COURT:  What grounds?

14            MR. NARDO:  Well, I think what we're here for is

15   the hours that the witness worked and that the employees

16   worked and whether or not they're owed overtime.  How he's

17   paid -- he said the amount of money he earned, which I

18   believe is $750 a week.  Whether he received it in cash or

19   check is irrelevant to what your Honor has to find.

20            MS. GOLDSTEIN:  Your Honor, this will go to the

21   accuracy of some of the payroll records that Ms. Vasquez

22   will be discussing later today or tomorrow.

23            THE COURT:  What do you mean?

24            MS. GOLDSTEIN:  We believe that Mr. Quarta, I'm

25   sorry, Mr. Alfaro will testify that he was paid a

1    combination of cash and check.  The payroll records that

2    Ms. Vasquez will discuss will show that only the check

3    payments are, that we only have records of check payments

4    made.

5                 MR. NARDO:  Judge, we're going to object to

6    those records.  And we believe that the inquiry here --

7    how many hours did they work, how much were they paid,

8    what's owed in overtime, how they're paid, in cash or

9    check or stamps or however they're paid -- is not part of

10   what your Honor has to find.

11                THE COURT:  I do have to determine whether the

12   records are accurate or not, don't I?

13                MR. NARDO:  What -- do you -- our position is

14   that you don't need those records.

15                THE COURT:  That they have to prove, and how

16   they are trying to prove that goes to whatever records

17   they have or don't have with regard to that.

18                MR. NARDO:  Those were just payroll records.

19   There are no records of the hours worked.  We've

20   stipulated to that.  So nothing you see in those records

21   is going to indicate the hours worked.

22                The basis of this claim is that they were not

23   paid time and a half for hours over 40 a week and maybe,

24   for some employees, that they weren't paid minimum wage.

25   So the payroll records are completely irrelevant to what

Pastor - for the Plaintiff - Direct/Ms. Goldstein

88

1   your Honor has to find.

2           THE COURT:  That is tremendously relevant, the

3   payroll records --

4           MS. GOLDSTEIN:  Your Honor, in addition to the

5   overt violation, the Secretary has also pled a

6   recordkeeping violation.

7           Under the Fair Labor Standards Act, the

8   defendants are required to keep records of other things;

9   among other things, money earned each day and each week.

10  The accuracy of defendant's records with respect to wages

11  paid is clearly relevant to that recordkeeping violation.

12          THE COURT:  I'm going to allow it.

13          Okay.  Go ahead.

14          (Question translated.)

15  A.   At the beginning, he started paying me the 750 by

16  check.  But it was a check from the business.

17  BY MS. GOLDSTEIN:

18  Q.   And did the way that you were paid, by business

19  check, ever change?

20  A.   He paid me with a business check for a certain period

21  of time, and then it changed and he paid me with a stub.

22  Q.   What do you mean by a stub?

23  A.   For instance, the first checks were only the business

24  checks.  They had no stub.  And then the checks came with

25  a stub.

Pastor - for the Plaintiff - Direct/Ms. Goldstein

89

1   Q.   Did you ever receive any pay in addition to what you

2   received by check?

3   A.   When he changed and he gave it to me that way, yes, I

4   would also get cash.

5   Q.   And when you say when it changed, you mean when he

6   started paying you with a stub.

7   A.   Um-hum.  Right.

8   Q.   When you received the pay stub, did the stub show all

9   of the money that you received in both cash and check?

10  A.   No.

11  Q.   What did the stub include?

12  A.   Only what was paid to me by check.

13  Q.   How much were you paid when you first started?

14  A.   $750 a week.

15  Q.   And who paid you?

16  A.   Mr. Luigi Quarta did.

17  Q.   And when you were paid $750 each week, did you

18  receive exactly $750 each week, or did the amount vary

19  from week to week?

20  A.   No, it never did.  It was exactly 750.

21  Q.   Did you ever get a raise?

22  A.   Yes.

23  Q.   When did you get a raise?

24  A.   Approximately six months after I started.

25  Q.   And after this raise, how much did you receive?

Pastor - for the Plaintiff - Direct/Ms. Goldstein

90

1   A.   The raise was an additional $100 per week.

2   Q.   So at that time were you receiving exactly $850 every

3   week?

4   A.   Yes.

5   Q.   Did you receive any further raises?

6   A.   Yes.  After that he would give me a $50 raise every

7   six months until I earned $1,000, which was the highest

8   salary I made there.

9   Q.   When you were paid $1,000, was that $1,000 each week?

10   A.   Yes.

11   Q.   And during that time, did you receive exactly $1,000

12   each week or did your pay vary each week?

13   A.   No.  Exactly $1,000.

14   Q.   Did you ever miss any days of work?

15   A.   No.

16   Q.   Were there any weeks in which the restaurant was

17   closed?

18   A.   He would always close up one week out of the year.

19   Q.   And would you be paid for that week?

20   A.   Out of all the time that he closed up, just one week,

21   he paid me the first year.

22   Q.   How did you travel to the restaurant at the start of

23   each workday?

24        MR. NARDO:  Objection.

25        THE COURT:  What is the objection?

Pastor - for the Plaintiff - Direct/Ms. Goldstein

91

1      MR. NARDO:  Relevance.

2      MS. GOLDSTEIN:  Your Honor, defendants have

3  indicated in the past that they will contend that the

4  manager drove some of them home in the evening and that

5  their working hours were not what the individuals claim;

6  therefore, we will include evidence as to how employees

7  brought themselves to and from the workplace.

8      THE COURT:  Okay.  I will allow it.

9      THE INTERPRETER:  Can the question be repeated

10  for me, please?

11      THE COURT:  Sure.

12  BY MS. GOLDSTEIN:

13  Q.   How did you travel to the restaurant at the start of

14  each workday?

15  A.   In my car.

16  Q.   And who unlocked the restaurant each workday?

17  A.   To start out with, it was Vinnie.  Later on, Omar.

18  Q.   And did you have keys to open the restaurant,

19  Mr. Alfaro?

20  A.   No.

21  Q.   What did you do when you arrived in the morning?

22  A.   To prepare everything that, for example, if they

23  needed more salad or meat or fish, get it ready.  That was

24  my job.

25  Q.   And when you returned from your break at 4:30 pm on

Pastor - for the Plaintiff - Direct/Ms. Goldstein

1   weekdays, what did you do then?

2   A.   Well, for example, if we had to make more sauce or

3   meat or fish or chicken, that was my job; that's what I

4   did.  Or clean up or something.

5   Q.   Who decided what hours you should work?

6   A.   Luigi Quarta.

7   Q.   Could you set your own hours at the restaurant?

8   A.   No.

9   Q.   What kind of items was it your job to cook?

10  A.   Sauces.  There were some kinds that only I knew how

11  to make.  Fish, meat, chicken.  And to make the special,

12  because I would make the daily special.

13  Q.   Other than cooking, what else did you do at the

14  restaurant?

15  A.   Cleaning up.  And if there was something out of

16  order, to straighten up.

17  Q.   If you were getting low on something, like chicken,

18  for example, what would you do?

19           MR. NARDO:  Objection.  Leading.

20           THE COURT:  Overruled.

21  A.   If we needed something, then what I would do would be

22  to make up a list and give it to Luigi because he was the

23  one who was supervising and he would call all the

24  companies to get it.

25  Q.   Did you order any products, yourself?

Pastor - for the Plaintiff - Direct/Ms. Goldstein

93

1   A.    No.

2   Q.    Who decides whether a worker gets hired at the

3   restaurant?

4   A.    Luigi Quarta.

5   Q.    Have you ever hired a worker at the restaurant?

6   A.    No.

7   Q.    Have you ever recommended that Mr. Quarta hire a

8   certain person?

9   A.    No.

10  Q.    Has anyone ever told you that you had the authority

11  to hire workers at the restaurant?

12  A.    No.

13  Q.    Who decides how much employees are paid at the

14  restaurant?

15  A.    Mr. Luigi Quarta.

16  Q.    How do you know that?

17  A.    Because he was always the one who would interview

18  them and tell them how much they were going to be paid.

19  Q.    Did you personally see Mr. Quarta interviewing

20  employees?

21  A.    On some occasions, I have.

22  Q.    Did you ever decide how much an employee should be

23  paid?

24  A.    No.

25  Q.    Who decides what hours the kitchen workers should

Pastor - for the Plaintiff - Direct/Ms. Goldstein

94

1   work?

2   A.   Mr. Luigi Quarta.

3   Q.   Did you decide what hours the men in the kitchen

4   should work?

5   A.   No.

6   Q.   Did you ever tell another worker to come in later

7   than 10:30 am on a weekday?

8   A.   No.

9   Q.   Do you know what time each of the other workers in

10  the kitchen went home in the evening?

11  A.   No, because I was the first one to leave and they

12  would stay there.

13  Q.   Who decided when those workers could go home?

14  A.   That was supposed to be Mr. Luigi Quarta.

15  Q.   Who can fire the kitchen workers?

16  A.   Mr. Luigi Quarta.

17  Q.   Did you ever fire a kitchen worker?

18  A.   No.

19  Q.   Did you ever ask Luigi to fire someone?

20  A.   No.

21  Q.   Was anyone fired during the time that you were

22  working at the restaurant?

23  A.   Yes.

24  Q.   Who was fired?

25  A.   A guy named Juan Carlos.

Pastor - for the Plaintiff - Direct/Ms. Goldstein

95

1   Q.   And how was Juan Carlos fired?

2   A.   Mr. Quarta told me to tell him that he didn't need

3   him there anymore, so I had to call him.

4   Q.   And why did you have to call him?

5   A.   Because Mr. Quarta does not speak Spanish and the guy

6   did not speak English.

7   Q.   Was it in any way your decision to fire Juan Carlos?

8   A.   No.

9   Q.   How many other people worked in the kitchen with you

10  at one time?

11  A.   Three others besides me.

12  Q.   And what were the three other jobs in the kitchen?

13  A.   There was another guy, who would make pasta.  And

14  another one, who would make salads.  And then there was

15  the dishwasher.

16  Q.   What time did the other workers arrive Monday through

17  Friday?

18  A.   The same time.  Everybody was there at 10:30.

19  Q.   And what time did the other workers arrive on

20  Saturdays?

21  A.   3 o'clock.

22  Q.   And did the other workers take the same or a

23  different break as you took?

24  A.   The same.

25  Q.   And did you leave before, after, or at the same time

96

1   as the other kitchen workers?

2            MR. NARDO:  Objection.

3            THE COURT:  Sustained as to that.

4   BY MS. GOLDSTEIN:

5   Q.   Did you ever work with someone named Johnny at the

6   restaurant?

7            THE INTERPRETER:  I'm sorry?

8            MS. GOLDSTEIN:  Johnny.

9   A.   Yes.

10  BY MS. GOLDSTEIN:

11  Q.   What was Johnny's job?

12  A.   Washing dishes.

13  Q.   Approximately how long did Johnny work at the

14  restaurant?

15  A.   I can't tell you exactly, but more or less from two

16  to three months.

17  Q.   When you stopped working at the restaurant, was

18  Johnny still working there?

19  A.   No.  He had left there.

20  Q.   About how long before you stopped working at the

21  restaurant did Johnny stop working there?

22  A.   I can't remember really well, but it was more or less

23  about two years before I left.  I continued on for about

24  two years.

25  Q.   Did you ever work with someone named Horacio at the

Pastor - for the Plaintiff - Direct/Ms. Goldstein

97

1    restaurant?

2    A.    Yes.

3    Q.    What was Horacio's job?

4    A.    He made salads.

5    Q.    And approximately how long did Horacio work at the

6    restaurant?

7    A.    About eight or nine months, more or less.

8    Q.    Was Horacio working at the restaurant when you

9    stopped working there?

10   A.    No.

11   Q.    About how long before you stopped working at the

12   restaurant did Horacio stop working at the restaurant?

13   A.    Approximately ten months to a year, around that time.

14   Q.    Did you ever work with someone named Alexander

15   Zanbrano-Banegas at the restaurant?

16   A.    Yes.

17   Q.    What was Alex's job?

18   A.    He was what they call the busboy or sometimes he

19   would carry out the food, too.

20   Q.    Was Alex working at the restaurant when you stopped

21   working there?

22   A.    Yes.  My understanding is, he is still there.

23   Q.    And do you recall when Alex started working at the

24   restaurant?

25   A.    Yes, I do.

Pastor - for the Plaintiff - Direct/Ms. Goldstein

1   Q.    When did Alex start working at the restaurant?

2   A.    Approximately seven to eight months after I began

3   working there.

4   Q.    What time did Alex normally arrive in the morning?

5   A.    10:30.

6   Q.    And what time did Alex normally arrive on Saturdays?

7         MR. NARDO:  Objection.

8         THE COURT:  I think we have been through this

9   already.

10        MS. GOLDSTEIN:  I don't think we've been through

11  this with the busboy, your Honor.  We have been through

12  this with the other kitchen employees.

13        THE COURT:  I will let him answer it.

14        Go ahead.

15  A.    3 o'clock.

16  BY MS. GOLDSTEIN:

17  Q.    And did Alex take the same break as you during the

18  weekdays or was his break different?

19  A.    It was totally different because, for example, if

20  there were no customers in the dining room, then he could

21  take a break.  But if there were customers in the dining

22  room, then he could not take a break.

23  Q.    Did Alex ever take a longer break than 3 to 4:30?

24  A.    No.  If he took his breaks, it was at the same time.

25  Q.    Did Alex finish working at the restaurant at the end

Pastor - for the Plaintiff - Direct/Ms. Goldstein

99

1    of the day before you or after you?

2    A.    After.

3    Q.    Did you ever work with somebody named Jeffrey Chavez

4    at the restaurant?

5    A.    Yes.

6    Q.    What was Jeffrey's job?

7    A.    He was the pasta man.  He would make the pasta.

8    Q.    Was Jeffrey working at the restaurant when you

9    stopped working there?

10    A.    Yes.

11    Q.    And was Jeffrey working at the restaurant when you

12    started working there?

13    A.    Yes.

14    Q.    And did Jeffrey work the same schedule as you or was

15    it different?

16    A.    We would start at the same time, but he would leave

17    later on weekdays.

18    Q.    What time did Mr. Quarta usually arrive at the

19    restaurant?

20    A.    He did not have a schedule, but he would normally

21    arrive between 10:30 and 12.

22    Q.    And what time did Mr. Quarta normally arrive on

23    Saturdays?

24    A.    I don't know exactly when he would get there, but we

25    would find him there already when we started.

100

1   Q.    Would Mr. Quarta leave before you or after you at the

2   end of the day?

3   A.    During all the time that I was there, he left

4   beforehand on a few occasions.

5   Q.    How did Mr. Quarta keep track of the hours that you

6   worked?

7              MR. NARDO:  Objection.

8              THE COURT:  Sustained as to form.

9   BY MS. GOLDSTEIN:

10  Q.    Did Mr. Quarta keep track of the hours that you

11  worked?

12             MR. NARDO:  Same objection.

13             THE COURT:  Based upon your own conversations

14  with him or your personal observations, do you know if he

15  kept records of your hours?

16             THE WITNESS:  I don't know if he kept track of

17  my hours.

18  BY MS. GOLDSTEIN:

19  Q.    Did you ever punch a time card when you worked at the

20  restaurant?

21  A.    No.

22  Q.    Did you ever see anyone punch a time card at the

23  restaurant?

24  A.    No.

25  Q.    Can I ask the witness to open the binder to Exhibit

101

1  7, please.

2           Do you recognize what is shown on this page?

3  A.   Yes.

4  Q.   What is this?

5  A.   I recall a schedule that he had on the wall in his

6  office that was just like this one.

7  Q.   And is this that schedule that you saw hanging on the

8  wall?

9  A.   Yes.

10  Q.   Is this a photograph of that schedule?

11  A.   Yes.

12  Q.   When did you see this schedule hanging in the office?

13  A.   Approximately four to five months before I left

14  there.

15  Q.   And does this photograph accurately show what the

16  schedule hanging in Mr. Quarta's office looked like?

17  A.   Yes.

18  Q.   Who took this photograph?

19  A.   I did.

20  Q.   And where were you when you took this photograph?

21  A.   I was going to the men's room and it is right next

22  door to the door to the office.  The door was open and I

23  saw the schedule there.

24  Q.   What did you use to take this photograph?

25  A.   A smartphone.

Pastor - for the Plaintiff - Direct/Ms. Goldstein

102

1       MS. GOLDSTEIN:  I move to admit Exhibit 7 into

2   evidence, your Honor.

3       THE COURT:  Any objections?

4       MR. NARDO:  Yes, judge.  I would object to it.

5       I don't know if the witness said when he took

6   the photograph, but it is barely legible.  You can't even

7   read, at least on my copy I can't even read, anything

8   below -- I can just read Anibal.  Anything below that is

9   very difficult to read.

10      THE COURT:  Well, can he say approximately when

11  he took the photograph?

12  BY MS. GOLDSTEIN:

13  Q.   Approximately when did you take this photograph,

14  Mr. Alfaro?

15  A.   About four months before I left.  More or less four

16  months.

17      MS. GOLDSTEIN:  With respect to the

18  illegibility, your Honor, it is what it is.  I believe

19  that some of it is sufficiently legible as to be of use.

20      THE COURT:  Yes.  I think, certainly as relates

21  to Mr. Pastor, it is legible.  It does get harder to see

22  as I go down the page.

23      I will admit it.  I can't read certain portions

24  of it, especially as it relates to this witness.

25      So Plaintiff's Exhibit 7 is admitted.

Pastor - for the Plaintiff - Direct/Ms. Goldstein

103

1   (Plaintiff's Exhibit 7 in evidence.)

2   BY MS. GOLDSTEIN:

3   Q.   Mr. Pastor, does this schedule -- did this Exhibit 7

4   accurately describe your schedule?

5   A.   No.

6   Q.   Can you explain why not.

7   A.   Well, for example, here I'm seeing that I had Sundays

8   and Mondays off, which is not true.

9        Here I see another schedule, that says 11 to 2.

10  Here it says 12 to 2.  That's a lie.

11  Q.   Does this schedule accurately describe the schedule

12  of the other workers?

13       MR. NARDO:  Objection.

14       THE COURT:  Overruled.

15  A.   No.

16  BY MS. GOLDSTEIN:

17  Q.   Why not?

18  A.   Well, here, for example, it says that Jeffrey had

19  every Sunday and Tuesday off, something that's not true.

20  He always had Sundays off, just like the rest of us.  And

21  that was the only day.

22  Q.   Now, if you were not looking at Exhibit 7 -- and

23  maybe I can ask you to close that up for a moment.

24       Mr. Pastor, can you recall the exact details of

25  this schedule that was hanging in that office?

Pastor - for the Plaintiff - Direct/Ms. Goldstein

1    A.    No.

2    Q.    Can I ask you to please open to Exhibit 7A.

3          Do you recognize this?

4    A.    Yes.

5    Q.    What is this?

6    A.    This is from the photograph I took.

7    Q.    What do you mean that it is from the photograph that

8    you took?

9    A.    This is from the schedule that was on the wall.  But

10   since I used the telephone, I enlarged all the images and

11   I wrote them down.

12   Q.    Is all of that handwriting on this page your

13   handwriting?

14   A.    Yes.

15   Q.    Why did you write this document?

16   A.    Because it -- you can't see everything completely in

17   the image of the phone, so I zoomed in on each name and

18   schedule.

19   Q.    When did you write Exhibit 7A?

20   A.    One week after I took the photo, more or less.

21   Q.    And does Exhibit 7A accurately record the information

22   that was hanging on Mr. Quarta's wall?

23   A.    Yes.  That's exactly what was on there.

24          MS. GOLDSTEIN:  Your Honor, I would move to

25   admit Exhibit 7A as a past-recollection recorded.

Pastor - for the Plaintiff - Direct/Ms. Goldstein

105

1         MR. NARDO:  No objection, judge.

2         THE COURT:  Okay.  7A is admitted.

3         (Plaintiff's Exhibit 7A in evidence.)

4    BY MS. GOLDSTEIN:

5    Q.   Mr. Alfaro, does Exhibit 7A accurately describe the

6    schedules of the kitchen workers at the restaurant?

7         MR. NARDO:  Objection.

8         THE COURT:  Again, is it based upon your own

9    personal observation of their hours?

10        THE WITNESS:  No.

11   BY MS. GOLDSTEIN:

12   Q.   During the time that you worked at the restaurant,

13   did any of the employees have two days off during the

14   week?

15        MR. NARDO:  Objection.

16        THE COURT:  What grounds?

17        MR. NARDO:  This was asked and answered, judge.

18   And if 7A is the same as 7, then we have to ask the same

19   questions for 7A as we did with 7.

20        THE COURT:  I think she is now covering more

21   employees.  I think we spoke about Jeffrey, himself, and

22   she is asking about the remainder of the employees.

23        I will allow this question, but I believe we

24   probably need to move on.

25        MS. GOLDSTEIN:  Yes, sir.

106

1        THE INTERPRETER:  Can this question be repeated

2    for the interpreter, please?

3        THE COURT:  Did any of the employees listed on

4    this page have two days off at any time during the time he

5    was employed there?

6    A.   No.

7    BY MS. GOLDSTEIN:

8    Q.   During the time that you worked at the restaurant,

9    did Mr. Quarta ever discuss the investigators from the

10   Department of Labor with you?

11       MR. NARDO:  Objection.

12       THE COURT:  What grounds?

13       MR. NARDO:  Relevance.

14       THE COURT:  Issue of willfulness.  I assume he's

15   going to testify to conversations with the investigators?

16       MS. GOLDSTEIN:  Yes, your Honor.

17       THE COURT:  I will allow it.

18   A.   I believe that one time I believe he had received a

19   letter about the investigation, saying that the

20   investigators were coming.  And he told us to say that we

21   started later, that we came in at 2 o'clock, which wasn't

22   true, and that we had two days off.

23   BY MS. GOLDSTEIN:

24   Q.   And who did you mean by *he*?

25   A.   Oh.  I'm sorry.  Mr. Quarta.

Pastor - for the Plaintiff - Cross/Mr. Nardo

107

1   Q.   When did this conversation happen?

2   A.   Approximately a year after they began to investigate

3   him.

4   Q.   And who do you mean by they, Mr. Alfaro?

5   A.   Ms. Vasquez.

6   Q.   Where did this conversation take place?

7   A.   He went into the kitchen to say that.

8   Q.   And who was present during that conversation?

9   A.   All the people in the kitchen.  There were four of

10  us.

11          MS. GOLDSTEIN:  I have no further questions,

12  your Honor.

13          THE COURT:  Why don't we take our afternoon

14  break before the cross-examination.

15          (Recess taken from 3:15 pm until 3:20 pm.)

16

17  CROSS-EXAMINATION

18  BY MR. NARDO:

19  Q.   Have we met before, Mr. Pastor?

20          We have met before, correct?

21  A.   It seems to me I saw you, I've seen you, once.

22  Q.   Okay.  Aside from yourself, how many employees were

23  working in the kitchen?

24  A.   Three.

25  Q.   And one was the salad chef.  Correct?

108

1    A.    Yes, there was a salad man.

2    Q.    And there was also a pasta man?

3    A.    Yes.

4    Q.    And there was a dishwasher?

5    A.    Yes.

6    Q.    And could you assign those employees tasks to

7    perform?

8    A.    By order of Mr. Luigi Quarta, yes, I could.

9    Q.    Well, Mr. Quarta spent most of his time outside the

10   kitchen when customers were there.  Is that right?

11   A.    That's the case.  But he would always step into the

12   kitchen to speak with me and tell me what had to be done.

13   Q.    Weren't you in charge in the kitchen when it came to

14   the three employees we just discussed?

15   A.    I was the person who translated Mr. Luigi's orders to

16   them.

17   Q.    Mr. Pastor, if you needed something to perform your

18   duties in the kitchen, maybe a special knife or a cutting

19   board or a plate, could you direct the kitchen employee to

20   get that for you?

21          MS. GOLDSTEIN:  Objection, your Honor.

22   Speculation.

23          THE COURT:  I don't think he is asking him to

24   speculate.

25          When that type of thing happened, what would you

1   do?

2          THE WITNESS:  I would draw up a list of the

3   things that were needed, I would give it to Mr. Luigi, and

4   he was in charge of calling up all the companies.

5   BY MR. NARDO:

6   Q.   Let's suppose you were cutting something and the

7   knife broke.  Did that ever happen?

8   A.   No.

9   Q.   Let's suppose you needed something that was available

10  but wasn't within your reach, like a knife or a cutting

11  board or something like that.  Could you ask another

12  employee in the kitchen to bring that to you?

13  A.   Usually that never happened because it's a small

14  place and everything is handy for us.

15  Q.   Mr. Pastor, did you ever give any direction to one of

16  the other employees in the kitchen to do something for you

17  to help you perform your duties as chef?

18  A.   As a chef I was the person -- you mean, as a chef I

19  was the person who had the most experience in the kitchen.

20          Now, for instance, on a weekend, let's say

21  Friday or a Saturday, and those are the busiest days,

22  let's say if I was very busy and let's say I needed a

23  piece of meat that was hidden somewhere in the storeroom,

24  I would tell the dishwasher, yes, bring it to me.

25  Q.   And aside from having the most experience in the

110

1    kitchen, you had the most authority in the kitchen.

2    Correct?

3    A.    Not authority.

4    Q.    Okay.  Did the dishwasher ever tell you to do

5    something for him?

6    A.    No.

7    Q.    You know who Alex Torres is.  Is that correct?

8    A.    Yes.

9    Q.    You spoke with him today.  Correct?

10   A.    No, we have not spoken.

11   Q.    Okay.  If Alex Torres testified that you were in

12   charge in the kitchen, would that be correct?

13            MS. GOLDSTEIN:  Objection, your Honor.

14   Mischaracterizes --

15            THE COURT:  First of all, whether it

16   mischaracterizes or not, it is an improper question, To

17   tell one witness what another witness said.

18            Each witness testifies independently.  And I

19   judge their credibility.  You don't.

20            It's an improper question.

21            MR. NARDO:  Okay.

22   BY MR. NARDO:

23   Q.    Were you in charge in the kitchen?

24   A.    No.

25   Q.    Did you have the authority to direct the pasta chef

111

1   what to do?

2           MS. GOLDSTEIN:  Objection.  Asked and answered.

3           THE COURT:  I'll allow it one more time.

4   A.   Well, I was the person who had the most experience in

5   the kitchen.  But for instance, if he was letting

6   something get burned in the kitchen, then I had to correct

7   him.

8   BY MR. NARDO:

9   Q.   And would you do the same with the salad chef?

10  A.   Yes.  I would do it by order of Mr. Luigi because he

11  would always tell me to make sure that the salad was

12  nicely decorated because he was always checking on the

13  food plates, making sure that they were served properly.

14  Q.   And sometimes you would check on those food plates to

15  make sure they were proper?

16  A.   For instance, this is an example and this hardly ever

17  happened, this is an example and I repeat.  If the pasta

18  man was letting something get burned, then I would tell

19  him that that could not be so because Mr. Luigi would tell

20  me that such a thing could not be served.

21  Q.   Do you recall the first time you spoke with

22  Ms. Vasquez over the phone?

23  A.   I do not exactly remember the date, but I did speak

24  with her.

25  Q.   Did you speak with her in the summer of 2008?

1   A.   I did not remember whether it was in 2008.

2   Q.   Did you tell her at any time that you were in charge

3   of the kitchen?

4   A.   No.

5   Q.   Did you tell her that you worked approximately 55

6   hours a week?

7   A.   I have not said that.

8   Q.   I'd like to show you what has been marked as

9   Defendant's Exhibit L, and I ask you to turn to the third

10  page of that exhibit.

11        Can you read English, Mr. Pastor?

12  A.   No.

13  Q.   Can you read where it says Statement and then it says

14  *(in charge of kitchen and chef)* in parentheses?

15        MS. GOLDSTEIN:  Objection, your Honor.  He just

16  testified he can't read English.

17        THE COURT:  Do you want to have the interpreter

18  translate that for him?

19        MR. NARDO:  Yes.

20        (Interpreter translating document.)

21  A.   As I was saying, I was the person with the most

22  experience.  And since the other people did not speak

23  English, I was the only person who translated, in my

24  limited English, the orders that Mr. Quarta gave them.

25  BY MR. NARDO:

Pastor - for the Plaintiff - Cross/Mr. Nardo

113

1   Q.    You have been a chef at other restaurants, haven't

2   you?

3            MS. GOLDSTEIN:  Objection, your Honor.

4            THE COURT:  Relevance?

5            MR. NARDO:  I would like to know, in the

6   industry, if it is typical that the head chef is in charge

7   of the kitchen.

8            THE COURT:  No.  I'll sustain the objection.

9   What is typical in the industry doesn't help me at all.

10  It's what happened at this particular place.

11           MR. NARDO:  Okay.

12  BY MR. NARDO:

13  Q.    Do you see below that where it says *55 HRS WK*?

14           INTERPRETER:  Would you like me to interpret

15  that in English?

16           MR. NARDO:  Yes.  Sure.

17  A.    That I worked?

18  BY MR. NARDO:

19  Q.    Do you know if that 55 hours a week indicates that is

20  what you worked?

21  A.    I never said that I worked 55 hours, because I got a

22  salary and that was per week.

23  Q.    And do you see at the bottom, the second-to-last

24  line, where it says 54.5?

25           Do you see that number?

114

1   A.    I do.

2   Q.    Do you know if that represents the number of hours

3   you worked in a week for Luigi Q's?

4   A.    I was telling you I work per shift, not by the hour.

5   That is --

6   Q.    Okay.  So you don't know how many hours you worked

7   per week.  Correct?

8   A.    I never counted it.  The fact is, I never counted it.

9   But you do approximately 60 hours, more or less, you don't

10  have to run the figure.

11  Q.    And before right now, you have never calculated that.

12  A.    No.  I never ran the figures.

13  Q.    And your testimony was that you never took a vacation

14  when you worked there?

15          MS. GOLDSTEIN:  Objection.

16          MR. NARDO:  I will withdraw that.

17  BY MR. NARDO:

18  Q.    Did you ever take a vacation during the time you

19  worked there?

20  A.    When he closed for a week.  And he closes for a week

21  each year.

22  Q.    Did you ever call in sick or not report to work

23  because of illness or injury when you worked there?

24  A.    I never, never let him down.  I never missed work.

25  Q.    Did you ever complain to Luigi Quarta about how you

115

1    were being paid?

2    A.    No, I never complained because I needed the job and I

3    never bothered him about any rate.

4    Q.    And you never kept track in writing of the hours you

5    worked at Luigi Q's, did you?

6    A.    Not in writing.

7    Q.    When you received the letter to testify in this case,

8    did you also receive a check with that?

9    A.    No.  Just the letter.

10   Q.    And did you meet with anyone to discuss your

11   testimony today from the Department of Labor?

12   A.    We met sometimes.

13   Q.    Who did you meet with?

14   A.    With Ms. Vasquez.

15   Q.    How many times did you meet with her to prepare your

16   testimony for today?

17            MS. GOLDSTEIN:  Objection.

18            THE COURT:  Overruled.

19   A.    About two.  Two or three times.

20   BY MR. NARDO:

21   Q.    And when were those times?  In the last week?  Or the

22   last month?

23   A.    That happened last year when a court appearance was

24   going to take place here and subsequently was canceled.

25   Q.    Did Mr. Vasquez -- withdrawn.

1    Did Ms. Vasquez ever tell you that you can get

2  an award of money for this case?

3  A.    No.

4  Q.    Are you of the opinion that Luigi Quarta's restaurant

5  owes you money?

6  A.    Because of the overtime, I do believe that he owes

7  me.

8  Q.    And you learned that from the Department of Labor.

9  Correct?

10  A.    I know that myself, that when you work over 40 hours,

11  you are supposed to get paid overtime.

12  Q.    How come you never complained to Luigi Quarta about

13  that?

14         MS. GOLDSTEIN:  Objection.  Asked and answered.

15         THE COURT:  I will allow that.

16  A.    I did not complain because I have to work and I have

17  many responsibilities to pay.

18  BY MR. NARDO:

19  Q.    What kitchen employees were hired during the time you

20  worked at Luigi Qs?

21  A.    I am not able to remember, but the ones that changed

22  the most there were the dishwashers.

23  Q.    Who was the last dishwasher that worked there when

24  you were still working there?

25  A.    The last one, and it is my understanding that he is

1    still there, is Anibal Acosta.

2    Q.    Who was the dishwasher before then?

3    A.    Before, I do not exactly know, but I think it was

4    Alex Torres.

5    Q.    Did Mr. Torres come to you and have a discussion with

6    you before he started working at Luigi Q's?

7    A.    No.

8    Q.    So you just showed up and one day Mr. Torres was

9    there working as a dishwasher?

10   A.    No.  I had already been working there when he came to

11   work there.

12   Q.    Before Mr. Torres' first day at work, did he have a

13   conversation with you about the job?

14        MS. GOLDSTEIN:  Objection.

15        THE COURT:  Overruled.

16   A.    The day before, no.  I don't remember if it was the

17   day before, but I do believe that he came.  I don't

18   remember really well when, but he had come in the day

19   before that because his friend had referred him for the

20   job.

21   BY MR. NARDO:

22   Q.    And this friend was Johnny Diaz.  Correct?

23   A.    Supposedly.  I don't know whether they're friends or

24   acquaintances.

25   Q.    And did Mr. Torres tell you that Johnny Diaz referred

Pastor - for the Plaintiff - Cross/Mr. Nardo

118

1   him, Mr. Torres, for the job?

2   A.   The one who was there first, it was Johnny.  And then

3   Johnny left and he said that he would like to leave him

4   the job.

5   Q.   And Johnny told that to you?

6   A.   It was said to me and then I passed word on to

7   Mr. Luigi Quarta, because he was the only one who did the

8   interviews and decided how much they were going to be

9   paid.

10  Q.   Luigi Quarta does speak Spanish.  Correct?

11  A.   He doesn't.  He says a few words.

12  Q.   And Alex Torres doesn't speak English.  Correct?

13  A.   Exactly.

14  Q.   So do we agree that Luigi Quarta did not interview

15  Alex Torres for the job since they don't share a common

16  language?

17  A.   Well, I don't believe they need that much English for

18  that.  If they are told *I'm going to pay you this much*,

19  it's really not necessary to understand a lot of English.

20  You know, *I'll pay you this much*.  And you don't really

21  need to have a long interview for a dishwasher.

22  Q.   Were you present for any interview between

23  Luigi Quarta and Alex Torres?

24  A.   I don't remember.  I don't believe so, no.

25  Q.   During the workday you would leave before Mr. Torres.

Pastor - for the Plaintiff - Cross/Mr. Nardo

119

1   Correct?

2   A.   I would always leave at 9 or 10, and the dishwashers

3   were the last to go.

4   Q.   Did Ms. Vasquez ever come to the restaurant to speak

5   to you and then tell you not to tell Luigi Quarta that she

6   was at the restaurant?

7           MS. GOLDSTEIN:  Objection.  Compound.

8           THE COURT:  Overruled.

9   A.   Not that I recall.

10  BY MR. NARDO:

11  Q.   If you could, open up to Exhibit 7 --

12          MR. NARDO:  Judge, can I ask questions from

13  here?

14  BY MR. NARDO:

15  Q.   -- you testified that Exhibit 7A was your manual

16  copying of the schedule which is the picture in Exhibit 7.

17  Correct?

18  A.   It's the same; that is to say, it is the same

19  schedule.  The only difference is, I made it clearer than

20  in the photograph which isn't very clear.

21  Q.   But do you see on Exhibit 7, it has the words *THIS*

22  *WEEK* in capitals and underlined at the top?

23          Do you see that?

24  A.   Yes, I do.

25  Q.   It doesn't have that on 7A, does it?

120

1    A.    I forgot to write down those same letters.

2    Q.    So this exhibit that you took a picture of which --

3    withdrawn.

4          This schedule that you took a picture of, which

5    is here as Exhibit 7, was only a schedule for one week.

6    Isn't that correct?

7    A.    Supposedly so.  It says one week.  But it doesn't

8    have any date on it, either.

9    Q.    And you took that picture.  And who did you send that

10   picture to?

11   A.    I let Ms. Vasquez know about it.

12   Q.    Did you send her the actual picture?

13   A.    I texted it to her.

14   Q.    And that was while -- withdrawn.

15         When you took that picture, you were working for

16   Luigi Q's.  Correct?

17   A.    Yes.

18   Q.    And when you texted it to her, you were working for

19   Luigi Q's.

20   A.    Yes.

21   Q.    Were you upset with Luigi Q's at the time?

22   A.    Upset?  No.

23   Q.    Did you tell Mr. Quarta that you were sending that

24   picture to Ms. Vasquez?

25   A.    No.

Pastor - for the Plaintiff - Cross/Mr. Nardo

1  Q.   Did Ms. Vasquez ask you to take that picture?

2  A.   No.

3  Q.   How did you have her email address or her phone

4  number?

5  A.   I knew her phone number.

6  Q.   How did you know that?

7  A.   Because that's very easy.  A friend of mine got it

8  for me.

9  Q.   Who was that?  What friend?

10  A.   Jeffrey.

11  Q.   Is that Jeffrey Chavez?

12  A.   I don't remember Jeffrey's last name.  He was

13  Jeffrey, the pasta man.

14  Q.   Was there a difference between the amount --

15  withdrawn.

16        Did you receive a W-2 at the end of the year

17  from Luigi Quarta?

18        MS. GOLDSTEIN:  Objection, your Honor.  The

19  court has already granted a motion in limine precluding

20  discussions about Luigi's tax filings.

21        MR. NARDO:  They brought it out on direct,

22  judge.

23        THE COURT:  About a W-2?

24        MR. NARDO:  They brought up the fact that he

25  receives payment in cash and payment by check and their

122

1  argument is that some of the cash payments aren't

2  reflected in the records.

3         MS. GOLDSTEIN:  No, your Honor, we asked no

4  questions concerning past records that Mr. Alfaro had or

5  filed.  We asked only whether the records that -- the pay

6  stubs that he received each week included all of the pay

7  that he received.

8         THE COURT:  I don't think they opened the door

9  on this and I don't think it is proper for you to ask any

10  questions regarding W-2s.  I'm barring it.

11         MR. NARDO:  All right.  I have nothing further.

12         THE COURT:  Any redirect?

13         MS. GOLDSTEIN:  No, your Honor.

14         THE COURT:  You can step down, sir.  Thank you.

15         (The witness was excused.)

16         THE COURT:  Next witness.

17         MR. NARDO:  Judge, I think you see the tenor of

18  the case, and what is happening under Rule 403 includes

19  cumulative testimony, so I don't know how much of this

20  your Honor wants to go through.

21         We would like to go through as little as

22  possible, for the defendant.  I don't know about the

23  plaintiff.  I don't know if you want to issue an order

24  along those lines.

25         MS. GOLDSTEIN:  Your Honor, to the extent that

Acosta - for the Plaintiff - Direct/Ms. Goldstein

123

1    the defendant is interested in sitting down with me and

2    stipulating as to the schedules of the workers and so

3    forth, I am happy to do that.

4           I think that it is far from mature to issue an

5    order for cumulative testimony only to avoid testifying.

6           THE COURT:  Yes.  I'm all for streamlining this

7    case, believe me.  But I agree with Ms. Goldstein.

8           To the extent you want to streamline this case,

9    I would suggest -- since we're going to go for another 20

10   minutes today and we will end about 4:30 -- if you are

11   willing to stipulate about schedules and hours of the two

12   employees, I think that would streamline things.  But

13   assuming that you are disputing that, I don't see how you

14   can make that application.

15          MR. NARDO:  Okay.  Thank you.

16          THE COURT:  Okay.

17

18   **JOSE ANIBAL ACOSTA**

19          called by the plaintiff, having been first duly

20          sworn/affirmed, was examined and testified (through

21          the Spanish interpreters) as follows:

22

23   DIRECT EXAMINATION

24   BY MS. GOLDSTEIN:

25   Q.   Good afternoon, Mr. Acosta.

1    A.    Good afternoon.

2    Q.    What is your primary language, Mr. Acosta?

3    A.    Spanish.

4    Q.    Do you speak any English?

5    A.    No.

6    Q.    There is an interpreter here to translate the

7    questions from English to Spanish and back again, so I

8    would ask that, even if you understand any of the words in

9    English, that you just wait until she is finished

10   translating.  Okay?

11   A.    Yes.

12   Q.    Why did you come to court today?

13   A.    Because I was sent a form saying to come.

14   Q.    Did you ever work at Luigi Q's Restaurant?

15   A.    Yes.

16   Q.    When did you start working there?

17   A.    September 20, 2009.

18   Q.    Do you still work there?

19   A.    Yes.

20   Q.    What kind of work do you do at the restaurant?

21   A.    Washing dishes.

22   Q.    And have you been a dishwasher the whole time you

23   have been there?

24   A.    Yes.

25   Q.    How did you get the job at the restaurant?

125

1    A.    Juan Carlos called me and told me the job was there.

2    Q.    Who is Juan Carlos?

3    A.    Juan Carlos is one of the workers who works there in

4    the kitchen.

5    Q.    What is his job in the kitchen?

6    A.    His job is making pasta and salad man.  He does both

7    jobs.

8    Q.    Who hired you to work at the restaurant?

9    A.    Luigi.

10   Q.    When you started were you told anything about minimum

11   wage?

12   A.    No.

13   Q.    Were you told anything about overtime when you were

14   hired?

15   A.    No.

16   Q.    Were you told anything about overtime pay from any

17   supervisor at the restaurant?

18   A.    No.

19   Q.    What days of the week do you work at the restaurant?

20   A.    Mondays through Saturdays.

21   Q.    Have you always worked those days?

22   A.    Yes.

23   Q.    Monday through Friday what time do you start working

24   at the restaurant?

25   A.    From Monday through Thursday, at 10:30.  From Monday

1   through Friday, at 10:30.

2   Q.   Do you always arrive at the exact same time Monday

3   through Friday or does it vary?

4   A.   No, the same time.

5   Q.   Have you ever been told to come in later than

6   10:30 am on a weekday?

7   A.   No.

8   Q.   On Saturdays what time do you start work at the

9   restaurant?

10   A.   3 o'clock.

11   Q.   And do you always arrive exactly at 3 or does it vary

12   from week to week?

13   A.   No.  Always at 3.

14   Q.   Have you ever been told to come in after 3 pm on a

15   Saturday?

16   A.   No.

17   Q.   Monday through Friday do you take any breaks during

18   your day?

19   A.   Just the one at 3 o'clock.  I don't know what the

20   question is about, if that's it.

21   Q.   Do you usually take a break at 3 o'clock during the

22   week?

23   A.   Yes.  One hour, an hour and a half.

24   Q.   What time does that break usually start?

25          MR. NARDO:  Objection.  The question before this

Acosta - for the Plaintiff - Direct/Ms. Goldstein

127

1   was:  *Do you usually take a break at 3 o'clock during the*

2   *week?*

3              Now we have:  *What time does that break start?*

4              MS. GOLDSTEIN:  Your Honor, the answer was that

5   it varies.  I'm just trying to nail this down.

6              THE COURT:  Go ahead.

7   A.   What time do I start -- what was the question?

8   BY MS. GOLDSTEIN:

9   Q.   What time does your break usually start?

10  A.   Normally there is no set time to go out and start the

11  break.  Sometimes we get off at 3:30, sometimes 3:20,

12  depending on how busy it is.  There is no definite time to

13  leave for break.

14  Q.   Approximately how many times during the week does

15  your break start after 3 pm?

16  A.   After?  What do you mean?

17  Q.   How many times during the week does your break start

18  later than 3 o'clock?

19  A.   It depends.  Two to three days.  Depending.  Two to

20  three.  It depends how the week goes.

21  Q.   Does your break ever start before 3 o'clock?

22  A.   No.

23  Q.   What time does your break end?

24  A.   4:30.

25  Q.   Do you ever take a break that ends later than 4:30?

Acosta - for the Plaintiff - Direct/Ms. Goldstein

128

1    A.    No.

2    Q.    Other than the break that you have just described, do

3    you take any other breaks Monday through Friday?

4    A.    No.

5    Q.    On Saturdays do you take any breaks during the day?

6    A.    Just to eat, for about 10 minutes.

7    Q.    At night do you leave at the exact same time every

8    day?

9    A.    No.

10   Q.    Why do you finish later on some days?

11   A.    Well, sometimes it's more busy and all of the dishes

12   have to be washed because Luigi does not like you to leave

13   any dishes dirty.  That's why everything has to be

14   cleaned.

15   Q.    What time do you usually finish work on Mondays?

16   A.    Usually 9:30, 9:20, depending upon whether or not it

17   is busy.  Or if it is busy, sometimes at 10.  It depends.

18         You never will really know if it is going to be

19   busy or if it is going to be slow.

20   Q.    And is your departure time the same Tuesday through

21   Thursday?

22   A.    Yes.

23   Q.    What time do you usually leave on Fridays?

24   A.    Well, according to him, he says at 10.  But sometimes

25   we leave at 10:30 and sometimes we even leave at 11:30.

Acosta - for the Plaintiff - Direct/Ms. Goldstein

129

1   Q.   What do you mean by *according to him*?

2   A.   Well, when I started working, he told me that

3   10 o'clock was the time to go home.

4   Q.   And who do you mean by *he*?

5   A.   Luigi.

6   Q.   Do you ever leave before 10:30 pm on Fridays?

7   A.   Very few times I've left at 10:20.

8   Q.   Do you ever leave after 10:30 on Friday?

9   A.   Yes.

10  Q.   What time do you finish work on Saturdays?

11  A.   Same as on Fridays.

12  Q.   Do you talk to anyone before you leave the restaurant

13  at night?

14  A.   No.

15  Q.   Did your schedule ever change during the time you

16  have worked at the restaurant?

17  A.   No.

18  Q.   How are you paid?  Cash?  Check?  Or both?

19  A.   Cash.

20  Q.   Who pays you?

21  A.   Luigi gives my envelope to the chef, and he gives it

22  to me.

23  Q.   Are you given any receipt or paper with your pay?

24  A.   No.

25  Q.   How much were you paid when you first started working

Acosta - for the Plaintiff - Direct/Ms. Goldstein

130

1   at the restaurant?

2   A.   The same thing I'm getting now:  $400 a week.

3   Q.   And do you receive exactly $400 every week, or does

4   your pay vary a bit from week to week?

5   A.   No, the same.

6   Q.   Were you paid for your first week of work?

7   A.   No.

8   Q.   Why not?

9   A.   Because Luigi told us that we had to be paid a week

10  later; that is, we would start working and get paid for

11  that week two weeks later.

12  Q.   Have you ever missed any days of work, Mr. Acosta?

13  A.   No.

14  Q.   While you've worked at the restaurant, has the

15  restaurant ever closed for a week?

16  A.   Yes.

17  Q.   Can you explain.

18  A.   It will always close for a week when Luigi would go

19  on vacation.

20  Q.   And during the week when the restaurant was closed,

21  were you paid for that week?

22  A.   No.

23  Q.   How do you travel to the restaurant?

24  A.   By bicycle.

25  Q.   Who normally unlocks the restaurant each workday?

Acosta - for the Plaintiff - Direct/Ms. Goldstein

131

1  A.   Right now?

2  Q.   Yes.  Right now.

3  A.   Luigi.

4  Q.   When did Luigi start unlocking the restaurant in the

5  morning?

6  A.   When Omar left.

7  Q.   Who was Omar?

8  A.   Omar was someone who worked with us.  He was the

9  manager inside.  That is what we called him.

10  Q.   When did Omar stop working at the restaurant?

11  A.   I don't remember the date when he stopped working

12  there, but it has been about two months or three months.

13  Q.   During the time that Omar worked at the restaurant,

14  who unlocked the restaurant each morning?

15  A.   Omar.

16  Q.   Have you ever seen anyone else unlock the restaurant?

17  A.   No.

18  Q.   What do you do when you arrive at the very beginning

19  of each workday?

20  A.   The very first thing that I do is the bathroom.  I

21  clean the bathrooms.  I wash the floor.  I clean the bar,

22  the mirrors, everything.

23  Q.   When you started working at the restaurant, how many

24  other people worked in the kitchen with you at one time?

25  A.   There were four in the kitchen.

Acosta - for the Plaintiff - Direct/Ms. Goldstein

132

1  Q.    And can you list those four jobs for us.

2  A.    Well, the four is with me.  Right.

3  Q.    Okay.  So in addition to you being the dishwasher,

4  can you list the other jobs in the kitchen?

5  A.    Yes.  The person who was there was Juan Carlos,

6  Jeffrey, Pastor.

7  Q.    Did Juan Carlos work the same or different schedule

8  as you?

9  A.    The same.  We all started together in the morning.

10  Q.    And did Juan Carlos leave at the same time as you in

11  the evening?

12  A.    No.  Sometimes.  He always used to leave about 20

13  minutes earlier.

14  Q.    You just testified that someone named Jeffrey worked

15  with you in the kitchen.  Correct?

16  A.    Yes.

17  Q.    What was Jeffrey's job?

18  A.    He made the pasta.

19  Q.    And did Jeffrey work the same schedule as you or a

20  different schedule?

21  A.    They always worked, since they were in the kitchen,

22  they worked different times, and one of them used to leave

23  a little early.

24  Q.    Has there been a pasta chef working in the kitchen

25  the whole time you have been at the restaurant?

Acosta - for the Plaintiff - Direct/Ms. Goldstein

133

1   A.   Yes.

2   Q.   What is the current -- is there currently a chef

3   working in the kitchen?

4   A.   Yes.

5   Q.   And what is the chef's name?

6   A.   Enrique.

7   Q.   And does Enrique work the same schedule as you or a

8   different schedule?

9   A.   No, he always works a different schedule since he's

10  the chef.

11  Q.   And when you say a different schedule, can you

12  explain to the court what you mean.

13  A.   Yes, because he starts at 11 and I start at 10:30.

14  Q.   And does this chef leave at the same time as you in

15  the evening?

16  A.   No, he leaves first.

17  Q.   Prior to Enrique working with you, did the chef

18  always start at 11 o'clock in the morning rather than

19  10:30?

20  A.   No.  The one who was there when I first got there

21  would start at 10:30.

22  Q.   So other than Enrique, do all the kitchen workers,

23  during the time you've worked at the restaurant, start on

24  weekdays at 10:30 in the morning?

25         MR. NARDO:  Objection.  Leading.

Acosta - for the Plaintiff - Direct/Ms. Goldstein

134

```
 1              THE COURT:  Overruled.
 2              THE INTERPRETER:  I am sorry.  May the
 3    interpreter have the last question read back, please.
 4              (Last question read back by court reporter.)
 5    A.   Yes.
 6    BY MS. GOLDSTEIN:
 7    Q.   When did Enrique start work at the restaurant?
 8    A.   I do not remember, but it's been about a year, for
 9    about a year already.
10    Q.   Who was the chef before Enrique?
11    A.   Well, when I first got there, there was Pastor and
12    there have been three all together.  There was a guy named
13    Jorge there.  Then Rico started working there, filling in
14    for him.
15    Q.   How long did Jorge work as a chef in the restaurant?
16    A.   For about six months.
17    Q.   And when you say Rico, is that the same person as
18    Enrique?
19    A.   Yes.  Enrique.
20    Q.   Is there a busboy that works at the restaurant?
21    A.   Yes.
22    Q.   What is the name of the busboy that currently works
23    there?
24    A.   Alex Zanbrano.
25    Q.   And has Mr. Zanbrano been the busboy the whole time
```

1   you have worked at the restaurant?

2   A.   Yes.

3   Q.   What time does Mr. Zanbrano arrive in the morning?

4   Is it the same time as you or a different time?

5   A.   At the same time.

6   Q.   And does Alex Zanbrano take the same or a different

7   break as you?

8   A.   He takes a different one.

9   Q.   Can you explain how Mr. Zambrano's break is different

10  than yours.

11  A.   It varies because when we leave, then the chef cooks

12  the food for us.  And we have the food and he stays behind

13  making coffee for the clients or something.

14       The fact is that I don't know what time he goes

15  for his breaks, but he always stays behind doing

16  something.

17  Q.   So is it fair to say that Mr. Zanbrano has a shorter

18  break than you do?

19  A.   Yes.

20  Q.   At nighttime does Mr. Zanbrano leave before you,

21  after you, or at the same time?

22  A.   Well, when I leave, he always stays behind.  I don't

23  know what time.

24  Q.   Earlier you mentioned working with someone named

25  Jeffrey.  Is that right?

Acosta - for the Plaintiff - Direct/Ms. Goldstein

136

1    A.    Yes.

2    Q.    Was Jeffrey working at the restaurant when you

3    started working there?

4    A.    Yes.

5    Q.    Approximately how long did Jeffrey work at the

6    restaurant with you?

7    A.    I don't remember how long, but he worked for

8    approximately a year or so.

9    Q.    Did Jeffrey work the same schedule as you or was it

10   different?

11   A.    It was different because starting time was always the

12   same for all, but as far as the departure time, he would

13   always leave 10 or 20 minutes early.

14   Q.    Now, a few minutes ago you testified about working

15   with someone named Pastor.  Correct?

16   A.    Yes.

17   Q.    What was Pastor's job?

18   A.    Pastor was in charge of preparing the meats,

19   everything that a chef does.

20   Q.    And how much of his time did Pastor spend preparing

21   and cooking food?

22   A.    Well, I couldn't tell you the time because when I

23   would see him, he would be doing one thing or the other.

24   But when I looked at him, he was always there working.

25   Q.    When you say he was working, do you mean he was

Acosta - for the Plaintiff - Direct/Ms. Goldstein

137

1   cooking?

2   A.   He was cooking or preparing some meat or preparing a

3   sauce.  He would always be there doing something.

4   Q.   Did you meet Pastor for the first time before or

5   after Luigi hired you?

6   A.   No.  He was already there when I started.

7   Q.   Mr. Quarta hired you.  Correct?

8   A.   Yes.

9   Q.   Did you meet Pastor before you were hired?

10  A.   No.

11  Q.   Other than the 3 to 4:30 break, did Pastor ever leave

12  the restaurant during the day?

13  A.   No.

14  Q.   Did he have keys to the restaurant?

15          MR. NARDO:  Objection.

16          THE COURT:  Overruled.

17  A.   No.

18  BY MS. GOLDSTEIN:

19  Q.   Did you ever see Pastor hire a worker?

20  A.   No.

21  Q.   Did you ever see Pastor fire a worker?

22  A.   No.

23  Q.   Could Pastor change your work schedule?

24  A.   No.

25  Q.   Could Pastor discipline a kitchen worker?

Acosta - for the Plaintiff - Direct/Ms. Goldstein

138

1              MR. NARDO:  Objection.

2              THE COURT:  Sustained.

3    BY MS. GOLDSTEIN:

4    Q.   Did you ever see Pastor discipline a kitchen worker?

5    A.   What do you mean by that?  I don't know or I don't

6    understand very well.

7    Q.   Did you ever see Pastor suspend a worker or send

8    someone home early?

9    A.   No.

10   Q.   Who was your boss at the restaurant?

11   A.   Luigi has always been the boss.

12   Q.   And how often is Luigi at the restaurant?

13   A.   He's there every day, the whole day.

14   Q.   Are there ever times that Luigi is not at the

15   restaurant?

16   A.   No.  He's always there.

17   Q.   Who at the restaurant can hire workers?

18   A.   Luigi.

19   Q.   And who at the restaurant can fire workers?

20   A.   Luigi.

21   Q.   Who trained you when you first started?

22   A.   Juan Carlos.

23   Q.   Have you ever punched a time card at the restaurant?

24   A.   No.

25   Q.   Have you ever seen time cards at the restaurant?

Acosta - for the Plaintiff - Direct/Ms. Goldstein

139

 1    A.    Yes.

 2    Q.    Where have you seen time cards at the restaurant?

 3    A.    At the office.

 4    Q.    Have you ever seen anyone at the restaurant punching

 5    a time card?

 6    A.    Yes.

 7    Q.    Who have you seen punching the time cards?

 8    A.    Omar.  When Omar was in.

 9    Q.    Has anyone from the restaurant ever said anything to

10    you about time cards?

11    A.    What do you mean?

12    Q.    Has anyone ever asked you to punch a time card?

13    A.    Oh, that I should punch it in myself?  No.

14    Q.    Did Omar ever say anything to you about the

15    Department of Labor?

16              MR. NARDO:  Objection.

17              THE COURT:  Sustained.

18    BY MS. GOLDSTEIN:

19    Q.    What if anything has anyone at the restaurant told

20    you about the Department of Labor?

21              MR. NARDO:  Same objection.

22              THE COURT:  I don't know what the purpose of

23    this is.

24              MS. GOLDSTEIN:  Your Honor, 801(d)(2) material.

25    These are admissions by the employer.

140

1          Mr. Acosta has testified that Omar was a

2    manager.  These are statements made within the scope of

3    his employment concerning --

4          THE COURT:  That wasn't your question.  Your

5    question was, did anybody at the restaurant ever.  Right?

6    Wasn't that your question?

7          MS. GOLDSTEIN:  My question was initially did

8    Omar say anything to him about the Department of Labor.

9    And that objection was sustained, so I tried to make it

10   less leading.

11         So I think that with this witness, to the extent

12   that I can narrow things down, I think it will move a lot

13   faster.

14         I think the question *did Omar say anything to*

15   *him about the Department of Labor* is permissible under

16   Rule 801(d)(2).

17         MR. NARDO:  Judge, if it's an admission made by

18   an employer, that's the admission made in the course and

19   scope of employment.  Discussions about the Department of

20   Labor are not discussions in the course and the scope of

21   employment under Rule 801.

22         MS. GOLDSTEIN:  To the extent -- I'll make an

23   offer of proof where we can do this conditionally.

24         It's my belief that Mr. Acosta will testify that

25   Omar advised him to say certain things relating to his

Acosta - for the Plaintiff - Direct/Ms. Goldstein

141

1   schedule and hours of work, which is clearly within the

2   scope of his employment.

3            MR. NARDO:  Judge, that should have occurred

4   outside of the earshot of the witness.

5            THE COURT:  First of all, I don't think he

6   understands English.  So I'm going to admit it on that

7   exception to the hearsay rule.  I think it falls within

8   the exception that it is within the scope of employment,

9   during the existence of the employment relationship

10  obviously, right?

11           MS. GOLDSTEIN:  Yes, your Honor.

12           THE COURT:  It does fall under 801(d)(2)(D).

13  BY MS. GOLDSTEIN:

14  Q.   Did Omar ever say anything to you about the

15  Department of Labor?

16  A.   Yes.

17  Q.   What did Omar say to you?

18  A.   That I only worked 40 hours and that I only worked

19  for five days.

20  Q.   Did Omar say anything else to you during this

21  conversation?

22  A.   No.

23  Q.   When did Omar say this to you?

24  A.   When I had recently started at the job there.

25  Q.   And where were you when Omar said this to you?

Acosta - for the Plaintiff - Direct/Ms. Goldstein

142

1  A.   There in the kitchen.

2  Q.   Was anyone else present?

3  A.   No.

4  Q.   Now, prior to this week did Mr. Quarta ever say

5  anything to you about this lawsuit?

6  A.   Yes.

7  Q.   What did Mr. Quarta tell you about this lawsuit prior

8  to this week?

9  A.   Oh.  He discussed with me whether I was coming here.

10  I told him yes, I did.  And then he told me, then there's

11  no more work for you, only till Saturday and that's it.

12  Q.   When did that conversation happen?

13  A.   On Thursday.

14  Q.   Prior to Thursday, back in the fall, did Luigi ever

15  say anything to you about this lawsuit?

16  A.   Yes.

17  Q.   What did he say to you back in the fall?

18  A.   That if I got called to come here to court, to say

19  that I was fine, that he was paying me all right, and that

20  I was doing okay there.

21  Q.   Where were you when that conversation happened?

22  A.   Inside, in the saloon.

23  Q.   In the restaurant?

24  A.   Yes.

25  Q.   In what language did Mr. Quarta speak when he told

Acosta - for the Plaintiff - Direct/Ms. Goldstein

143

1  you this?

2  A.   In his language.  Omar was the one who interpreted it

3  for me.

4  Q.   Now let's talk about what's happened in the last few

5  days.

6        You just testified about a conversation that you

7  had with Mr. Quarta on Thursday.  Is that correct?

8  A.   Yes.

9  Q.   What happened after that conversation with

10  Mr. Quarta?

11  A.   Well, he didn't tell me anything else again.  The

12  only person was Alex, who would tell me Luigi was telling

13  him to tell me not to come here.

14  Q.   When Luigi told you that you wouldn't --

15        MS. GOLDSTEIN:  I apologize, your Honor.  I

16  realize this is asked and answered, but can I just ask the

17  witness to recount that conversation so I can use those

18  words?

19        THE COURT:  Yes.

20  BY MS. GOLDSTEIN:

21  Q.   Can you tell the court one more time what Mr. Quarta

22  told you on Thursday.

23  A.   He asked me whether I was going to come here, and I

24  told him yes.

25        And then he said, then as of Saturday I won't

Acosta - for the Plaintiff - Direct/Ms. Goldstein

144

1   give you any more work.

2   Q.   Where were you when this conversation took place?

3   A.   In the kitchen, right there by the place where I wash

4   the dishes.

5   Q.   In what language did Mr. Quarta tell you that he

6   won't give you any more work?

7   A.   In Spanish.

8   Q.   Did anyone translate for Mr. Quarta, either right

9   then or soon thereafter?

10  A.   Yes.

11  Q.   What happened?

12  A.   Well, the other guy, Enrique, told me that until

13  Saturday, that after that, I wouldn't have any more work.

14  And that was it.

15  Q.   And when Enrique told you that after Saturday you

16  wouldn't have any more work, did he mention Luigi Quarta

17  at all?

18          MR. NARDO:  Objection.  Leading.

19          THE COURT:  Overruled.

20  A.   No.  He only told me.  He says you don't have any

21  more work.

22  BY MS. GOLDSTEIN:

23  Q.   Do you know who Enrique meant by *he*?

24          MR. NARDO:  Objection.

25  A.   Luigi.

145

1      MR. NARDO:  Objection.

2  A.   Because he was there.

3          THE COURT:  Overruled.

4          Luigi was standing there during the

5  conversation?

6          THE WITNESS:  Yes.

7  BY MS. GOLDSTEIN:

8  Q.   How did you feel after that conversation?

9          MR. NARDO:  Objection.

10         THE COURT:  Sustained as to form.

11 BY MS. GOLDSTEIN:

12 Q.   Did anyone else speak to you on Thursday about

13 testifying?

14 A.   No.

15 Q.   After Thursday, on Friday or Saturday, did anyone

16 else at the restaurant speak to you about your testimony?

17 A.   Yes.

18 Q.   Can you explain to the court what happened.

19 A.   Well, Alex said to me not to come because Luigi had

20 told him that if I didn't come here, I would continue

21 working for him.  Otherwise, he would look for other

22 workers.

23 Q.   And what time of the day was this conversation on

24 Friday?

25 A.   The whole day long, from starting at 10:30 until we

Acosta - for the Plaintiff - Direct/Ms. Goldstein

146

1   closed, every now and then.

2   Q.   Did anyone speak to you on Saturday about your

3   testimony here today?

4   A.   The same thing Alex Zanbrano told me Friday he also

5   told me on Saturday.

6   Q.   And on Saturday did Alex Zanbrano again reference

7   Luigi Quarta?

8              MR. NARDO:  Objection.  Leading.

9              THE COURT:  Overruled.

10  A.   Yes.

11  BY MS. GOLDSTEIN:

12  Q.   Can you describe to the court your reaction after

13  being told that you wouldn't have work on Saturday if you

14  came to testify today.

15             MR. NARDO:  Objection.

16             THE COURT:  He asked you that?  I don't

17  understand.  What did he say to that?

18             MS. GOLDSTEIN:  What did he say to that?

19             THE COURT:  I will allow it.  Yes.

20  BY MS. GOLDSTEIN:

21  Q.   Did you say anything to Mr. Quarta or Alex or Enrique

22  when they told you that you wouldn't have work after

23  Saturday?

24  A.   No, I didn't say anything.

25  Q.   Did you feel pressure not to testify today?

Acosta - for the Plaintiff - Direct/Ms. Goldstein

147

1        MR. NARDO:  Objection.

2        MS. GOLDSTEIN:  Your Honor, this is relevant,

3    particularly to the extent that we are able to amend that

4    15(a)(3) violation.

5        MR. NARDO:  He's testified to what was said.

6    Did you feel pressure --

7        MS. GOLDSTEIN:  The actual witness intimidation

8    is probative, the defendant's --

9        THE COURT:  I'll allow it.

10        THE INTERPRETER:  Can the question be repeated

11    for the interpreter, please?

12        MS. GOLDSTEIN:  Certainly.

13    BY MS. GOLDSTEIN:

14    Q.   Did you feel pressure not to testify here today?

15    A.   Yes.  When he told me that you won't have a job

16    anymore if you do, then I kind of felt afraid, like, as

17    you might say, but I still came here anyway.

18        MS. GOLDSTEIN:  Thank you, Mr. Acosta.  Nothing

19    further.

20        THE COURT:  We are going to break for the day.

21    Let me ask you to come back tomorrow morning at 9:30 to

22    finish your testimony.

23        MS. GOLDSTEIN:  Your Honor, the remaining

24    witness, Mr. Acosta and the last witness, are current

25    employees.  We would just ask that defendants be ordered

148

1    to produce them, as well, or allow them to be released

2    from work tomorrow.

3              THE COURT:  You may.

4              Do you --

5              MR. NARDO:  I'm sorry.  Who are they?

6              MS. GOLDSTEIN:  Mr. Acosta and Juan Carlos

7    Chevez.

8              MR. NARDO:  And that's it?  Those are your last

9    witnesses?

10             MS. GOLDSTEIN:  One employee and the

11   investigator.  Yes.

12             MR. NARDO:  Okay.  Great.  I'll talk to my

13   client.  I don't anticipate a problem with that, judge.

14             I have some housekeeping things, but I guess we

15   can do that in the morning before --

16             THE COURT:  Yes.  You can step down.

17             THE WITNESS:  Thank you.

18             (The witness was excused.)

19             THE COURT:  Go ahead.

20             MR. NARDO:  Do you want to go over the

21   housekeeping things?

22             THE COURT:  Sure.

23             MR. NARDO:  I've looked at the Quarta deposition

24   and the Banegas depositions, so I have a few comments.  We

25   can go over that tomorrow about objections to a particular

149

1   page in there, and there are very few.  I assume that you

2   do not want us to read the deposition transcripts into the

3   record, right?

4            THE COURT:  I will review it on my own time.

5            MR. NARDO:  You got it.

6            And I subpoenaed a witness for tomorrow,

7   Mr. Gluszak, so I may need to take him out of order

8   because he's a CPA and it's a very busy time of year for

9   him.

10           THE COURT:  Fine.

11           MR. NARDO:  And I guess we can remove the Torres

12  deposition transcripts from both sets of binders, since he

13  testified today.  Exhibit 14 of plaintiff's.

14           THE COURT:  The only exhibits independent of

15  what you gave me in the binder, unless it's offered, it's

16  not in evidence.

17           MR. NARDO:  Okay.  Okay.  Great.

18           THE COURT:  Unless it's going to be offered and

19  not an exhibit.  Whether it's in the binder or not doesn't

20  mean anything.

21           MR. NARDO:  Excellent.  Thank you, judge.

22           THE COURT:  Does the Department have anything?

23           MS. GOLDSTEIN:  No, your Honor.

24           THE COURT:  How many more witnesses?

25           MS. GOLDSTEIN:  We have one more employee

150

1  witness and then the testimony of our investigator, your

2  Honor.

3          THE COURT:  Okay.  Then how many witnesses did

4  you expect?

5          MR. NARDO:  I'm not sure, your Honor.  There may

6  be two.

7          THE COURT:  Okay.  I will see you tomorrow

8  morning at 9:30.

9          MR. NARDO:  Thank you.

10          (Proceedings adjourned at 5:10 pm.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

151

I N D E X

OPENING FOR PLAINTIFF                          19
OPENING FOR DEFENSE                            25

EVIDENCE FOR PLAINTIFF                         32

ALVIN ALEXANDER TORRES
DIRECT EXAMINATION                             32
BY MR. HENNEFELD
CROSS-EXAMINATION                              55
BY MR. NARDO

SANTOS ALFARO PASTOR
DIRECT EXAMINATION                             76
BY MS. GOLDSTEIN
CROSS-EXAMINATION                             107
BY MR. NARDO

JOSE ANIBAL ACOSTA
DIRECT EXAMINATION                            123
BY MS. GOLDSTEIN


                    E X H I B I T S


Plaintiff Exhibit 1 in evidence               14
Plaintiff Exhibit 8A in evidence              16
Plaintiff Exhibit 13 in evidence              19
Defense Exhibit G in evidence                 19
Plaintiff Exhibit 6 in evidence               55
Plaintiff Exhibit 7 in evidence              103
Plaintiff Exhibit 7A in evidence             105

1

## $

**$1,000** [5] - 90:7, 90:9, 90:11, 90:13
**$100** [1] - 90:1
**$137,000** [1] - 20:10
**$15** [1] - 26:20
**$400** [6] - 42:8, 42:9, 42:11, 42:16, 130:2, 130:3
**$50** [1] - 90:6
**$70,000** [1] - 25:10
**$750** [5] - 78:6, 86:18, 89:14, 89:17, 89:18
**$850** [1] - 90:2

## 0

**09-CV-2212** [1] - 1:3

## 1

**1** [5] - 14:8, 14:9, 14:14, 14:16, 151:14
**10** [16] - 9:15, 37:21, 38:2, 58:6, 73:17, 73:22, 74:19, 74:21, 85:4, 85:6, 119:2, 128:6, 128:17, 128:24, 129:3, 136:13
**10-minute** [1] - 55:10
**10014** [1] - 1:16
**103** [1] - 151:16
**105** [1] - 151:17
**107** [1] - 151:8
**10:00** [1] - 23:7
**10:20** [1] - 129:7
**10:30** [34] - 21:18, 23:3, 35:14, 35:15, 35:25, 38:12, 45:9, 45:10, 73:17, 73:22, 73:25, 78:21, 78:24, 81:7, 81:19, 81:20, 81:23, 85:4, 85:6, 94:7, 95:18, 98:5, 99:21, 125:25, 126:1, 126:6, 128:25, 129:6, 129:8, 133:13, 133:19, 133:21, 133:24, 145:25
**10th** [1] - 9:4
**11** [12] - 23:7, 38:12, 38:16, 39:6, 39:12, 59:3, 59:6, 73:25, 74:2, 103:9, 133:13, 133:18
**11/3/08** [1] - 71:7
**11501** [1] - 1:19
**11722** [1] - 1:22

**1180** [1] - 1:22
**11:20** [1] - 55:12
**11:30** [4] - 38:16, 39:6, 128:25
**11:35** [1] - 55:12
**12** [5] - 16:22, 20:10, 21:16, 99:21, 103:10
**12/3/08** [2] - 68:1, 69:2
**123** [1] - 151:10
**129** [1] - 1:19
**12:20** [1] - 75:19
**13** [5] - 17:12, 17:24, 18:23, 19:2, 151:15
**14** [2] - 149:13, 151:14
**15** [1] - 51:24
**15(a)(3** [1] - 147:4
**158.3** [2] - 6:2, 6:4
**16** [2] - 59:6, 151:14
**17** [1] - 18:11
**18** [1] - 59:9
**19** [4] - 56:12, 151:2, 151:15, 151:15
**1:30** [1] - 75:18

## 2

**2** [6] - 14:25, 15:8, 85:24, 103:9, 103:10, 106:21
**20** [4] - 123:9, 124:17, 132:12, 136:13
**2003** [1] - 24:1
**2006** [4] - 21:23, 24:7, 51:25, 77:6
**2007** [2] - 33:16, 57:2
**2008** [17] - 24:9, 33:17, 33:18, 44:12, 44:17, 56:7, 57:11, 57:13, 66:7, 68:7, 71:17, 74:19, 74:21, 74:23, 75:1, 111:25, 112:1
**2009** [9] - 21:23, 21:25, 24:7, 33:24, 44:13, 44:14, 44:18, 51:25, 124:17
**201** [1] - 1:16
**2010** [3] - 56:12, 67:19, 77:10
**2011** [1] - 26:4
**2012** [2] - 1:10, 9:4
**21** [1] - 51:25
**25** [1] - 151:2
**29** [1] - 18:10
**2:15** [1] - 76:2

## 3

**3** [40] - 23:6, 36:3, 36:4, 36:6, 36:14, 36:15, 45:14, 45:19,

45:22, 46:7, 66:7, 68:7, 71:17, 74:2, 74:23, 75:1, 82:2, 82:3, 82:5, 82:13, 82:19, 82:23, 83:2, 83:5, 83:7, 83:15, 95:21, 98:15, 98:23, 126:10, 126:11, 126:13, 126:14, 126:19, 126:21, 127:1, 127:15, 127:18, 127:21, 137:11
**30** [1] - 18:11
**32** [1] - 151:4
**3:00** [1] - 22:21
**3:15** [1] - 107:15
**3:20** [2] - 107:15, 127:11
**3:30** [1] - 127:11

## 4

**4** [3] - 14:25, 15:8, 71:2
**40** [6] - 20:24, 22:13, 24:10, 87:23, 116:10, 141:18
**400** [2] - 43:24, 44:4
**403** [1] - 122:18
**45** [1] - 47:3
**4:30** [2] - 22:22, 36:14, 36:15, 46:7, 49:22, 82:15, 91:25, 98:23, 123:10, 127:24, 127:25, 137:11

## 5

**5** [1] - 51:25
**53** [1] - 23:12
**54.5** [1] - 113:24
**55** [6] - 112:5, 113:13, 113:19, 113:21, 151:5, 151:16
**5:10** [1] - 150:10

## 6

**6** [11] - 51:4, 51:14, 51:17, 53:16, 53:22, 54:14, 55:5, 55:6, 56:22, 151:16
**60** [1] - 114:9
**61** [1] - 23:12
**631** [1] - 1:23

## 7

**7** [14] - 64:16, 101:1,

102:1, 102:25, 103:1, 103:3, 103:22, 105:18, 105:19, 119:11, 119:16, 119:21, 120:5, 151:16
**710** [2] - 57:15, 57:22
**712-6108** [1] - 1:23
**712-6124** [1] - 1:23
**750** [3] - 78:5, 88:15, 89:20
**76** [1] - 151:7
**7A** [12] - 104:2, 104:19, 104:21, 104:25, 105:2, 105:3, 105:5, 105:18, 105:19, 119:15, 119:25, 151:17

## 8

**8** [3] - 16:3, 18:11, 56:25
**801** [1] - 140:21
**801(d)(2** [1] - 139:24
**801(d)(2)** [1] - 140:16
**801(d)(2)(D)** [1] - 141:12
**8038** [1] - 16:6
**8A** [4] - 16:16, 16:20, 151:14

## 9

**9** [18] - 1:10, 23:2, 37:12, 37:21, 37:24, 46:17, 58:2, 58:6, 58:9, 84:10, 84:11, 84:14, 84:17, 84:18, 84:21, 85:2, 86:1, 119:2
**983** [1] - 1:16
**9:20** [1] - 128:18
**9:30** [4] - 1:10, 128:16, 147:21, 150:8

## A

**a.m** [1] - 1:10
**able** [10] - 4:7, 29:23, 37:23, 39:11, 40:2, 69:10, 78:4, 83:7, 116:21, 147:3
**absent** [1] - 12:8
**acceptable** [2] - 12:25, 18:2
**accompanied** [1] - 16:5
**accord** [1] - 18:7
**according** [2] -

**128:24, 129:1
accuracy** [2] - 86:21, 88:10
**accurate** [2] - 31:13, 87:12
**accurately** [5] - 101:15, 103:4, 103:11, 104:21, 105:5
**achieve** [1] - 8:24
**ACOSTA** [2] - 123:18, 151:9
**acosta** [1] - 148:6
**Acosta** [8] - 117:1, 123:25, 124:2, 130:12, 140:1, 140:24, 147:18, 147:24
**acquaintances** [1] - 117:24
**act** [1] - 21:11
**Act** [10] - 20:6, 20:13, 20:18, 21:9, 21:15, 21:19, 23:24, 24:22, 27:17, 88:7
**acted** [1] - 23:15
**action** [1] - 12:4
**actual** [2] - 120:12, 147:7
**add** [2] - 6:3, 31:4
**added** [1] - 11:18
**adding** [1] - 8:24
**addition** [3] - 88:4, 89:1, 132:3
**additional** [4] - 40:21, 40:25, 72:12, 90:1
**additionally** [1] - 72:12
**address** [9] - 2:17, 2:18, 2:24, 3:1, 3:4, 8:17, 31:6, 84:2, 121:3
**addressed** [2] - 6:23, 28:15
**adjourn** [1] - 7:16
**adjourned** [1] - 150:10
**adjournment** [5] - 7:7, 7:15, 8:2, 10:25, 30:19
**adjudicated** [3] - 6:8, 6:11, 26:9
**administer** [1] - 32:9
**admissible** [1] - 17:16
**admission** [3] - 53:4, 140:17, 140:18
**admissions** [2] - 15:7, 139:25
**admit** [10] - 14:9, 14:22, 15:8, 15:10, 54:14, 72:5, 102:1,

102:23, 104:25, 141:6
**admitted** [12] - 14:15, 14:21, 15:22, 16:17, 18:24, 21:9, 21:13, 22:5, 27:8, 55:5, 102:25, 105:2
**advance** [1] - 66:9
**advised** [1] - 140:25
**affidavit** [1] - 3:7
**afloat** [1] - 26:22
**afraid** [1] - 147:16
**afternoon** [15] - 4:17, 36:4, 36:7, 36:15, 45:14, 45:16, 45:19, 46:7, 76:13, 76:14, 82:13, 83:8, 107:13, 123:25, 124:1
**ago** [5] - 8:15, 29:1, 66:16, 66:17, 136:14
**agree** [6] - 2:8, 14:19, 15:11, 15:22, 118:14, 123:7
**agreement** [4] - 5:20, 14:20, 17:15, 78:5
**agrees** [1] - 2:18
**ahead** [8] - 13:21, 16:2, 31:17, 63:13, 88:13, 98:14, 127:6, 148:19
**Alex** [26] - 45:2, 47:17, 47:19, 47:21, 47:23, 97:20, 97:23, 98:1, 98:4, 98:6, 98:17, 98:23, 98:25, 110:7, 110:11, 117:4, 118:12, 118:15, 118:23, 134:24, 135:6, 143:12, 145:19, 146:4, 146:6, 146:21
**Alex's** [1] - 97:17
**Alexander** [2] - 32:4, 97:14
**ALEXANDER** [2] - 32:11, 151:3
**ALFARO** [2] - 76:6, 151:6
**Alfaro** [8] - 76:13, 76:25, 86:25, 91:19, 102:14, 105:5, 107:4, 122:4
**allegations** [4] - 6:23, 10:19, 10:20, 10:23
**allege** [1] - 21:18
**allegedly** [1] - 48:18
**allow** [17] - 18:12, 18:19, 30:20, 37:19, 53:9, 53:13, 55:4, 63:12, 88:12, 91:8,

105:23, 106:17, 111:3, 116:15, 146:19, 147:9, 148:1
**allowed** [1] - 22:24
**almost** [5] - 37:11, 38:15, 39:24, 51:11, 65:17
**ALVIN** [2] - 32:11, 151:3
**AM** [3] - 73:17, 73:22, 73:25
**amend** [13] - 6:3, 7:17, 7:20, 7:21, 8:5, 8:8, 8:13, 9:17, 9:23, 11:12, 28:21, 28:22, 147:3
**amended** [9] - 6:25, 7:4, 7:25, 8:10, 8:17, 10:8, 10:9, 10:25, 29:3
**amending** [2] - 6:24, 7:24
**amendment** [2] - 9:19, 31:3
**amount** [8] - 20:15, 22:3, 22:8, 26:11, 42:12, 86:17, 89:18, 121:14
**analysis** [2] - 25:25
**ANIBAL** [2] - 123:18, 151:9
**Anibal** [2] - 102:8, 117:1
**answer** [24] - 7:1, 7:6, 7:22, 28:4, 28:11, 28:22, 33:7, 33:8, 38:5, 38:21, 38:23, 56:21, 57:5, 57:8, 57:11, 57:14, 58:5, 59:5, 59:12, 59:16, 68:11, 76:23, 98:13, 127:4
**ANSWER** [2] - 57:1, 59:10
**answered** [7] - 37:18, 38:17, 56:17, 105:17, 111:2, 116:14, 143:16
**answers** [1] - 33:5
**anticipate** [1] - 148:13
**anticipation** [1] - 30:7
**anyway** [1] - 147:17
**apart** [2] - 15:3, 18:6
**apologies** [1] - 45:23
**apologize** [2] - 73:2, 143:15
**appearance** [1] - 115:23
**Appearances** [1] - 2:1
**APPEARANCES** [1] -

1:14
**application** [4] - 2:23, 7:11, 11:11, 123:14
**applications** [1] - 3:22
**apply** [2] - 21:9, 26:6
**appointment** [1] - 69:25
**approach** [2] - 71:4, 74:4
**appropriate** [3] - 6:4, 15:14, 15:15
**April** [3] - 1:10, 9:4, 9:15
**area** [1] - 84:1
**areas** [1] - 49:20
**argument** [1] - 122:1
**arose** [1] - 62:25
**arrive** [19] - 35:24, 36:6, 48:7, 48:8, 81:6, 81:17, 82:1, 85:23, 95:16, 95:19, 98:4, 98:6, 99:18, 99:21, 99:22, 126:2, 126:11, 131:18, 135:3
**arrived** [5] - 22:18, 23:6, 48:19, 48:22, 91:21
**arrives** [1] - 84:17
**arriving** [4] - 48:14, 49:3, 49:6, 49:10
**aside** [2] - 107:22, 109:25
**assets** [1] - 26:8
**assign** [2] - 60:10, 108:6
**assigns** [1] - 27:19
**assist** [1] - 51:6
**assume** [4] - 2:18, 52:20, 106:14, 149:1
**assuming** [2] - 3:23, 123:13
**attempted** [1] - 24:24
**attorney** [2] - 5:21, 64:18
**August** [3] - 44:8, 44:17
**Augusts** [1] - 44:16
**authenticity** [1] - 15:2
**authority** [8] - 29:6, 29:9, 29:12, 30:3, 93:10, 110:1, 110:3, 110:25
**available** [2] - 78:1, 109:9
**avoid** [1] - 123:5
**award** [2] - 27:18, 116:2
**aware** [5] - 4:18, 23:19, 23:22, 23:24,

69:14

## B

**background** [2] - 18:14, 48:24
**bad** [2] - 26:3, 26:4
**ballpark** [1] - 22:8
**Banegas** [3] - 17:13, 97:15, 148:24
**bankrupt** [1] - 26:9
**bankruptcy** [3] - 25:18, 25:20, 26:3
**Bar** [2] - 20:9, 21:10
**bar** [1] - 131:21
**barely** [1] - 102:6
**barring** [1] - 122:10
**based** [5] - 6:2, 10:12, 54:15, 56:4, 105:8
**Based** [1] - 100:13
**basic** [3] - 18:13, 18:19, 20:19
**basis** [4] - 11:5, 16:6, 21:21, 87:22
**Bates** [1] - 64:23
**bathroom** [1] - 131:20
**bathrooms** [3] - 49:13, 49:14, 131:21
**BEFORE** [1] - 1:12
**beforehand** [1] - 100:4
**began** [4] - 33:16, 56:6, 98:2, 107:2
**begin** [3] - 2:4, 8:6, 13:14
**beginning** [4] - 10:16, 85:13, 88:15, 131:18
**Begins** [1] - 72:23
**behind** [4] - 48:1, 135:12, 135:15, 135:22
**belief** [1] - 140:24
**below** [2] - 102:8, 113:13
**bench** [3] - 2:4, 2:9, 13:10
**Bernhardt** [2] - 31:21, 32:1
**between** [15] - 22:21, 23:2, 23:12, 24:7, 31:20, 31:22, 33:5, 37:21, 41:7, 58:6, 85:4, 85:6, 99:21, 118:22, 121:14
**beyond** [1] - 60:2
**Beyond** [1] - 60:12
**BIANCO** [1] - 1:12
**bicycle** [1] - 130:24
**billions** [1] - 26:21
**binder** [5] - 32:17,

51:4, 100:25, 149:15, 149:19
**binders** [1] - 149:12
**bit** [3] - 8:4, 80:7, 130:4
**board** [2] - 108:19, 109:11
**boot** [1] - 26:25
**borrow** [1] - 26:21
**boss** [3] - 60:16, 138:10, 138:11
**bothered** [1] - 115:3
**bottom** [5] - 9:16, 12:7, 65:24, 73:9, 113:23
**boundaries** [1] - 21:20
**brand** [1] - 10:22
**brand-new** [1] - 10:22
**break** [50] - 13:5, 22:22, 22:25, 23:6, 36:19, 36:24, 45:15, 45:19, 45:20, 45:21, 45:25, 46:4, 49:21, 55:9, 55:10, 75:18, 82:12, 82:14, 82:24, 83:7, 83:10, 83:14, 86:2, 91:25, 95:23, 98:17, 98:18, 98:21, 98:22, 98:23, 107:14, 126:21, 126:24, 127:1, 127:3, 127:9, 127:11, 127:13, 127:15, 127:17, 127:21, 127:23, 127:25, 128:2, 135:7, 135:9, 135:18, 137:11, 147:20
**breaks** [11] - 36:9, 36:22, 82:8, 82:9, 82:16, 83:13, 98:24, 126:17, 128:3, 128:5, 135:15
**brief** [2] - 4:19, 75:8
**briefing** [1] - 14:5
**bring** [3] - 7:23, 109:12, 109:24
**bringing** [1] - 67:15
**broke** [1] - 109:7
**brought** [5] - 31:15, 34:11, 91:7, 121:21, 121:24
**bulk** [1] - 21:7
**burned** [2] - 111:6, 111:18
**busboy** [7] - 47:22, 47:23, 97:18, 98:11, 134:20, 134:22, 134:25

3

**busboys** [1] - 27:3
**busiest** [1] - 109:21
**business** [11] - 14:10, 20:8, 72:3, 72:7, 72:10, 72:11, 88:16, 88:18, 88:20, 88:23
**busy** [7] - 109:22, 127:12, 128:11, 128:17, 128:19, 149:8
**BY** [82] - 1:17, 32:22, 35:23, 37:22, 38:9, 39:3, 43:2, 43:18, 44:21, 45:24, 46:6, 49:5, 51:12, 53:14, 54:9, 55:16, 57:6, 58:7, 58:14, 59:25, 60:5, 60:17, 61:7, 63:14, 64:8, 65:12, 66:14, 68:23, 71:6, 72:15, 72:22, 73:7, 76:12, 78:15, 79:9, 84:4, 88:17, 91:12, 96:4, 96:10, 98:16, 100:9, 100:18, 102:12, 103:2, 103:16, 105:4, 105:11, 106:7, 106:23, 107:18, 109:5, 110:22, 111:8, 112:25, 113:12, 113:18, 114:17, 115:20, 116:18, 117:21, 119:10, 119:14, 123:24, 127:8, 134:6, 137:18, 138:3, 139:18, 141:13, 143:20, 144:22, 145:7, 145:11, 146:11, 146:20, 147:13, 151:4, 151:5, 151:7, 151:8, 151:10

**C**

**calculated** [1] - 114:11
**canceled** [1] - 115:24
**cannot** [4] - 54:20, 65:20, 65:22, 83:14
**capitals** [1] - 119:22
**car** [1] - 91:15
**card** [5] - 100:19, 100:22, 138:23, 139:5, 139:12
**cards** [4] - 138:25, 139:2, 139:7, 139:10
**Carlos** [16] - 45:2, 47:8, 47:11, 47:12,

47:14, 94:25, 95:1, 95:7, 125:1, 125:2, 125:3, 132:5, 132:7, 132:10, 138:22, 148:6
**Carlos's** [1] - 47:9
**carry** [1] - 97:19
**case** [29] - 10:17, 11:21, 13:5, 15:23, 19:21, 20:1, 20:2, 20:4, 20:5, 20:14, 21:7, 21:9, 22:10, 24:15, 25:21, 26:1, 26:7, 28:4, 28:9, 28:11, 29:14, 67:11, 67:15, 108:11, 115:7, 116:2, 122:18, 123:7, 123:8
**cases** [1] - 25:12
**cash** [12] - 22:2, 42:2, 86:10, 86:18, 87:1, 87:8, 89:4, 89:9, 121:25, 122:1, 129:18, 129:19
**caught** [1] - 24:23
**Central** [2] - 1:6, 1:22
**certain** [6] - 14:20, 20:21, 88:20, 93:8, 102:23, 140:25
**Certainly** [1] - 147:12
**certainly** [4] - 15:6, 29:16, 29:18, 30:2, 53:11, 102:20
**certified** [1] - 31:16
**chair** [1] - 32:8
**chance** [3] - 2:24, 8:16, 17:8
**change** [12] - 37:14, 40:15, 40:17, 42:12, 43:20, 43:22, 44:1, 44:3, 86:5, 88:19, 129:15, 137:23
**changed** [10] - 40:25, 41:3, 41:9, 43:19, 43:25, 85:17, 88:21, 89:3, 89:5, 116:21
**characterization** [1] - 63:9
**charge** [15] - 8:3, 11:16, 60:1, 80:14, 80:17, 80:19, 80:24, 108:13, 109:4, 110:12, 110:23, 112:2, 112:14, 113:6, 136:18
**Chavez** [3] - 3:8, 99:3, 121:11
**check** [21] - 69:21, 70:4, 79:14, 79:22, 86:11, 86:19, 87:1,

87:2, 87:3, 87:9, 88:16, 88:19, 88:20, 89:2, 89:9, 89:12, 111:14, 115:8, 121:25, 129:18
**checking** [1] - 111:12
**checks** [3] - 88:23, 88:24
**chef** [24] - 27:16, 27:18, 30:3, 46:14, 58:15, 107:25, 109:17, 109:18, 110:25, 111:9, 112:14, 113:1, 113:6, 129:21, 132:24, 133:2, 133:10, 133:14, 133:17, 134:10, 134:15, 135:11, 136:19
**chef's** [2] - 29:6, 133:5
**chefs** [1] - 27:3
**Chevez** [1] - 148:7
**chicken** [3] - 92:3, 92:11, 92:17
**circumstances** [3] - 26:2, 61:24, 68:13
**cite** [1] - 7:17
**claim** [6] - 6:3, 6:24, 11:14, 28:14, 87:22, 91:5
**claimed** [1] - 6:1
**claims** [1] - 11:4
**clarification** [1] - 70:11
**clarify** [2] - 38:18, 78:16
**clean** [7] - 49:13, 49:23, 50:7, 50:8, 92:4, 131:21
**cleaned** [1] - 128:14
**cleaning** [4] - 22:20, 49:19, 79:24, 92:15
**clear** [4] - 4:9, 30:5, 59:18, 119:20
**clearer** [1] - 119:19
**clearly** [2] - 88:11, 141:1
**client** [7] - 3:3, 3:12, 4:24, 5:6, 9:5, 148:13
**clients** [2] - 8:25, 135:13
**clock** [1] - 50:18
**close** [7] - 27:1, 44:17, 78:14, 85:17, 90:18, 103:23, 130:18
**closed** [11] - 44:5, 44:9, 78:24, 85:18, 85:20, 90:17, 90:20,

114:20, 130:15, 130:20, 146:1
**closer** [1] - 17:5
**closes** [1] - 114:20
**CM** [1] - 1:21
**cocounsel** [1] - 19:18
**coffee** [1] - 135:13
**coincidence** [2] - 39:13, 39:14
**combination** [1] - 87:1
**coming** [4] - 56:12, 66:10, 106:20, 142:9
**comments** [1] - 148:24
**common** [1] - 118:15
**communicate** [2] - 60:20, 80:4
**companies** [2] - 92:24, 109:4
**compare** [1] - 74:23
**complain** [3] - 61:23, 114:25, 116:16
**complained** [4] - 58:21, 62:6, 115:2, 116:12
**complaint** [28] - 6:3, 6:25, 7:5, 7:20, 7:21, 7:23, 7:24, 7:25, 8:5, 8:8, 8:10, 9:17, 9:19, 9:24, 10:8, 10:9, 10:15, 10:21, 10:25, 11:5, 11:12, 11:18, 11:25, 20:4, 28:21, 29:3, 63:3, 63:10
**complaints** [1] - 8:17
**completed** [1] - 14:11
**completely** [2] - 87:25, 104:16
**compliance** [5] - 20:12, 20:17, 24:11, 53:8
**comply** [5] - 4:12, 20:5, 21:11, 23:15, 24:23
**compound** [1] - 119:7
**computation** [1] - 21:14
**computer** [1] - 1:25
**conceded** [3] - 21:16, 21:21, 27:8
**concerned** [1] - 8:4
**concerning** [6] - 22:3, 24:13, 28:2, 29:2, 122:4, 140:3
**concerns** [1] - 22:10
**conclusions** [3] - 28:7, 29:17, 31:3
**conditionally** [1] - 140:23
**conduct** [1] - 6:12

**conducted** [1] - 23:9
**confirms** [1] - 23:10
**conform** [2] - 8:8, 10:10
**confused** [3] - 38:20, 68:10, 68:16
**conjunction** [2] - 11:8, 13:11
**connected** [1] - 12:1
**connection** [1] - 8:3
**consent** [3] - 8:19, 8:22, 9:1
**consequently** [1] - 6:7
**consider** [2] - 8:1, 12:16
**consistently** [1] - 22:12
**constant** [1] - 23:21
**constitutes** [1] - 30:6
**constrained** [1] - 25:24
**contact** [1] - 2:15
**contained** [1] - 70:21
**contains** [1] - 70:19
**contend** [1] - 91:3
**contention** [1] - 52:12
**contested** [1] - 22:5
**context** [1] - 31:6
**continuation** [1] - 10:22
**continue** [6] - 5:14, 5:19, 5:23, 11:16, 145:20
**continued** [4] - 6:6, 10:12, 24:17, 96:23
**continues** [2] - 5:22, 9:4
**continuing** [2] - 6:12, 20:17
**contradiction** [1] - 29:2
**contrary** [1] - 53:5
**conversation** [14] - 107:1, 107:6, 107:8, 117:13, 141:21, 142:12, 142:21, 143:6, 143:9, 143:17, 144:2, 145:5, 145:8, 145:23
**conversations** [5] - 4:1, 18:18, 58:18, 100:13, 106:15
**convert** [1] - 6:9
**converted** [1] - 11:7
**cook** [13] - 34:11, 47:1, 49:9, 53:19, 59:1, 59:14, 59:19, 77:12, 78:1, 79:13, 84:18, 92:9
**cooking** [4] - 92:13,

136:21, 137:1, 137:2
**cooks** [2] - 49:15, 135:11
**copy** [6] - 17:2, 32:17, 65:3, 65:7, 71:3, 102:7
**copying** [1] - 119:16
**Corp** [1] - 21:10
**CORP** [1] - 1:7
**Corporation** [2] - 1:8, 20:8
**correct** [56] - 2:10, 5:11, 9:2, 18:24, 29:8, 45:19, 52:21, 55:23, 56:4, 58:2, 58:16, 58:19, 58:22, 58:25, 60:1, 60:7, 60:11, 60:23, 61:12, 61:16, 61:17, 61:20, 61:21, 62:4, 62:5, 63:7, 67:19, 67:22, 70:24, 70:25, 73:9, 74:12, 74:15, 74:19, 74:24, 85:15, 107:20, 107:25, 110:2, 110:7, 110:9, 110:12, 111:6, 114:7, 116:9, 117:22, 118:10, 118:12, 119:1, 119:17, 120:6, 120:16, 132:15, 136:15, 137:7, 143:7
**correction** [1] - 65:21
**correctly** [1] - 69:16
**counsel** [6] - 25:21, 26:23, 57:4, 70:13, 83:19, 83:21
**Counsel** [1] - 63:4
**counted** [2] - 114:8
**counterdeposition** [1] - 17:20
**counterdepositions** [1] - 17:22
**country** [3] - 17:17, 17:21, 18:14
**counts** [1] - 21:1
**couple** [1] - 3:20
**course** [4] - 4:20, 48:24, 140:18, 140:20
**Court** [2] - 1:21, 2:1
**court** [32] - 2:21, 2:24, 3:9, 3:21, 3:25, 4:14, 4:17, 6:16, 8:13, 11:14, 11:20, 22:15, 23:8, 23:14, 24:13, 24:19, 28:11, 31:2, 31:15, 33:10, 54:24, 71:23, 76:25,

115:23, 121:19, 124:12, 133:12, 134:4, 142:18, 143:21, 145:18, 146:12
**COURT** [189] - 1:1, 2:3, 2:8, 2:13, 2:21, 3:20, 4:22, 5:6, 5:12, 5:18, 6:13, 6:19, 7:14, 7:24, 8:14, 9:16, 10:5, 11:1, 12:3, 12:22, 12:25, 13:3, 13:10, 13:21, 14:6, 14:12, 14:14, 14:19, 15:11, 16:2, 16:9, 16:16, 16:19, 17:7, 17:23, 18:2, 18:8, 18:12, 18:17, 19:4, 19:7, 19:10, 19:13, 19:22, 25:2, 27:23, 28:13, 28:17, 29:8, 29:21, 30:11, 30:18, 31:4, 31:9, 31:17, 32:2, 32:6, 32:19, 35:21, 37:19, 38:4, 38:6, 38:20, 39:2, 42:25, 43:16, 44:14, 44:16, 45:20, 48:16, 48:21, 49:1, 51:7, 51:9, 52:12, 52:15, 52:20, 52:24, 53:9, 54:7, 54:22, 55:9, 55:13, 58:5, 58:12, 59:24, 60:3, 60:13, 61:1, 62:13, 62:17, 62:21, 62:23, 63:12, 64:6, 64:23, 65:6, 65:9, 66:12, 68:10, 70:14, 70:23, 71:1, 71:5, 72:9, 72:21, 73:3, 75:7, 75:12, 75:14, 75:18, 76:4, 79:7, 83:23, 86:13, 86:23, 87:11, 87:15, 88:2, 88:12, 90:25, 91:8, 91:11, 92:20, 96:3, 98:8, 98:13, 100:8, 100:13, 102:3, 102:10, 102:20, 103:14, 105:2, 105:8, 105:16, 105:20, 106:3, 106:12, 106:14, 106:17, 107:13, 108:23, 110:15, 111:3, 112:17, 113:4, 113:8, 115:18, 116:15, 117:15, 119:8, 121:23, 122:8,

122:12, 122:14, 122:16, 123:6, 123:16, 127:6, 134:1, 137:16, 138:2, 139:17, 139:22, 140:4, 141:5, 141:12, 143:19, 144:19, 145:3, 145:10, 146:9, 146:16, 146:19, 147:9, 147:20, 148:3, 148:16, 148:19, 148:22, 149:4, 149:10, 149:14, 149:18, 149:22, 149:24, 150:3, 150:7
**court's** [1] - 4:12
**Courthouse** [2] - 1:6, 1:21
**cousin** [2] - 34:21, 61:22
**cousin's** [1] - 34:23
**cover** [2] - 23:16, 83:24
**covered** [2] - 21:11, 30:24
**covering** [1] - 105:20
**CPA** [1] - 149:8
**credibility** [1] - 110:19
**criminal** [2] - 13:5, 13:7
**cross** [2] - 55:11, 107:14
**CROSS** [4] - 55:15, 107:17, 151:5, 151:8
**cross-examination** [2] - 55:11, 107:14
**CROSS-EXAMINATION** [4] - 55:15, 107:17, 151:5, 151:8
**CSR** [1] - 1:21
**cumulative** [2] - 122:19, 123:5
**current** [5] - 20:10, 21:17, 22:15, 133:2, 147:24
**customer** [2] - 84:17, 84:19
**customers** [20] - 22:23, 37:8, 39:17, 40:3, 40:13, 48:13, 48:19, 48:22, 49:2, 49:6, 49:8, 49:10, 49:17, 49:25, 50:2, 50:5, 85:8, 98:20, 98:21, 108:10
**cutting** [3] - 108:18, 109:6, 109:10

**D**

**d'** [3] - 80:23, 81:6, 81:8
**d/b/a** [1] - 1:7
**daily** [1] - 92:12
**damages** [1] - 20:15
**DANIEL** [1] - 1:17
**Daniel** [1] - 19:18
**data** [1] - 14:11
**date** [12] - 12:6, 66:8, 68:7, 69:3, 69:8, 69:9, 70:2, 71:7, 74:20, 111:23, 120:8, 131:11
**dated** [5] - 68:1, 74:18, 74:21, 74:23, 74:25
**days** [27] - 8:15, 20:11, 22:14, 24:10, 35:7, 40:14, 45:3, 45:4, 57:18, 57:19, 73:19, 78:13, 78:22, 80:11, 81:13, 90:14, 105:13, 106:4, 106:22, 109:21, 125:19, 125:21, 127:19, 128:10, 130:12, 141:19, 143:5
**deal** [6] - 12:6, 12:12, 12:14, 13:5, 14:5, 83:25
**debt** [1] - 26:20
**December** [5] - 26:4, 66:7, 68:7, 74:23, 75:1
**decide** [3] - 15:17, 93:22, 94:3
**decided** [4] - 7:18, 92:5, 94:13, 118:8
**decides** [3] - 93:2, 93:13, 93:25
**deciding** [1] - 11:21
**decision** [1] - 95:7
**declaration** [3] - 3:6, 16:6, 16:7
**decorated** [1] - 111:12
**defendant** [19] - 4:11, 4:16, 6:5, 6:11, 14:11, 15:7, 17:14, 20:7, 24:7, 24:8, 24:17, 24:21, 24:23, 25:17, 28:6, 51:25, 52:18, 122:22, 123:1
**Defendant** [2] - 1:18, 18:6
**Defendant's** [9] - 18:23, 65:14, 68:6, 70:10, 71:20, 72:17,

74:6, 74:8, 112:9
**defendant's** [12] - 15:5, 16:24, 18:5, 18:6, 20:16, 24:5, 30:7, 52:9, 53:3, 54:19, 88:10, 147:8
**Defendants** [3] - 1:10, 15:1, 20:19
**defendants** [24] - 2:22, 13:12, 14:8, 15:1, 16:7, 16:11, 16:23, 16:25, 20:12, 20:25, 21:8, 21:23, 22:1, 22:5, 23:15, 23:19, 25:13, 25:18, 28:3, 29:16, 54:16, 88:8, 91:2, 147:25
**defense** [9] - 14:3, 28:10, 28:15, 28:17, 29:15, 29:18, 29:19, 30:6
**DEFENSE** [2] - 25:6, 151:2
**Defense** [4] - 19:3, 65:6, 65:9, 151:15
**definite** [1] - 127:12
**depart** [2] - 23:2
**Department** [40] - 1:4, 4:2, 8:5, 12:25, 13:17, 13:23, 14:10, 16:4, 19:10, 19:20, 19:25, 24:2, 27:5, 53:7, 53:11, 55:3, 62:7, 62:19, 63:1, 63:5, 63:16, 63:23, 64:1, 64:4, 64:10, 67:15, 67:22, 71:17, 72:2, 72:3, 106:10, 115:11, 116:8, 139:15, 139:20, 140:8, 140:15, 140:19, 141:15, 149:22
**DEPARTMENT** [1] - 1:15
**departure** [2] - 128:20, 136:12
**deposed** [1] - 29:13
**deposition** [18] - 16:23, 17:13, 17:16, 30:9, 30:15, 30:24, 56:13, 56:16, 59:3, 59:5, 59:12, 59:17, 59:21, 64:19, 66:24, 148:23, 149:2, 149:12
**depositions** [5] - 10:19, 16:22, 29:5, 29:6, 148:24
**DEPUTY** [1] - 31:23

5

**describe** [4] - 103:4, 103:11, 105:5, 146:12
**described** [5] - 23:10, 26:5, 39:22, 41:4, 128:2
**designated** [1] - 17:14
**designations** [2] - 17:20, 18:5
**despite** [4] - 4:21, 24:6, 52:10, 53:9
**details** [1] - 103:24
**determine** [1] - 87:11
**Diaz** [6] - 34:24, 35:2, 61:22, 61:23, 117:22, 117:25
**Diaz's** [1] - 34:25
**difference** [2] - 119:19, 121:14
**different** [24] - 10:15, 29:25, 47:19, 59:16, 74:7, 75:4, 84:6, 85:14, 95:23, 98:18, 98:19, 99:15, 132:7, 132:20, 132:22, 133:8, 133:9, 133:11, 135:4, 135:6, 135:8, 135:9, 136:10, 136:11
**difficult** [2] - 26:17, 102:9
**dining** [2] - 98:20, 98:21
**dinner** [2] - 49:25, 50:2
**DIRECT** [6] - 32:21, 76:11, 123:23, 151:4, 151:7, 151:10
**direct** [6] - 29:1, 29:4, 51:10, 108:19, 110:25, 121:21
**direction** [1] - 109:15
**dirty** [4] - 49:9, 49:15, 49:20, 128:13
**discharge** [1] - 4:13
**discipline** [2] - 137:25, 138:4
**discovery** [2] - 8:3, 10:19
**discuss** [6] - 10:1, 33:12, 67:11, 87:2, 106:9, 115:10
**discussed** [3] - 9:5, 108:14, 142:9
**discussing** [2] - 3:11, 86:22
**discussion** [1] - 117:5
**discussions** [3] - 28:20, 121:20, 140:20

**Discussions** [1] - 140:19
**dishes** [6] - 50:3, 96:12, 124:21, 128:11, 128:13, 144:4
**dishwasher** [13] - 23:4, 34:1, 35:1, 95:15, 108:4, 109:24, 110:4, 116:23, 117:2, 117:9, 118:21, 124:22, 132:3
**dishwashers** [3] - 27:3, 116:22, 119:2
**dispose** [1] - 10:12
**dispute** [4] - 3:24, 21:7, 21:8, 22:10
**disputed** [1] - 15:10
**disputing** [1] - 123:13
**disrespect** [1] - 6:21
**DISTRICT** [3] - 1:1, 1:1, 1:13
**District** [1] - 1:21
**divided** [1] - 21:5
**Division** [2] - 19:19, 19:25
**document** [16] - 16:5, 16:8, 16:10, 16:14, 70:12, 70:14, 70:15, 70:17, 70:18, 70:19, 70:20, 70:24, 71:13, 72:13, 104:15, 112:20
**documents** [4] - 15:13, 16:12, 16:13, 55:25
**dollars** [2] - 26:21, 78:6
**Dominick** [1] - 1:21
**DomTursi@email. com** [1] - 1:23
**done** [4] - 3:23, 51:11, 75:15, 108:12
**door** [4] - 101:22, 122:8
**down** [15] - 3:14, 6:17, 19:23, 65:18, 75:14, 80:23, 102:22, 104:11, 114:24, 120:1, 122:14, 123:1, 127:5, 140:12, 148:16
**draw** [1] - 109:2
**drove** [1] - 91:4
**duly** [5] - 31:19, 31:21, 32:12, 76:7, 123:19
**During** [1] - 131:13
**during** [51] - 7:13, 14:5, 30:24, 36:9,

36:12, 36:22, 36:24, 39:21, 40:19, 40:20, 41:20, 42:13, 43:6, 43:10, 43:22, 46:1, 46:2, 48:24, 50:5, 50:24, 51:24, 79:3, 82:8, 82:9, 82:16, 83:13, 90:11, 94:21, 98:17, 100:3, 105:12, 105:13, 106:4, 106:8, 107:8, 114:18, 116:19, 118:25, 126:17, 126:21, 127:1, 127:14, 127:17, 128:5, 129:15, 130:20, 133:23, 137:12, 141:9, 141:20, 145:4
**duties** [6] - 27:18, 29:9, 48:24, 49:1, 108:18, 109:17

## E

**earliest** [2] - 38:12, 38:16
**early** [4] - 39:13, 132:23, 136:13, 138:8
**earned** [3] - 86:17, 88:9, 90:7
**earshot** [1] - 141:4
**easily** [1] - 11:25
**EASTERN** [1] - 1:1
**easy** [1] - 121:7
**eat** [3] - 59:2, 85:9, 128:6
**eating** [1] - 49:25
**economies** [1] - 27:4
**educational** [1] - 18:13
**efforts** [2] - 23:17, 24:5
**eight** [2] - 97:7, 98:2
**either** [7] - 3:7, 9:12, 25:13, 49:19, 50:3, 120:8, 144:8
**Elena** [1] - 19:17
**ELENA** [1] - 1:17
**elicited** [2] - 10:10, 18:20
**elsewhere** [1] - 30:16
**email** [1] - 121:3
**employed** [1] - 106:5
**employee** [7] - 17:17, 47:16, 93:22, 108:19, 109:12, 148:10, 149:25
**employees** [69] - 2:23,

3:7, 3:13, 4:6, 4:14, 4:20, 5:13, 8:21, 11:9, 12:4, 13:13, 20:10, 21:4, 21:13, 21:17, 22:2, 22:4, 22:12, 22:16, 22:17, 22:22, 22:24, 23:1, 23:6, 23:11, 23:12, 23:20, 24:9, 24:14, 24:16, 25:11, 25:22, 26:8, 26:15, 26:17, 29:7, 44:24, 45:3, 45:5, 45:12, 45:15, 45:18, 45:25, 46:9, 48:18, 52:2, 52:5, 52:19, 54:18, 54:21, 54:25, 67:12, 86:15, 87:24, 91:6, 93:13, 93:20, 98:12, 105:13, 105:21, 105:22, 106:3, 107:22, 108:6, 108:14, 109:16, 116:19, 123:12, 147:25
**employer** [3] - 26:19, 139:25, 140:18
**employers** [1] - 21:11
**employment** [8] - 33:12, 61:23, 140:3, 140:19, 140:21, 141:2, 141:8, 141:9
**enclosed** [1] - 70:4
**end** [9] - 37:2, 45:15, 82:14, 84:24, 98:25, 100:2, 121:16, 123:10, 127:23
**ended** [2] - 49:21, 83:17
**ends** [1] - 127:25
**energy** [1] - 26:23
**engaged** [1] - 24:21
**English** [28] - 31:20, 31:22, 33:2, 33:5, 61:4, 61:10, 61:11, 61:12, 61:14, 65:16, 68:9, 73:5, 76:17, 76:20, 80:7, 95:6, 112:11, 112:16, 112:23, 112:24, 113:15, 118:12, 118:17, 118:19, 124:4, 124:7, 124:9, 141:6
**enjoin** [1] - 13:12
**enjoining** [1] - 2:22
**enlarged** [1] - 104:10
**Enrique** [13] - 3:8, 133:6, 133:7, 133:17, 133:22,

134:7, 134:10, 134:18, 134:19, 144:12, 144:15, 144:23, 146:21
**entire** [3] - 72:5, 79:3, 85:10
**entitled** [2] - 8:1, 21:14
**entitles** [1] - 25:23
**envelope** [3] - 50:15, 50:16, 129:21
**equal** [2] - 20:15, 21:6
**especially** [2] - 30:23, 102:24
**ESQ** [3] - 1:17, 1:17, 1:18
**established** [2] - 28:9, 72:8
**evade** [2] - 24:5, 24:24
**evening** [7] - 3:5, 23:3, 23:7, 91:4, 94:10, 132:11, 133:15
**event** [1] - 9:13
**eventually** [1] - 26:25
**evidence** [42] - 3:11, 8:8, 10:10, 10:13, 11:10, 14:16, 15:4, 16:20, 19:2, 19:3, 20:7, 20:25, 21:25, 22:11, 22:21, 23:11, 23:14, 23:19, 23:23, 24:4, 24:13, 24:15, 25:8, 52:6, 53:10, 54:14, 55:1, 55:2, 55:6, 71:21, 91:6, 102:2, 103:1, 105:3, 149:16, 151:14, 151:14, 151:15, 151:15, 151:16, 151:16, 151:17
**exact** [3] - 103:24, 126:2, 128:7
**exactly** [15] - 24:10, 42:11, 89:18, 89:20, 90:2, 90:11, 90:13, 96:15, 99:24, 104:23, 111:23, 117:3, 118:13, 126:11, 130:3
**examination** [2] - 55:11, 107:14
**EXAMINATION** [10] - 32:21, 55:15, 76:11, 107:17, 123:23, 151:4, 151:5, 151:7, 151:8, 151:10
**examined** [2] - 32:13, 76:8, 123:20
**example** [9] - 79:22,

91:22, 92:2, 92:18, 98:19, 103:7, 103:18, 111:16, 111:17
**exceeded** [1] - 22:13
**excellent** [1] - 149:21
**exception** [5] - 11:15, 71:24, 72:8, 141:7, 141:8
**excerpts** [5] - 16:23, 16:25, 17:1, 17:14, 17:15
**excused** [2] - 75:17, 122:15, 148:18
**exempt** [2] - 21:18, 27:17
**exemption** [11] - 27:16, 28:2, 28:3, 28:6, 28:10, 28:14, 28:24, 29:15, 29:18, 29:24, 30:20
**exercise** [1] - 26:13
**Exhibit** [60] - 14:8, 14:9, 14:14, 14:16, 16:3, 16:14, 16:15, 16:20, 16:22, 17:12, 17:22, 17:23, 18:23, 19:2, 19:3, 51:4, 51:14, 51:16, 53:16, 53:22, 54:14, 55:5, 55:6, 65:6, 65:10, 65:14, 67:25, 68:6, 70:10, 71:20, 72:17, 74:7, 74:8, 100:25, 102:1, 102:25, 103:1, 103:3, 103:22, 104:2, 104:19, 104:21, 104:25, 105:3, 105:5, 112:9, 119:11, 119:15, 119:16, 119:21, 120:5, 149:13, 151:14, 151:14, 151:15, 151:15, 151:16, 151:16, 151:17
**exhibit** [13] - 16:8, 18:6, 32:17, 51:4, 51:6, 67:24, 72:1, 72:5, 74:12, 74:18, 112:10, 120:2, 149:19
**exhibits** [11] - 13:20, 14:1, 14:3, 14:4, 14:20, 15:4, 15:21, 15:25, 19:5, 65:1, 149:14
**Exhibits** [2] - 14:25, 15:8

**existed** [1] - 29:1
**existence** [1] - 141:9
**exists** [2] - 28:24, 29:24
**expect** [2] - 22:19, 150:4
**experience** [5] - 23:25, 109:19, 109:25, 111:4, 112:22
**expires** [1] - 12:7
**explain** [7] - 4:7, 39:14, 103:6, 130:17, 133:12, 135:9, 145:18
**explained** [2] - 5:9, 9:4, 24:2
**explicitly** [1] - 30:12
**explored** [1] - 29:5
**extent** [7] - 28:24, 30:16, 122:25, 123:8, 140:11, 140:22, 147:3
**extra** [3] - 41:9, 41:19, 43:19

## F

**fact** [12] - 2:9, 8:19, 21:16, 21:17, 28:25, 30:20, 30:22, 31:3, 69:14, 114:8, 121:24, 135:14
**facts** [9] - 4:21, 6:2, 8:12, 12:1, 22:3, 27:11, 28:7, 29:16
**factual** [2] - 21:21, 22:10
**factually** [1] - 29:23
**failed** [2] - 21:1
**failure** [3] - 20:12, 20:17, 30:5
**fair** [1] - 135:17
**Fair** [9] - 20:6, 20:18, 21:8, 21:15, 21:20, 23:24, 24:22, 27:17, 88:7
**faked** [1] - 24:11
**fall** [3] - 141:12, 142:14, 142:17
**falls** [1] - 141:7
**false** [7] - 24:8, 52:9, 52:13, 52:23, 53:6, 53:10, 55:1
**falsification** [1] - 23:17
**falsified** [1] - 24:24
**far** [6] - 3:11, 7:10, 22:13, 37:7, 123:4, 136:12

**Farka** [1] - 78:11
**fast** [1] - 27:12
**fast-forward** [1] - 27:12
**faster** [1] - 140:13
**faulting** [1] - 9:22
**Fax** [1] - 1:23
**February** [3] - 33:20, 56:6, 57:1
**Federal** [1] - 1:22
**federally** [1] - 31:16
**federally-certified** [1] - 31:16
**felt** [1] - 147:16
**few** [13] - 10:1, 15:25, 38:8, 57:18, 57:19, 80:2, 100:4, 118:11, 129:7, 136:14, 143:4, 148:24, 149:1
**figure** [1] - 114:10
**figures** [1] - 114:12
**file** [4] - 10:24, 11:25, 25:18, 25:19
**filed** [4] - 20:5, 26:3, 29:16, 122:5
**filings** [1] - 121:20
**filling** [1] - 134:13
**finally** [2] - 16:21, 17:12
**findings** [1] - 31:2
**fine** [6] - 6:19, 7:2, 12:23, 71:5, 142:19, 149:10
**finish** [8] - 84:17, 85:3, 85:5, 98:25, 128:10, 128:15, 129:10, 147:22
**finished** [2] - 76:23, 124:9
**finishes** [1] - 33:6
**fire** [6] - 94:15, 94:17, 94:19, 95:7, 137:21, 138:19
**fired** [5] - 4:9, 12:15, 94:21, 94:24, 95:1
**fires** [1] - 27:19
**firing** [1] - 5:8
**first** [52] - 2:19, 3:21, 4:25, 5:25, 8:16, 12:12, 12:15, 12:16, 13:5, 19:11, 23:3, 27:23, 31:10, 32:3, 32:12, 41:8, 42:15, 42:19, 42:22, 43:3, 46:11, 48:7, 48:8, 49:12, 50:11, 66:15, 67:14, 71:25, 76:7, 78:14, 80:16, 85:14, 85:16, 86:10, 88:23, 89:13, 90:21, 94:11,

110:15, 111:21, 117:12, 118:2, 123:19, 129:25, 130:6, 131:20, 133:16, 133:20, 134:11, 137:4, 138:21, 141:5
**First** [2] - 6:22, 24:5
**firsthand** [3] - 3:10, 3:25, 4:7
**fish** [2] - 91:23, 92:3
**Fish** [1] - 92:11
**five** [5] - 13:4, 24:10, 86:8, 101:13, 141:19
**five-day-a-week** [1] - 86:8
**five-minute** [1] - 13:4
**fixed** [1] - 22:6
**floor** [1] - 131:21
**folks** [1] - 7:9
**follows** [3] - 32:14, 76:9, 123:21
**food** [12] - 22:20, 58:24, 59:8, 79:14, 82:25, 83:2, 97:19, 111:13, 111:14, 135:12, 136:21
**FOR** [4] - 19:15, 25:6, 151:2, 151:2
**forgot** [1] - 120:1
**form** [5] - 8:24, 14:11, 100:8, 124:13, 145:10
**former** [3] - 20:10, 21:17, 22:16
**forth** [2] - 70:12, 123:3
**forward** [4] - 11:19, 13:8, 27:12, 32:6
**foundation** [1] - 72:7
**four** [17] - 20:3, 25:11, 41:21, 41:22, 70:14, 70:18, 70:19, 70:23, 72:4, 73:19, 101:13, 102:15, 107:9, 131:25, 132:1, 132:2
**four-page** [4] - 70:14, 70:18, 70:19, 70:23
**fourth** [6] - 70:9, 70:13, 73:1, 74:6, 74:18, 74:21
**Francis** [1] - 67:1
**free** [2] - 5:16, 9:14
**frequently** [1] - 84:22
**Friday** [24] - 2:14, 3:5, 4:17, 8:12, 9:23, 36:17, 36:18, 38:24, 39:16, 73:25, 78:23, 81:18, 85:3, 95:17, 109:21, 125:23, 126:1, 126:3,

126:17, 128:3, 129:8, 145:15, 145:24, 146:4
**Fridays** [12] - 35:18, 38:13, 38:18, 38:21, 39:4, 39:11, 39:19, 46:19, 85:7, 128:23, 129:6, 129:11
**fridges** [1] - 50:8
**friend** [5] - 77:17, 117:19, 117:22, 121:7, 121:9
**friends** [1] - 117:23
**front** [2] - 51:14, 67:24
**full** [1] - 22:24
**furthermore** [1] - 4:11
**futility** [1] - 26:13
**future** [2] - 11:13, 20:16

## G

**general** [1] - 29:11
**generally** [2] - 17:16, 22:7
**given** [15] - 6:5, 8:11, 20:16, 21:3, 40:18, 41:2, 42:14, 50:12, 50:14, 54:2, 62:14, 62:19, 71:18, 72:2, 129:23
**glasses** [1] - 49:19, 50:3
**glassware** [1] - 26:11
**Gluszak** [1] - 149:7
**GOLDSTEIN** [89] - 1:17, 19:12, 19:17, 19:24, 27:25, 28:14, 28:23, 29:10, 30:1, 31:1, 31:8, 65:7, 76:12, 78:12, 78:15, 79:9, 84:4, 86:20, 86:24, 88:4, 88:17, 91:2, 91:12, 96:4, 96:8, 96:10, 98:10, 98:16, 100:9, 100:18, 102:1, 102:12, 102:17, 103:2, 103:16, 104:24, 105:4, 105:11, 105:25, 106:7, 106:16, 106:23, 107:11, 108:21, 110:13, 111:2, 112:15, 113:3, 114:15, 115:17, 116:14, 117:14, 119:7, 121:18, 122:3, 122:13, 122:25, 123:24, 127:4,

127:8, 134:6, 137:18, 138:3, 139:18, 139:24, 140:7, 140:22, 141:11, 141:13, 143:15, 143:20, 144:22, 145:7, 145:11, 146:11, 146:18, 146:20, 147:2, 147:7, 147:12, 147:13, 147:18, 147:23, 148:6, 148:10, 149:23, 149:25, 151:7, 151:10
**Goldstein** [6] - 19:17, 25:2, 70:18, 70:24, 84:3, 123:7
**Gotler** [2] - 31:19, 31:25
**government** [7] - 2:18, 23:8, 26:6, 26:16, 26:20, 27:1
**granted** [1] - 121:19
**Great** [2] - 148:12, 149:17
**Grill** [2] - 20:9, 21:10
**ground** [1] - 54:23
**grounds** [5] - 15:16, 48:16, 86:13, 105:16, 106:12
**group** [2] - 14:22, 15:20
**guess** [8] - 5:18, 7:15, 11:17, 17:2, 30:11, 65:4, 148:14, 149:11
**guy** [5] - 94:25, 95:5, 95:13, 134:12, 144:12

## H

**half** [5] - 20:23, 22:25, 46:4, 87:23, 126:23
**halfway** [1] - 65:18
**handle** [1] - 25:12
**handwriting** [2] - 104:12, 104:13
**handy** [1] - 109:14
**hanging** [5] - 101:7, 101:12, 101:16, 103:25, 104:22
**happy** [3] - 16:12, 51:8, 123:3
**harder** [1] - 102:21
**hardly** [3] - 37:11, 37:25, 111:16
**head** [5] - 27:16, 27:18, 29:6, 30:3, 113:6

**hear** [12] - 3:25, 4:2, 7:10, 11:4, 11:9, 15:17, 22:15, 23:8, 23:14, 24:13, 27:23, 68:11
**heard** [2] - 27:7, 68:18
**hearing** [2] - 11:15, 12:10
**hearsay** [6] - 3:22, 71:22, 71:23, 71:24, 72:11, 141:7
**held** [1] - 30:4
**help** [2] - 109:17, 113:9
**HENNEFELD** [76] - 1:17, 2:6, 2:11, 2:20, 4:5, 5:25, 8:7, 10:3, 10:7, 13:2, 13:18, 13:22, 14:1, 14:7, 14:17, 14:24, 15:24, 16:3, 16:11, 16:21, 17:4, 17:11, 18:3, 18:10, 18:16, 18:25, 19:5, 31:14, 32:4, 32:16, 32:22, 35:23, 37:22, 38:9, 38:25, 39:3, 43:2, 43:18, 44:19, 44:21, 45:23, 45:24, 46:3, 46:6, 48:23, 49:4, 49:5, 51:5, 51:11, 51:12, 52:7, 52:14, 53:2, 53:14, 54:9, 54:13, 55:7, 58:3, 58:10, 59:23, 60:2, 60:12, 60:24, 62:8, 63:2, 63:9, 64:5, 65:2, 66:11, 68:8, 70:11, 71:22, 72:7, 75:8, 75:13, 151:4
**Hennefeld** [8] - 6:23, 9:16, 19:18, 52:24, 55:20, 62:15, 70:16, 70:21
**Hicksville** [1] - 26:24
**hidden** [1] - 109:23
**highest** [1] - 90:7
**highlighted** [4] - 17:2, 17:3, 17:8, 17:24
**HILDA** [1] - 1:3
**himself** [4] - 29:13, 59:1, 59:20, 105:21
**hire** [4] - 93:7, 93:11, 137:19, 138:17
**hired** [9] - 85:15, 93:2, 93:5, 116:19, 125:8, 125:14, 137:5, 137:7, 137:9
**hires** [1] - 27:19
**hold** [1] - 17:7

**holiday** [1] - 2:16
**home** [5] - 91:4, 94:10, 94:13, 129:3, 138:8
**honest** [1] - 64:11
**honestly** [1] - 68:2
**honor** [1] - 11:16
**Honor** [96] - 2:6, 2:7, 2:11, 2:12, 2:20, 3:2, 4:5, 4:19, 5:11, 5:25, 8:7, 10:4, 10:7, 10:11, 10:15, 11:24, 12:24, 13:2, 13:18, 14:2, 14:7, 14:17, 14:24, 15:24, 16:18, 18:1, 18:3, 18:16, 18:25, 19:1, 19:6, 19:9, 19:12, 25:1, 25:4, 25:8, 26:13, 27:11, 27:21, 27:25, 28:23, 29:10, 30:1, 30:10, 30:14, 31:1, 31:8, 31:14, 32:16, 39:1, 44:19, 45:23, 49:4, 51:5, 51:11, 52:7, 52:14, 53:2, 54:13, 54:19, 55:8, 63:2, 68:8, 70:11, 75:8, 75:13, 86:19, 86:20, 87:10, 88:1, 88:4, 91:2, 98:11, 102:2, 102:18, 104:24, 106:16, 107:12, 108:21, 110:13, 112:15, 113:3, 121:18, 122:3, 122:13, 122:20, 122:25, 127:4, 139:24, 141:11, 143:15, 147:2, 147:23, 149:23, 150:2, 150:5
**HONORABLE** [1] - 1:12
**hopefully** [1] - 27:11
**Horacio** [4] - 96:25, 97:5, 97:8, 97:12
**Horacio's** [1] - 97:3
**hour** [6] - 22:25, 36:11, 46:4, 114:4, 126:23
**hour-and-a-half** [1] - 22:25
**hours** [58] - 3:5, 20:21, 20:23, 21:2, 21:5, 21:24, 22:1, 22:6, 22:11, 22:13, 23:12, 23:20, 23:22, 24:3, 24:8, 24:11, 41:4, 48:18, 50:22, 52:1,

52:4, 52:19, 54:17, 54:20, 54:25, 55:2, 55:25, 56:3, 62:3, 74:7, 74:8, 74:22, 86:15, 87:7, 87:19, 87:21, 87:23, 91:5, 92:5, 92:7, 93:25, 94:3, 100:5, 100:10, 100:15, 100:17, 105:9, 112:6, 113:19, 113:21, 114:2, 114:6, 114:9, 115:4, 116:10, 123:11, 141:1, 141:18
**house** [2] - 20:22, 64:16
**housekeeping** [3] - 13:19, 148:14, 148:21
**HRS** [1] - 113:13
**hum** [1] - 89:7
**hundreds** [1] - 26:21

## I

**idea** [1] - 62:3
**illegibility** [1] - 102:18
**illness** [1] - 114:23
**image** [1] - 104:17
**images** [1] - 104:10
**impossible** [1] - 26:7
**improper** [2] - 110:16, 110:20
**include** [2] - 89:11, 91:6
**included** [1] - 122:6
**includes** [1] - 122:13
**incorrectly** [1] - 69:12
**increases** [1] - 20:11
**independent** [1] - 149:14
**independently** [1] - 110:18
**indicate** [1] - 87:21
**indicated** [5] - 2:2, 5:2, 29:14, 72:25, 91:3
**indicates** [2] - 74:22, 113:19
**indicating** [1] - 4:24
**individual** [1] - 30:4
**individually** [2] - 1:9, 24:18
**individuals** [2] - 5:7, 91:5
**industry** [3] - 24:1, 113:6, 113:9
**informant** [2] - 62:18, 62:20

**informant's** [2] - 62:9, 62:11
**information** [2] - 18:19, 104:21
**informing** [1] - 84:1
**initial** [1] - 20:3
**injunction** [14] - 6:1, 6:8, 6:10, 7:20, 11:8, 11:11, 11:16, 12:8, 12:11, 12:14, 12:21, 13:12, 20:16
**injury** [1] - 114:23
**inquiry** [1] - 87:6
**inside** [5] - 49:13, 60:15, 60:21, 131:9, 142:22
**insofar** [1] - 12:20
**insolvent** [1] - 25:19
**instance** [7] - 79:13, 84:16, 84:23, 88:23, 109:20, 111:5, 111:16
**instead** [1] - 7:11
**intend** [4] - 3:18, 5:13, 9:6, 52:7
**intended** [1] - 29:15
**intent** [2] - 3:16, 9:13
**intention** [1] - 5:12
**interested** [1] - 123:1
**interpret** [5] - 6:21, 31:19, 31:21, 61:19, 113:14
**interpreted** [1] - 143:2
**Interpreter** [3] - 65:21, 72:24, 112:20
**interpreter** [10] - 31:11, 33:4, 33:6, 51:5, 76:19, 106:2, 112:17, 124:6, 134:3, 147:11
**INTERPRETER** [16] - 31:25, 32:1, 46:2, 51:8, 57:4, 72:24, 74:25, 75:3, 75:16, 78:11, 91:9, 96:7, 106:1, 113:14, 134:2, 147:10
**interpreters** [4] - 31:16, 32:14, 76:9, 123:21
**interview** [5] - 77:19, 93:17, 118:14, 118:21, 118:22
**interviewed** [3] - 63:22, 77:22, 77:25
**interviewing** [1] - 93:19
**interviews** [1] - 118:8
**intimidate** [1] - 23:17
**intimidation** [1] -

147:7
**introduce** [2] - 13:22, 83:24
**investigate** [1] - 107:2
**investigation** [2] - 20:3, 106:19
**investigator** [3] - 13:24, 148:11, 150:1
**investigators** [4] - 26:22, 106:9, 106:15, 106:20
**involves** [1] - 20:2
**irrelevant** [2] - 86:19, 87:25
**Isidro** [1] - 17:13
**Islip** [2] - 1:6, 1:22
**Isolina** [2] - 31:21, 32:1
**Issue** [1] - 106:14
**issue** [22] - 2:13, 2:21, 2:24, 3:1, 4:3, 4:5, 9:7, 12:12, 12:18, 27:15, 27:20, 28:1, 28:8, 29:21, 30:21, 31:6, 52:16, 53:12, 55:4, 122:23, 123:4
**issued** [3] - 4:14, 4:17, 6:7
**issues** [3] - 7:25, 28:6, 29:2
**Italian** [6] - 20:2, 26:24, 56:24, 67:16, 69:11, 69:15
**ITALIAN** [1] - 1:8
**items** [1] - 92:9

## J

**January** [1] - 77:6
**Jeff** [1] - 3:8
**Jefferson** [3] - 57:15, 57:22, 64:16
**Jeffrey** [22] - 45:2, 46:24, 47:2, 47:4, 47:7, 58:15, 99:3, 99:8, 99:11, 99:14, 103:18, 105:21, 121:10, 121:11, 121:13, 132:6, 132:14, 132:19, 135:25, 136:2, 136:5, 136:9
**Jeffrey's** [4] - 46:25, 99:6, 121:12, 132:17
**job** [34] - 33:25, 34:20, 34:25, 46:13, 46:25, 47:9, 47:21, 62:1, 77:13, 77:16, 77:24, 81:2, 81:3, 91:24, 92:3, 92:9, 96:11,

97:3, 97:17, 99:6, 115:2, 117:13, 117:20, 118:1, 118:4, 118:15, 124:25, 125:1, 125:5, 125:6, 132:17, 136:17, 141:24, 147:15
**jobs** [4] - 95:12, 125:7, 132:1, 132:4
**Johnny** [5] - 34:24, 34:25, 35:2, 61:22, 61:23, 96:5, 96:8, 96:13, 96:18, 96:21, 117:22, 117:25, 118:2, 118:3, 118:5
**Johnny's** [1] - 96:11
**Jorge** [2] - 134:13, 134:15
**JOSE** [2] - 123:18, 151:9
**JOSEPH** [1] - 1:12
**Juan** [17] - 45:2, 47:8, 47:9, 47:11, 47:12, 47:14, 94:25, 95:1, 95:7, 125:1, 125:2, 125:3, 132:5, 132:7, 132:10, 138:22, 148:6
**JUDGE** [1] - 1:13
**Judge** [10] - 17:19, 29:4, 51:21, 54:15, 71:20, 71:25, 83:19, 87:5, 140:17, 141:3
**judge** [38] - 5:5, 6:14, 7:4, 7:7, 7:9, 7:23, 9:3, 9:8, 9:11, 14:13, 15:9, 16:15, 17:6, 26:24, 27:7, 30:17, 38:19, 44:11, 48:17, 52:17, 62:12, 63:11, 64:22, 65:4, 65:11, 72:19, 74:5, 75:5, 75:10, 102:4, 105:1, 105:17, 110:19, 119:12, 121:22, 122:17, 148:13, 149:21
**judgement** [1] - 10:11
**judgment** [1] - 12:15
**July** [3] - 56:12, 67:19, 77:10
**juncture** [1] - 11:22
**June** [3] - 21:23, 24:7, 51:25

## K

**keep** [12] - 20:20, 21:1, 21:24, 52:1, 52:18, 53:3, 54:17,

55:25, 82:19, 88:8, 100:5, 100:10
**keeping** [3] - 15:5, 21:22, 50:21
**kept** [4] - 24:7, 100:15, 100:16, 115:4
**keys** [2] - 91:18, 137:14
**kind** [7] - 65:22, 65:23, 77:11, 92:9, 124:20, 147:16
**kinds** [1] - 92:10
**kitchen** [60] - 19:10, 25:11, 30:4, 53:18, 53:20, 58:25, 59:8, 60:1, 60:11, 60:15, 79:16, 79:18, 79:20, 80:5, 93:25, 94:3, 94:10, 94:15, 94:17, 95:9, 95:12, 96:1, 98:12, 105:6, 107:7, 107:9, 107:23, 108:10, 108:12, 108:13, 108:18, 108:19, 109:12, 109:16, 109:19, 110:1, 110:12, 110:23, 111:5, 111:6, 112:3, 112:14, 113:7, 116:19, 125:4, 125:5, 131:24, 131:25, 132:4, 132:15, 132:21, 132:24, 133:3, 133:22, 137:25, 138:4, 142:1, 144:3
**knife** [3] - 108:18, 109:7, 109:10
**known** [1] - 8:9

## L

**labor** [1] - 55:1
**Labor** [49] - 1:4, 1:4, 4:2, 8:5, 13:1, 13:17, 13:23, 14:10, 16:4, 19:10, 19:20, 19:25, 20:6, 20:18, 21:9, 21:15, 21:20, 23:24, 24:2, 24:22, 27:17, 53:7, 53:11, 55:3, 62:7, 62:19, 63:1, 63:5, 63:16, 63:23, 64:1, 64:4, 64:10, 67:15, 67:22, 71:17, 72:2, 72:3, 88:7, 106:10, 115:11, 116:8, 139:15, 139:20, 140:8, 140:15, 140:20,

141:15
**LABOR** [1] - 1:15
**Labor's** [1] - 27:6
**language** [8] - 32:25, 61:8, 76:15, 118:16, 124:2, 142:25, 143:2, 144:5
**large** [1] - 15:20
**largely** [1] - 22:4
**Last** [1] - 134:4
**last** [15] - 25:10, 70:3, 78:17, 113:23, 115:21, 115:22, 115:23, 116:22, 116:25, 119:3, 121:12, 134:3, 143:4, 147:24, 148:8
**late** [3] - 5:3, 30:23, 85:9
**Law** [1] - 16:4
**law** [8] - 5:9, 23:16, 24:12, 28:7, 28:9, 28:12, 29:17, 31:3
**lawsuit** [4] - 27:6, 142:5, 142:7, 142:15
**lawyers** [1] - 13:7
**leading** [7] - 38:3, 83:20, 92:19, 133:25, 140:10, 144:18, 146:8
**learned** [2] - 67:14, 116:8
**least** [8] - 5:20, 11:21, 12:10, 38:15, 41:11, 51:25, 72:2, 102:7
**leave** [52] - 37:3, 37:24, 38:1, 39:11, 39:13, 40:2, 40:13, 46:9, 46:15, 46:17, 46:20, 46:21, 47:2, 47:3, 47:8, 47:11, 47:12, 47:13, 47:23, 47:25, 75:11, 81:8, 84:11, 84:14, 85:2, 85:25, 94:11, 95:25, 99:16, 100:1, 118:3, 118:25, 119:2, 127:13, 128:7, 128:12, 128:23, 128:25, 129:6, 129:8, 129:12, 132:10, 132:12, 132:22, 133:14, 135:11, 135:20, 135:22, 136:13, 137:11
**leaves** [1] - 133:16
**leaving** [4] - 23:3, 40:4, 40:7, 40:10
**left** [25] - 23:4, 34:14,

34:16, 34:21, 34:22, 37:9, 37:12, 39:9, 40:3, 44:13, 46:11, 46:23, 47:7, 47:14, 49:14, 59:19, 80:16, 96:19, 96:23, 100:3, 101:13, 102:15, 118:3, 129:7, 131:6
**legible** [3] - 102:6, 102:19, 102:21
**less** [10] - 41:22, 43:24, 83:6, 96:15, 96:22, 97:7, 102:15, 104:20, 114:9, 140:10
**letter** [5] - 65:20, 77:1, 106:19, 115:7, 115:9
**letters** [2] - 65:23, 120:1
**letting** [3] - 5:13, 111:5, 111:18
**liability** [2] - 24:5, 24:24
**lie** [1] - 103:10
**lifetime** [2] - 27:5
**light** [3] - 4:3, 5:18, 9:19
**likewise** [1] - 22:4
**limine** [1] - 121:19
**limited** [2] - 14:5, 112:24
**line** [9] - 9:16, 12:7, 18:11, 56:22, 56:25, 59:6, 59:9, 113:24
**lines** [2] - 11:2, 122:24
**liquidated** [1] - 20:15
**list** [6] - 14:21, 18:6, 92:22, 109:2, 132:1, 132:4
**listed** [5] - 18:5, 21:13, 28:5, 74:7, 106:3
**litigate** [1] - 5:20
**litigation** [1] - 27:9
**lived** [2] - 57:18, 57:24
**living** [3] - 57:17, 57:21, 57:25
**locate** [1] - 51:13
**long-standing** [1] - 23:25
**look** [11] - 8:16, 17:5, 17:8, 30:19, 65:14, 65:17, 67:24, 70:9, 71:1, 74:4, 145:21
**looked** [3] - 101:16, 136:24, 148:23
**looking** [3] - 69:5, 74:15, 103:22
**looks** [1] - 75:4
**lost** [1] - 25:10
**low** [1] - 92:17

**Luigi** [98] - 20:8, 25:9, 26:3, 33:13, 33:21, 33:25, 34:2, 42:4, 48:4, 48:7, 54:4, 54:11, 55:22, 56:1, 56:4, 56:6, 56:23, 58:18, 58:21, 58:24, 58:25, 59:7, 60:8, 60:18, 60:20, 60:22, 61:5, 61:8, 61:23, 61:24, 62:4, 66:10, 67:4, 67:11, 67:12, 67:15, 69:11, 69:15, 77:3, 77:11, 77:23, 77:24, 78:2, 79:11, 79:19, 85:1, 89:16, 92:6, 92:22, 93:4, 93:15, 94:2, 94:14, 94:16, 94:19, 108:8, 109:3, 111:10, 111:19, 114:3, 114:25, 115:5, 116:4, 116:12, 116:20, 117:6, 118:7, 118:10, 118:14, 118:23, 119:5, 120:16, 120:19, 120:21, 121:17, 124:14, 125:9, 128:12, 129:5, 129:21, 130:9, 130:18, 131:3, 131:4, 137:5, 138:11, 138:12, 138:14, 138:18, 138:20, 142:14, 143:12, 143:14, 144:16, 144:25, 145:4, 145:19, 146:7
**LUIGI** [2] - 1:8, 1:9
**Luigi's** [13] - 20:9, 21:10, 27:1, 34:20, 35:4, 41:24, 50:11, 53:20, 57:18, 57:21, 78:17, 108:15, 121:20
**lunch** [6] - 48:14, 48:19, 49:7, 49:10, 49:18, 75:19

## M

**main** [1] - 22:10
**maintain** [1] - 30:15
**man** [8] - 47:10, 81:1, 99:7, 108:1, 108:2, 111:18, 121:13, 125:6
**manager** [4] - 34:6, 91:4, 131:9, 140:2
**manual** [1] - 119:15

**Marchan** [4] - 67:1, 67:3, 67:7, 67:10
**Marcia** [2] - 31:19, 31:25
**Mark** [1] - 65:6
**mark** [1] - 65:9
**marked** [3] - 65:5, 65:13, 112:8
**marks** [1] - 73:20
**material** [1] - 139:24
**matter** [2] - 13:7, 83:21
**mature** [1] - 123:4
**maître** [3] - 80:23, 81:6, 81:8
**meal** [1] - 50:6
**mean** [25] - 36:11, 39:15, 40:21, 45:17, 53:17, 53:18, 54:24, 63:19, 64:20, 69:22, 86:23, 88:22, 89:5, 104:7, 106:24, 107:4, 109:18, 127:16, 129:1, 129:4, 133:12, 136:25, 138:5, 139:11, 149:20
**meaning** [1] - 46:7
**means** [3] - 38:22, 52:21, 52:22
**meant** [1] - 144:23
**meantime** [1] - 12:3
**meat** [5] - 91:23, 92:3, 92:11, 109:23, 137:2
**meats** [1] - 136:18
**mechanical** [1] - 1:25
**meet** [7] - 66:18, 71:24, 115:10, 115:13, 115:15, 137:4, 137:9
**meeting** [4] - 64:3, 66:4, 67:9, 70:6
**memory** [2] - 56:4, 69:6
**men** [1] - 94:3
**men's** [1] - 101:21
**mention** [1] - 144:16
**mentioned** [5] - 47:16, 79:2, 79:8, 85:13, 135:24
**mentions** [1] - 71:10
**meritorious** [1] - 30:21
**met** [8] - 56:9, 64:9, 64:13, 66:15, 66:16, 107:19, 107:20, 115:12
**mic** [1] - 6:17
**might** [5] - 4:3, 5:5, 26:16, 39:16, 147:17

**mine** [2] - 34:21, 121:7
**Mineola** [4] - 1:19, 66:25, 67:9, 67:18
**minimum** [8] - 11:7, 20:22, 21:6, 42:23, 43:8, 53:12, 87:24, 125:10
**minute** [1] - 13:4
**minutes** [6] - 47:3, 123:10, 128:6, 132:13, 136:13, 136:14
**mirrors** [1] - 131:22
**mischaracterizes** [6] - 44:11, 58:3, 58:10, 62:8, 110:14, 110:16
**mischaracterizing** [1] - 63:3
**miss** [1] - 90:14
**Miss** [2] - 3:7, 13:24
**missed** [2] - 114:24, 130:12
**mistake** [1] - 57:14
**mistaken** [1] - 57:10
**model** [1] - 26:5
**moment** [5] - 10:3, 51:13, 75:8, 78:4, 103:23
**moments** [1] - 10:1
**Monday** [31] - 3:14, 3:15, 5:3, 36:17, 36:18, 37:16, 37:20, 38:1, 40:19, 41:14, 41:18, 43:25, 58:1, 58:9, 73:12, 73:14, 73:17, 81:14, 81:17, 84:8, 84:11, 84:14, 84:21, 95:16, 125:23, 125:25, 126:2, 126:17, 128:3
**Mondays** [13] - 35:8, 35:17, 37:10, 37:12, 37:23, 78:14, 78:24, 84:5, 85:17, 85:20, 103:8, 125:20, 128:15
**money** [12] - 25:22, 26:2, 26:4, 26:8, 26:12, 69:11, 69:15, 86:17, 88:9, 89:9, 116:2, 116:5
**month** [5] - 26:21, 83:5, 83:6, 84:23, 115:22
**months** [7] - 35:3, 41:12, 41:21, 41:22, 85:21, 89:24, 90:7, 96:16, 97:7, 97:13, 98:2, 101:13, 102:15, 102:16,

131:12, 134:16
**moot** [2] - 4:3, 4:6
**Morning** [1] - 19:13
**morning** [29] - 2:4, 5:24, 12:17, 13:25, 19:12, 22:18, 32:2, 32:23, 32:24, 35:16, 35:25, 45:10, 55:9, 55:17, 55:18, 81:6, 81:20, 81:24, 91:21, 98:4, 131:5, 131:14, 132:9, 133:18, 133:24, 135:3, 147:21, 148:15, 150:8
**most** [8] - 12:21, 108:9, 109:19, 109:25, 110:1, 111:4, 112:21, 116:22
**motion** [5] - 7:1, 7:22, 11:12, 13:11, 121:19
**move** [7] - 14:9, 15:8, 71:20, 102:1, 104:24, 105:24, 140:12
**moves** [1] - 54:13
**MR** [234] - 2:6, 2:7, 2:11, 2:12, 2:20, 3:2, 4:5, 5:2, 5:11, 5:15, 5:25, 6:14, 6:20, 7:18, 8:7, 9:3, 10:3, 10:7, 10:14, 11:24, 12:20, 12:23, 13:2, 13:18, 13:22, 14:1, 14:7, 14:13, 14:17, 14:24, 15:9, 15:24, 16:3, 16:11, 16:14, 16:18, 16:21, 17:2, 17:4, 17:5, 17:11, 17:19, 18:1, 18:3, 18:10, 18:16, 18:25, 19:1, 19:5, 19:9, 25:4, 25:8, 28:19, 29:4, 30:9, 30:14, 31:14, 32:4, 32:16, 32:22, 35:20, 35:23, 37:18, 37:22, 38:3, 38:9, 38:19, 38:25, 39:3, 42:24, 43:2, 43:15, 43:18, 44:11, 44:15, 44:19, 44:21, 45:23, 45:24, 46:3, 46:6, 48:15, 48:17, 48:23, 49:4, 49:5, 51:5, 51:11, 51:12, 51:21, 52:7, 52:14, 52:17, 52:22, 53:2, 53:14, 54:6, 54:9, 54:13, 54:15, 55:7,

55:16, 57:6, 58:3, 58:7, 58:10, 58:14, 59:23, 59:25, 60:2, 60:5, 60:12, 60:17, 60:24, 61:7, 62:8, 62:10, 62:14, 62:18, 62:22, 62:24, 63:2, 63:6, 63:9, 63:11, 63:14, 64:5, 64:8, 64:25, 65:2, 65:3, 65:8, 65:11, 65:12, 66:11, 66:14, 68:8, 68:23, 70:11, 70:16, 70:25, 71:3, 71:6, 71:22, 71:25, 72:7, 72:15, 72:22, 73:2, 73:6, 73:7, 74:4, 75:2, 75:5, 75:8, 75:10, 75:13, 79:6, 83:19, 86:12, 86:14, 87:5, 87:13, 87:18, 90:24, 91:1, 92:19, 96:2, 98:7, 100:7, 100:12, 102:4, 103:13, 105:1, 105:7, 105:15, 105:17, 106:11, 106:13, 107:18, 109:5, 110:21, 110:22, 111:8, 112:19, 112:25, 113:5, 113:11, 113:12, 113:16, 113:18, 114:16, 114:17, 115:20, 116:18, 117:21, 119:10, 119:12, 119:14, 121:21, 121:24, 122:11, 122:17, 123:15, 126:25, 133:25, 137:15, 138:1, 139:16, 139:21, 140:17, 141:3, 144:18, 144:24, 145:1, 145:9, 146:8, 146:15, 147:1, 147:5, 148:5, 148:8, 148:12, 148:20, 148:23, 149:5, 149:11, 149:17, 149:21, 150:5, 150:9, 151:4, 151:5, 151:8
**MS** [89] - 13:25, 19:12, 19:17, 19:24, 27:25, 28:14, 28:23, 29:10, 30:1, 31:1, 31:8, 65:7, 76:12, 78:12, 78:15, 79:9, 84:4, 86:20, 86:24, 88:4,

88:17, 91:2, 91:12, 96:4, 96:8, 96:10, 98:10, 98:16, 100:9, 100:18, 102:1, 102:12, 102:17, 103:2, 103:16, 104:24, 105:4, 105:11, 105:25, 106:7, 106:16, 106:23, 107:11, 108:21, 110:13, 111:2, 112:15, 113:3, 114:15, 115:17, 116:14, 117:14, 119:7, 121:18, 122:3, 122:13, 122:25, 123:24, 127:4, 127:8, 134:6, 137:18, 138:3, 139:18, 139:24, 140:7, 140:22, 141:11, 141:13, 143:15, 143:20, 144:22, 145:7, 145:11, 146:11, 146:18, 146:20, 147:2, 147:7, 147:12, 147:13, 147:18, 147:23, 148:6, 148:10, 149:23, 149:25, 151:7, 151:10
**must** [4] - 28:10, 54:4, 68:5, 69:8

### N

**nail** [1] - 127:5
**name** [14] - 19:17, 31:23, 34:18, 34:23, 50:17, 65:25, 66:2, 71:10, 78:17, 81:1, 104:17, 121:12, 133:5, 134:22
**named** [11] - 34:8, 47:17, 94:25, 96:5, 96:25, 97:14, 99:3, 132:14, 134:12, 135:24, 136:15
**NARDO** [160] - 1:18, 2:7, 2:12, 3:2, 5:2, 5:11, 5:15, 6:14, 6:20, 7:18, 9:3, 10:14, 11:24, 12:20, 12:23, 14:13, 15:9, 16:14, 16:18, 17:2, 17:5, 17:19, 18:1, 19:1, 19:9, 25:4, 25:8, 28:19, 29:4, 30:9, 30:14, 35:20,

37:18, 38:3, 38:19, 42:24, 43:15, 44:11, 44:15, 48:15, 48:17, 51:21, 52:17, 52:22, 54:6, 54:15, 55:16, 57:6, 58:7, 58:14, 59:25, 60:5, 60:17, 61:7, 62:10, 62:14, 62:18, 62:22, 62:24, 63:6, 63:11, 63:14, 64:8, 64:25, 65:3, 65:8, 65:11, 65:12, 66:14, 68:23, 70:16, 70:25, 71:3, 71:6, 71:25, 72:15, 72:22, 73:2, 73:6, 73:7, 74:4, 75:2, 75:5, 75:10, 79:6, 83:19, 86:12, 86:14, 87:5, 87:13, 87:18, 90:24, 91:1, 92:19, 96:2, 98:7, 100:7, 100:12, 102:4, 103:13, 105:1, 105:7, 105:15, 105:17, 106:11, 106:13, 107:18, 109:5, 110:21, 110:22, 111:8, 112:19, 112:25, 113:5, 113:11, 113:12, 113:16, 113:18, 114:16, 114:17, 115:20, 116:18, 117:21, 119:10, 119:12, 119:14, 121:21, 121:24, 122:11, 122:17, 123:15, 126:25, 133:25, 137:15, 138:1, 139:16, 139:21, 140:17, 141:3, 144:18, 144:24, 145:1, 145:9, 146:8, 146:15, 147:1, 147:5, 148:5, 148:8, 148:12, 148:20, 148:23, 149:5, 149:11, 149:17, 149:21, 150:5, 150:9, 151:5, 151:8
**Nardo** [14] - 2:15, 3:1, 4:24, 6:13, 8:25, 10:1, 14:12, 19:8, 25:3, 28:1, 28:17, 29:14, 55:13, 64:18
**narrow** [1] - 140:12
**near** [2] - 23:21, 51:4
**near-constant** [1] - 23:21

**nearly** [2] - 20:3, 20:4
**necessary** [2] - 7:5, 118:19
**need** [10] - 8:8, 13:5, 29:25, 49:2, 87:14, 95:2, 105:24, 118:17, 118:21, 149:7
**needed** [9] - 3:24, 6:8, 91:23, 92:21, 108:17, 109:3, 109:9, 109:22, 115:2
**never** [27] - 10:20, 29:13, 29:14, 58:8, 58:18, 58:21, 58:24, 79:2, 79:8, 81:25, 86:9, 89:20, 109:13, 113:21, 114:8, 114:11, 114:12, 114:13, 114:24, 115:2, 115:3, 115:4, 116:12, 128:18
**NEW** [1] - 1:1
**new** [1] - 10:22
**New** [6] - 1:16, 1:19, 1:22, 16:3, 24:1
**next** [9] - 46:23, 47:7, 47:8, 47:14, 73:19, 76:4, 83:24, 101:21, 122:16
**nicely** [1] - 111:12
**night** [27] - 37:4, 37:9, 37:15, 37:17, 38:14, 39:5, 39:8, 39:12, 40:1, 40:5, 40:8, 40:11, 46:9, 46:11, 46:16, 46:20, 46:23, 47:2, 47:7, 47:11, 47:14, 47:24, 81:9, 84:6, 84:25, 128:7, 129:13
**nighttime** [1] - 135:20
**nine** [1] - 97:7
**none** [1] - 52:5
**normal** [2] - 83:4, 83:5
**normally** [9] - 82:12, 82:14, 85:10, 98:4, 98:6, 99:20, 99:22, 127:10, 130:25
**note** [7] - 4:15, 10:9, 33:11, 63:19, 64:12, 64:15, 70:2
**Nothing** [1] - 147:18
**nothing** [3] - 85:2, 87:20, 122:11
**Notice** [1] - 16:4
**notice** [1] - 10:17
**November** [3] - 71:17, 74:19, 74:21
**number** [8] - 20:11,

22:11, 64:23, 69:2, 113:25, 114:2, 121:4, 121:5
**numerically** [1] - 14:18
**NY** [1] - 1:6

### O

**o'clock** [32] - 36:3, 36:4, 37:12, 45:14, 45:22, 46:18, 82:2, 82:3, 82:5, 82:13, 82:23, 83:2, 83:5, 83:7, 83:15, 84:10, 84:11, 84:21, 85:2, 85:24, 86:1, 95:21, 98:15, 106:21, 126:10, 126:19, 126:21, 127:1, 127:18, 127:21, 129:3, 133:18
**oath** [4] - 31:18, 32:9, 56:15, 56:18
**object** [6] - 16:11, 16:15, 54:15, 63:9, 87:5, 102:4
**objected** [1] - 16:7
**objecting** [1] - 17:1
**Objection** [3] - 60:2, 60:12, 146:15
**objection** [74] - 9:20, 14:8, 14:13, 15:2, 15:3, 15:16, 16:24, 18:4, 18:5, 18:9, 18:13, 18:15, 18:22, 35:20, 37:18, 38:3, 38:19, 42:24, 43:15, 44:11, 48:15, 51:21, 52:15, 54:6, 54:22, 58:3, 58:10, 59:23, 60:24, 62:8, 63:2, 64:5, 66:11, 71:22, 79:6, 83:25, 86:12, 90:24, 90:25, 92:19, 96:2, 98:7, 100:7, 100:12, 103:13, 105:1, 105:7, 105:15, 106:11, 108:21, 110:13, 111:2, 112:15, 113:3, 113:8, 114:15, 115:17, 116:14, 117:14, 119:7, 121:18, 126:25, 133:25, 137:15, 138:1, 139:16, 139:21, 140:9, 144:18, 144:24, 145:1, 145:9, 146:8, 147:1

**objections** [6] - 14:4, 14:5, 15:21, 16:1, 102:3, 148:25
**obligations** [1] - 20:20
**observation** [1] - 105:9
**observations** [1] - 100:14
**observe** [1] - 61:8
**observed** [1] - 61:2
**obtain** [1] - 25:22
**obviously** [8] - 3:25, 8:1, 8:9, 8:15, 9:22, 31:5, 62:25, 141:10
**Obviously** [1] - 3:23
**occasion** [1] - 80:16
**occasions** [9] - 80:13, 82:21, 82:22, 83:1, 83:3, 84:16, 84:22, 93:21, 100:4
**occur** [1] - 84:20
**occurred** [1] - 141:3
**OF** [3] - 1:1, 1:12, 1:15
**offer** [5] - 15:15, 16:12, 52:6, 52:7, 140:23
**Offer** [1] - 16:7
**offered** [2] - 149:15, 149:18
**offering** [5] - 15:4, 16:9, 16:10, 17:13, 52:4
**Office** [1] - 1:15
**office** [15] - 2:15, 26:23, 51:20, 53:16, 53:17, 56:12, 66:23, 67:18, 101:6, 101:12, 101:16, 101:22, 103:25, 139:3
**offices** [1] - 64:13
**often** [4] - 39:18, 80:9, 84:20, 138:12
**oil** [1] - 50:9
**Omar** [25] - 34:19, 48:10, 81:1, 81:4, 91:17, 131:6, 131:7, 131:8, 131:10, 131:13, 131:15, 139:8, 139:14, 140:1, 140:8, 140:14, 140:25, 141:14, 141:17, 141:20, 141:23, 141:25, 143:2
**Omar's** [1] - 81:2
**once** [3] - 54:18, 62:10, 107:21
**One** [1] - 104:20
**one** [59] - 2:13, 10:3,

14:22, 14:23, 15:14, 16:22, 17:10, 18:4, 18:8, 23:3, 27:4, 27:15, 34:11, 39:20, 40:18, 44:6, 44:17, 66:22, 70:20, 70:22, 72:18, 74:16, 75:8, 79:13, 79:22, 80:6, 90:18, 90:20, 92:23, 93:17, 94:11, 95:10, 95:14, 101:6, 106:18, 107:25, 109:15, 110:17, 111:3, 116:25, 117:8, 118:2, 118:7, 120:5, 120:7, 125:3, 126:19, 126:23, 131:24, 132:22, 133:20, 135:8, 136:23, 143:2, 143:21, 148:10, 149:25

**ones** [3] - 14:20, 48:8, 116:21

**open** [12] - 5:3, 5:5, 35:9, 35:22, 48:8, 48:11, 59:3, 91:18, 100:25, 101:22, 104:2, 119:11

**opened** [2] - 48:6, 122:8

**OPENING** [4] - 19:15, 25:6, 151:2, 151:2

**opening** [4] - 13:14, 13:15, 13:18, 19:8

**opens** [1] - 5:13

**operate** [1] - 5:22

**operation** [2] - 5:1, 9:12

**opinion** [1] - 116:4

**opportunity** [1] - 13:16

**opposed** [1] - 6:17

**opposing** [1] - 10:18

**opposite** [2] - 10:17, 10:18

**oral** [1] - 9:19

**orally** [1] - 9:23

**Order** [1] - 2:1

**order** [17] - 2:9, 4:12, 4:14, 4:16, 6:11, 8:24, 14:9, 24:18, 28:5, 60:16, 92:16, 92:25, 108:8, 111:10, 122:23, 123:5, 149:7

**ordered** [1] - 147:25

**orders** [5] - 34:11, 60:14, 80:23, 108:15, 112:24

**otherwise** [4] - 7:8, 21:19, 41:3, 145:21

**out-of-court** [1] - 71:23

**outcome** [1] - 26:14

**outset** [1] - 6:15

**outside** [4] - 21:19, 60:14, 108:9, 141:4

**overrule** [1] - 18:22

**overruled** [22] - 35:21, 38:4, 42:25, 43:16, 52:15, 54:22, 58:12, 60:3, 60:13, 64:6, 66:12, 79:7, 92:20, 103:14, 115:18, 117:15, 119:8, 134:1, 137:16, 144:19, 145:3, 146:9

**Overruled** [1] - 38:20

**oversight** [3] - 30:13, 30:14, 30:17

**overt** [1] - 88:5

**overtime** [13] - 20:23, 21:4, 43:4, 43:12, 79:1, 79:2, 79:5, 86:16, 87:8, 116:6, 116:11, 125:13, 125:16

**owe** [1] - 20:9

**owed** [2] - 86:16, 87:8

**owes** [2] - 116:5, 116:6

**own** [4] - 92:7, 100:13, 105:8, 149:4

**owner** [2] - 34:5, 54:5

**Owner** [1] - 1:9

## P

**page** [33] - 56:22, 59:6, 65:15, 65:18, 68:6, 70:9, 70:13, 70:14, 70:15, 70:16, 70:18, 70:19, 70:23, 72:1, 72:16, 72:25, 73:1, 73:8, 74:6, 74:8, 74:11, 74:14, 74:18, 74:21, 74:23, 74:25, 101:2, 102:22, 104:12, 106:4, 112:10, 149:1

**Page** [4] - 18:10, 18:11, 59:3, 71:2

**pages** [4] - 51:14, 70:12, 70:22, 72:4

**paid** [48] - 20:21, 21:2, 22:2, 22:4, 22:5, 22:9, 41:25, 42:3, 42:5, 42:7, 42:15, 42:18, 43:24, 44:22,

69:12, 69:16, 86:10, 86:17, 86:25, 87:7, 87:8, 87:9, 87:23, 87:24, 88:11, 88:18, 88:20, 88:21, 89:12, 89:13, 89:15, 89:17, 90:9, 90:19, 90:21, 93:13, 93:18, 93:23, 115:1, 116:11, 118:9, 129:18, 129:25, 130:6, 130:9, 130:10, 130:21

**paper** [4] - 51:20, 64:16, 68:14, 129:23

**papers** [14] - 3:4, 3:6, 50:12, 50:25, 51:16, 51:19, 53:15, 53:22, 53:24, 54:1, 54:2, 54:3, 54:10, 54:12

**paperwork** [1] - 28:20

**parentheses** [1] - 112:14

**parking** [7] - 49:23, 66:4, 66:10, 66:19, 66:21, 67:3, 70:6

**part** [7] - 7:17, 11:14, 11:19, 11:20, 27:9, 54:16, 87:9

**particular** [3] - 18:8, 113:10, 148:25

**particularly** [1] - 147:3

**parties** [3] - 2:25, 22:7, 28:5

**parts** [1] - 68:17

**party** [4] - 10:17, 10:18, 13:23

**party's** [1] - 28:11

**passage** [1] - 18:9

**passed** [1] - 118:6

**past** [8] - 58:8, 82:19, 82:23, 83:5, 84:21, 91:3, 104:25, 122:4

**past-recollection** [1] - 104:25

**pasta** [10] - 95:13, 99:7, 108:2, 110:25, 111:17, 121:13, 125:6, 132:18, 132:24

**pastor** [11] - 45:2, 46:12, 60:1, 60:15, 102:21, 103:3, 103:24, 108:17, 109:15, 112:11, 136:18

**PASTOR** [2] - 76:6, 151:6

**Pastor** [35] - 29:6, 29:11, 29:13, 30:3,

46:15, 46:20, 46:23, 47:3, 54:2, 54:3, 54:11, 58:15, 60:6, 60:8, 60:10, 60:14, 60:20, 60:22, 61:9, 61:11, 61:18, 107:19, 132:6, 134:11, 136:15, 136:20, 137:4, 137:9, 137:11, 137:19, 137:21, 137:23, 137:25, 138:4, 138:7

**Pastor's** [2] - 46:13, 136:17

**pause** [1] - 10:6

**pay** [26] - 20:21, 20:23, 41:24, 42:20, 43:14, 43:20, 43:22, 44:1, 44:3, 50:14, 78:3, 78:5, 79:1, 79:5, 89:1, 89:8, 90:12, 116:17, 118:18, 118:20, 122:5, 122:6, 125:16, 129:23, 130:4

**payable** [1] - 15:5

**paying** [3] - 88:15, 89:6, 142:19

**payment** [2] - 121:25

**payments** [3] - 87:3, 122:1

**payroll** [6] - 15:1, 86:21, 87:1, 87:18, 87:25, 88:3

**pays** [1] - 129:20

**pending** [2] - 11:6, 11:12

**people** [8] - 9:10, 18:19, 37:7, 79:16, 95:9, 107:9, 112:22, 131:24

**per** [7] - 40:14, 42:9, 42:16, 90:1, 113:22, 114:4, 114:7

**perfect** [1] - 76:24

**perform** [2] - 108:7, 108:17, 109:17

**performed** [2] - 22:18

**perhaps** [2] - 25:20, 53:7

**period** [5] - 39:21, 41:23, 51:24, 86:4, 88:20

**permanent** [4] - 6:1, 6:8, 6:10, 7:19

**permissible** [1] - 140:15

**permitted** [1] - 3:21

**person** [13] - 2:25, 25:24, 80:22, 93:8, 108:15, 109:18, 109:19, 111:4, 112:21, 112:23, 132:5, 134:17, 143:12

**personal** [2] - 100:14, 105:9

**personally** [2] - 4:16, 93:19

**phone** [5] - 71:16, 104:17, 111:22, 121:3, 121:5

**photo** [1] - 104:20

**photograph** [1] - 101:10, 101:15, 101:18, 101:20, 101:24, 102:6, 102:11, 102:13, 104:6, 104:7, 119:20

**picture** [9] - 119:16, 120:2, 120:4, 120:9, 120:10, 120:12, 120:15, 120:24, 121:1

**piece** [1] - 109:23

**piecemeal** [1] - 7:12

**place** [6] - 107:6, 109:14, 113:10, 115:24, 144:2, 144:3

**PLAINTIFF** [2] - 19:15, 151:2

**Plaintiff** [10] - 1:5, 1:15, 14:16, 16:20, 19:2, 55:6, 151:14, 151:14, 151:15, 151:16

**plaintiff** [10] - 17:13, 32:12, 52:3, 52:6, 54:13, 54:18, 54:20, 76:7, 122:23, 123:19

**plaintiff's** [2] - 25:21, 149:13

**Plaintiff's** [13] - 14:7, 14:9, 14:14, 16:3, 16:22, 17:12, 18:23, 51:3, 102:25, 103:1, 105:3, 151:16, 151:17

**plaintiffs** [4] - 19:20, 20:1, 25:13, 25:16

**planned** [1] - 24:14

**plants** [1] - 49:24

**plate** [3] - 79:14, 82:25, 108:19

**plates** [3] - 83:1, 111:13, 111:14

**Plaza** [1] - 1:22

**pleading** [1] - 10:16

12

**pled** [2] - 28:11, 88:5
**pm** [10] - 75:19, 82:19, 84:14, 91:25, 107:15, 126:14, 127:15, 129:6, 150:10
**PM** [11] - 37:21, 37:24, 38:2, 58:2, 58:9, 73:17, 73:22, 73:25, 74:2, 76:2
**point** [5] - 9:20, 27:2, 27:12, 30:9, 69:4
**portions** [4] - 17:3, 17:9, 17:24, 102:23
**poses** [1] - 7:24
**position** [6] - 10:15, 34:22, 53:3, 54:19, 78:1, 87:13
**positive** [1] - 26:14
**possibility** [1] - 11:2
**possible** [2] - 4:18, 122:22
**possibly** [1] - 23:4
**potential** [2] - 11:12, 29:21
**potentially** [1] - 11:19
**practically** [1] - 39:9
**practice** [2] - 53:3, 53:4
**practices** [1] - 15:5
**pre** [1] - 2:9
**pre-trial** [1] - 2:9
**precluding** [1] - 121:19
**predicate** [1] - 28:25
**prefer** [2] - 6:18, 14:17
**prejudice** [1] - 29:21
**prejudicial** [1] - 18:21
**preliminary** [8] - 6:10, 11:8, 11:11, 12:8, 12:10, 12:14, 12:20, 13:11
**preparation** [2] - 22:19, 52:9
**prepare** [4] - 59:2, 83:16, 91:22, 115:15
**prepared** [3] - 4:18, 7:14, 30:7
**preparing** [7] - 22:20, 58:24, 59:8, 136:18, 136:20, 137:2
**prepping** [1] - 49:16
**presence** [2] - 23:21, 63:1
**present** [5] - 22:1, 54:20, 107:8, 118:22, 142:2
**presentation** [2] - 31:6, 79:15
**presented** [1] - 6:2

**pressure** [3] - 146:25, 147:6, 147:14
**presumably** [1] - 18:18
**pretrial** [2] - 14:9, 28:5
**pretty** [1] - 22:17
**prevent** [1] - 8:20
**previously** [1] - 70:21
**primary** [2] - 32:25, 76:15, 124:2
**privilege** [2] - 62:9, 62:11
**privileged** [1] - 25:12
**privy** [1] - 30:2
**probative** [1] - 147:8
**problem** [1] - 148:13
**proceed** [11] - 2:5, 7:8, 9:18, 9:21, 10:2, 10:8, 13:10, 14:18, 15:23, 31:1, 55:10
**proceeding** [4] - 8:16, 11:6, 28:16, 30:8
**proceedings** [1] - 10:6
**Proceedings** [2] - 1:25, 150:10
**produce** [2] - 53:6, 148:1
**produced** [4] - 1:25, 22:1, 53:6, 72:4
**production** [1] - 52:9
**products** [1] - 92:25
**progressed** [1] - 23:18
**proof** [1] - 140:23
**proper** [2] - 111:15, 122:9
**properly** [1] - 111:13
**propose** [2] - 11:1, 13:19
**proposed** [3] - 29:2, 29:19, 31:2
**proposing** [2] - 8:5, 12:18
**protection** [2] - 21:8, 21:15, 21:19
**prove** [3] - 27:13, 87:15, 87:16
**provide** [2] - 4:19, 48:23
**proving** [1] - 27:10
**public** [1] - 16:5
**Public** [1] - 16:6
**punch** [5] - 50:18, 100:19, 100:22, 139:12, 139:13
**punched** [1] - 138:23
**punching** [2] - 139:4, 139:7
**purpose** [4] - 8:23, 27:9, 66:5, 139:22
**purposes** [5] - 3:22,

11:11, 11:15, 11:21, 12:10
**pursuant** [1] - 2:8
**pursue** [2] - 29:14, 29:15
**put** [4] - 9:18, 10:17, 25:14, 32:17
**puts** [1] - 10:14
**putting** [1] - 26:17

## Q

**Q's** [29] - 20:8, 25:9, 33:13, 33:21, 33:25, 55:22, 56:1, 56:4, 56:6, 56:24, 58:25, 61:23, 61:24, 62:4, 66:10, 67:4, 67:11, 67:12, 67:15, 69:11, 69:15, 77:11, 114:3, 115:5, 117:6, 120:16, 120:19, 120:21, 124:14
**Qs** [1] - 116:20
**Quarta** [72] - 23:23, 26:3, 26:8, 58:18, 58:21, 58:24, 59:7, 60:18, 60:20, 60:22, 61:8, 61:18, 78:9, 78:12, 78:18, 78:19, 78:25, 79:4, 79:11, 79:19, 79:20, 80:1, 80:4, 80:9, 80:11, 80:14, 80:24, 85:1, 86:24, 89:16, 92:6, 93:4, 93:7, 93:15, 93:19, 94:2, 94:14, 94:16, 95:2, 95:5, 99:18, 99:22, 100:1, 100:5, 100:10, 106:9, 106:25, 108:8, 108:9, 112:24, 114:25, 116:12, 118:7, 118:10, 118:14, 118:23, 119:5, 120:23, 121:17, 137:7, 142:4, 142:7, 142:25, 143:7, 143:10, 143:21, 144:5, 144:8, 144:16, 146:7, 146:21, 148:23
**QUARTA** [1] - 1:9
**Quarta's** [5] - 22:6, 23:20, 101:16, 104:22, 116:4
**QUESTION** [2] - 56:23, 59:7
**questions** [20] - 29:5, 29:9, 29:11, 33:5,

55:7, 55:19, 56:17, 68:2, 68:4, 72:6, 72:12, 75:6, 76:20, 83:20, 105:19, 107:11, 119:12, 122:4, 122:10, 124:7
**quickly** [2] - 3:23, 4:18
**quit** [1] - 60:6
**quite** [1] - 80:2
**quitting** [1] - 60:7
**quotation** [1] - 73:20

## R

**raise** [13] - 19:7, 27:25, 28:3, 28:4, 28:6, 29:17, 30:6, 43:14, 89:21, 89:23, 89:25, 90:1, 90:6
**raised** [7] - 28:1, 28:8, 28:18, 28:19, 30:12, 30:15, 30:16
**raises** [1] - 90:5
**raising** [1] - 30:23
**ran** [1] - 114:12
**range** [1] - 37:9
**rate** [1] - 115:3
**rather** [3] - 14:22, 15:17, 133:18
**rational** [2] - 25:24, 26:5
**RAYMOND** [1] - 1:18
**reach** [2] - 2:16, 109:10
**reached** [1] - 78:5
**reaction** [1] - 146:12
**read** [25] - 61:14, 61:16, 65:20, 65:22, 65:23, 68:9, 68:12, 68:17, 68:18, 68:20, 72:20, 73:3, 102:7, 102:8, 102:9, 102:23, 112:11, 112:13, 112:16, 134:3, 134:4, 149:2
**reading** [6] - 72:23, 73:5, 73:11, 73:16, 73:19, 73:21
**reads** [1] - 54:24
**ready** [5] - 2:5, 8:6, 9:24, 55:13, 91:23
**realize** [3] - 9:9, 15:11, 143:16
**really** [7] - 3:19, 83:23, 96:22, 117:18, 118:19, 118:20, 128:18
**receipt** [1] - 129:23
**receive** [16] - 42:11, 60:14, 60:16, 69:11,

69:15, 69:21, 69:24, 78:3, 89:1, 89:18, 89:25, 90:5, 90:11, 115:8, 121:16, 130:3
**received** [10] - 69:23, 77:1, 86:18, 89:2, 89:8, 89:9, 106:18, 115:7, 122:6, 122:7
**receives** [1] - 121:25
**receiving** [2] - 58:22, 90:2
**recently** [1] - 141:24
**recess** [2] - 13:9, 75:19
**Recess** [2] - 55:12, 107:15
**recognize** [3] - 51:16, 101:2, 104:3
**recollection** [2] - 71:15, 104:25
**recommended** [3] - 61:22, 77:18, 93:7
**record** [12] - 15:5, 21:22, 31:24, 50:22, 52:8, 72:3, 72:7, 72:10, 72:11, 104:21, 149:3
**record-keeping** [2] - 15:5, 21:22
**recorded** [2] - 1:25, 104:25
**recordkeeping** [2] - 88:6, 88:11
**Records** [1] - 16:7
**records** [47] - 15:1, 20:20, 21:2, 21:24, 22:1, 22:2, 23:17, 24:7, 24:9, 24:11, 24:24, 50:10, 52:1, 52:4, 52:9, 52:11, 52:13, 52:19, 52:21, 52:23, 53:1, 53:4, 53:6, 53:10, 54:17, 54:20, 54:25, 86:21, 87:1, 87:3, 87:6, 87:12, 87:14, 87:16, 87:18, 87:19, 87:20, 87:25, 88:3, 88:8, 88:10, 100:15, 122:2, 122:4, 122:5
**recount** [1] - 143:17
**redirect** [1] - 75:7, 75:13, 122:12
**reference** [1] - 146:6
**referred** [2] - 117:19, 117:25
**referring** [3] - 18:15, 68:16, 72:16
**reflected** [1] - 122:2
**refrain** [1] - 83:25

13

**refresh** [2] - 69:6, 71:15
**refused** [1] - 24:23
**refuses** [1] - 20:5
**refusing** [1] - 23:15
**regard** [1] - 87:17
**regarding** [4] - 11:10, 27:16, 29:9, 122:10
**regular** [1] - 37:11
**regularly** [1] - 22:12
**related** [1] - 8:9
**relates** [1] - 102:20, 102:24
**relating** [1] - 140:25
**relationship** [1] - 141:9
**released** [1] - 148:1
**relevance** [17] - 15:3, 15:16, 16:24, 17:1, 18:4, 18:9, 18:13, 18:17, 18:22, 48:21, 62:9, 62:13, 64:5, 66:11, 91:1, 106:13, 113:4
**relevant** [8] - 3:19, 15:6, 48:20, 52:8, 54:16, 88:2, 88:11, 147:2
**relief** [8] - 4:22, 6:4, 6:7, 8:18, 8:20, 8:22, 8:24, 10:12
**rely** [2] - 3:21, 30:22
**Remain** [1] - 32:9
**remainder** [1] - 105:22
**remained** [1] - 80:19
**remaining** [1] - 147:23
**remedy** [1] - 5:19
**remember** [28] - 41:10, 41:19, 41:20, 43:23, 44:8, 57:24, 59:13, 64:11, 66:8, 66:16, 66:17, 66:20, 66:21, 67:5, 67:6, 68:2, 70:2, 96:22, 111:23, 112:1, 116:21, 117:16, 117:18, 118:24, 121:12, 131:11, 134:8, 136:7
**remove** [1] - 149:11
**repeat** [3] - 8:7, 38:25, 111:17
**repeated** [4] - 24:21, 91:9, 106:1, 147:10
**replace** [1] - 34:15
**replaced** [3] - 34:15, 48:10, 81:3
**report** [1] - 114:22
**reporter** [1] - 134:4
**Reporter** [1] - 1:21

**represent** [2] - 19:20, 20:1
**representative** [1] - 13:23
**representing** [1] - 25:15
**represents** [1] - 114:2
**request** [4] - 7:15, 10:12, 10:25, 14:10
**requested** [1] - 66:23
**requesting** [1] - 6:9
**required** [7] - 20:20, 20:21, 20:22, 20:23, 21:6, 21:11, 88:8
**requirements** [6] - 20:6, 20:18, 22:23, 23:24, 24:3, 24:22
**reservations** [1] - 5:4
**reserve** [1] - 10:11
**resided** [1] - 57:22
**residing** [1] - 57:15
**resolve** [1] - 25:21
**resolved** [2] - 3:25, 7:3
**respect** [10] - 4:23, 14:25, 17:12, 21:22, 22:8, 28:1, 31:3, 72:13, 88:10, 102:17
**respond** [1] - 37:19
**response** [1] - 54:8
**responsibilities** [1] - 116:17
**rest** [1] - 103:20
**Restaurant** [20] - 20:8, 20:9, 21:10, 67:16, 69:11, 69:15, 77:3, 77:11, 124:14
**RESTAURANT** [2] - 1:7, 1:8
**restaurant** [177] - 3:14, 4:25, 5:22, 9:10, 9:11, 20:2, 21:17, 22:19, 22:23, 23:9, 23:21, 23:25, 25:9, 25:10, 26:10, 26:18, 26:24, 27:1, 33:13, 33:21, 33:25, 34:5, 34:6, 34:8, 34:10, 34:12, 34:20, 34:25, 35:5, 35:6, 35:9, 35:13, 35:22, 37:3, 39:23, 40:1, 40:5, 40:7, 40:11, 41:8, 41:11, 41:24, 42:1, 42:3, 42:5, 42:19, 43:7, 43:10, 43:11, 44:5, 44:9, 44:24, 44:25, 46:13, 46:15, 46:25, 47:4, 47:9, 47:16, 47:21, 48:2,

48:3, 48:4, 48:6, 48:9, 48:11, 49:7, 50:10, 50:11, 50:19, 50:21, 50:25, 51:1, 53:20, 53:25, 54:5, 56:24, 60:6, 77:9, 77:14, 77:16, 79:4, 79:10, 80:9, 80:12, 80:14, 81:13, 83:11, 83:18, 85:11, 85:19, 85:20, 90:16, 90:22, 91:13, 91:16, 91:18, 92:7, 92:14, 93:3, 93:5, 93:11, 93:14, 94:22, 96:6, 96:14, 96:17, 96:21, 97:1, 97:6, 97:8, 97:12, 97:15, 97:20, 97:24, 98:1, 98:25, 99:4, 99:8, 99:11, 99:19, 100:20, 100:23, 105:6, 105:12, 106:8, 116:4, 119:4, 119:6, 124:20, 124:25, 125:8, 125:17, 125:19, 125:24, 126:9, 129:12, 129:16, 130:1, 130:14, 130:15, 130:20, 130:23, 130:25, 131:4, 131:10, 131:13, 131:14, 131:16, 131:23, 132:25, 133:23, 134:7, 134:15, 134:20, 135:1, 136:2, 136:6, 137:12, 137:14, 138:10, 138:12, 138:15, 138:17, 138:19, 138:23, 138:25, 139:2, 139:4, 139:9, 139:19, 140:5, 142:23, 145:16
**restaurants** [2] - 85:8, 113:1
**restraining** [1] - 24:18
**result** [1] - 27:2
**retaliate** [2] - 5:7, 23:18
**retaliating** [3] - 8:20, 8:21, 24:14
**retaliation** [5] - 6:1, 8:3, 8:17, 11:18, 13:13
**retaliatory** [2] - 6:6, 6:12
**returned** [1] - 91:25

**review** [1] - 149:4
**reviews** [1] - 10:18
**reward** [1] - 25:25
**Rico** [2] - 134:13, 134:17
**risk** [1] - 25:25
**risk-versus-reward** [1] - 25:25
**room** [3] - 98:20, 98:22, 101:21
**Room** [1] - 1:16
**rule** [2] - 15:14, 141:7
**Rule** [4] - 16:6, 122:18, 140:16, 140:21
**rules** [1] - 8:9
**run** [1] - 114:10
**rush** [1] - 19:22

## S

**Salad** [1] - 47:10
**salad** [6] - 91:23, 107:25, 108:1, 111:9, 111:11, 125:6
**salads** [2] - 95:14, 97:4
**salaries** [2] - 21:3, 21:5
**salary** [3] - 22:6, 90:8, 113:22
**saloon** [1] - 142:22
**SANTOS** [2] - 76:6, 151:6
**Saturday** [24] - 4:13, 5:4, 36:7, 41:15, 41:18, 44:1, 73:12, 73:14, 74:2, 81:14, 82:6, 83:13, 109:21, 126:15, 142:11, 143:25, 144:13, 144:15, 145:15, 146:2, 146:5, 146:6, 146:13, 146:23
**Saturdays** [23] - 23:5, 35:8, 36:1, 36:2, 36:24, 37:1, 37:13, 39:7, 39:11, 39:19, 45:13, 46:19, 82:1, 82:3, 85:5, 85:7, 95:20, 98:6, 99:23, 125:20, 126:8, 128:5, 129:10
**sauce** [2] - 92:2, 137:3
**sauces** [1] - 92:10
**saw** [8] - 53:15, 58:24, 61:3, 66:22, 101:7, 101:23, 107:21
**SCA** [3] - 1:7, 20:7, 21:10

**schedule** [53] - 22:17, 35:4, 39:22, 39:23, 39:24, 40:14, 40:17, 40:25, 41:3, 43:19, 43:25, 69:20, 75:4, 78:10, 81:4, 81:11, 83:10, 85:10, 85:14, 86:5, 86:7, 86:8, 99:14, 99:20, 101:5, 101:7, 101:10, 101:12, 101:16, 101:23, 103:3, 103:4, 103:9, 103:11, 103:25, 104:9, 104:18, 119:16, 119:19, 120:4, 120:5, 129:15, 132:7, 132:19, 132:20, 133:7, 133:8, 133:9, 133:11, 136:9, 137:23, 141:1
**scheduled** [3] - 22:22, 23:2, 41:9
**schedules** [5] - 22:13, 23:10, 105:6, 123:2, 123:11
**scope** [7] - 60:2, 60:12, 140:2, 140:19, 140:20, 141:2, 141:8
**seat** [1] - 51:4
**Second** [1] - 6:24
**second** [10] - 65:15, 68:6, 71:25, 72:16, 74:8, 74:11, 74:23, 74:25, 80:24, 113:23
**second-to-last** [1] - 113:23
**secretary** [1] - 32:4
**Secretary** [9] - 1:3, 20:14, 24:4, 24:6, 24:20, 28:24, 29:18, 55:1, 88:5
**Secretary's** [1] - 21:14
**Section** [2] - 6:2, 6:4
**see** [41] - 3:4, 26:22, 33:4, 52:6, 57:4, 59:7, 65:18, 65:24, 67:3, 68:6, 68:7, 69:2, 71:7, 71:10, 71:12, 72:19, 73:11, 73:16, 73:23, 74:6, 74:20, 87:20, 93:19, 100:22, 101:12, 102:21, 103:9, 104:16, 113:13, 113:23, 113:25, 119:21, 119:23, 122:17, 123:13,

14

136:23, 137:19, 137:21, 138:4, 138:7, 150:7
**seeing** [2] - 11:15, 103:7
**seek** [4] - 5:23, 6:3, 8:13, 28:22
**seeking** [6] - 4:22, 5:19, 6:1, 9:17, 12:11, 17:3
**seeks** [1] - 20:14
**send** [3] - 120:9, 120:12, 138:7
**sending** [1] - 120:23
**sense** [4] - 11:23, 12:11, 15:9, 15:19
**sent** [1] - 124:13
**separate** [4] - 7:23, 11:17, 11:19, 12:5
**September** [3] - 33:24, 44:14, 124:17
**serve** [4] - 4:16, 6:25, 10:24, 83:1
**served** [4] - 24:18, 82:24, 111:13, 111:20
**set** [2] - 92:7, 127:10
**sets** [1] - 149:12
**settle** [1] - 26:1
**seven** [2] - 85:21, 98:2
**share** [1] - 118:15
**sharp** [2] - 84:10, 85:2
**shift** [1] - 114:4
**short** [1] - 41:23
**shorter** [1] - 135:17
**shortly** [1] - 4:16
**show** [22] - 20:7, 20:25, 21:25, 22:12, 22:16, 22:21, 23:5, 23:11, 23:19, 23:23, 24:4, 24:6, 24:15, 24:20, 25:8, 53:8, 64:21, 65:13, 87:2, 89:8, 101:15, 112:8
**showed** [2] - 24:9, 117:8
**shown** [1] - 101:2
**shut** [1] - 3:14
**sick** [1] - 114:22
**side** [2] - 13:16, 25:13
**sides** [3] - 2:5, 2:8, 15:21
**sign** [6] - 6:21, 50:25, 53:22, 53:24, 54:10, 54:11
**signature** [5] - 68:25, 69:1, 73:8, 74:11, 74:14
**signed** [16] - 54:1, 62:20, 62:21, 63:6,

63:8, 66:18, 67:21, 68:1, 68:12, 68:15, 68:21, 69:6, 69:9, 72:1, 74:24
**signing** [3] - 63:21, 63:25, 68:24
**silverware** [1] - 26:10
**simple** [1] - 20:12
**simplest** [1] - 7:8
**simply** [4] - 3:12, 16:12, 22:11, 30:22
**sit** [1] - 6:17
**sitting** [1] - 123:1
**situation** [6] - 9:5, 25:14, 25:15, 25:17, 26:1, 26:17
**six** [6] - 22:13, 45:4, 78:13, 89:24, 90:7, 134:16
**slow** [2] - 19:23, 128:19
**small** [6] - 9:11, 25:10, 26:11, 26:18, 26:24, 109:13
**smartphone** [1] - 101:25
**Solicitor** [1] - 1:15
**SOLIS** [1] - 1:3
**someone** [13] - 34:8, 34:15, 63:22, 66:20, 94:19, 96:5, 96:25, 97:14, 131:8, 132:14, 135:24, 136:15, 138:8
**sometime** [1] - 46:17
**sometimes** [20] - 23:7, 38:7, 41:2, 47:3, 47:8, 48:7, 49:23, 49:24, 50:7, 60:21, 97:18, 111:14, 115:12, 127:11, 128:11, 128:17, 128:24, 128:25, 132:12
**somewhere** [1] - 109:23
**soon** [2] - 8:11, 144:9
**sooner** [1] - 8:10
**sorry** [13] - 30:4, 33:17, 73:2, 73:20, 78:8, 78:16, 80:19, 80:20, 86:25, 96:7, 106:25, 134:2, 148:5
**sort** [2] - 7:19, 49:20
**sounds** [2] - 8:18, 8:21
**Spanish** [38] - 31:20, 31:22, 32:14, 33:1, 33:5, 33:7, 33:8, 60:18, 60:23, 61:3,

61:6, 61:16, 63:18, 63:22, 63:24, 65:19, 68:9, 68:18, 72:20, 72:23, 73:4, 73:11, 73:17, 73:19, 73:21, 76:9, 76:16, 76:20, 76:23, 80:1, 80:2, 80:3, 95:5, 118:10, 123:21, 124:3, 124:7, 144:7
**speaking** [5] - 60:23, 61:2, 61:3, 61:9, 61:18
**speaks** [1] - 61:11
**special** [3] - 92:11, 92:12, 108:18
**specific** [1] - 16:25
**specify** [1] - 16:25
**speculate** [1] - 108:24
**speculation** [1] - 60:25
**Speculation** [1] - 108:22
**spell** [1] - 31:23
**spend** [1] - 136:20
**spent** [2] - 26:23, 108:9
**spoken** [1] - 110:10
**stamps** [1] - 87:9
**stand** [5] - 6:16, 7:9, 32:18, 62:10, 62:19
**Standards** [9] - 20:6, 20:18, 21:9, 21:15, 21:20, 23:24, 24:22, 27:17, 88:7
**standing** [3] - 23:25, 32:9, 145:4
**start** [46] - 15:18, 15:22, 19:8, 33:7, 33:15, 33:18, 35:11, 35:12, 35:15, 36:2, 45:5, 45:12, 45:22, 48:14, 56:23, 77:5, 78:20, 78:24, 81:16, 81:20, 82:3, 82:12, 83:15, 90:22, 91:13, 91:17, 98:1, 99:16, 124:16, 125:23, 126:8, 126:24, 127:3, 127:7, 127:9, 127:10, 127:15, 127:17, 127:21, 130:10, 131:4, 133:13, 133:18, 133:21, 133:23, 134:7
**started** [41] - 2:17, 35:6, 35:17, 41:8, 42:17, 42:19, 42:22, 43:3, 44:12, 45:18,

49:2, 49:6, 49:10, 50:11, 57:1, 57:13, 57:20, 77:19, 78:14, 81:15, 85:16, 86:10, 88:15, 89:6, 89:13, 89:24, 97:23, 99:12, 99:25, 106:21, 117:6, 125:10, 129:2, 129:25, 131:23, 132:9, 134:13, 136:3, 137:6, 138:21, 141:24
**starting** [4] - 13:16, 18:10, 78:21, 78:22, 136:11, 145:25
**starts** [1] - 133:13
**state** [1] - 31:23
**State** [2] - 16:4, 24:2
**statement** [29] - 13:19, 62:14, 62:16, 62:19, 62:24, 62:25, 63:4, 63:10, 63:11, 63:15, 63:17, 63:22, 63:25, 64:13, 64:21, 66:5, 66:18, 67:18, 67:21, 67:25, 68:20, 70:7, 70:17, 70:22, 71:18, 71:23, 72:1, 72:19, 74:5
**Statement** [2] - 65:17, 112:13
**statements** [7] - 3:9, 13:14, 19:8, 27:8, 70:19, 70:22, 140:2
**STATES** [2] - 1:1, 1:13
**states** [1] - 2:1
**States** [4] - 1:4, 26:6, 63:23, 67:22
**statute** [1] - 25:23
**statutory** [2] - 20:22, 21:6
**stay** [3] - 13:6, 26:22, 48:1, 84:20, 94:12
**stays** [3] - 135:12, 135:15, 135:22
**stenography** [1] - 1:25
**step** [5] - 32:6, 75:14, 108:11, 122:14, 148:16
**still** [12] - 20:5, 33:21, 40:23, 41:4, 72:25, 77:7, 96:18, 97:22, 116:24, 117:1, 124:18, 147:17
**stipulate** [1] - 123:11
**stipulated** [6] - 21:23, 27:9, 27:13, 52:3, 54:18, 87:20
**stipulating** [1] - 123:2

**stipulation** [10] - 24:6, 51:24, 52:5, 52:10, 52:18, 52:21, 52:25, 53:10, 54:16, 54:24
**stipulations** [1] - 51:23
**stop** [17] - 6:11, 12:12, 33:23, 37:17, 38:10, 38:13, 39:4, 39:7, 39:25, 77:9, 83:20, 84:5, 84:8, 84:24, 96:21, 97:12, 131:10
**stopped** [5] - 57:11, 57:12, 58:15, 81:12, 96:17, 96:20, 97:9, 97:11, 97:20, 99:9, 131:11
**storeroom** [1] - 109:23
**straighten** [1] - 92:16
**straightforward** [1] - 20:19
**streamline** [2] - 123:8, 123:12
**streamlining** [1] - 123:6
**Street** [4] - 1:16, 1:19, 57:15, 57:23
**strike** [1] - 54:7
**struggling** [1] - 25:9
**stub** [9] - 50:14, 88:21, 88:22, 88:24, 88:25, 89:6, 89:8, 89:11
**stubs** [1] - 122:6
**stuff** [1] - 49:9
**subject** [3] - 2:23, 11:17, 83:21
**submit** [4] - 3:10, 10:8, 27:7, 27:15
**submits** [1] - 55:1
**submitted** [4] - 24:8, 53:11, 55:2, 79:13
**subpoena** [3] - 69:21, 69:24, 70:4
**subpoenaed** [3] - 67:8, 69:19, 149:6
**subsequent** [1] - 52:10
**subsequently** [2] - 4:12, 115:24
**sufficiently** [1] - 102:19
**suggest** [1] - 123:9
**suggesting** [1] - 11:3
**sum** [2] - 23:11, 24:20
**summer** [1] - 7:2, 111:25
**Sunday** [7] - 40:21, 40:23, 41:15, 85:22,

85:23, 86:5, 103:19
**Sundays** [6] - 35:9, 85:18, 85:25, 86:2, 103:7, 103:20
**supervise** [2] - 79:12, 79:20
**supervised** [1] - 79:18
**supervising** [2] - 27:19, 92:23
**supervisor** [2] - 79:10, 125:17
**support** [1] - 29:20
**suppose** [2] - 109:6, 109:9
**supposed** [2] - 94:14, 116:11
**supposedly** [3] - 64:18, 117:23, 120:7
**surveillance** [1] - 23:9
**suspend** [1] - 138:7
**sustain** [1] - 113:8
**sustained** [8] - 54:7, 59:24, 96:3, 100:8, 138:2, 139:17, 140:9, 145:10
**sworn** [2] - 31:19, 31:21
**sworn/affirmed** [3] - 32:13, 76:8, 123:20
**systems** [1] - 50:21

## T

**tasks** [1] - 108:6
**tax** [1] - 121:20
**telephone** [6] - 70:7, 70:20, 71:12, 71:14, 71:18, 104:10
**temporary** [2] - 6:7, 24:18
**ten** [2] - 84:18, 97:13
**tenor** [1] - 122:17
**term** [2] - 45:20, 45:21
**terminate** [5] - 3:16, 3:17, 3:18, 9:7, 9:14
**terminated** [3] - 5:21, 9:12, 12:9
**terminating** [4] - 2:22, 3:17, 9:6, 13:12
**termination** [3] - 4:3, 9:8, 24:16
**terms** [3] - 18:17, 29:23, 32:16
**testified** [17] - 32:13, 45:18, 53:15, 56:3, 68:9, 68:17, 76:8, 110:11, 112:16, 119:15, 123:20, 132:14, 136:14, 140:1, 143:6, 147:5,

149:13
**testifies** [1] - 110:18
**testify** [19] - 3:13, 4:7, 4:21, 17:18, 23:1, 24:14, 26:18, 29:23, 58:8, 61:3, 69:19, 77:2, 86:25, 106:15, 115:7, 140:24, 146:14, 146:25, 147:14
**testifying** [4] - 4:10, 69:18, 123:5, 145:13
**testimony** [22] - 7:10, 7:12, 11:9, 12:19, 22:15, 23:5, 44:12, 58:1, 58:4, 58:11, 62:9, 85:13, 114:13, 115:11, 115:16, 122:19, 123:5, 145:16, 146:3, 147:22, 150:1
**texted** [2] - 120:13, 120:18
**THE** [216] - 1:12, 2:3, 2:8, 2:13, 2:21, 3:20, 4:22, 5:6, 5:12, 5:18, 6:13, 6:19, 7:14, 7:24, 8:14, 9:16, 10:5, 11:1, 12:3, 12:22, 12:25, 13:3, 13:10, 13:21, 14:6, 14:12, 14:14, 14:19, 15:11, 16:2, 16:9, 16:16, 16:19, 17:7, 17:23, 18:2, 18:8, 18:12, 18:17, 19:4, 19:7, 19:10, 19:13, 19:22, 25:2, 27:23, 28:13, 28:17, 29:8, 29:21, 30:11, 30:18, 31:4, 31:9, 31:17, 31:23, 31:25, 32:1, 32:2, 32:6, 32:19, 35:21, 37:19, 38:4, 38:5, 38:6, 38:20, 39:2, 42:25, 43:16, 44:14, 44:16, 45:20, 46:2, 48:16, 48:21, 49:1, 51:7, 51:9, 52:12, 52:15, 52:20, 52:24, 53:9, 54:7, 54:22, 55:9, 55:13, 57:4, 58:5, 58:6, 58:12, 58:13, 59:24, 60:3, 60:4, 60:13, 61:1, 61:5, 62:13, 62:17, 62:21, 62:23, 63:12, 64:6, 64:23, 65:6, 65:9, 66:12, 66:13, 68:10, 68:22,

70:14, 70:23, 71:1, 71:5, 72:9, 72:21, 72:24, 73:3, 74:25, 75:3, 75:7, 75:12, 75:14, 75:16, 75:18, 76:4, 78:11, 79:7, 83:23, 86:13, 86:23, 87:11, 87:15, 88:2, 88:12, 90:25, 91:8, 91:9, 91:11, 92:20, 96:3, 96:7, 98:8, 98:13, 100:8, 100:13, 100:16, 102:3, 102:10, 102:20, 103:14, 105:2, 105:8, 105:10, 105:16, 105:20, 106:1, 106:3, 106:12, 106:14, 106:17, 107:13, 108:23, 109:2, 110:15, 111:3, 112:17, 113:4, 113:8, 115:18, 116:15, 117:15, 119:8, 121:23, 122:8, 122:12, 122:14, 122:16, 123:6, 123:16, 127:6, 134:1, 134:2, 137:16, 138:2, 139:17, 139:22, 140:4, 141:5, 141:12, 143:19, 144:19, 145:3, 145:6, 145:10, 146:9, 146:16, 146:19, 147:9, 147:10, 147:20, 148:3, 148:16, 148:17, 148:19, 148:22, 149:4, 149:10, 149:14, 149:18, 149:22, 149:24, 150:3, 150:7
**themselves** [2] - 3:4, 91:7
**thereafter** [1] - 144:9
**therefore** [2] - 55:4, 91:6
**thereto** [1] - 6:4
**they've** [1] - 21:9
**They've** [3] - 21:13, 21:15, 21:21
**third** [1] - 112:9
**Third** [1] - 1:19
**THIS** [1] - 119:21
**threat** [3] - 3:17, 4:9, 25:20

**threaten** [1] - 25:19
**threatened** [1] - 24:16
**threats** [5] - 4:13, 4:21, 6:6, 6:12, 24:17
**three** [16] - 9:10, 20:4, 20:19, 25:11, 35:3, 83:6, 95:11, 95:12, 96:16, 107:24, 108:14, 115:19, 127:19, 127:20, 131:12, 134:12
**throw** [2] - 26:2, 26:4
**Thursday** [13] - 73:22, 84:9, 84:12, 84:15, 84:21, 125:25, 128:21, 142:13, 142:14, 143:7, 143:22, 145:12, 145:15
**Thursdays** [3] - 37:13, 38:10, 84:5
**time-keeping** [1] - 50:21
**today** [28] - 2:25, 3:19, 4:7, 4:21, 5:1, 5:13, 5:15, 5:17, 8:13, 10:10, 10:13, 11:6, 11:9, 11:15, 33:10, 65:4, 76:25, 86:22, 110:9, 115:11, 115:16, 123:10, 124:12, 146:3, 146:14, 146:25, 147:14, 149:13
**Together** [1] - 19:18
**together** [5] - 7:10, 46:9, 47:25, 132:9, 134:12
**tomorrow** [8] - 9:15, 12:7, 86:22, 147:21, 148:2, 148:25, 149:6, 150:7
**took** [17] - 62:1, 80:24, 95:23, 98:24, 101:18, 101:20, 102:5, 102:11, 104:6, 104:8, 104:20, 114:13, 120:2, 120:4, 120:9, 120:15, 144:2
**top** [5] - 68:7, 69:2, 71:8, 71:12, 119:22
**topic** [1] - 83:24
**Torres** [34] - 32:5, 32:6, 32:23, 32:25, 33:10, 33:12, 38:17, 39:4, 39:25, 40:14, 45:25, 49:6, 51:3, 51:13, 51:16, 53:15,

54:10, 55:17, 56:10, 61:12, 69:18, 70:20, 110:7, 110:11, 117:4, 117:5, 117:8, 117:25, 118:1, 118:12, 118:15, 118:23, 118:25, 149:11
**TORRES** [2] - 32:11, 151:3
**Torres'** [1] - 117:12
**Torres's** [1] - 48:24
**totally** [1] - 98:19
**track** [4] - 100:5, 100:10, 100:16, 115:4
**trading** [1] - 31:16
**trained** [1] - 138:21
**TRANSCRIPT** [1] - 1:12
**transcript** [1] - 1:25
**transcripts** [3] - 30:10, 149:2, 149:12
**translate** [5] - 33:4, 76:19, 112:18, 124:6, 144:8
**translated** [4] - 73:4, 88:14, 108:15, 112:23
**translating** [3] - 33:6, 112:20, 124:10
**translation** [1] - 76:22
**transpired** [2] - 4:20, 11:10
**travel** [3] - 90:22, 91:13, 130:23
**treatment** [1] - 21:4
**tremendously** [1] - 88:2
**TRIAL** [1] - 1:12
**trial** [19] - 2:4, 2:9, 7:13, 7:17, 11:5, 11:17, 11:20, 12:1, 12:13, 12:19, 13:10, 15:18, 15:22, 23:18, 28:8, 30:7, 31:5
**tried** [2] - 2:15, 140:9
**trillion** [1] - 26:20
**TRO** [10] - 2:21, 6:6, 6:9, 7:11, 7:12, 7:17, 7:18, 9:3, 11:6, 12:7
**true** [7] - 52:21, 52:23, 54:24, 61:25, 103:8, 103:19, 106:22
**truth** [2] - 64:12, 80:6
**try** [3] - 15:10, 25:21, 26:1
**trying** [7] - 15:17, 23:16, 25:22, 26:7, 48:23, 87:16, 127:5

**Tuesday** [5] - 73:21, 78:23, 86:5, 103:19, 128:20
**Tuesdays** [1] - 41:2
**turn** [3] - 51:3, 72:25, 112:9
**Tursi** [1] - 1:21
**twice** [1] - 84:23
**two** [28] - 2:22, 4:6, 8:15, 16:21, 41:11, 44:16, 51:13, 70:12, 70:15, 70:16, 70:19, 70:21, 70:22, 80:13, 96:15, 96:23, 96:24, 105:13, 106:4, 106:22, 115:19, 123:11, 127:19, 130:11, 131:12, 150:6
**two-page** [2] - 70:15, 70:16
**type** [2] - 12:8, 108:25
**types** [1] - 3:22
**typical** [3] - 22:18, 113:6, 113:9
**typically** [2] - 22:24, 23:12

# U

**Um-hum** [1] - 89:7
**unable** [1] - 2:16
**unavailable** [1] - 17:17
**uncomfortable** [2] - 25:14, 25:15
**under** [11] - 6:2, 6:3, 21:19, 26:25, 56:15, 56:18, 88:7, 122:18, 140:15, 140:21, 141:12
**underlined** [1] - 119:22
**underlying** [5] - 16:8, 16:10, 16:12, 16:13, 16:14
**understood** [1] - 80:6
**Understood** [1] - 15:24
**undertook** [1] - 4:15
**unemployed** [1] - 27:4
**UNITED** [2] - 1:1, 1:13
**United** [4] - 1:4, 26:6, 63:23, 67:22
**unless** [2] - 149:15, 149:18
**unlock** [1] - 131:16
**unlocked** [2] - 91:16, 131:14
**unlocking** [1] - 131:4

**unlocks** [1] - 130:25
**up** [23] - 2:14, 9:22, 12:18, 23:16, 27:11, 30:24, 32:8, 32:17, 58:2, 59:3, 75:11, 90:18, 90:20, 92:4, 92:15, 92:16, 92:22, 103:23, 109:2, 109:4, 117:8, 119:11, 121:24
**update** [1] - 4:19
**upscale** [1] - 20:2
**upset** [2] - 120:21, 120:22
**US** [5] - 1:6, 1:15, 1:21, 13:23, 14:10
**usual** [1] - 85:8
**utilizing** [1] - 31:12

# V

**vacation** [6] - 80:13, 80:15, 80:25, 114:13, 114:18, 130:19
**vague** [1] - 53:7
**Varick** [1] - 1:16
**varies** [2] - 127:5, 135:11
**vary** [5] - 89:18, 90:12, 126:3, 126:11, 130:4
**VASQUEZ** [1] - 13:25
**Vasquez** [23] - 3:7, 13:24, 19:19, 19:24, 64:3, 64:9, 66:4, 66:9, 66:15, 69:10, 70:6, 71:16, 86:21, 87:2, 107:5, 111:22, 115:14, 115:25, 116:1, 119:4, 120:11, 120:24, 121:1
**versus** [1] - 25:25
**views** [1] - 29:18
**Vinnie** [17] - 34:8, 34:10, 34:12, 34:15, 40:9, 40:10, 48:2, 48:7, 48:10, 80:16, 80:18, 80:19, 80:21, 80:22, 81:3, 81:4, 91:17
**Violation** [1] - 16:4
**violation** [6] - 5:9, 24:21, 88:5, 88:6, 88:11, 147:4
**violations** [3] - 20:16, 21:22, 23:16
**visited** [1] - 24:1

# W

**W-2** [2] - 121:16, 121:23
**W-2s** [1] - 122:10
**wage** [7] - 21:6, 21:14, 42:23, 43:8, 58:22, 87:24, 125:11
**Wage/Hour** [2] - 19:19, 19:25
**wages** [7] - 20:15, 20:21, 20:22, 21:2, 22:2, 24:3, 88:10
**wait** [5] - 33:6, 57:21, 76:22, 124:9
**waiters** [1] - 27:2
**waitresses** [1] - 27:2
**waived** [2] - 28:15, 29:19
**waiver** [1] - 30:19
**wall** [4] - 101:5, 101:8, 104:9, 104:22
**walls** [1] - 50:8
**wants** [3] - 30:18, 30:19, 122:20
**wash** [4] - 49:9, 49:15, 131:21, 144:3
**washed** [1] - 128:12
**washing** [4] - 49:19, 50:3, 96:12, 124:21
**watch** [1] - 55:23
**watering** [1] - 49:24
**wear** [1] - 55:22
**Wednesday** [4] - 38:24, 58:2, 58:9, 73:22
**Wednesdays** [11] - 37:10, 37:12, 37:16, 37:20, 37:23, 38:1, 38:15, 38:17, 38:18, 38:22, 41:2
**week** [84] - 22:13, 22:14, 23:13, 24:10, 24:11, 35:7, 37:15, 39:23, 39:24, 40:15, 40:19, 40:20, 41:1, 41:20, 42:5, 42:9, 42:11, 42:14, 42:16, 44:6, 44:9, 44:17, 45:3, 45:4, 48:3, 48:5, 62:4, 70:3, 78:6, 78:8, 78:13, 81:13, 83:4, 86:8, 86:18, 87:23, 88:9, 89:14, 89:17, 89:18, 89:19, 90:1, 90:3, 90:9, 90:12, 90:18, 90:19, 90:20, 104:20, 105:14, 112:6, 113:19,

113:22, 114:3, 114:7, 114:20, 115:21, 120:5, 120:7, 122:6, 125:19, 126:12, 126:22, 127:2, 127:14, 127:17, 127:20, 130:2, 130:3, 130:4, 130:6, 130:9, 130:11, 130:15, 130:18, 130:20, 130:21, 142:4, 142:8
**WEEK** [1] - 119:22
**weekday** [6] - 35:25, 45:6, 81:24, 83:10, 94:7, 126:6
**weekdays** [18] - 22:16, 35:12, 35:15, 36:9, 36:13, 46:1, 46:2, 78:21, 78:23, 81:16, 81:21, 82:9, 82:17, 82:20, 92:1, 98:18, 99:17, 133:24
**weekend** [2] - 11:10, 109:20
**weekends** [1] - 85:9
**weekly** [3] - 21:3, 22:6, 39:22
**weeks** [4] - 44:5, 44:22, 90:16, 130:11
**Westbury** [2] - 57:16, 57:23
**whole** [13] - 34:12, 42:13, 47:4, 48:3, 48:5, 72:13, 77:13, 83:10, 124:22, 132:25, 134:25, 138:13, 145:25
**willful** [1] - 24:21
**willfully** [1] - 23:15
**willfulness** [5] - 52:8, 52:16, 53:12, 55:5, 106:14
**willing** [2] - 8:25, 123:11
**wish** [2] - 13:15, 31:5
**withdraw** [2] - 63:20, 114:16
**withdrawn** [6] - 69:23, 73:20, 115:25, 120:3, 120:14, 121:15
**WITNESS** [12] - 38:5, 58:6, 58:13, 60:4, 61:5, 66:13, 68:22, 100:16, 105:10, 109:2, 145:6, 148:17
**witness** [42] - 7:9, 15:15, 17:17, 31:10,

32:3, 32:8, 32:17, 38:22, 51:6, 55:8, 62:10, 62:21, 63:3, 63:4, 63:7, 64:21, 68:8, 71:23, 72:25, 75:17, 76:4, 83:20, 83:22, 84:1, 86:15, 100:25, 102:5, 102:24, 110:17, 110:18, 122:15, 122:16, 140:11, 141:4, 143:17, 147:7, 147:24, 148:18, 149:6, 150:1
**witnesses** [10] - 12:19, 18:20, 23:18, 24:25, 29:22, 29:25, 30:2, 148:9, 149:24, 150:3
**WK** [1] - 113:13
**word** [1] - 118:6
**words** [10] - 22:6, 68:15, 68:16, 68:19, 80:2, 118:11, 119:21, 124:8, 143:18
**workday** [13] - 35:11, 36:10, 36:22, 36:25, 37:2, 81:15, 82:8, 90:23, 91:14, 91:16, 118:25, 130:25, 131:19
**workdays** [1] - 83:17
**worker** [9] - 93:2, 93:5, 94:6, 94:17, 137:19, 137:21, 137:25, 138:4, 138:7
**workers** [21] - 16:16, 21:18, 23:22, 79:18, 79:21, 80:5, 93:11, 93:25, 94:9, 94:13, 94:15, 95:16, 95:19, 95:22, 96:1, 103:12, 105:6, 123:2, 125:3, 133:22, 138:17, 138:19, 145:22
**workplace** [1] - 91:7
**works** [4] - 125:3, 133:9, 134:20, 134:22
**worst** [1] - 27:4
**worth** [2] - 26:10, 26:11
**wrap** [2] - 7:10, 12:18
**wrist** [1] - 55:22
**write** [4] - 66:2, 104:15, 104:19, 120:1
**writing** [7] - 9:18, 10:9, 63:15, 63:17,

65:22, 115:4, 115:6
**written** [10] - 50:16,
52:1, 52:4, 52:18,
52:21, 52:22, 54:17,
54:20, 65:16, 65:18
**wrote** [2] - 3:8, 104:11

**Y**

**year** [14] - 25:10,
33:18, 44:7, 90:18,
90:21, 97:13, 107:2,
114:21, 115:23,
121:16, 134:8,
134:9, 136:8, 149:8
**years** [5] - 20:3, 20:4,
44:10, 96:23, 96:24
**YORK** [1] - 1:1
**York** [6] - 1:16, 1:19,
1:22, 16:3, 24:2
**yourself** [2] - 92:25,
107:22

**Z**

**Zambrano's** [1] -
135:9
**Zanbrano** [9] - 97:15,
134:24, 134:25,
135:3, 135:6,
135:17, 135:20,
146:4, 146:6
**Zanbrano-Banegas**
[1] - 97:15
**zoomed** [1] - 104:17
**Zorayda** [5] - 13:24,
19:19, 19:24, 64:3,
68:5