152

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - X
                        :
HILDA L. SOLIS, Secretary,    09-CV-2212
Of Labor, United States
Department of Labor,
                        :

            Plaintiff,

                              US Courthouse
        -against-         :   Central Islip, NY

SCA RESTAURANT CORP., d/b/a
LUIGI Q ITALIAN RESTAURANT,
a Corporation, and
LUIGI QUARTA, individually
and as Owner,
            Defendants.:   April 10, 2012
                           9:45 am

- - - - - - - - - - - - X

        TRANSCRIPT OF TRIAL
        BEFORE THE HONORABLE JOSEPH F. BIANCO
        UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:   US DEPARTMENT OF LABOR
                     Office of the Solicitor
                     201 Varick Street, Room 983
                     New York, New York 10014
                     BY:  DANIEL HENNEFELD, ESQ.
                          ELENA S. GOLDSTEIN, ESQ.


For the Defendant:   RAYMOND NARDO, ESQ.
                     129 Third Street
                     Mineola, New York 11501


Court Reporter:      Dominick M. Tursi, CM, CSR
                     US District Courthouse
                     1180 Federal Plaza
                     Central Islip, New York 11722
                     (631) 712-6108 Fax:  712-6124
                     DomTursi@email.com


        Proceedings recorded by mechanical stenography.
        Transcript produced by computer.

153

1          (Call to Order of the Court.)

2          MR. HENNEFELD:  For the plaintiff Secretary of

3    Labor, David Hennefeld.

4          MS. GOLDSTEIN:  Elena Goldstein, also for the

5    plaintiff.

6          MR. NARDO:  For the defendant, Raymond Nardo.

7          THE COURT:  Good morning.

8          We're continuing the trial this morning.  We

9    have the same two interpreters from yesterday.

10         Is there anything we need to address before we

11   proceed?

12         MR. HENNEFELD:  No, your Honor.

13         THE COURT:  You can bring in --

14         MR. NARDO:  Judge, I'd like to make one

15   application.

16         I previously made an application based on the

17   fact that the investigator was seeking high 9s to ask

18   about the employee's immigration status and now I see in

19   the papers for the temporary restraining order the

20   government has again referenced the immigration status of

21   the employees.

22         As stated on page 6, *irreparable harm is*

23   *particularly likely to result in this case where the*

24   *immigration status of the employees is unknown.*

25         It is well established that undocumented workers

154

1   are not entitled to posttermination backpay or

2   reinstatement even when their termination qualifies as

3   retaliatory conduct.  So again, I think that the

4   government has opened the door to that issue.

5             THE COURT:  Again, the application is denied.

6   Obviously, that was put in there to try to demonstrate

7   irreparable harm.  As a result of that there was a

8   termination, but the fact they put that in there in order

9   to support that particular issue does not mean they opened

10  it up for purposes of the trial generally.

11            MR. NARDO:  If I may, judge.  But this

12  particular witness is testifying about the retaliation.

13            THE COURT:  Do you want to ask him if he is

14  illegally here so that you can -- are you going to try to

15  demonstrate that he is legally here and therefore there is

16  no irreparable harm.

17            Is that why you want to ask him?

18            MR. NARDO:  It goes towards the backpay or to

19  the remedies for the temporary injunction that they're

20  seeking in the TRO.  And there be would no irreparable

21  harm if he is legal, which would undercut the TRO.

22            THE COURT:  Mr. Help if he would or Ms.

23  Goldstein.

24            MS. GOLDSTEIN:  Your Honor, there are many

25  issues with Mr. Nardo's explanation so far.

155

1          The first is that the Secretary does not and
2     will not seek, with respect to the 15(a)(3) violation for
3     the TRO, any backpay or compensatory relief.  The
4     Secretary intends to seek only punitive damages as well as
5     a permanent injunction.  On that ground there is no
6     opening of the door with respect to immigration status on
7     the remedies issue.
8          With respect to irreparable harm, the
9     immigration status of these individuals as in these papers
10    is unknown, and inquiry into that immigration status is,
11    for the reasons that the court upheld in the Secretary's
12    previous motion in limine, unduly prejudicial under Rule
13    403.  It was justified keeping that material out.
14         In addition, the Secretary's TRO papers set
15    forth numerous rationales for irreparable harm that rely
16    in no way on the immigration status of the individual
17    employees at issue here.
18         THE COURT:  I guess you are not relying then on
19    their immigration status to demonstrate irreparable harm.
20    Is that what I just heard you say?
21         MS. GOLDSTEIN:  Your Honor, there are, I think,
22    three reasons why there is irreparable harm in this case
23    justifying an injunction against terminating these
24    employees.
25         The first is that witness intimidation

156

1    undermines the effectiveness of the Department's

2    investigation of the Fair Labor Standards Act.  It impedes

3    the department's ability to investigate these cases.

4            The second reason is that intimidating witnesses

5    interferes with both the ability of these particular

6    people as well as the other folks in the workplace to come

7    forward and testify in support, which is also irreparable

8    harm.

9            The third justification for irreparable harm is

10   that in the event that these individuals do turn out to be

11   undocumented, they would not be entitled to full relief.

12           Now, I think that that is a supporting reason,

13   and to the extent that --

14           THE COURT:  If you are going to use that as a

15   supporting reason, wouldn't you have to identify out then

16   whether in fact they were in that category or not?

17           MS. GOLDSTEIN:  If the court needed to reach

18   that, your Honor, but I think that the first two reasons

19   here are sufficient.

20           THE COURT:  Okay.

21           MR. NARDO:  Judge, if I may just respond to

22   that.  Witness intimidation undermines the act.  That is

23   what the Secretary of Labor is advancing.  And that is

24   true.  But I don't see how you get irreparable harm from

25   that.

157

1          Irreparable harm is, you need some harm other

2     than monetary damages that is going to be irreparable

3     here.  And the fact that witness intimidation is the same

4     as retaliation, you can't retaliate --

5          THE COURT:  Wouldn't it be irreparable harm if

6     your clients are firing people who were going to testify

7     in this case to try to prevent them from testifying?

8          Why wouldn't that be irreparable harm if they

9     didn't have those people to testify because they were

10    placed in fear of testifying.

11         Wouldn't that be irreparable harm to the

12    government and their ability to prove this case if all

13    their witnesses refused to comply with the subpoenas

14    because they had all been fired?  Isn't that irreparable

15    harm?

16         MR. NARDO:  Could be.  But he's testified, and

17    the next witness is going to testify.  So both witnesses

18    who are alleged to have been a target of this and from

19    whom the irreparable harm is being derived are both here

20    and are both going to testify.

21         THE COURT:  That's also because there is a TRO

22    in place that prevents that from happening.  But they're

23    not relying on that additional reason.  There is no reason

24    to question him if they didn't ask him that on direct and

25    they're not relying upon that for purpose of their

158

1    preliminary injunction application.

2           I have been thinking about this whole issue

3    about amending the complaint and it is not clear in my

4    mind how that would work.  My belief is, first of all, I

5    haven't gone back and looked, but there hasn't been any

6    adverse action taken.  So again, I'm confused as to what

7    the relief would be.  To the extent you would want a

8    permanent injunction, if you amend it to include

9    retaliation and the relief you are seeking as a permanent

10   injunction, the injunction would simply basically, the

11   injunction cannot be that they could never fire these

12   workers under any circumstances because that would be too

13   broad.  A worker could commit misconduct or some other

14   reason to be fired.  Or the store, the restaurant may go

15   out of business.  It would only be an injunction that they

16   can't retaliate, basically.  So it would be an injunction

17   not to violate the law.

18           And I'm not sure exactly what the purpose would

19   be if, in fact, no retaliation is taken during the trial

20   and the government successfully gets their testimony to

21   amend their complaint.  I don't know they could put in an

22   answer.  I would have to consider whether I would reopen

23   the trial record to allow them to put on additional

24   evidence on that issue beyond what we have done for

25   purpose of a potential preliminary injunction.

159

1          So I don't know exactly how the government

2    intends on pursuing that, or whether they intend to pursue

3    that, but I suggest you think about whether that would be

4    necessary, given the posture that we're in.

5          And I believe that Mr. Quarta, if he didn't know

6    on Thursday or Friday about the law of retaliation, he

7    certainly knows it now.  Mr. Nardo has been explaining it

8    to him.

9          So I suggest the government consider all those

10   things and we'll try to figure how any amendment to the

11   complaint would work at this point in this particular

12   case.  Okay?

13          MR. HENNEFELD:  Yes, your Honor.

14          May we respond further on that when we rest our

15   case?

16          THE COURT:  Yes.

17          MR. HENNEFELD:  Yes.

18          MR. NARDO:  If I could just continue this

19   application.

20          The last point I just want to make is, and just

21   specifically this is on page 5 and 6 of the government's

22   brief.  I would only be asking these two witnesses,

23   Mr. Acosta and the next witness, Mr. Cantos Chevez, who

24   either have alleged or will allege some sort of

25   retaliation if your Honor found irreparable harm, and

160

1    again, from the brief by the government said irreparable

2    harm is particularly likely to result in this case where

3    the immigration status of the employees is unknown.

4           So I think since they are both here, both

5    testifying, they're both going to work, as far as I know,

6    today and thereafter, I think that the immigration status

7    has been put into play for the irreparable harm and that I

8    should be allowed to inquire into that to determine

9    whether or not there is in fact irreparable harm.

10          THE COURT:  Okay.  But again, I don't want to

11   repeat myself, but the government, whatever is put in

12   their papers as grounds for potential irreparable harm,

13   they are not pursuing that for purposes of the preliminary

14   injunction.

15          It is pretty clear to me, based upon my review

16   of the papers, that, as I said a moment ago, their

17   inability to have these people testify would be

18   irreparable harm in and of itself so that was sufficient

19   for me to issue the TRO.

20          I did not want a situation where all the

21   witnesses were disappearing because your client was firing

22   them before the trial.  So that was the basis for me

23   issuing the TRO and the irreparable harm that I believe

24   was clear.

25          Whether or not again there would be other

Acosta - for the Plaintiff - Cross/Mr. Nardo

161

1   irreparable harm, once they testify at this hearing, that

2   would continue to the government wanting to consider that

3   at that point.  But they're not to rely upon the

4   immigration status, they just stated that, so I don't

5   believe there is any basis, given their position on that,

6   to allow questioning on that.

7           Okay?

8           MR. NARDO:  Thank you, your Honor.

9           THE COURT:  So let's bring Mr. Acosta back in.

10

11  **JOSE ANIBAL ACOSTA**

12          called by the Plaintiff, having been previously

13          duly sworn/affirmed, continued testified (through

14          the Spanish interpreters) as follows:

15          THE COURT:  Mr. Acosta, I remind you that you

16  are still under oath.

17          Do you understand?

18          THE WITNESS:  Yes.

19          THE COURT:  You can be seated.

20          Mr. Nardo, whenever you are ready.

21          MR. NARDO:  Thank you, your Honor.

22

23  CROSS-EXAMINATION

24  BY MR. NARDO:

25  Q.   Good morning, Mr. Acosta.

Acosta - for the Plaintiff - Cross/Mr. Nardo

162

1   A.   Good morning.

2   Q.   After you testify today, are you going to work at

3   Luigi Q's?

4   A.   I don't know.  If he allows it I will.  But I don't

5   know because I don't know if he will take me back again

6   because he told me that I wouldn't have a job any more.

7   Q.   You intend to go to the restaurant after you testify.

8   Correct?

9   A.   Yes.

10  Q.   Mr. Acosta, have you ever had a conversation directly

11  with Luigi Quarta?

12  A.   Yes.

13  Q.   And during that conversation -- withdrawn.

14        Does Luigi Quarta speak Spanish?

15  A.   Yes.

16  Q.   Does he speak Spanish fluently?

17  A.   Yes.

18  Q.   And it is your testimony that Luigi Quarta has had

19  conversations with you in the Spanish language.  Correct?

20        MS. GOLDSTEIN:  Objection.  Mischaracterizes the

21  conversations.

22        THE COURT:  Overruled.

23  A.   Yes.

24  BY MR. NARDO:

25  Q.   Have you ever received direction from -- withdrawn.

Acosta - for the Plaintiff - Cross/Mr. Nardo

163

1    Did you work at Luigi Q's at the time that

2  Pastor worked there?

3  A.   Yes.

4  Q.   Did Pastor ever give you directions as to what to do?

5  A.   No.

6  Q.   Did Pastor ever need an item and ask you to get that

7  item for him?

8  A.   Well, I don't know what the question you are asking

9  me is, because in the kitchen he is the chef and if he

10 needs a sauce he tells you bring me such-and-such a sauce,

11 you have to bring it to him because he's in charge.

12 Q.   And is that the same -- withdrawn.

13      Is that the same with Enrique, the current head

14 chef?

15 A.   Yes.  When something has to be brought to him, you

16 have to bring it to him.

17 Q.   Did Luigi -- withdrawn.

18      Do you recall signing a statement for the

19 Department of Labor?

20 A.   What do you mean?  How so?

21 Q.   Do you recall meeting Miss Vasquez in the parking lot

22 of Luigi Q's Italian Restaurant?

23 A.   With Mrs. Vasquez?  Yes.  But at the parking lot of

24 the pizzeria next door.

25 Q.   How did you know to meet her there at a certain time?

Acosta - for the Plaintiff - Cross/Mr. Nardo

164

1   A.   Well, I don't know.  I was having a break and I got a

2   call.  And I don't know because some had already gone, so

3   they must have given her my telephone number.

4   Q.   So your first communication with Miss Vasquez was her

5   calling you on your cell phone.  Is that correct?

6   A.   Yes.  Yes.

7   Q.   What did she say to you?

8   A.   Well, they were there and she told me that they were

9   out there and that they were inviting me to come to court.

10  Q.   When you say *they*, who are you talking about?

11  A.   To her, Mrs. Vasquez.

12  Q.   And did you go and speak with Miss Vasquez at that

13  time?

14  A.   Yes.

15  Q.   Did she have -- withdrawn.

16       Did she take a statement from you at that time?

17  A written statement?

18  A.   Yes.

19  Q.   And did you sign that statement?

20  A.   Yes.

21  Q.   Was there anyone there at that time other than

22  yourself and Miss Vasquez?

23       MS. GOLDSTEIN:  Objection.

24       THE COURT:  What grounds?

25       MS. GOLDSTEIN:  To the extent that other

Acosta - for the Plaintiff - Cross/Mr. Nardo

165

1    informants were there whose identities have not been

2    disclosed, we ask that those identities not be disclosed.

3              THE COURT:  Overruled.

4    A.   Yes, there were.

5    BY MR. NARDO:

6    Q.   Who?

7    A.   I do not remember the name of who it was, but there

8    was another guy there.

9    Q.   Did he work at the restaurant or was he from the

10   Department of Labor?

11   A.   Yes, he worked at the restaurant.

12   Q.   And this occurred in January of 2010.  Correct?

13   A.   Yes.

14   Q.   And as you sit here today and you are testifying, you

15   can't remember the name of your coemployee who was meeting

16   with you at that time with Miss Vasquez?

17             MS. GOLDSTEIN:  Objection.

18             THE COURT:  Sustained.

19             Just go back to the other issue.  I think the

20   issue of credibility that would relate to how that

21   information was brought to the Department of Labor and

22   whether it was part of some group effort among employees

23   or a decision made on his own could potentially go to the

24   witness' credibility.

25             Therefore, it is probative under 403, it

Acosta - for the Plaintiff - Cross/Mr. Nardo

166

1   outweighs any other issue related to the name of the other

2   individual who may have been involved in reporting

3   information.

4   BY MR. NARDO:

5   Q.   So there was one other individual with you from the

6   restaurant at this time.  Correct?

7   A.   Yes.

8   Q.   Do you remember what position that person had at the

9   restaurant?

10          MS. GOLDSTEIN:  Objection.

11          THE COURT:  Overruled.

12  A.   Yes.

13  BY MR. NARDO:

14  Q.   What was his position?

15  A.   Salad man.

16  Q.   And do you remember his first name or last name?

17  A.   The name Horacio.

18  Q.   Did Horacio give a statement to -- withdrawn.

19          Did Horacio sign a statement before Miss Vasquez

20  at that time?

21          MS. GOLDSTEIN:  Objection.

22          THE COURT:  What is the grounds?

23          MS. GOLDSTEIN:  Horacio's statement is not at

24  issues in this case.

25          THE COURT:  You keep saying it is privileged

Acosta - for the Plaintiff - Cross/Mr. Nardo

167

1    under the law.  But isn't it relevant whether people

2    together giving statements at the same time, if they were

3    providing information at the same time, hearing what

4    someone else was saying?  Doesn't that go the issue of

5    credibility, whether he was simply repeating what some

6    other person said or he was providing independent

7    information on his own?

8          MS. GOLDSTEIN:  To the extent there was another

9    person there and Mr. Nardo seeks to inquire as to what

10   that person said and the contents of that statement, the

11   government would not have an objection.

12         To the extent that Mr. Nardo seeks to elicit the

13   identity of that individual, the government believes the

14   identity of that individual is and should be privileged.

15         MR. NARDO:  If I may respond, judge.

16         During discovery they had all these privileges.

17   Informant privilege was one of them.  Once they present

18   their case, once they put the people on the witness stand,

19   it is my understanding that that privilege is waived and

20   that now a search for the truth occurs regardless of who

21   the informants are.

22         MS. GOLDSTEIN:  Your Honor, the government is

23   happy to brief this issue that privilege is waived with

24   respect to certainly those individuals who testify but not

25   nontestifying informant witnesses.

Acosta - for the Plaintiff - Cross/Mr. Nardo

168

1      THE COURT:  But again, my belief is that it

2  would be relevant if this informant was present for his

3  statement, the same statement at the same time he made

4  these statements, that that would be important in

5  determining the credibility of the witness.

6          And I think that is what this employee was

7  about.  I thought he had said that he was there.  So I'm

8  going to allow that testimony to that extent, that it

9  doesn't go to potential issues of credibility and whether

10  information would be provided together or separately by

11  each of these individuals.

12          I will allow him to testify that this other

13  individual made statements to Miss Vasquez in his

14  presence.

15  BY MR. NARDO:

16  Q.   When you and Mr. Horacio met with Miss Vasquez, were

17  you standing in a parking lot?  Were you sitting in a car?

18  Where were you?

19  A.   Sitting in a car.

20  Q.   Was that the car driven by Miss Vasquez?

21  A.   Well, they were there.  I don't know if it was there

22  because they stayed back there and I left, so I don't know

23  if it was theirs but they were there.

24  Q.   Who was in the car?

25  A.   Mrs. Zorayda.  There was another guy but I do not

Acosta - for the Plaintiff - Cross/Mr. Nardo

169

1   remember his name.  It was just them.

2   Q.    Okay.  And the other guy was the person who worked at

3   Luigi Q's.  Correct?

4   A.    Yes.

5   Q.    Did the three of you -- did everyone speak in

6   Spanish?

7   A.    Who?

8   Q.    Did you and the other employee from Luigi Q's and

9   Miss Vasquez converse in Spanish while you were in the car

10  that Miss Vasquez drove?

11  A.    Yes.

12  Q.    Did you hear what the other employee, Horacio, was

13  telling Miss Vasquez?

14  A.    No.

15  Q.    Did Horacio have a conversation with Miss Vasquez in

16  the car while you were in the car?

17  A.    I do not remember.

18  Q.    Did you have a conversation with Miss Vasquez while

19  Horacio was in the car?

20  A.    No.

21  Q.    On this day when did you have a conversation with

22  Miss Vasquez?

23  A.    What do you mean?  Explain it to me a little bit

24  more.

25  Q.    Did you speak with Miss Vasquez while you were in the

170

1  car on that day when you signed the statement?

2  A.    Yes.

3  Q.    And did Horacio or the other employee also speak with

4  Miss Vasquez that day while you were in the car?

5          MS. GOLDSTEIN:  Objection.  Asked and answered.

6          THE COURT:  Overruled.

7  A.    I do not recall.

8  BY MR. NARDO:

9  Q.    Do you recall what Miss Vasquez said to you during

10  that conversation?

11  A.    Yes.

12  Q.    What did she say to you?

13  A.    She asked me what time we got in.  What time I left.

14  The time for the break.  And what time I went back home in

15  the evening.

16  Q.    And did she ask the same questions of Horacio?

17  A.    I don't know.  I don't.  I don't know if she asked

18  him the same ones.  I don't know.

19  Q.    How many seats were in this car?

20  A.    Four.

21  Q.    Where was Miss Vasquez sitting?

22  A.    Always sitting in front.  In front, on the driver's

23  side, where the steering wheel is.

24  Q.    Where was Horacio sitting?

25  A.    Horacio was not there at that moment.

Acosta - for the Plaintiff - Cross/Mr. Nardo

171

1   Q.   Did Horacio enter the car at some point?

2   A.   Yes, he did go in after I left the car.

3   Q.   I thought your prior testimony was that all three of

4   you were in the car at the same time.

5   A.   I do not remember because the three of us who were

6   there were two attorneys and myself.

7   Q.   This was in Miss Vasquez' car?

8   A.   Well, as I was telling you, I don't know whose car it

9   was.

10  Q.   This was when you were in the car where Miss Vasquez

11  was sitting in the driver's seat, that you have been

12  testifying about?

13  A.   Yes.

14  Q.   Am I correct that there were three people in that car

15  at one time?

16  A.   Yes.

17  Q.   And was it Miss Vasquez, you, and Horacio, the other

18  employee?

19  A.   No.

20  Q.   When you were in the car talking with Miss Vasquez,

21  who was the third person in the car?

22  A.   The other guy who was there, I don't know whether or

23  not he was a lawyer but he was in the back.

24  Q.   Was he an employee of Luigi Q's?

25  A.   No.

Acosta - for the Plaintiff - Cross/Mr. Nardo

1   Q.    Before you went to the car -- withdrawn.

2         Before you went to that part of the parking lot

3   to speak with Miss Vasquez, did any employee of Luigi Q's

4   walk over to the car with you?

5   A.    No.  No.  They were having their break by the tree

6   that is on the parking lot.

7   Q.    At some point did you see Horacio there by that car

8   where Miss Vasquez was in the driver's seat?

9   A.    Yes, because I saw him go into the car that was

10  there.

11  Q.    Was that before you went in or after you went into

12  the car?

13  A.    After.

14  Q.    And your testimony is that you did not walk over to

15  the car with Mr. Horacio?

16        MS. GOLDSTEIN:  Objection.

17        THE COURT:  I think you have gone into this,

18  Mr. Nardo.

19        I will let you ask it one more time.  Go ahead.

20  A.    Yes.

21  BY MR. NARDO:

22  Q.    Did you walk back to the restaurant with Horacio?

23  A.    No.

24  Q.    Did you ever discuss the conversation you had with

25  the Department of Labor on that day with Horacio at any

Acosta - for the Plaintiff - Cross/Mr. Nardo

173

1  other time?

2  A.   No.

3  Q.   Before you had that conversation with Miss Vasquez,

4  did you know that the Department of Labor was suing Luigi

5  Q's Italian Restaurant?

6  A.   No.

7  Q.   So did you find out about this lawsuit when you spoke

8  to Miss Vasquez in the car on that day?

9  A.   Yes.

10  Q.   And after finding that out, did you go back to the

11  restaurant and have a conversation with any employees

12  about the fact that the Department of Labor was suing

13  Luigi Q's Italian Restaurant and Luigi Quarta?

14  A.   No.

15  Q.   Were you told not to discuss this with other

16  employees?

17           MS. GOLDSTEIN:  Objection.

18           THE COURT:  Overruled.

19  A.   No -- well, you are asking me the question whether I

20  was told not to say anything?

21  BY MR. NARDO:

22  Q.   That's correct.

23  A.   We simply did not discuss anything about court

24  amongst us.  We did not discuss anything about that, about

25  the court.

Acosta - for the Plaintiff - Cross/Mr. Nardo

174

1   Q.   Did someone tell you not to discuss it amongst

2   yourselves?

3           MS. GOLDSTEIN:  Objection.  Asked and answered.

4           THE COURT:  Sustained.

5           MR. NARDO:  It was asked.  I don't believe he

6   answered it.

7   BY MR. NARDO:

8   Q.   Did Miss Vasquez ever tell you not to discuss this

9   case with other employees?

10          MS. GOLDSTEIN:  Objection.

11          THE COURT:  I will allow it one more time.

12  A.   No.  She did not tell me anything.

13  BY MR. NARDO:

14  Q.   Did you discuss this case with Luigi Quarta after

15  this meeting with Miss Vasquez where she was seated in a

16  car?

17  A.   What do you mean?

18  Q.   After you met with Miss Vasquez in her car in the

19  parking lot -- in a car in the parking lot on that day,

20  and you first learned of this lawsuit against Luigi Q's

21  Italian Restaurant, did you tell Luigi Quarta about this

22  conversation you had with Miss Vasquez?

23  A.   No.

24  Q.   Did Miss Vasquez tell you not to discuss the lawsuit

25  with Luigi Quarta?

Acosta - for the Plaintiff - Cross/Mr. Nardo

175

1    MS. GOLDSTEIN:  Objection.

2    THE COURT:  Overruled.

3    A.   No.

4    BY MR. NARDO:

5    Q.   Did it ever occur to you that you should tell

6    Mr. Quarta that the Department of Labor was suing him and

7    was interviewing you?

8    A.   No.

9    Q.   Why didn't you tell Luigi Quarta that you had just

10   met with Miss Vasquez about this lawsuit?

11            MS. GOLDSTEIN:  Objection as irrelevant.

12            THE COURT:  Sustained.

13   BY MR. NARDO:

14   Q.   Did Miss Vasquez tell you that you were not being

15   paid correctly?

16   A.   No.  Not at that moment.

17   Q.   Did Miss -- did she ever tell you that you were not

18   being paid correctly?

19   A.   She did not tell me that I was not being paid

20   correctly.

21   Q.   Did anyone ever tell you that?

22   A.   No.

23   Q.   Is it your opinion that you were being paid

24   incorrectly?

25            MS. GOLDSTEIN:  Objection.

Acosta - for the Plaintiff - Cross/Mr. Nardo

176

1     THE COURT:  Sustained.

2   BY MR. NARDO:

3   Q.   Did Miss Vasquez or anyone from the Department of

4   Labor ever tell you that they were trying to recover money

5   for you?

6   A.   No.

7            MR. NARDO:  I think I'm up to Exhibit M, judge.

8   I would like to show Exhibit M to the witness, marked I

9   guess for identification.  It is a three-page statement.

10           I would like to direct him to the second and

11  third pages.

12           MS. GOLDSTEIN:  Your Honor, the record already

13  reflects that this individual cannot so much as even spell

14  his name, so the Department would object to any request to

15  have this individual read the words on the page.

16           THE COURT:  Well, this is the statement that he

17  signed.

18           MR. NARDO:  His name is written at the bottom of

19  it.

20           THE COURT:  I think he is entitled to explore

21  whether his signature was written at the bottom, whether

22  he dotted it in some way.  So I will allow it even if he

23  can't read it.

24  BY MR. NARDO:

25  Q.   Do you see on the last page of this document your

Acosta - for the Plaintiff - Cross/Mr. Nardo

177

1   name is written?

2   A.   Yes.

3   Q.   Did you write your name there?

4   A.   Yes.

5   Q.   Why did you write your name there?

6   A.   Because the woman lawyer -- I mean Zorayda, told me

7   to sign.

8   Q.   And were you able to read the statement before you

9   signed it?

10   A.   No.  She read it to me.

11        Yes, I did, because she read it to me.

12   Q.   And after she read it to you, did you sign it?

13   A.   Yes.

14   Q.   And in that statement it says:  *We have not been told*

15   *anything about the investigation.*  Withdrawn.  Withdrawn.

16        Do you remember Miss Vasquez reading to you a

17   sentence that said:  *We have not been told anything about*

18   *the investigation?*

19   A.   What do you mean?

20   Q.   When Miss Vasquez read the statement back to you, was

21   there a sentence in that statement that said:  *We have not*

22   *been told anything about the investigation*?

23   A.   Who?  I had not been told or who hadn't been?  I

24   don't understand.

25   Q.   Are you able to read Spanish, Mr. Acosta?

178

1   A.   Yes.

2   Q.   Can you look at the second page of that statement.

3          MR. NARDO:  Can I direct him to a sentence,

4   judge?

5          THE COURT:  Yes.

6   A.   But I don't understand that.  I don't understand it

7   that way.  No.

8   BY MR. NARDO:

9   Q.   If I direct you to a certain part --

10  A.   I can't read it like that.  Only this name.  That is

11  my signature.

12  Q.   I'm not sure I can read it, either, but do you see

13  here where it says:  *No mas*?

14         MS. GOLDSTEIN:  Objection, your Honor.  He has

15  already testified that he can only read his name.

16         THE COURT:  If you want to have the interpreter

17  read a portion of that to him and ask him whether he

18  recalls that being said to him, I will allow that.

19         MR. NARDO:  Can you read this sentence,

20  beginning with *"No mas,"* to him.

21         (Interpreter confers with witness.)

22  BY MR. NARDO:

23  Q.   Do you know what that means?

24  A.   I don't know what it means.

25  Q.   How many times have you spoken with Miss Vasquez

Acosta - for the Plaintiff - Cross/Mr. Nardo

179

1    other than this meeting?

2    A.   Twice.

3    Q.   And when was that?

4    A.   I don't remember the exact date of the second time.

5    I don't remember.

6    Q.   What did you discuss on that second occasion?

7    A.   The same thing, about what time I started, and she

8    told me that I should tell the truth because, she told me,

9    I was going to be before the judge and so I could not lie.

10   Q.   And do you see on that statement before you, do you

11   see at the top of it, it is dated 1/28/10?

12        The top right.

13   A.   Here?  Yes.

14   Q.   And do you see where it says 1/28/10?

15   A.   Yes.

16   Q.   Mr. Acosta, do you feel awkward having to testify

17   against your current employer, Luigi Q's Italian

18   Restaurant?

19   A.   What do you mean?

20   Q.   Do you feel uncomfortable testifying against your

21   current employer?

22   A.   Uncomfortable?

23   Q.   Yes.

24   A.   Well, yes, because he's my boss and I did it because

25   he kicked me off the job because he told me don't come

Chevez - for the Plaintiff - Direct/Ms. Goldstein

180

1   back any more, so that's the way it is.

2   Q.   And you received a subpoena from the Department of

3   Labor to appear here and testify against Mr. Quarta.  Is

4   that correct?

5   A.   Yes.

6   Q.   Did you receive a check with that subpoena?

7   A.   No.

8         MR. NARDO:  I have nothing further.

9         THE COURT:  Any redirect?

10        MS. GOLDSTEIN:  No, your Honor.

11        THE COURT:  You can step down, Mr. Acosta.

12        (The witness was excused.)

13        THE COURT:  Next witness.

14        Please come up to the witness stand, sir.

15

16  **JUAN CARLOS CANTOR CHEVEZ**

17        called by the Plaintiff, having been first duly

18        sworn/affirmed, was examined and testified (through

19        the Spanish interpreters) as follows:

20

21        THE COURT:  Go ahead.

22

23  DIRECT EXAMINATION

24  BY MS. GOLDSTEIN:

25  Q.   Good morning, Mr. Chevez.

Chevez - for the Plaintiff - Direct/Ms. Goldstein

181

1   A.   Good morning.

2   Q.   Can you please state your primary language.

3   A.   Spanish.

4   Q.   Do you speak any English?

5   A.   No.  A little bit.

6   Q.   Well, there is an interpreter here to translate the

7   questions from Spanish to English and back again, so I

8   would ask that even if you understand some of the

9   questions, you just wait until it is translated and then

10  give your answer in Spanish.  Okay?

11  A.   Okay.

12  Q.   Why did you come to court today?

13  A.   Because I received a letter that said I had to appear

14  in court.

15  Q.   Did you ever work at Luigi Q's Italian Restaurant?

16  A.   Yes.

17  Q.   How did you get that job?

18  A.   Through a friend, Jeffrey Chavez.

19  Q.   Did Jeffrey Chavez work at the restaurant?

20  A.   Yes.

21  Q.   When you first went to the restaurant, who hired you

22  for the job?

23  A.   Luigi.

24  Q.   And did Luigi tell you anything about the job when

25  you were hired?

Chevez - for the Plaintiff - Direct/Ms. Goldstein

182

1    A.    Yes.

2    Q.    What did Luigi tell you?

3    A.    That I would work six days and that he was going to

4    pay me $400.

5    Q.    Was that $400 --

6    A.    And my job was as a dishwasher.

7    Q.    And was that $400 a week?

8    A.    Yes.

9    Q.    Did Luigi tell you anything about overtime pay?

10   A.    No.

11   Q.    When did you first start working at the restaurant?

12   A.    2005.

13   Q.    And are you currently working at the restaurant?

14   A.    Now I am.

15   Q.    From 2005 to the present was there a period of time

16   when you did not work at the restaurant?

17   A.    Yes.

18   Q.    When did you stop working at the restaurant?

19   A.    2009.

20   Q.    And about how many months passed before you went back

21   to work at the restaurant?

22   A.    About nine months.

23   Q.    How did you end up coming back to work at Luigi Q's?

24   A.    Because through Jeffrey Chevez, he called me to find

25   out if I could come talk to him because he needed me to

183

1    come back again to work.

2    Q.    Who do you mean by *he*?

3    A.    Well, that is to say, Jeffrey called me to tell me

4    that Luigi had asked or had told him that he needed to

5    talk to me to come back to work.

6    Q.    What kind of work did you do at the restaurant when

7    you first started?

8    A.    Dishwasher.

9    Q.    Did your job ever change?

10   A.    Yes.

11   Q.    What did your job change to?

12   A.    Salad man.

13   Q.    About how long had you been working as a dishwasher

14   when you started doing the salads?

15   A.    About two years later.

16   Q.    So were you doing salads before you left in 2009?

17   A.    Yes.

18   Q.    What is your current job at the restaurant?

19   A.    Pasta.

20   Q.    When did you start working doing pasta at the

21   restaurant?

22   A.    When I returned in 2009.

23   Q.    What days of the week do you currently work at the

24   restaurant?

25   A.    I'm sorry?  I didn't -- please repeat that.

Chevez - for the Plaintiff - Direct/Ms. Goldstein

184

1   Q.   What days of the week do you work?

2   A.   From Monday through Friday through Saturday.

3   Q.   And Monday through Friday what time do you start

4   working?

5   A.   10:30.

6   Q.   Do you always start working exactly at 10:30 or does

7   the start time change from day to day?

8   A.   Always 10:30.

9   Q.   Have you ever been told to come in later than 10:30

10  in the morning Monday through Friday?

11  A.   No.

12  Q.   When you first started in 2005, how did you know what

13  time to come in the morning?

14  A.   Because Luigi told me that that was the starting

15  time.

16  Q.   And Saturdays what time do you start work?

17  A.   3 o'clock.

18  Q.   Have you always started at 3 o'clock on Saturdays?

19  A.   Yes.

20  Q.   Have you ever been told to come into work later than

21  3 pm on a Saturday?

22  A.   No.

23  Q.   On weekdays, Monday through Friday, do you take a

24  break during the day?

25  A.   Yes.

Chevez - for the Plaintiff - Direct/Ms. Goldstein

185

1   Q.   What time does your break start?

2   A.   3 o'clock.

3   Q.   Do you ever have to keep working past 3 o'clock on

4   weekdays?

5   A.   Sometimes I do.

6   Q.   Why do you sometimes have to work past 3 o'clock?

7   A.   Well, there are times when their friends come and

8   they get there around 2:30 or so and then they take a

9   while to order and because the people get there really

10  late sometimes.

11  Q.   About how many times a week or a month do you need to

12  keep working past 3 pm?

13  A.   Like once or twice a week.

14  Q.   Are you ever able to take a break before 3 pm?

15  A.   No.

16  Q.   What time does your break end on weekdays?

17  A.   4:30.

18  Q.   Other than the break that you have just described, do

19  you take any other breaks Monday through Friday?

20  A.   No.

21  Q.   And during the whole time you have worked at the

22  restaurant, has this been your break schedule?

23  A.   Yes.  Now it is.

24  Q.   Do you take any breaks on Saturday?

25  A.   No.

Chevez - for the Plaintiff - Direct/Ms. Goldstein

186

1   Q.   Do you stop working at the exact same time every

2   evening?

3   A.   No.

4   Q.   Why not?

5   A.   Because sometimes it's just the same thing.  There

6   are customers who get there a little late and so you end

7   up going past your time.  Sometimes.

8   Q.   What time do you usually finish work Monday through

9   Thursdays?

10  A.   9 o'clock.

11  Q.   Do you ever stay later than 9 o'clock?

12  A.   Sometimes I do.

13  Q.   Approximately how many times a normal week or a month

14  do you stay after 9 o'clock Monday through Thursday?

15  A.   Once or twice.

16  Q.   Once or twice a week or a month?

17  A.   A week.

18  Q.   Do you ever leave before 9 o'clock Monday through

19  Thursday?

20  A.   No.

21  Q.   What time do you usually finish work on Friday?

22  A.   10 o'clock.

23  Q.   Do you ever leave before 10 o'clock on Friday?

24  A.   No.

25  Q.   What time do you usually finish work on Saturdays?

Chevez - for the Plaintiff - Direct/Ms. Goldstein

1   A.   10 o'clock.

2   Q.   And do you ever leave before 10 o'clock on Saturdays?

3   A.   No.

4   Q.   Do you ever leave after 10 o'clock on Fridays or

5   Saturdays?

6   A.   Yes.

7   Q.   About how often does that happen?

8   A.   Like once a week.

9   Q.   When you first started, how were you paid, Mr. Cantos

10  Chevez?

11  A.   Cash.

12  Q.   Are you still paid in cash?

13  A.   No.

14  Q.   How are you paid now?

15  A.   Part by check and the other part in cash.

16  Q.   Who pays you?

17  A.   Luigi.

18  Q.   Has Luigi always paid you since you have worked at

19  the restaurant?

20  A.   Yes.

21  Q.   When you first started working at Luigi Q's, how much

22  were you paid?

23  A.   $400 per week.

24  Q.   And when you received $400 per week, did you receive

25  exactly that amount or did it vary a bit from week to

188

1   week?

2   A.   Always the same amount.

3   Q.   Did your pay ever increase?

4   A.   Yes.

5   Q.   What did your pay increase to?

6   A.   420.

7   Q.   And when did your pay increase to 420?

8   A.   When I switched from dishwasher to salad man.

9   Q.   And when you say 420, do you mean $420 per week?

10  A.   Yes.

11  Q.   During the time you were earning $420 per week, did

12  you receive exactly that amount each week?

13  A.   Yes.

14  Q.   Did your pay ever increase again?

15  A.   Yes.

16  Q.   When did your pay next increase?

17  A.   450.

18  Q.   Is that $450 per week?

19  A.   Yes.

20  Q.   When did your pay go up to $450 a week?

21  A.   That was still while I was there as a salad man.

22  Q.   About how many years or months did you earn $450 a

23  week?

24  A.   For about a year-and-a-half or so.

25  Q.   How did you come to receive that raise to $450 a

189

1   week?

2   A.   Because I told Luigi that I needed a $30 raise or

3   more.

4   Q.   And was it Luigi's decision to give you that raise?

5        THE INTERPRETER:  Interpreter correction.

6        It is a $30 raise, period.

7        MR. NARDO:  Objection.

8        THE COURT:  Overruled.

9   A.   Yes.

10  BY MS. GOLDSTEIN:

11  Q.   When you were earning $450 a week, did you receive

12  exactly that amount each week?

13  A.   Yes.

14  Q.   How much are you currently paid at the restaurant?

15  A.   550.

16  Q.   And is that $550 each week?

17  A.   Yes.

18  Q.   And when did you start receiving $550 each week?

19  A.   When I went back there again to the same place.

20  Q.   How did you find out what your pay would be when you

21  returned to the restaurant after being gone?

22  A.   Because I spoke to Luigi and he told me that that was

23  the pay I was going to get when I returned to work.

24  Q.   What language do you use to communicate with Luigi?

25  A.   Spanish.

Chevez - for the Plaintiff - Direct/Ms. Goldstein

190

1   Q.    Do you currently earn exactly $550 each week or does

2   it change from week to week?

3   A.    No, it's always the same.

4   Q.    How do you travel into the restaurant at the start of

5   the workday?

6   A.    Bike.

7   Q.    Who unlocks the restaurant each day?

8   A.    He opens it now.

9   Q.    Who is *he*?

10  A.    Luigi.

11  Q.    And for approximately how long has Luigi been

12  unlocking the restaurant in the morning?

13  A.    For about two months.

14  Q.    Who unlocked the restaurant before that?

15        MR. NARDO:  Objection.  Relevance as to who is

16  unlocking the restaurant.

17        MS. GOLDSTEIN:  Your Honor, to the extent he is

18  pursuing an executive exemption against the chef, it is

19  relevant as to who has keys and unlocks the restaurant.

20        THE COURT:  Overruled.

21        THE INTERPRETER:  May the question be repeated

22  for the interpreter?

23  BY MS. GOLDSTEIN:

24  Q.    Before the time that Luigi unlocked the restaurant,

25  who would unlock the door?

Chevez - for the Plaintiff - Direct/Ms. Goldstein

191

1    A.    Omar.

2    Q.    Who is Omar?

3    A.    The manager.

4    Q.    And what was his job?

5    A.    To unlock the doors at 10:30, to close up, to take

6    orders, and wait on customers.

7    Q.    Is Omar currently working at the restaurant?

8    A.    No.

9    Q.    When did Omar stop working at the restaurant?

10   A.    About two months ago or so.

11   Q.    During the time that you worked at the restaurant,

12   have there been managers other than Omar?

13   A.    Yes.

14   Q.    Can you tell me the name of those other managers?

15   A.    Yes.  Victoria --

16          THE INTERPRETER:  Victorio.  Interpreter

17   correction.

18   A.    And Vinnie.

19          THE INTERPRETER:  May the interpreter clarify?

20          (Conversation with witness.

21   BY MS. GOLDSTEIN:

22   Q.    So other than the last couple of months, has there

23   always been a manager working at the restaurant?

24   A.    I don't understand.

25   Q.    Did Omar, Vinnie and Victorio work at the same time?

Chevez - for the Plaintiff - Direct/Ms. Goldstein

192

1    A.    Yes.

2    Q.    The three people worked together?

3          MR. NARDO:  Objection.  Asked and answered.

4          THE COURT:  Overruled.

5    A.    No.  Not together.

6    BY MS. GOLDSTEIN:

7    Q.    So for some period of time, Omar was the manager.

8    Correct?

9    A.    Yes.  For now there isn't anybody after that.  But

10   first Victorio was there and then Vinnie and after that

11   Omar.

12   Q.    What days of the week does the manager work?

13   A.    It was always the same schedule.

14   Q.    The same schedule as the one that you described for

15   yourself?

16   A.    Yes, the same days.

17   Q.    Can you describe for the court the kinds of work that

18   you do when you first arrive in the morning.

19   A.    Yes.

20   Q.    Please go ahead.

21   A.    What I do now in the morning is, I start by making

22   vegetables, getting seasonings and sauces ready.

23   Q.    When you were a salad maker, what kind of work would

24   you do first thing in the morning?

25   A.    Get things ready for the salads, dressings, dessert.

193

1   Q.   And when you were a dishwasher, what kind of work did

2   you do first thing in the morning?

3   A.   Cleaning the bathrooms and mopping.

4   Q.   Earlier you testified that you have worked as a

5   dishwasher, a salad maker, and a pasta cook.  Correct?

6   A.   Right.

7   Q.   Are there any other jobs in the kitchen at the

8   restaurant?

9   A.   No.  Just that.

10  Q.   Is there also a chef who works at the restaurant?

11  A.   Yes.

12  Q.   What is the name of the current chef?

13  A.   Enrique.

14  Q.   And how long has Enrique been working at the

15  restaurant?

16  A.   For about nine months.

17  Q.   What kind of work does the chef do?

18  A.   The chef is in charge of cleaning the fish, preparing

19  the meats.

20  Q.   What time do the other kitchen workers arrive in the

21  morning Monday through Friday?

22          MR. NARDO:  Objection, judge.

23          We are getting down to I think our last witness

24  here.  There has been a lot of testimony about when other

25  employees come in.  Perhaps we could just restrict this to

Chevez - for the Plaintiff - Direct/Ms. Goldstein

194

1   this employee's hours, since that is what is relevant.

2           MS. GOLDSTEIN:  Your Honor, the Secretary is

3   having four witnesses testify on behalf of 12 current and

4   former employees.  The issue of representative testimony

5   is important in this case.

6           I'm streamlining this to the extent possible,

7   but it is important that employees be permitted to testify

8   as to the hours of the other positions in the kitchen,

9   particularly given that this individual worked in numerous

10  positions.

11          The testimony is probative on this point.

12          THE COURT:  The objection is overruled.

13  A.   No, I don't understand what the question was.

14  BY MS. GOLDSTEIN:

15  Q.   What time do the other kitchen workers arrive in the

16  morning Monday through Friday?

17  A.   At the same time.  10:30.

18  Q.   And what time do the other kitchen workers arrive in

19  the morning on Saturdays?

20  A.   At the same time.  3 o'clock.

21  Q.   And do the other kitchen workers take the same break

22  as you Monday through Friday or is their break different?

23  A.   No.  At the same time.

24  Q.   Do the other kitchen workers leave at the same time

25  as you in the evening?

Chevez - for the Plaintiff - Direct/Ms. Goldstein

195

1    A.    Sometimes they do but sometimes they don't.

2    Q.    Who usually leaves the kitchen first?

3    A.    Myself and the chef.

4    Q.    And which workers are usually the last to leave the

5    restaurant?

6    A.    Anibal and Alex.

7    Q.    And what are their jobs?

8    A.    Anibal is the dishwasher.  And Alex, he gets the food

9    out.  He's the foot runner.

10   Q.    Have you ever worked with someone named Walter

11   Naranjo?

12   A.    Yes.

13   Q.    What was Walter's job?

14   A.    Pasta man.

15   Q.    Was Walter working at the restaurant when you started

16   there?

17   A.    Yes.

18   Q.    And is Walter currently working at the restaurant?

19   A.    No.

20   Q.    About how long did you work with Walter?

21   A.    For about two years or so.

22   Q.    And did Walter work the same schedule as you or was

23   it different?

24   A.    The same.

25   Q.    Did you ever work with someone named Pastor?

196

1    A.   Yes.

2    Q.   What was Pastor's job?

3    A.   Originally he started out as the pasta man and then

4    he became the chef.

5    Q.   Did Pastor work the same schedule that you described

6    previously?

7    A.   Yes.

8    Q.   Did Pastor have keys to the restaurant?

9         MR. NARDO:  Objection.

10        THE COURT:  Grounds?

11        MR. NARDO:  How would this witness be competent

12   to know whether or not Pastor had keys to the restaurant?

13        THE COURT:  He is working there.

14        Based upon your personal observation, do you

15   know whether Pastor had keys to the restaurant.

16        THE WITNESS:  He did not.

17   BY MS. GOLDSTEIN:

18   Q.   Who hired workers at the restaurant?

19   A.   Luigi.  Luigi.

20   Q.   Did you ever see anyone else hire someone to work at

21   the restaurant?

22   A.   No.

23   Q.   Who decided that you would be promoted from

24   dishwasher to salads?

25   A.   Luigi.

197

1   Q.   How do you know that Luigi made that decision?

2   A.   Because Pastor said to me that Luigi had said to him

3   to promote me to salad man.

4   Q.   Did Pastor ever change your hours at the restaurant?

5   A.   No.

6   Q.   Did you ever see Pastor suspend or send home a

7   worker?

8   A.   No.

9   Q.   To your knowledge does the restaurant keep track of

10  the exact hours that you work?

11  A.   No.

12  Q.   Do you currently punch a time clock?

13  A.   No.

14  Q.   Have you ever punched a time clock at the restaurant?

15  A.   No.

16  Q.   Have you ever heard a manager at the restaurant say

17  anything about the Department of Labor's investigation?

18  A.   Yes.

19  Q.   Can you explain.

20  A.   Yes.

21       On one occasion I overheard Vinnie say that if

22  the Department of Labor ever went there, if we were asked

23  how many hours we work or what time did we start, we were

24  to say that we only worked five days; that we started at

25  11 o'clock and that sometimes we left at 8:30; and that my

Chevez - for the Plaintiff - Direct/Ms. Goldstein

198

1    day off was also Wednesday.

2    Q.    Who did Vinnie say this to?

3    A.    To myself, right there in the kitchen.

4    Q.    Was anyone else present?

5    A.    I actually do not remember.

6    Q.    And do you know when this conversation happened?

7    A.    I don't have the exact date, but it was about a

8    year-and-a-half or so ago.

9    Q.    Have you ever worked only five days a week at the

10   restaurant?

11   A.    No.

12   Q.    In the last several days, has anyone at the

13   restaurant asked you if you were coming to testify in

14   court?

15              MR. NARDO:  Objection.  Leading.

16              THE COURT:  Overruled.

17   A.    Yes.

18   BY MS. GOLDSTEIN:

19   Q.    When was the first time in the last several days that

20   someone at the restaurant asked you if you were planning

21   to testify here?

22   A.    The first time was like on Tuesday or so.

23   Q.    And can you explain to the court what happened on

24   Tuesday or so.

25   A.    Well, that was the first time when Luigi asked us

Chevez - for the Plaintiff - Direct/Ms. Goldstein

199

1   which day we were going to come to the court.

2   Q.   And what did you say to Luigi?

3   A.   That I had to come here on Monday.

4   Q.   Did Luigi say anything else to you?

5   A.   No.  But later on, later on, like on Thursday or so,

6   he asked us again if we were going to come.

7   Q.   Let's talk about that Thursday conversation.

8   A.   Right.

9   Q.   Who did you speak to on Thursday about testifying in

10  court?

11  A.   Luigi approached the chef and told him to ask us

12  which exact date we had to come to court.

13  Q.   What happened then?

14  A.   And then he came over to me, the chef, and he asked

15  me and I told him that my day was Tuesday.

16          And then he told him to go and ask Anibal and

17  the others which day they also had to come.  And after

18  that Anibal went over to him and told him that his day was

19  Monday.

20          And then when he told him that his day was

21  Monday, then he came over and told the chef that if we

22  were going to come to court, we would only have work there

23  until Saturday.

24  Q.   And when you say *he*, who are you referring to?

25  A.   Luigi.

Chevez - for the Plaintiff - Direct/Ms. Goldstein

200

1  Q.   Did anyone else say anything to you about coming to

2  court on Thursday?

3  A.   Yes.

4  Q.   Can you explain.

5  A.   Yes.

6        After that happened, Alex came over on behalf of

7  Luigi, he came over to the kitchen to tell Anibal and

8  myself that he should convince us not to come to court.

9  Q.   Why do you say that Alex came on behalf of Luigi?

10 A.   Because he told it to us.

11 Q.   Did Alex say that he was acting on Luigi's direction?

12       MR. NARDO:  Objection.  Hearsay, judge.

13       MS. GOLDSTEIN:  Your Honor, 801(d)(2).

14       THE COURT:  Yes.  This is clearly admissible.

15 Luigi is the owner and his direction is clearly

16 admissible.

17 A.   Yes.  Alex said to us that Luigi was sending word to

18 us.

19 BY MS. GOLDSTEIN:

20 Q.   Did anyone say anything to you about testifying on

21 Friday?

22 A.   Yes.

23 Q.   Can you explain.

24 A.   Yes.

25       Alex said to me again to please not to come to

Chevez - for the Plaintiff - Direct/Ms. Goldstein

201

1   court and he asked me whether I had any recording.

2   Q.   Did Alex mention Luigi Quarta to you on Friday?

3   A.   Yes.

4   Q.   What did Alex say about Luigi Quarta to you on

5   Friday?

6   A.   That he was saying to him to tell us and convince us

7   not to come.

8   Q.   Just to clarify.  Luigi was telling Alex to convince

9   you not to come?

10          MR. NARDO:  Objection.  Leading.

11          THE COURT:  Overruled.

12   A.   Right.

13   BY MS. GOLDSTEIN:

14   Q.   On Saturday did anyone at the restaurant say anything

15   to you about testifying?

16   A.   Yes.

17   Q.   What happened on Saturday?

18   A.   On Saturday, at the end of the working day, the chef

19   came over to us and he said that Luigi was sending word

20   that the decision to come to court was up to us.  We would

21   either come to court or we would go to work.

22   Q.   Did the chef say anything else?

23   A.   No.  That was it.

24   Q.   Did the chef say anything about your job and whether

25   you would have a job after you testified?

Chevez - for the Plaintiff - Direct/Ms. Goldstein

202

```
 1              MR. NARDO:  Objection.
 2              THE COURT:  Overruled.
 3   A.   I spoke with him and he said to me that, according to
 4   what he had said, that if we showed up in court then we
 5   exactly would not have a job any more.
 6   BY MS. GOLDSTEIN:
 7   Q.   And when you refer to what he said, are you referring
 8   to Luigi Quarta?
 9   A.   Yes.  Because he was the one who told him.
10   Q.   Luigi Quarta was the one who told the chef.  Correct?
11   A.   Yes.  Right.
12   Q.   What is the chef's name?
13   A.   Enrique.
14   Q.   Can you tell the court how you felt when the chef
15   told you that you might not have a job.
16              MR. NARDO:  Objection.
17              THE COURT:  I will allow it under the assumption
18   there was pressure exerted or intimidation.  It is being
19   asked that way, I think, so I will allow it.
20   A.   Well, I felt like being under pressure and afraid,
21   because I was saying to myself do I go, do I not go,
22   because he had already said that if we put in an
23   appearance we wouldn't have a job any more.
24              I felt afraid, nervous.  Yes.
25              MS. GOLDSTEIN:  Nothing further, your Honor.
```

Chevez - for the Plaintiff - Cross/Mr. Nardo

203

1      THE COURT:  Let's take our morning ten-minute

2   break and then we will resume.

3            (Recess taken at 11:25 am.)

4            THE COURT:  Proceed, Mr. Nardo.

5            MR. NARDO:  Thank you.

6

7   CROSS-EXAMINATION

8   BY MR. NARDO:

9   Q.   Good morning, Mr. Chevez.

10  A.   Good morning.

11  Q.   Do you recall speaking with Miss Vasquez at the

12  Department of Labor?

13  A.   Yes.

14  Q.   Do you recall speaking with her by phone?

15  A.   Yes.

16  Q.   Do you recall at some point she gave you a statement

17  to sign?

18  A.   Yes.

19  Q.   On the first occasion you spoke with her, did you

20  discuss with her the hours that you worked for Luigi Q's

21  Italian Restaurant?

22  A.   Yes.

23  Q.   And did you discuss the hours you worked with --

24  withdrawn.

25            Did you discuss with Miss Vasquez the hours you

Chevez - for the Plaintiff - Cross/Mr. Nardo

204

1    worked, on the second occasion you spoke with her?

2    A.   Yes.

3    Q.   And were the hours you worked referred to in the

4    written statement that you signed?

5    A.   Yes.

6    Q.   Was your first conversation with her on September 29,

7    2008?

8    A.   I don't recall exactly.

9         MR. NARDO:  I'm up to Exhibit N.

10        May I approach the witness?

11        THE COURT:  Yes.

12   BY MR. NARDO:

13   Q.   I ask the witness to look at Defendant's Exhibit N,

14   and specifically if he could look at the fifth page.

15        Do you see the date at the top of that page,

16   where it says 9/29/08?

17   A.   Yes.

18   Q.   And then, if you move ahead to the page before that,

19   do you see where it is dated 10/6/08?  The fourth page in.

20   A.   Yes.

21   Q.   And then do you see the second page in where the date

22   is 12/3/08?

23   A.   Yes.

24   Q.   On that second page it has your signature at the

25   bottom.  Correct?

Chevez - for the Plaintiff - Cross/Mr. Nardo

205

1    A.    Yes.

2    Q.    So if you had conversations with the Department of

3    Labor on September 29 of '08, October 6 of '08 and

4    December 3 of '08, did it ever occur to you to keep track

5    of the hours you were working, in writing?

6              MS. GOLDSTEIN:  Objection.

7              THE COURT:  Sustained as to form.

8    BY MR. NARDO:

9    Q.    After you had these communications with the

10   Department of Labor, did you ever take any steps to keep

11   track of the hours you worked at Luigi Q's, in writing?

12   A.    Honestly, I didn't.

13   Q.    So when you testify about the hours you worked, you

14   are testifying from your memory.  Is that right?

15   A.    Yes.

16   Q.    Do you have a smartphone?

17   A.    No.

18   Q.    Did Luigi Quarta speak Spanish?

19   A.    Yes.  He speaks a little.

20   Q.    How often would he converse with you in Spanish?

21   A.    Sometimes when he needed me to make him an order of

22   food the way he likes it, then he would explain it to me.

23   Q.    And he would do that in Spanish?

24   A.    Yes.

25   Q.    Was he fluent in Spanish?

Chevez - for the Plaintiff - Cross/Mr. Nardo

206

1    A.    When he talks to me, yes.

2    Q.    And would you agree that Pastor was in charge of the

3    kitchen?

4    A.    In charge of the kitchen?

5    Q.    Yes.

6    A.    Yes.  He was like the one in charge.  The chef was in

7    charge.

8    Q.    And when you were the salad man, did Pastor supervise

9    you?

10   A.    Yes, because he was exactly the one who would say to

11   me when I was a salad man make me this, make a salad, make

12   some dressing, like that.

13   Q.    When you were the pasta chef, did he supervise you?

14   A.    No.

15   Q.    Did Pastor ever supervise the dishwasher?

16   A.    No.

17   Q.    When you were the dishwasher, did Pastor, or the chef

18   at the time, ever ask you to bring them things?

19   A.    No.

20   Q.    And when you were the pasta chef, did Pastor tell you

21   what pastas to make?

22   A.    No.

23   Q.    Did Pastor ever review the pastas before they were

24   sent to the customer?

25   A.    Sometimes he did.

Chevez - for the Plaintiff - Cross/Mr. Nardo

207

1   Q.    Did you ever see Pastor get upset with an employee in

2   the kitchen?

3   A.    No.

4   Q.    When you first started working at Luigi Q's, you

5   agreed to compensation of $400 a week.  Is that right?

6   A.    Yes.

7   Q.    And then that salary went from $400 to $450 to $550 a

8   week.  Is that right?

9           MS. GOLDSTEIN:  Objection.

10          MR. NARDO:  Let me withdraw that.

11  BY MR. NARDO:

12  Q.    That compensation went from $400 a week to $450 a

13  week to $550 a week.  Is that right?

14  A.    Yes.  But first it was $420, then 450, and then after

15  that 550.

16  Q.    Were you thankful that your compensation was being

17  raised?

18          MR. HENNEFELD:  Objection.  Relevance.

19          THE COURT:  Sustained.

20  BY MR. NARDO:

21  Q.    Did you ever express thanks to Mr. Quarta after he

22  gave you a raise in compensation?

23          MS. GOLDSTEIN:  Objection.

24          THE COURT:  Sustained.

25  BY MR. NARDO:

Chevez - for the Plaintiff - Cross/Mr. Nardo

208

1  Q.    Were you ever upset when Mr. Quarta gave you a raise

2  in compensation?

3            MS. GOLDSTEIN:  Objection.

4            THE COURT:  I will allow it.

5            Do you want to ask him if he ever complained to

6  Mr. Quarta about his compensation?  That I will allow.

7            MR. NARDO:  Fine.

8  BY MR. NARDO:

9  Q.    Did you ever complain to Mr. Quarta about your

10 compensation?

11 A.    I don't understand the question.

12 Q.    Did you ever complain to Mr. Quarta that you weren't

13 making enough money?

14 A.    Yes.

15 Q.    And did he give you a raise after that?

16 A.    Yes.

17 Q.    Did you ever complain to Mr. Quarta that you weren't

18 being paid overtime?

19 A.    No.

20 Q.    Did you ever complain to Mr. Quarta that you weren't

21 being paid the minimum wage?

22 A.    No.

23 Q.    And you told the Department of Labor that you were

24 not being paid overtime.  Correct?

25 A.    Yes.

209

1  Q.   How come you never said to Mr. Quarta that you

2  weren't being paid overtime?

3          MS. GOLDSTEIN:  Objection.

4          THE COURT:  I will allow it.

5  A.   Because I didn't know.

6  BY MR. NARDO:

7  Q.   Well, you found out from the Department of Labor that

8  you weren't getting paid overtime.  Correct?

9  A.   Yes.

10  Q.   After that how come you didn't complain -- withdrawn.

11          After you found out from the Department of Labor

12  that you weren't receiving overtime, how come you didn't

13  bring that up with Mr. Quarta?

14  A.   Because I didn't know.

15  Q.   Okay.  Why don't you take a look at your statement.

16  The second page of your statement.  Do you see -- can you

17  read Spanish?

18  A.   Yes.

19  Q.   Do you see in that statement, towards the end, where

20  it says:  *I am not paid overtime for hours worked*?

21          MR. NARDO:  May I approach to show the witness,

22  judge?

23  BY MR. NARDO:

24  Q.   Do you see that sentence?

25  A.   All I see is where it says I'm paid a salary of 400.

210

1    Q.    Look at the next sentence.

2    A.    My work hours.  I'm sorry, counsel?

3    Q.    Look at the next sentence.

4    A.    *I am not paid overtime.*

5    Q.    And that was a statement that you signed.  Correct?

6    A.    Yes.

7    Q.    And that was on December 3, 2008.

8    A.    I don't remember.  I don't have that date in my

9    memory.  I don't remember.

10   Q.    It's on the top right of the document.  Do you see

11   where it says 12/3/08?  The same page.

12   A.    12?  12/3/08?

13   Q.    Okay.  So does that indicate that as of December 3,

14   2008 at least, you knew that you were not being paid

15   overtime?

16   A.    Yes.

17   Q.    After December 3, 2008, why didn't you discuss with

18   Luigi Quarta the fact that you weren't being paid

19   overtime?

20   A.    Because I didn't know whether or not I was working

21   overtime hours or if there was any overtime.

22   Q.    And did you ever form a conclusion as to whether or

23   not you worked overtime hours?

24   A.    Yes.

25   Q.    When was that?

Chevez - for the Plaintiff - Cross/Mr. Nardo

211

1  A.   Well, when I spoke with the Department of Labor, I

2  spoke with them and they did the math and I was working

3  overtime hours.

4  Q.   When did you learn that?

5  A.   From the first time that I spoke with them.

6  Q.   Okay.  And after that did you ever discuss with Luigi

7  Quarta the fact that he wasn't paying you overtime hours?

8         MS. GOLDSTEIN:  Objection.

9  BY MR. NARDO:

10 Q.   Or overtime pay?

11        THE COURT:  Sustained.  I think he answered this

12 already.

13 BY MR. NARDO:

14 Q.   Now, at some point you left for another employer.

15 You left Luigi Quarta to work for another employer.

16 Correct?

17 A.   Yes.

18 Q.   What was the period -- and then you came back to work

19 for Luigi Quarta.  Correct?

20 A.   Yes.

21 Q.   What was the period of time that you worked for

22 another employer rather than Luigi Quarta?

23 A.   I had about nine months when I did not work for him.

24 Q.   And again, you are testifying from your memory about

25 that?

Chevez - for the Plaintiff - Cross/Mr. Nardo

212

1    A.    Yes.

2    Q.    Did you ever have a vacation when you worked at Luigi

3    Quarta's?

4    A.    Yes.

5    Q.    How many weeks per year did you have a vacation at

6    Luigi Quarta's?

7    A.    One week per year.

8    Q.    Did you ever miss any days working at Luigi Quarta's

9    because you were sick?

10   A.    No.  I missed one day because I had to go run an

11   errand in New Jersey and so the car broke down and I did

12   not bring my phone along so I was not able to call him and

13   tell him that I cannot get back to work.

14         That was the only day that I did not come in.

15   Q.    And when you worked at Luigi Quarta's, aside from the

16   break from 3 to 4:30, wasn't there another break you had

17   to eat dinner while you worked there?

18   A.    No.

19   Q.    When you quit Luigi Quarta's, did you tell Pastor you

20   were quitting?

21         MS. GOLDSTEIN:  Objection.  The witness has not

22   testified as to whether he quit or was terminated.

23         THE COURT:  You might have to clarify that,

24   Mr. Nardo.

25         MR. NARDO:  Sure.

Chevez - for the Plaintiff - Cross/Mr. Nardo

213

1    BY MR. NARDO:

2    Q.   For the period of time that you weren't working at

3    Luigi Quarta's, how did it come about that you were no

4    longer working there?

5    A.   Well, because when I stopped working there it was

6    because Luigi had told Pastor to call me and tell me that

7    I did not have a job there any more.

8    Q.   Did you hear about that from Luigi or did you hear

9    about that from Pastor?

10   A.   Through Pastor.

11   Q.   And when you were recruited to work again for Luigi

12   Q's, did you receive a phone call from Pastor?

13   A.   No.  From Jeffrey.

14   Q.   Have you ever seen Luigi cook for customers at the

15   restaurant?

16   A.   No.

17   Q.   And does the restaurant use time cards?

18   A.   No.

19   Q.   You testified that -- withdrawn.

20            Is Enrique, the chef, also called Rico?

21   A.   Yes.

22   Q.   And you had a conversation with Rico about your

23   testimony in court last week.  Correct?

24   A.   Yes.

25   Q.   And Rico is the head chef who replaced Pastor.

214

1   Correct?

2   A.   Yes.

3   Q.   And at some point you felt pressure and afraid about

4   testifying here today.  Correct?

5   A.   Yes.

6   Q.   And the government sent you a subpoena to be here

7   today.  Correct?

8   A.   Yes.  I received a letter.

9   Q.   And as you sit here today, do you believe that Luigi

10  Q's Italian Restaurant or Luigi Quarta owes you money for

11  wages?

12  A.   No, I don't know.

13           MR. NARDO:  I have nothing further.

14           THE COURT:  Redirect?

15           MS. GOLDSTEIN:  No, your Honor.

16           THE COURT:  You can step down.  Thank you, sir.

17           (The witness was excused.)

18

19           THE COURT:  Next witness.

20           MR. HENNEFELD:  Your Honor, if I just may have

21  two minutes briefly to connect the projector for the next

22  witness.

23           THE COURT:  Sure.

24           (There was a pause in the proceedings.)

25           MR. HENNEFELD:  May we do some very brief

215

1    housekeeping on the record before the next witness?

2              THE COURT:  Sure.

3              MR. HENNEFELD:  I have discussed with

4    defendant's counsel there are some other exhibits that we

5    have agreed that defendants have no objections on.

6              THE COURT:  Okay.

7              MR. HENNEFELD:  Those are Exhibits 10, 10A, and

8    11.

9              THE COURT:  Okay.

10             Is that correct?

11             MR. NARDO:  Yes, your Honor.

12             THE COURT:  Okay.  Plaintiff's Exhibit 10, 10A

13   and 11 are admitted.

14             (Plaintiff Exhibits 10, 10A, and 11 in

15   evidence.)

16             MR. HENNEFELD:  Thank you.  May I call the next

17   witness?

18             THE COURT:  Sure.

19             MR. HENNEFELD:  Secretary calls Zorayda Vasquez.

20

21   **ZORAYDA VASQUEZ**

22        called by the plaintiff, having been first duly

23        sworn/affirmed, was examined and testified as

24        follows:

25             THE COURT:  Go ahead, Mr. Hennefeld.

Vasquez - for the Plaintiff - Direct/Mr. Hennefeld

216

1        MR. HENNEFELD:  Thank you, your Honor.

2    DIRECT EXAMINATION

3    BY MR. HENNEFELD:

4    Q.    Miss Vasquez, who is your employer?

5    A.    The United States Department of Labor, the Wage and

6    Hour Division in the Long Island district office.

7    Q.    When did you first start working for the Wage and

8    Hour Division?

9    A.    I first started June 23, 1997.

10   Q.    What is your position with Wage and Hour?

11   A.    I'm an investigator.

12   Q.    How long have you held that position?

13   A.    It is going to be 15 years in June.

14   Q.    And as an investigator, what are your duties?

15   A.    My duties are, as an investigator I investigate firms

16   to establish compliance with the federal labor laws

17   pertaining to minimum wage, overtime, recordkeeping, and

18   child labor.

19   Q.    What languages do you speak?

20   A.    I speak Spanish and English.

21   Q.    Approximately how many investigations do you conduct

22   per year?

23   A.    I would say approximately between 10 and 20 cases.

24   Q.    And what was your role in this case, Luigi Q's

25   Restaurant?

Vasquez - for the Plaintiff - Direct/Mr. Hennefeld

217

1   A.   I was an investigator that was assigned the case

2   Luigi Q's Restaurant.

3   Q.   And approximately when did you begin your

4   investigation of the defendant's restaurant?

5   A.   It was approximately June of 2006.

6   Q.   I'm sorry.  You testified June of 2006.  Can you

7   clarify that?

8   A.   Can you repeat that question please?

9   Q.   Approximately when did you begin investigating Luigi

10  Q's Restaurant?

11          MR. NARDO:  Objection, your Honor.

12  A.   Approximately June --

13          MR. NARDO:  Asked and answered.

14  A.   -- 2006.

15          THE COURT:  Overruled.  We have had it twice

16  now.

17  BY MR. HENNEFELD:

18  Q.   Miss Vasquez, during your investigation of Luigi Q's

19  Restaurant, did you interview any employees of the

20  restaurant?

21  A.   Yes, I did.

22  Q.   And when you interviewed employees of the restaurant,

23  did you interview the employees together, in a group, or

24  separately?

25  A.   All my interviews were separately.

Vasquez - for the Plaintiff - Direct/Mr. Hennefeld

218

1    Q.    Do you typically interview employees in your

2    investigations?

3    A.    Yes.

4    Q.    And why do you do that?

5    A.    To find out the hours that they work; how they are

6    being paid.  And it is basically to determine compliance

7    with the federal labor laws, make sure they're getting

8    paid correctly.

9    Q.    And is employee cooperation important to your

10   investigations?

11   A.    Yes, very important.

12   Q.    How so?

13   A.    Well, without the employees' interviews, basically I

14   have no case.

15          The law is very crucial that we speak to the

16   employees to make sure how they're getting paid and, you

17   know, they are getting paid overtime and if they are

18   getting paid compliance.

19   Q.    In cases where the employer hasn't kept complete and

20   accurate records, does that affect the importance of

21   employee cooperation?

22   A.    Oh, yes.  Very important.

23   Q.    How so?

24   A.    Because, I mean, if I have bad records, I need to do

25   interviews from the employees.  And if I have inaccurate

Vasquez - for the Plaintiff - Direct/Mr. Hennefeld

219

1    or falsified records from the employer, then it is very

2    important for me to get good interviews from the

3    employees.

4    Q.    Was it important to have employee cooperation in this

5    case?

6    A.    Yes, very important.

7    Q.    Why?

8    A.    Because the employer did produce falsified records.

9    They were bad records.

10   Q.    In your experience when an employer threatens not to

11   participate in a Department of Labor case, does that

12   affect employee cooperation?

13   A.    Yes.

14   Q.    How so?

15   A.    Well, without the employee interviews, I basically

16   have no case.

17   Q.    Miss Vasquez, during your investigation of the

18   restaurant, did you ever visit the restaurant?

19   A.    Yes.

20   Q.    And why did you visit the restaurant?

21   A.    Because I was assigned the case of Luigi Q's to

22   investigate.

23   Q.    And what did you do at the restaurant for your

24   investigation?

25   A.    I interviewed employees.  I met with the employer.  I

Vasquez - for the Plaintiff - Direct/Mr. Hennefeld

220

1    reviewed payroll and time records.  And I also conducted

2    surveillance.

3    Q.    Can you explain what you mean by surveillance.

4    A.    I observed.  I watched.

5    Q.    What did you watch?

6    A.    I observed employees coming in and out of the

7    restaurant.

8    Q.    And why did you do that?

9    A.    Because I needed to confirm their statements as to

10   their arrival time to work and the time that they took

11   their breaks.

12   Q.    And when you made these observations, where were you

13   watching from?

14   A.    I was at the parking lot behind the restaurant.

15   Q.    If you were behind the restaurant, how did you

16   observe employees coming and going to the restaurant?

17   A.    There is a back door to the restaurant where I saw

18   when the employees were coming in.  They were traveling in

19   bicycles and they were coming through a back door from the

20   restaurant.

21   Q.    Did you ever observe employees of the restaurant

22   arriving there in the morning?

23   A.    Yes.

24   Q.    Approximately how many times did you observe

25   employees arriving at the restaurant in the morning?

Vasquez - for the Plaintiff - Direct/Mr. Hennefeld

221

1   A.   I would say five or more times.  Five-plus times.

2   Q.   What did you see when you observed employees at the

3   restaurant arriving in the morning?

4   A.   When I saw the employees, I saw them coming in

5   bicycles.  They would park the bicycles behind the

6   restaurant and then I would see that they were cleaning

7   the back of the restaurant, they were sweeping the back of

8   the restaurant, or they were wiping the glass for the

9   restaurant.

10  Q.   At what time did you observe employees of the

11  restaurant arriving there in the morning?

12  A.   It was between 10:30 to 11.

13  Q.   That is the time when you observed employees arrive

14  at the restaurant?

15  A.   Yes.

16  Q.   Did you ever observe employees of the restaurant

17  arrive later than 10:30 in the morning?

18        MR. NARDO:  Objection.  Judge, she just said

19  between 10:30 and 11.

20        THE COURT:  Overruled.

21  BY MR. HENNEFELD:

22  Q.   Do you need me to repeat the question?

23  A.   Repeat the question, please.

24  Q.   Did you ever observe employees of the restaurant

25  arriving later than 10:30 in the morning?

Vasquez - for the Plaintiff - Direct/Mr. Hennefeld

222

1    A.    No.

2    Q.    You just testified a moment ago about observing

3    employees performing some activities at the restaurant in

4    the morning.

5          Approximately what time was it when you saw

6    employees performing those activities at the restaurant?

7    A.    It was between 10:30 and 11 am.

8    Q.    Did you ever do surveillance of the restaurant in the

9    afternoon?

10   A.    Yes.

11   Q.    Did you ever observe employees of the restaurant

12   exiting the restaurant in the afternoon?

13   A.    Yes.

14   Q.    And where were you watching from when you observed

15   that?

16   A.    From the parking lot in the rear of the restaurant.

17   Q.    And where did you observe employees exit from?

18   A.    The back door from the restaurant.

19   Q.    At what time did you observe employees of the

20   restaurant exiting the restaurant in the afternoon?

21   A.    Between 3 and 3:30.

22   Q.    Did you ever observe employees exiting the restaurant

23   earlier than 3 in the afternoon?

24   A.    No.

25   Q.    And did you ever observe employees reentering the

Vasquez - for the Plaintiff - Direct/Mr. Hennefeld

223

1    restaurant in the afternoon?

2    A.   Yes.

3    Q.   At what time did you observe employees reentering the

4    restaurant in the afternoon?

5    A.   At 4:30 pm.

6    Q.   Did you ever observe employees reentering the

7    restaurant later than 4:30 in the afternoon?

8    A.   No.  Never.

9         MR. HENNEFELD:  Bear with me one moment, your

10   Honor.

11        May I approach the witness briefly?

12        THE COURT:  Yes.

13   BY MR. HENNEFELD:

14   Q.   Miss Vasquez, if you can open the -- before looking

15   at the screen, if you can, open the exhibit binder and

16   look at Plaintiff's Exhibit 1.

17        Do you recognize Plaintiff's Exhibit 1?

18   A.   Yes.

19   Q.   What is it?

20   A.   This is a request for business data.  This is a form

21   that I had given Luigi Quarta to complete when I first met

22   with him.

23   Q.   And did you receive back a completed form from the

24   employer?

25   A.   Yes.

1   Q.   Now if you can look at whatever is easier for you to

2   look at, on the screen or reading the paper.  If it's

3   easier for you to look on the paper, that's fine.

4           If you can, look at page 3.  Do you see at the

5   bottom of page 3?  It says:  *I attest that the above*

6   *information is true and correct to the best of my*

7   *knowledge and belief*?

8   A.   Yes.

9   Q.   Do you see where it says that?

10  A.   Yes.

11  Q.   Is there a signature below that?

12  A.   Yes.

13  Q.   Whose signature?

14  A.   Luigi Quarta.

15  Q.   And looking near the bottom of page 3, do you see the

16  question:  *Who is in charge of setting pay and time*

17  *policies for the business?*

18  A.   Yes.

19  Q.   What was the response to that question?

20  A.   *Luigi Quarta, President.*

21  Q.   Looking near the top of page 3, do you see the

22  question:  *Any extra pay premiums for working over a*

23  *certain number of hours in the week and/or pay period?*

24  A.   Yes.

25  Q.   And what was the response to that question?

Vasquez - for the Plaintiff - Direct/Mr. Hennefeld

225

1   A.   He responded *No*.

2   Q.   If you can turn the page 2.  I'm looking to page 2 on

3   the screen as well.  You can stay on the paper.  If you

4   look at page 2, near the middle of the page, do you see

5   the question:  *Are time records kept?*

6   A.   Yes.

7   Q.   What was the response to that question?

8   A.   Luigi responded *No*.

9   Q.   Also looking at page 2 in the list of the

10  restaurant's employees, how did Mr. Quarta describe his

11  position at the restaurant?

12  A.   As executive chef.

13  Q.   Now on the issue of time records.  Did the employer

14  ever provide any time records during this case?

15  A.   Yes.

16  Q.   Now, if you can, turn to Plaintiff's Exhibit 5 in the

17  exhibit binder.

18         Do you recognize the documents in Exhibit 5?

19  A.   Yes.

20  Q.   What are they?

21  A.   These are time records provided by Luigi Quarta.

22  Q.   And have you reviewed the time records in Exhibit 5?

23  A.   Yes.

24  Q.   And is Exhibit 5 a true and accurate copy of the time

25  records that were produced by the defendants during this

Vasquez - for the Plaintiff - Direct/Mr. Hennefeld

226

1    case?

2    A.    Yes.

3          MR. NARDO:  Judge, I'm going to object to this

4    line of questioning.

5          Again, we stipulated in paragraph 15, during the

6    period of June 5, 2006, through at least May 21, 2009, the

7    defendants did not keep written records of the hours

8    worked by their employees.  And now we're having testimony

9    about what we have already stipulated does not exist,

10   written records of the hours worked by the employees.

11         THE COURT:  Mr. Hennefeld.

12         MR. HENNEFELD:  Your Honor, I believe this issue

13   was addressed yesterday, that the production of falsified

14   time records is relevant to the issue of willfulness as

15   well as the issue of the recordkeeping violation, and

16   those are the purposes for which we offer this exhibit.

17         THE COURT:  When were these records produced, if

18   you recall, Miss Vasquez?

19         THE WITNESS:  The copies?  It was received on

20   December of 2008.

21         THE COURT:  Again my ruling, the objection is

22   noted for the record, but notwithstanding the stipulation

23   that they did not keep written records of hours worked,

24   for the purposes of this it is for the government to try

25   to demonstrate that false records were produced to the

Case 2:09-cv-02212-JFB-ETB  Document 82  Filed 01/09/13  Page 76 of 200 PageID #: 1554

1   Department of Labor, and that certainly would go to the

2   issue of willfulness.

3           Therefore, it is admissible notwithstanding the

4   stipulation that they did not keep written records of

5   hours worked.

6           These are not being offered as true records.

7   They're being offered as false records.

8           So you're offering these?

9           MR. HENNEFELD:  Yes, your Honor, we move to

10  admit Exhibit 5.

11          THE COURT:  5 or 6?

12          MR. HENNEFELD:  No.  This is Plaintiff's trial

13  Exhibit 5.  The *Exhibit 6* sticker is from a deposition.

14          THE COURT:  Okay.  So Trial Exhibit 5 is

15  admitted.

16          (Plaintiff Exhibit 5 in evidence.)

17          MR. NARDO:  If we concede on the issue of

18  willfulness, would you not admit these documents and

19  similar documents?

20          THE COURT:  You are going to concede that your

21  client willfully violated --

22          MR. NARDO:  To the extent you have to make this

23  determination of willfulness.

24          THE COURT:  I do.

25          MR. NARDO:  We're not conceding that he violated

Vasquez - for the Plaintiff - Direct/Mr. Hennefeld

228

1   the act, but you are going to see payroll records, all

2   sort of records.

3              THE COURT:  I don't understand.  You said we're

4   not conceding that he violated the act, but you are

5   conceding that he did willfully?  I don't understand that.

6              MR. NARDO:  You have to find whether or not he

7   violated the act and for which employees.  But we are

8   willing to concede that, to the extent you find a

9   violation if we can dispense with the payroll records and

10  these records and other records, we will concede to

11  willfulness.

12             THE COURT:  Mr. Hennefeld?

13             MR. HENNEFELD:  Your Honor, could you give me

14  one moment?

15             THE COURT:  Yes.

16             (There was a pause in the proceedings.)

17             THE COURT:  That is hard for me.  You are not

18  conceding that he violated the law, but are willing to

19  concede that he did violate the law and he did it

20  willfully?

21             MR. NARDO:  If you find a violation of law, then

22  we will concede to willfulness if we can keep these

23  exhibits -- we have got payroll records, all sorts of

24  other records here -- if we can keep them out.

25             MR. HENNEFELD:  Your Honor, we are happy to

229

1    attempt to streamline, but we don't see how we can accept

2    a stipulation of willfulness without a stipulation to the

3    violations, themselves.

4            THE COURT:  Yes.  I'm a little reluctant to do

5    that.  I'm not sure that that would work.

6            You can't concede there was a willful violation

7    but say there wasn't a violation at all.

8            MR. NARDO:  Willfulness is an additional

9    penalty, liquidated damages, so it is whether or not you

10   are going to double the award, if any, that you find.

11           We are willing to concede that if you find that

12   there is any violation of the FLSA you can double the

13   penalty on willfulness to the extent willfulness applies

14   to that violation, as a tradeoff for keeping all these

15   financial documents out and streamlining the case.

16           MR. HENNEFELD:  Your Honor, just to clarify one

17   thing.

18           Mr. Nardo stated that willfulness is relevant to

19   liquidated damages, but just to clarify, its relevance to

20   statute of limitations whether it is two or three years.

21           THE COURT:  You concede also then to three

22   years?

23           MR. NARDO:  Yes, your Honor, as a tradeoff for

24   just keeping these exhibits relating to payroll, relating

25   to hours, relating to time records, all that.

Vasquez - for the Plaintiff - Direct/Mr. Hennefeld

230

 1          THE COURT:  I guess, okay.

 2          MR. HENNEFELD:  Your Honor, if the defendant

 3   would also stipulate to having produced falsified time

 4   records to the Department of Labor in an attempt to show

 5   compliance, that is something that is more specific and

 6   concrete, that would work in lieu of going through these

 7   records.

 8          THE COURT:  Show compliance.  What do you mean

 9   by that?

10          MR. HENNEFELD:  In an effort to simulate

11   compliance; in an effort to attempt to convince the

12   government that they were in compliance.

13          MR. NARDO:  Judge, that is a finding that is

14   made in order to get to the conclusion of willfulness.

15          We are willing to concede or stipulate on the

16   willfulness, so you don't need to find it.  You have the

17   stipulation.  You don't need the witnesses.  You don't

18   need the documents.  You don't need --

19          THE COURT:  What would the falsification of

20   records go to other than willfulness, is the question?

21          MR. HENNEFELD:  The violation.

22          THE COURT:  Do you also concede the

23   recordkeeping violation as well?

24          MR. NARDO:  Yes, your Honor, in return for all

25   the financial data and time records not being in evidence.

231

1          MR. HENNEFELD:  Again, your Honor, we are not

2     comfortable with stipulating the willfulness without the

3     underlying violation and the willfulness.  In the event

4     that the violation is found, that is not something that we

5     have ever done and this is a lot to add up.

6          THE COURT:  We're going to take a lunch break

7     anyway for a criminal matter that I have to handle, so you

8     can think about it over the lunch break.  We will

9     reconvene at 1:45.

10          (Lunch recess taken at 12:45 pm.)

Vasquez - for the Plaintiff - Direct/Mr. Hennefeld

232

1           A F T E R N O O N   S E S S I O N.

2                        2:15 PM

3

4           THE COURT:  Notwithstanding your desire to

5    streamline things by conceding willfulness, I think it is

6    too unorthodox to continue to dispute the violation itself

7    by trying to concede willfulness.

8           I don't know if there is any case law that would

9    be applicable to that type of thing because it is a pretty

10   unusual concession.  So in an abundance of caution,

11   because one of the last things I want to do is to redo

12   this someday, I'm going to allow them to put on the proof

13   of willfulness.

14           In light of that stipulation, I don't know how

15   long you anticipate this witness to be, but I would try to

16   streamline it, given that there doesn't appear to be any

17   dispute that if there is a violation, that it was willful.

18           I think that is the best way to deal with the

19   situation.  Okay?

20           What happened to your witness?

21           MR. NARDO:  Judge, we would like to call

22   Richard Gluszak out of order.  He is here and has other

23   things to do.

24           THE COURT:  Okay.

25           MR. NARDO:  So if it is okay, I will call

Gluszak - for the Defense - Direct/Mr. Nardo

233

1  Richard Gluszak.

2          THE COURT:  Okay.

3

4              **EVIDENCE FOR DEFENSE**

5

6  **RICHARD GLUSZAK**

7          called by the defense, having been first duly

8          sworn/affirmed, was examined and testified as

9          follows:

10

11  DIRECT EXAMINATION

12  BY MR. NARDO:

13  Q.   Good afternoon, Mr. Gluszak.  Do you know Luigi

14  Quarta?

15  A.   Yes, I do.

16  Q.   How long have you known him?

17  A.   Approximately ten years.

18  Q.   Are you familiar with his restaurant, Luigi Q's?

19  A.   Yes.

20  Q.   Did you have an office near there?

21  A.   My office was right next door to the restaurant.

22  Q.   And did you go to the restaurant often?

23  A.   Frequently.  Almost every day.

24  Q.   Were you an attorney for Luigi Quarta at some point?

25  A.   Yes, I was.

Gluszak - for the Defense - Direct/Mr. Nardo

234

1   Q.   Did you have an advisory role with the restaurant?

2   A.   Yes, I did.

3   Q.   How often were you at the restaurant?  Over four

4   years?

5   A.   Almost every day that the restaurant was open.  And

6   sometimes on Sunday I would meet with Luigi and go over

7   paperwork.

8   Q.   Were you familiar with Mr. Quarta's operations?

9   A.   Yes.

10  Q.   And what years were you in some sort of advisory role

11  with Luigi Q's Italian Restaurant?

12  A.   I believe it was from 2001 through 2007.  Some point

13  in time in 2007.

14  Q.   During that period of time, were you familiar with

15  the hours of the restaurant?

16  A.   Yes, I was.

17  Q.   What time would employees report to the restaurant

18  Monday through Friday?

19          MS. GOLDSTEIN:  Objection.  Personal knowledge.

20          THE COURT:  Is this based upon your own

21  observations?

22          THE WITNESS:  Yes, it is, your Honor.

23          THE COURT:  I will allow it then.

24  A.   The employees would come in in a steady fashion.  The

25  first one in might be the chef or the assistant chef, and

235

1   he would be followed by waiter and dish washer.

2          Generally speaking, there wouldn't be anyone

3   there until about 11 o'clock, 11:15.

4   BY MR. NARDO:

5   Q.   And then when would the last employee arrive to work,

6   from your observations?

7   A.   The last employee would probably be around 11:30,

8   20 to 12.

9   Q.   Did Luigi personally see customers at the restaurant?

10  A.   Either Luigi -- usually Luigi, but if he was in the

11  kitchen, he would have, you know, a waiter that would also

12  accommodate them.

13  Q.   Mondays through Fridays, was there a time at which

14  Mr. Quarta would stop seating people?

15  A.   He generally would stop seating people around 8 pm

16  because he didn't want to rush their meal and have the

17  kitchen open too late.

18  Q.   And so did you ever observe a customer come to the

19  restaurant after 8 o'clock on Monday through Friday?

20  A.   Several times.

21  Q.   What occurred?

22  A.   He wouldn't seat them.  Even if he knew them well or

23  they called on the way, he would say if you can't get here

24  by 8 o'clock I can't accommodate you.

25  Q.   Did you observe employees leave the workplace --

236

1    A.    Yes.

2    Q.    -- on Monday through Friday?

3    A.    Yes, I did.

4    Q.    What time would employees leave the work place?

5    A.    The employees would start leaving somewhere around

6    9 o'clock.

7                What he -- what would happen is, whoever came in

8    first between the chef and the assistant chef, they would

9    normally be the first one to leave because they opened up;

10   or opened up the kitchen.  That would start somewhere

11   around 9.  And by, I guess, 10 o'clock, the place would be

12   emptied out of employees.

13   Q.    And what about on Saturdays?  What time -- did you

14   observe -- did you ever make observations as to what time

15   employees left the restaurant on Saturdays?

16   A.    Yes.  Saturdays they would be open a little later.

17   They would start leaving maybe around 9:45.  By 10:30

18   there wouldn't be any employees left.

19   Q.    Were there times when the employees would leave

20   earlier on Saturdays?

21   A.    Definitely.  There was a period of time that the

22   restaurant wasn't doing well -- I don't know how it's

23   doing now -- but Luigi would close early because there was

24   no need to keep the doors open.

25   Q.    And on Mondays to Fridays were there times when the

237

1    employees would leave before 9 pm?

2    A.   Definitely.

3    Q.   And why did that occur, according to your

4    observations?

5    A.   Because there would be very few patrons in the

6    restaurant.

7    Q.   Did you at some point receive the mail for Luigi Q's?

8    A.   Yes.  Because my building was next door, we had the

9    same mailman.

10          There were numerous occasions where the mail

11   would come, the mailman knew us both so he new that I was

12   involved in an advisory capacity, so he would leave the

13   mail for Luigi with me, especially on Saturdays in tax

14   season, when the restaurant wasn't open until Luigi would

15   get there around 3 pm.

16          MR. NARDO:  I have nothing further.

17          THE COURT:  Cross-examination.

18

19   CROSS-EXAMINATION

20   BY MS. GOLDSTEIN:

21   Q.   Good afternoon, Mr. Gluszak.

22   A.   Good afternoon.

23   Q.   My name is Elena Goldstein and I represent the

24   Department of Labor in this case.

25          Mr. Quarta had filed a lawsuit against you.

Gluszak - for the Defense - Cross/Ms. Goldstein

238

1  Correct?

2  A.  Yes, he did.

3  Q.  And Mr. Quarta claimed that you misrepresented

4  something accounting-wise in that lawsuit.  Correct?

5          MR. NARDO:  Objection, judge.  Beyond the scope

6  of the direct.

7          MS. GOLDSTEIN:  Your Honor, this goes to his

8  credibility and motive for testifying today.

9          THE COURT:  I will allow it.

10  A.  To my recollection, Luigi commenced a lawsuit for

11  accounting fees and to collect the balance of a personal

12  loan that he had made to me.

13  BY MS. GOLDSTEIN:

14  Q.  Did Mr. Quarta claim that you misrepresented

15  something accounting-wise in that lawsuit?

16  A.  I don't recollect that.

17  Q.  You gave a deposition in this case.  Correct,

18  Mr. Gluszak?

19  A.  Yes, I did.

20  Q.  You came to the Wage/Hour office in Westbury.

21  Correct?

22  A.  Yes.

23  Q.  And there was a court reporter there who wrote down

24  what you said?

25  A.  Yes.

Gluszak - for the Defense - Cross/Ms. Goldstein

239

1   Q.   You swore to tell the truth.  Correct?

2   A.   Yes, I did.

3   Q.   The same oath that you swore today?

4   A.   Yes.

5   Q.   And at that deposition, on Page 33, line 25, through

6   Page 34, line 6, do you recall being asked the question:

7           *What was that suit for?*

8           And giving the answer:

9           *It was basically, there was a loan between us,*

10  *was one of the items.  There was a claim, I guess, for*

11  *misrepresentation accounting-wise or malfeasance*

12  *accounting-wise.*

13          MR. NARDO:  Objection.  Misread.

14          MS. GOLDSTEIN:  I'm sorry.

15          *It was basically for, there was a loan between*

16  *us, was one of the items.  And there was a claim for, I*

17  *guess, misrepresentation accounting-wise or malfeasance*

18  *accounting-wise.*

19  BY MS. GOLDSTEIN:

20  Q.   Do you recall giving that -- being asked that

21  question and giving that answer?

22  A.   Vaguely I recall, yes.

23  Q.   You defaulted in that lawsuit.  Correct?

24  A.   Yes, I did.

25  Q.   And you didn't defend yourself in that lawsuit

**Gluszak - for the Defense - Cross/Ms. Goldstein**

240

1   because attorney-client privilege, in your words, meant

2   that you couldn't put on a proper defense without

3   violating privilege.  Correct?

4   A.   Correct.

5   Q.   And you swore under oath that attorney-client

6   privilege was the reason you did not respond to that

7   lawsuit?

8           MR. NARDO:  Objection.

9           THE COURT:  What is the objection?

10          MR. NARDO:  He just testified under oath that

11  attorney-client privilege is the reason.

12          THE COURT:  Next question.

13  BY MS. GOLDSTEIN:

14  Q.   Luigi Quarta has a judgment against you.  Correct?

15  A.   Yes.

16  Q.   And that judgment is for more than $500,000.

17  Correct?

18  A.   Yes, it is.

19  Q.   So is it fair to say that you owe Mr. Quarta more

20  than half a million dollars?

21  A.   Whatever the judgment says.

22  Q.   Is it fair to say -- the judgment is for more than

23  half a million dollars.  Correct?

24  A.   Correct.

25  Q.   So it is fair to say that you owe Mr. Quarta more

Gluszak - for the Defense - Cross/Ms. Goldstein

241

1    than half a million dollars.  True?

2    A.   Correct.

3    Q.   You used to have access to the restaurant's debit

4    card.  Correct?

5    A.   Yes.

6    Q.   And you would sometimes use that debit card if you

7    went to the supermarket?

8              MR. NARDO:  Objection.

9              MS. GOLDSTEIN:  Your Honor --

10             THE COURT:  Relevance?

11             MR. NARDO:  Yes.

12             MS. GOLDSTEIN:  Again, your Honor, this goes to

13   his credibility.

14             THE COURT:  I think the nature of his

15   relationship to Mr. Quarta and the restaurant goes to the

16   potential advisory capacity, so I'm going to allow it.

17   BY MS. GOLDSTEIN:

18   Q.   So you sometimes used the restaurant's credit card

19   when you went to the supermarket.  True?

20   A.   Yes.  For my own use as well as the restaurant.

21   Q.   And you sometimes used that restaurant's debit card

22   when you filled up your car.  Correct?

23   A.   Correct.

24   Q.   Now, it has been years since you've set foot in the

25   restaurant.  Correct?

Gluszak - for the Defense - Cross/Ms. Goldstein

242

1   A.   Yes.

2   Q.   You haven't been to the restaurant since 2007?

3   A.   2007.

4   Q.   And that was five years ago?

5   A.   Correct.

6   Q.   So you don't know if the restaurant's schedule has

7   changed in that time.  Correct?

8   A.   No, I don't.

9        THE COURT:  I'm sorry.  I didn't hear the

10   answer.

11        THE WITNESS:  I have no idea.

12   BY MS. GOLDSTEIN:

13   Q.   And it is certainly possible that in the last five

14   years the restaurant's hours of operation have changed?

15        MR. NARDO:  Objection.

16        THE COURT:  Sustained.  I think he answered he

17   has no idea.

18   BY MS. GOLDSTEIN:

19   Q.   You don't have any personal knowledge as to the time

20   that the restaurant's workers arrived in 2008.  Correct?

21   A.   No.

22        THE COURT:  No, that's not correct, or you have

23   no knowledge?

24        THE WITNESS:  No, I have no personal knowledge.

25   BY MS. GOLDSTEIN:

243

1    Q.    And you have no personal knowledge as to what time

2    they arrived in 2009?

3    A.    No, I have no personal knowledge.

4    Q.    And you have no personal knowledge as to when they

5    arrived in 2010 or 2011.  Correct?

6    A.    No, I don't.

7    Q.    And you have no personal knowledge as to what time

8    the workers left in 2008?

9    A.    2008?  No.

10   Q.    And you have no personal knowledge as to when workers

11   departed in 2009, 2010, or 2011.  Correct?

12   A.    Correct.

13   Q.    Now, you testified that you ate at the restaurant

14   frequently.  Correct?

15   A.    Yes.

16   Q.    And when you ate at the restaurant, you sat in the

17   dining room.  Right?

18   A.    Not necessarily.  Sometimes Luigi and I would sit at

19   the bar.

20   Q.    So you often ate at the dining room or you ate at the

21   bar.  Correct?

22   A.    Correct.

23   Q.    You did not eat in the kitchen.  Correct?

24   A.    No.

25   Q.    There was a back door to the restaurant.  Correct?

244

1    A.    Yes.

2    Q.    And that back door left through the kitchen.

3    Correct?

4    A.    Correct.

5    Q.    So if you were eating at the bar or the dining room

6    and someone went out the back door, you would not have

7    seen them.  Correct?

8    A.    Correct.

9    Q.    Now let's talk about your role in Mr. Quarta's

10   business from 2007 and prior.

11         Your role was to pay bills.  Correct?

12   A.    Correct.

13   Q.    And you made payments?

14   A.    Yes.

15   Q.    And you wrote checks?

16   A.    Yes.

17   Q.    And you reviewed mail?

18   A.    Yes.

19   Q.    Your job was not to supervise the kitchen workers.

20   Correct?

21   A.    Certainly not.

22   Q.    And your job was not to write down the hours that the

23   kitchen workers work.  Correct?

24   A.    Correct.

25   Q.    And you didn't write down the hours that Mr. Quarta's

Gluszak - for the Defense - Cross/Ms. Goldstein

245

1    kitchen workers worked.  Correct?

2    A.    No.  Correct.

3    Q.    And your job was not to make sure that Mr. Quarta's

4    employees arrived at work at a certain time.  Correct?

5    A.    Correct.

6    Q.    Or left at a certain time?

7    A.    Correct.

8    Q.    And you didn't decide how much workers were paid.

9    Correct?

10   A.    Correct.

11   Q.    And you never made any records of cash payments to

12   Mr. Quarta's employees.  Did you?

13   A.    No.

14   Q.    And you never saw records of cash payments to

15   Mr. Quarta's employees?

16   A.    No.

17   Q.    Now, you testified that you believe that Mr. Quarta

18   didn't let people into his restaurant after 8 pm.

19   Correct?

20   A.    He would let them in for drinks, but not seat them

21   for dinner.

22   Q.    So Mr. Quarta would let people into the restaurant to

23   sit at the bar?

24   A.    Yes.

25   Q.    After 8 pm?

Gluszak - for the Defense - Cross/Ms. Goldstein

246

1    A.   Yes.

2              MS. GOLDSTEIN:  I have nothing further, your

3    Honor.

4              THE COURT:  Let me just ask a question, Mr.

5    Gluszak.

6              When you say the people came in to work in the

7    morning, starting at 11, right?

8              THE WITNESS:  Right.

9              THE COURT:  What was that based upon?  Were you

10   sitting in the restaurant eating?  How do you know?

11             THE WITNESS:  Your Honor, what I would do is, my

12   office was next door.

13             A lot of times I would be the first one there,

14   because I had a key and the best time for me to do his

15   billing would be early in the day.  I couldn't do it when

16   the restaurant was open because I would spread out on the

17   bar.

18             So I would open up the restaurant and then I

19   would hear them start coming in, 11 o'clock, 11:30.  And I

20   would see the progression of the employees as they

21   arrived.

22             THE COURT:  Okay.

23             Any redirect?

24             MR. NARDO:  Yes, your Honor.

25

247

1   REDIRECT EXAMINATION

2   BY MR. NARDO:

3   Q.   How often per week or per month would you do the

4   billing at Luigi Quarta's restaurant?

5   A.   Probably at least four times a week, because we had

6   different vendors getting paid at different times of the

7   week, different times of the month.

8   Q.   When you went there to do the billing, how long would

9   you spend at the restaurant for that purpose, for the

10  billing?

11  A.   It could range anywhere from an hour to two hours.

12  Q.   And then you would often eat there at the restaurant.

13  Correct?

14  A.   I ate lunch there almost every day.

15          MS. GOLDSTEIN:  Objection.  Asked and answered.

16  A.   Yes.

17          THE COURT:  Overruled.

18  A.   Yes.  I ate lunch almost every day.

19  BY MR. NARDO:

20  Q.   And did you eat dinner there?

21  A.   Yes, sir.

22  Q.   How often?

23  A.   Probably at least three times a week.

24  Q.   At some point you and Mr. Quarta had a falling out?

25  A.   Yes, we did.

Vasquez - for the Plaintiff - Direct/Mr. Hennefeld

248

1   Q.   And so he has a judgment against you for $500,000?

2   A.   Yes, he does.

3   Q.   So it's fair to say you're upset with Mr. Quarta?

4   A.   Quite.

5   Q.   So you're not here testifying as a friend of Luigi

6   Quarta.  Is that right?

7   A.   Absolutely not.

8           MR. NARDO:  I have nothing further.

9           THE COURT:  Anything further?

10          MS. GOLDSTEIN:  No, your Honor.

11          THE COURT:  Thank you.  You can step down.

12          (The witness was excused.)

13          THE COURT:  Now we're back to the plaintiff's

14  case.

15                   **EVIDENCE FOR PLAINTIFF**

16

17  **ZORAYDA VASQUEZ**

18         called by the plaintiff, having been previously

19         duly sworn/affirmed, continued testifying as

20         follows:

21

22  DIRECT EXAMINATION (Continued)

23  BY MR. HENNEFELD:

24  Q.   We were discussing Plaintiff's Exhibit 5.

25          MR. HENNEFELD:  And, your Honor, just for a

**Vasquez - for the Plaintiff - Direct/Mr. Hennefeld**

249

1    point to clarify at this point, that when the exhibit was

2    admitted, Plaintiffs Exhibit 5 is a color copy of the time

3    records that were produced by the defendants, which will

4    be relevant here.

5            MR. NARDO:  I missed it.  It's a what copy?

6            MR. HENNEFELD:  It's a color copy.

7            MR. NARDO:  Oh.

8    BY MR. HENNEFELD:

9    Q.   Miss Vasquez, looking at the time records in

10   Exhibit 5.  What year are they from?

11   A.   2008.

12   Q.   Did the daily time records in Exhibit 5 include all

13   of the restaurant's employees?

14   A.   No.

15   Q.   Which types of employees are included in these time

16   records?

17   A.   Kitchen employees.

18   Q.   Which types of employees are not included in these

19   time records?

20   A.   The chef and the busboy.

21   Q.   Did the employer ever produce any daily time records

22   for the chef and the busboy?

23   A.   No.

24   Q.   Now let's look at Page 2 of Exhibit 5, Miss Vasquez.

25   If you can, look at the screen behind you.

250

1      What record does -- what period does the record

2  on this page cover?

3  A.    Week ending November 15, 2008.

4  Q.    And which employees are covered by this record?

5  A.    Jeffrey Chavez and Juan Carlos Chevez.

6  Q.    How many work days does this page show for these

7  employees for this work week?

8  A.    It shows five days.

9  Q.    What does this record show for the starting time each

10  morning?

11  A.    Shows 11 am.

12  Q.    What does this record show for the break time each

13  day for these employees?

14  A.    2:30 pm.

15  Q.    What ending time is shown for the break time for

16  these employees?

17  A.    5 pm.

18  Q.    And what is the total hours worked for the week as

19  that's shown on these records?

20  A.    40 regular hours.

21  Q.    Did you make any observations about the handwriting

22  on this page?

23  A.    Yes.

24  Q.    What did you observe about the handwriting on this

25  page?

Vasquez - for the Plaintiff - Direct/Mr. Hennefeld

251

1   A.   That the work ending date is in pen, and the

2   start/stop, start/finish hours, all this information here

3   is all written in pencil.

4   Q.   And why do you say that?

5   A.   Because you could tell by the color.

6   Q.   What about the color of the writing that you're

7   highlighting right now?

8   A.   This is written in pencil -- in pen because the week

9   is written in pen, blue ink.  And this other information

10  here, the hours, is written in pencil.

11          MR. NARDO:  Objection, judge, to this line of

12  testimony.

13          I don't believe she has demonstrated any

14  qualifications to conjecture about this writing and what

15  it is.

16          THE COURT:  I have a color copy here.

17          MR. HENNEFELD:  Yes, sir.

18          THE COURT:  So I can see for myself.  I don't

19  really need her assistance on that.

20          MR. HENNEFELD:  Okay.  Thank you, your Honor.

21  BY MR. HENNEFELD:

22  Q.   Miss Vasquez, we are now looking at -- on the screen

23  we have Page 1 of Exhibit 5.

24          What period does this Page 1 cover?

25  A.   It covers November 8, 2008.

Vasquez - for the Plaintiff - Direct/Mr. Hennefeld

252

1   Q.    Which employees?

2   A.    Jeffrey Chavez and Juan Carlos Chevez.

3   Q.    The same employees we saw on page 2 that we just

4   looked at?

5   A.    Yes.

6   Q.    In your review of Exhibit 5, did you compare this

7   page, page 1, with page 2 that we just looked at?

8   A.    Yes.

9   Q.    I'm showing you now on the screen, page 2 that we

10  looked at first is to the left side of the screen and

11  page 1, that we just looked at, is on the right side of

12  the screen.

13  A.    Yes.

14  Q.    Did you make any observations in comparing these

15  pages?

16  A.    Yes.

17  Q.    What did you observe in comparing these pages?

18  A.    That page 1 is a photocopy of page 2.

19  Q.    And why do you say that?

20  A.    I could tell because of the coloring.

21          Page 1, you could tell that it is darker than

22  page 2, the original.  You could tell by the coloring.

23  This is darker in color because this is a copy.  And this

24  one is like a greyish.  The pencil is, like, lighter, like

25  a light gray.  And the work ended is in pen, in blue pen.

253

1       So this information is the same, page 1 is the

2  same information as page 2.

3  Q.   Just to clarify the record.  When you said this one

4  is darker and looks like a copy, you were talking about

5  page 1 on the record.  Correct?

6  A.   Yes.  Page 1 is darker than page 2.

7  Q.   And did you observe any similarities between these

8  pages?

9  A.   Yes.

10 Q.   What similarities did you observe?

11 A.   You have the same exact information.  The same

12 information, the same handwriting.  You could tell that

13 page 1 is a photocopy of page 2, which is the original.

14 Q.   Can you identify any particular writing that looks

15 the same to you.

16 A.   Yes.  You could tell by the arrow.

17      Look at the arrow on Wednesday, where it says

18 *all*.  See how it's the same, it's curved the same.  And

19 you can also tell by 40 regular hours.  It's the same

20 handwriting.

21 Q.   Thank you.

22 A.   The same handwriting.  Everything is the same.  Just

23 a photocopy.  Page 1 is a photocopy of page 2.

24 Q.   All right.  Now showing you on the screen page 10 of

25 Exhibit 5.  And what employees are covered by this record?

254

1    A.    Jeffrey Chavez and Juan Carlos Chevez.

2    Q.    The same employees in the other record we looked at?

3    A.    Yes.

4    Q.    What period is covered?

5    A.    Week ending January 1, 2008.

6    Q.    And in your review of these records, have you

7    compared this page 10 with page 2 that we looked at first?

8    A.    Yes.

9    Q.    Showing you on the screen page 2 on the left and

10   page 10 on the right.  What did you observe in comparing

11   these pages?

12   A.    Page 10 is a photocopy of page 2.

13   Q.    And in your review of these records, did you observe

14   any other pages that also appeared to be photocopies of

15   page 2?

16   A.    Yes.

17   Q.    Can you please briefly look through Pages 10 through

18   52 of Exhibit 5.

19             MR. NARDO:  Objection, judge.  Do we have to go

20   through all these pages?

21             THE COURT:  No, we don't have to do this.

22             I have the exhibits.  I can look through the

23   pages and see how many are the same.  You don't have to

24   have her do that.  I can see that they are photocopies.

25   That is enough.

Vasquez - for the Plaintiff - Direct/Mr. Hennefeld

255

1   BY MR. HENNEFELD:

2   Q.   Miss Vasquez, going back to page 10.  You testified

3   that the period covered by page 10 is January, the week

4   ending January 12, 2008?

5   A.   Yes.

6   Q.   Going back to page 2, we see the week ending date

7   there is November 15, 2008.

8          So with respect to page 10, that is dated from

9   January 2008, when was that record actually filled out?

10  A.   I don't know.  But it wasn't January 12, 2008.

11  Q.   And how do you know that?

12  A.   Because the original was prepared -- if you look at

13  page 2, this is dated November 15, 2008, this is the

14  original, original handwriting.

15         So what happened here was that they made copies.

16  The original is dated November 15, 2008, and they made

17  copies and they went back to January 2008.

18         THE COURT:  Was there an objection or no?

19         MR. NARDO:  Well, yes.  There was an objection

20  to when they were prepared.

21         I don't see how she can know when they were

22  prepared, judge.

23         THE COURT:  I think again, she is just

24  testifying based upon when the one with the original ink

25  was on it.

Vasquez - for the Plaintiff - Direct/Mr. Hennefeld

256

1          Correct?

2          THE WITNESS:  Right.

3          THE COURT:  I want to emphasize again, she is

4    not an expert.  These are things that, if you want to put

5    in a letter after the trial that lists for me the pages --

6    this is just based on argument and I don't really need to

7    have her go through these.

8          If you want to do something after the trial,

9    provide me with a list of every one you think are

10   identical in a letter to me, post findings of fact.  Okay?

11         I think, given what's already been said

12   regarding this, what is stipulated, you don't have to go

13   through them page by page.

14         MR. HENNEFELD:  Understood, your Honor.  That is

15   all we had on this exhibit.

16         THE COURT:  Okay.

17         MR. HENNEFELD:  Thank you.

18   BY MR. HENNEFELD:

19   Q.   Miss Vasquez, could you please look at Plaintiff's

20   Exhibit 6, the subsequent exhibit in the binder.

21         MR. HENNEFELD:  And this exhibit has been

22   admitted?

23         THE COURT:  Yes.

24   BY MR. HENNEFELD:

25   Q.   Miss Vasquez, have you previously reviewed this

Vasquez - for the Plaintiff - Direct/Mr. Hennefeld

257

1   document?

2   A.   Yes.

3   Q.   And were you present in the courtroom when

4   Alex Torres testified about this document?

5   A.   Yes.

6   Q.   Okay.  I also have this document up on the screen.

7   You can feel free to look at it on paper there.  Whichever

8   is easier.

9          Miss Vasquez, we are looking at page 2 of

10  Exhibit 6 here.  This has a date of August 2008 at the

11  top.

12         Do you see the column on the far right side of

13  the page?

14  A.   Yes.

15  Q.   From your review of this document, what are the

16  computations in that column?

17  A.   It shows an hourly rate and it shows 40 hours and it

18  shows overtime -- it shows four hours overtime and it

19  shows that four hours were computed at regular time and

20  overtime was computed at time and a half.

21  Q.   During the course of your investigation, did the

22  employer ever tell you that they paid employees an hourly

23  rate, with time and a half for overtime?

24  A.   No.

25  Q.   During the course of your investigation, did the

Vasquez - for the Plaintiff - Direct/Mr. Hennefeld

258

1    defendant -- did the employer ever show you any other

2    documents that had hourly rate and overtime computations?

3    A.    No.

4    Q.    Now, according to this document, page 2 of Exhibit 6,

5    based on the number in the far right column, how many

6    hours per week did these employees work in August of 2008?

7    A.    It shows 44 hours.

8    Q.    And did you compare that number, 44 hours, with the

9    number of hours shown on the daily time records that we

10   looked at in Exhibit 5?

11   A.    Yes.

12   Q.    Were they consistent with each other?

13   A.    No.

14   Q.    I'm sorry.  I'm shifting gears just briefly here.

15          Miss Vasquez, are you aware that this court

16   issued a temporary restraining order against the

17   defendants on Friday?

18   A.    Yes.

19   Q.    And was a copy of that order served on Mr. Quarta on

20   Friday afternoon?

21   A.    Yes.

22   Q.    And could you please look at Exhibit 2 in the binder,

23   Plaintiff's Exhibit 2.

24          Do you recognize the documents in Plaintiff's

25   Exhibit 2.

Vasquez - for the Plaintiff - Direct/Mr. Hennefeld

259

1   A.    Yes.

2   Q.    What are they?

3   A.    Payroll records from Luigi Quarta Restaurant.

4   Q.    And are these documents true and accurate copies of

5   payroll records from Mr. Quarta's business?

6   A.    Yes.

7                 MR. NARDO:  Objection.

8                 THE COURT:  What is the objection?

9                 MR. NARDO:  She can testify that she received

10  them, but how can she know if it's a true and accurate

11  copy from his business?  She's not running the business.

12                THE COURT:  Okay.

13                You received these from Mr. Quarta?

14                THE WITNESS:  Yes.

15                THE COURT:  Okay.

16                MR. HENNEFELD:  We move to admit Exhibit 2.

17                THE COURT:  Any objection?

18                MR. NARDO:  Yes.  The same objection, judge, as

19  to relevance.

20                We're here for overtime.  We're here for whether

21  or not they were paid properly.  This exhibit just shows

22  some of the payroll but doesn't answer the questions about

23  overtime.  I don't think hours are even indicated --

24  withdrawn.  I take that back.

25                I don't see how this is relevant as opposed to

Vasquez - for the Plaintiff - Direct/Mr. Hennefeld

260

1   testimony of the employees and Mr. Gluszak as to when the

2   employees worked.

3           THE COURT:  Mr. Hennefeld?

4           MR. HENNEFELD:  Your Honor, as we have discussed

5   before, the payroll records are relevant certainly to the

6   relevance of the recordkeeping violation and the issue

7   that the employer did not accurately record the wages paid

8   to employees.

9           THE COURT:  Okay.  I'm going to admit them.  At

10  a minimum they are relevant on the issue of the

11  recordkeeping violation, for sure.  They're proven to be

12  inaccurate.

13          So I will admit Plaintiff's Exhibit 2, but we

14  don't need to go through it.

15          MR. HENNEFELD:  Understood.  I just have a few

16  brief questions about the exhibit.

17          THE COURT:  Very brief.

18          MR. HENNEFELD:  Yes, your Honor.

19          (Plaintiff's Exhibit 2 in evidence.)

20  BY MR. HENNEFELD:

21  Q.   Miss Vasquez, do the payroll record exhibits include

22  all the employees?

23  A.   No.

24  Q.   Which employees are included in these payroll

25  records?

Vasquez - for the Plaintiff - Direct/Mr. Hennefeld

261

1   A.    The chef and the busboy.

2   Q.    Which types of employees are not included in these

3   payroll records?

4   A.    The cooks.

5   Q.    Are there any other employees -- types of employees

6   that are not?

7   A.    The kitchen employees.  The dishwashers.  The salad

8   man, and the -- the salad man, the dishwasher, and the

9   cook.

10  Q.    And for the employees who are included in these

11  payroll records, are the payroll records accurate?

12  A.    No.

13  Q.    Why not?

14  A.    Because it doesn't show all the wages that they

15  received.  And the employer -- it only shows that they

16  worked 40 hours.

17  Q.    And is that accurate?

18  A.    No.

19  Q.    Miss Vasquez, please turn to Plaintiff's Exhibit 9.

20  What is Plaintiff's Exhibit 9?

21  A.    It is a back wage computation summary sheet from

22  May 25, 2006, to March 24, 2012.

23  Q.    Does Exhibit 9 consist of all your computations for

24  this trial?

25  A.    Yes.

262

1   Q.   And page 1 is the summary sheet for your

2   computations?

3   A.   Yes.

4   Q.   What is the total amount of back pay that you

5   computed?

6   A.   $137,206.76.

7   Q.   For how many employees?

8   A.   12 employees.

9   Q.   Miss Vasquez, just to clarify.  One of the employee

10  last names listed here is LNU.  What does that mean?

11  A.   *Last Name Unknown*.

12  Q.   And you stated that the top of the page shows the

13  summary of back wage computations is May 25, 2006, to

14  March 24, 2012.  Correct?

15  A.   Yes.

16  Q.   Why did you compute all the way up through March of

17  this year?

18  A.   Because the restaurant Luigi Q is still in violation.

19  He still hasn't come into compliance, so we had to compute

20  up to the present, which is March 24, 2012.

21  Q.   For these computations, what sources of information

22  did you use for the employees' hours worked?

23  A.   For the employees that was working was based on

24  testimony, expected testimony from the employees.

25  Q.   And does that testimony include by deposition as

263

1   well?

2   A.   Yes.

3   Q.   What about for employees who did not testify and were

4   not expected to testify?  What information did you use for

5   their hours worked?

6   A.   For the hours worked, it was based on employees'

7   testimony and also it was based on documentation from

8   interrogatory responses from the employer.

9          I'm sorry.  I'm sorry.  Let me correct that.

10   Can you ask me that again?

11   Q.   Sure.  The question was, for employees who did not

12   testify, what information did you use for their hours

13   worked?

14   A.   For the hours worked, it was based on employees'

15   testimony.

16   Q.   Now, how did you use the expected testimony of some

17   employees for the hours worked of other employees who

18   weren't testifying?

19   A.   Well, it was based on their occupation.  So

20   basically, if the employee was a dishwasher, I used based

21   on their occupation.

22   Q.   For your computation, for the employees who have

23   testified, what information did you use for those

24   employees' pay?

25   A.   It was based on the testimony.

264

1    Q.    Can you please turn to Plaintiff's Exhibit 10A.  We

2    will come back to your computations, but we're just going

3    to look at this briefly.  This document has been admitted.

4    For your computations -- withdraw that.

5              What is Exhibit 10A?

6    A.    These are interrogatory responses by the employer.

7    Q.    And for your computations for the employees who have

8    not testified, did you use Exhibit 10A?

9    A.    For the employees that did not testify?  Yes.

10   Q.    And how did you, what information did you use in

11   Exhibit 10A for the employees who have not testified?

12   A.    Can you repeat that again?

13   Q.    Sure.  How did you use the information in Exhibit 10A

14   for the employees who have not testified?

15   A.    Well, the responses for them from the interrogatory

16   shows what they got paid.  So I used what information that

17   was here for the people that did not testify.

18   Q.    And you see there is also information about dates of

19   employment, in Exhibit 10A?

20   A.    Yes.

21   Q.    Did you also use that information for employees who

22   have not testified?

23   A.    Yes.

24   Q.    Now, we talked about the employer's records in this

25   case.  Why didn't you base your computations only on the

265

1  employer's records?

2  A.   Because they were not accurate.  They were false

3  records.

4  Q.   Now, are your computations, that is -- we are done

5  with Exhibit 10A.

6        Are your computations in Exhibit 9 precise to

7  the penny?

8  A.   No.

9  Q.   Why not?

10  A.   Because I had to use an average because I didn't have

11  accurate records of the hours that these employees worked.

12  So I had to use an average based on the information from

13  the testimony.

14  Q.   Okay.  Let's go back to Exhibit 9 and to page 2 of

15  Exhibit 9.  I want to just briefly talk through the

16  columns on your spreadsheet here.

17        On page 2 there, it says computations for Jose

18  Anibal Acosta.  Correct?

19  A.   Yes.

20  Q.   What information generally did you use for these

21  computations?

22  A.   Can you repeat that?

23  Q.   What information did you use for Mr. Acosta's

24  computations?

25  A.   It was based on his testimony.

Vasquez - for the Plaintiff - Direct/Mr. Hennefeld

266

1   Q.    The first two columns on the left side of the page

2   are Start and End period dates.  Correct?

3   A.    Yes.

4   Q.    And then the next column, the third column from the

5   left, is *Total Weeks*?

6   A.    Right.

7   Q.    What is that column?

8   A.    *Total Weeks* is from the start and end date.  From

9   10/06/09 through 3/24/12, that's 129 weeks.  So those are

10  total weeks that the employee worked.

11  Q.    And is that just number of calendar weeks?

12  A.    Calendar weeks, yes.

13  Q.    The next column to the right is *Weeks Excluded*.  What

14  is that column?

15  A.    Those are weeks that were excluded because the

16  employee testified that the restaurant was closed one week

17  in August, so I excluded two weeks for that period.

18  Q.    You excluded one week for each August?

19  A.    Yes.

20  Q.    Did you do that throughout your computations?

21  A.    Yes.

22  Q.    And the next column over is *Total Weeks Worked*.  What

23  is that column?

24  A.    That is total weeks minus the weeks excluded.

25  Q.    And the next column over is *Weekly Hours Worked*.

Vasquez - for the Plaintiff - Direct/Mr. Hennefeld

267

1      How did you determine the number of weekly hours

2   worked?

3   A.   Well, I took the -- from the expected testimony, I

4   took the starting time and I took when they had a break at

5   3 pm.  They started at 10:30 am and then they took a break

6   at 3 pm.  They went back to work at 4:30 pm.  And then I

7   took -- added up the hours -- the time that they left,

8   added up the hours and I came up with roughly 57-1/2

9   weeks.

10  Q.   57-1/2 hours?

11  A.   I'm sorry.  Yes, 57-1/2 hours.

12  Q.   And do you recall hearing testimony that workers

13  didn't leave at the exact same time each night?

14  A.   Yes.

15  Q.   Do you also recall testimony, employees describing a

16  range of times that they left?

17  A.   Yes.

18  Q.   And so how did you treat those ranges of times for

19  determining hours worked?

20  A.   So if, for example, an employee says that they left

21  between 10 pm and 11 pm, so what I did, I based it on half

22  an hour.  Again, it's based on half an hour, so I will

23  compute 10:30.  I used an average.

24  Q.   Did you use that methodology throughout your

25  computations?

268

1   A.    Yes.

2   Q.    And with respect to breaks, did you give credit for

3   the full hour and a half break for every weekday

4   throughout your computations?

5   A.    Yes.

6   Q.    Do you recall hearing testimony from employees that

7   sometimes they were not able to take a full hour and a

8   half break?

9   A.    Yes.

10  Q.    So why did you give credit for the full hour and a

11  half break?

12  A.    I gave them the credit anyway.  I want to give them

13  the benefit of the doubt, so I gave them credit for that,

14  also.

15  Q.    The next column over is *Weekly Gross Pay*.  I think

16  that is self-explanatory for Mr. Acosta.

17          What is the weekly gross pay based on?

18  A.    It was based on his testimony.

19  Q.    And do you see, in the bottom of the two lines for

20  Mr. Acosta's computations, the weekly gross pay is zero.

21  Why is that?

22  A.    That's because the employee said that he didn't get

23  paid for the first week that he worked there; that it was

24  put in deposit.

25  Q.    The next column over after *Weekly Gross Pay* is

**Vasquez - for the Plaintiff - Direct/Mr. Hennefeld**

269

1   *Reconstructed Regular Hourly Rate.*

2              What is that column?

3   A.   That is weekly hours worked divided by weekly -- I'm

4   sorry -- weekly gross pay divided by weekly hours worked.

5   We get an hourly rate of 6.96.

6   Q.   And the next column over is *Hourly Minimum Wage.*

7   What is that column?

8   A.   Well, if you take the minimum wage.  Right now it is

9   $7.25.  So I took the minimum wage, 7.25, minus the 6.96

10  reconstructed hourly rate.  It gave me a discrepancy of 29

11  cents.

12  Q.   And the next column over is *Weekly Minimum Wage*

13  *Deficiency.*

14              What is that column?

15  A.   That's the hourly minimum wage times the weekly hours

16  worked.

17  Q.   Just to clarify it.  The hourly minimum wage

18  deficiency times weekly hours worked?

19  A.   Yes.

20  Q.   And the next column over, the *Weekly Overtime*

21  *Deficiency*, what is that column?

22  A.   That is the overtime deficiency.  So it is 7.25 times

23  .5 times the weekly hours worked equals 63.44.

24              Actually, let me rephrase that.  I'm sorry.

25              It is the minimum wage, 7.25, times .5, times

Vasquez - for the Plaintiff - Direct/Mr. Hennefeld

270

1    the overtime hours worked.  So in this case, is 17 hours

2    and a half.

3    Q.    And you get that from weekly hours worked of 57-1/2,

4    minus 40, equals 17-1/2 overtime hours?

5    A.    Yes.

6    Q.    And you used half of 7.25 as the rate for that

7    overtime computation.

8          Why are you using half of 7.25 rather than half

9    of 6.96, which was the reconstructed hourly rate?

10   A.    Because when we pulled it up to the minimum wage, we

11   brought all hours worked at 7.25, which is minimum wage.

12         So in this case, the reconstructed -- the

13   deficiency for all hours worked, so now all that

14   deficiency is only half time of minimum wage.

15   Q.    And the next column over, *Total Minimum Wage*

16   *Deficiency*, what is that column?

17   A.    That is weekly minimum wage deficiency times total

18   weeks worked.

19   Q.    And the next column over, *Total Overtime Deficiency*,

20   what is that column?

21   A.    That's total overtime deficiency times total weeks

22   worked.

23   Q.    And the final column to the right, *Amount Due*

24   *Employee*, what is that column?

25   A.    If you add up the total minimum wage deficiency and

271

1    the total overtime deficiency, it equals amount owed

2    employee.  The two together.

3    Q.   And the number in bold on this page for Mr. Acosta is

4    $6,680.

5             Is that the total owed for that employee?

6    A.   Yes.

7    Q.   And the methodology that you just described for the

8    columns on page 2, did you use these same methods

9    throughout your computations?

10   A.   Yes.

11            MR. HENNEFELD:  Plaintiff moves to admit Exhibit

12   9.

13            THE COURT:  Any objection?

14            MR. NARDO:  No objection, judge.

15            THE COURT:  Plaintiff's Exhibit 9 is admitted.

16            (Plaintiff's Exhibit 9 in evidence.)

17            MR. HENNEFELD:  One moment, your Honor.

18            Nothing further, your Honor.

19            THE COURT:  Cross-examination?

20

21   CROSS-EXAMINATION

22   BY MR. NARDO:

23   Q.   Good afternoon, Miss Vasquez.

24   A.   Good afternoon, Mr. Nardo.

25   Q.   Is an employee required to cooperate with the United

272

1    States Department of Labor investigation?

2    A.   Is it mandatory?  I mean, if it's required?

3    Q.   Well, when you go to an employer's workplace, is an

4    employee required to speak with you?

5    A.   I don't think it is required, no.

6    Q.   And when you went to Luigi Q's workplace, you were

7    doing that secretly.  Is that right?

8    A.   Secretly from?

9    Q.   From Luigi Q and from the management.

10   A.   Well, yes.

11   Q.   And you didn't want Luigi Q to know that you were

12   talking to his employees.  Correct?

13              MR. HENNEFELD:  Objection.  Relevance.

14              THE COURT:  I will allow it.

15   A.   Well, it didn't matter whether he knew or not, I

16   mean, if it came from the employees.

17   BY MR. NARDO:

18   Q.   Did you ever walk through the front door and say to

19   Mr. Quarta that you wanted to speak to his employees?

20   A.   No.

21   Q.   You went in through the back door to speak to the

22   employees directly.  Correct?

23   A.   Not the back door.  In the parking lot, the back of

24   the restaurant.

25   Q.   The restaurant has a back entrance.  Right?

Vasquez - for the Plaintiff - Cross/Mr. Nardo

273

1   A.   Yes.

2   Q.   You went to that entrance and spoke to the employees

3   directly?

4   A.   Yes.

5   Q.   Did you tell the employees not to tell Luigi Q that

6   the employees were speaking with you?

7   A.   Can you rephrase that?  Can you rephrase that?

8   Q.   Sure.  Did you tell any of Luigi -- withdrawn.

9        Did you tell any of the employees of Luigi Q

10  that -- not to say to Luigi that they were speaking to

11  you?

12  A.   No.

13       MR. HENNEFELD:  Objection.  Relevance.

14       THE COURT:  Overruled.

15  BY MR. NARDO:

16  Q.   Did you tell any of the employees to tell Luigi Q

17  that the Department of Labor stopped by?

18  A.   No.

19  Q.   And you're familiar with Luigi Q's signature?  Luigi

20  Quarta's signature, I should say.

21  A.   No.

22  Q.   And is it true that you never went to the secret

23  surveillance of Luigi Q's restaurant on a Saturday?

24  A.   Right.

25  Q.   So to the extent you're computing hours for

Vasquez - for the Plaintiff - Cross/Mr. Nardo

274

1   Saturdays, none of that is reliant upon your personal

2   observations.  Correct?

3   A.   It is based on information I got from the employees.

4   Q.   Right.  And that is employee interviews?

5   A.   Yes.

6   Q.   Many of those interviews were in the parking lot or

7   the back of Luigi Q's restaurant.  Correct?

8   A.   Yes.

9   Q.   And you took notes of these interviews?

10  A.   Yes.

11  Q.   And some of them were signed by the employees?

12  A.   Some were signed, yes.

13  Q.   Did you explain to the employees what it meant to be

14  paid overtime?

15  A.   If I explained to the employees?

16  Q.   Yes.

17  A.   Well, when I interviewed employees, I basically asked

18  them questions about the starting time, if they took any

19  breaks, the ending time.  I got all that information.  And

20  I also asked them about their pay.

21  Q.   In the employees' statements, did they sign

22  statements that said that they weren't paid overtime?

23  A.   Yes, they did sign statements.

24  Q.   So how did the employees know that they weren't paid

25  overtime?

275

1    A.    Because they gave me their schedules, so when I added

2    up the hours, it was more than 40 hours.  So at that

3    moment I asked them, you know, if you are working more

4    than 40 hours, do you get paid overtime?  And when the

5    employee would answer, no I don't get paid overtime.

6    Q.    And did you tell them to discuss that with

7    Mr. Quarta?

8    A.    No.

9    Q.    Did you ever personally go through the front door of

10   Luigi's restaurant to see if he had time sheets or time

11   cards or a time clock?

12   A.    I met with Mr. Luigi at the initial conference.  But

13   no, I didn't request any time records at that moment.

14   Q.    Did you ever go to the restaurant, itself, to see if

15   he had a time clock?

16   A.    No.

17   Q.    Did you ever go to the restaurant, itself, to see if

18   he had time cards?

19   A.    No.  I requested them.  But I never went there, no.

20   Q.    Do you remember Juan Carlos Cantos Chevez signing a

21   statement that says Pastor is in charge of the kitchen?

22   A.    Yes.

23   Q.    You do recall that?

24   A.    On his testimony?

25   Q.    No.  Do you recall preparing a statement, an employee

276

1    personal interview statement, for Juan Carlos Cantos

2    Chavez, where he'd signed a statement and part of the

3    statement said Pastor is in charge of the kitchen?

4    A.    Well, if it's there then I must have written it.

5    Q.    Okay.  Well, let's just make sure.

6    A.    Yes.

7    Q.    Let's take a look at Defendant's N.  And you can look

8    at, as far as I know, the first page is in English, the

9    second page is in Spanish.

10          Do you see where it says Pastor is in charge of

11   the kitchen?

12   A.    Okay.  I see it.

13   Q.    You see it?

14   A.    Yes.

15   Q.    So did he tell that to you and then you wrote it in

16   the statement?

17   A.    Yes.

18   Q.    And then you presented the statement for him to sign?

19   A.    Yes.

20   Q.    Do you know what Mr. Zanbrano-Banegas did?  I think

21   I'm getting that name wrong.  Alexander Banegas-Zanbrano.

22          Do you know what he did for the restaurant?

23   A.    Alexander Zanbrano?

24   Q.    Yes.

25   A.    Alexander Zanbrano is the busboy.

Vasquez - for the Plaintiff - Cross/Mr. Nardo

277

1  Q.   So was he included on the payroll?  You can look at

2  Exhibit 2.

3  A.   Exhibit 2.  Can I check it?

4  Q.   Yes.

5  A.   Okay.

6  Q.   Do you see his name in that exhibit?

7  A.   Yes.

8  Q.   There is a comment there on Enrique.  Do you know

9  his -- oh, I think his last name is unknown?

10  A.   Um-hmm.

11  Q.   You never spoke with him about his hours of work, did

12  you?

13  A.   No.

14  Q.   And you never spoke with him about his rate of pay?

15  A.   No.

16  Q.   So you had to estimate that for purposes of the

17  damage computations.  Is that right?

18  A.   It was based on chef.  The chef is basically making

19  750, so we based it on that.

20  Q.   That is what the prior chef made?

21  A.   That is what Pastor made when he started, 750.

22  Q.   Okay.  The same thing with someone named Horacio?

23  You estimated his wages and hours.  Correct?

24  A.   Yes.

25  Q.   The same thing with Jorge Gonzalez?

Vasquez - for the Plaintiff - Cross/Mr. Nardo

278

1   A.   Jorge Gonzalez, I can't recall what his position was

2   there.

3   Q.   But did you estimate his wages and hours?

4   A.   Yes.

5   Q.   And the estimate for Jose Anibal, you said it was

6   based on his testimony.  What did you mean by his

7   testimony?

8   A.   On his wages, you mean?

9   Q.   Yes.

10  A.   His wages was based on expected testimony.

11  Q.   Expected testimony?

12  A.   Yes.

13  Q.   Okay.  Do you recall at one point believing that the

14  employees were working 61 hours at Luigi Q's?

15  A.   Yes.

16  Q.   Did you later conclude that that was too high an

17  estimate for all the employees?

18  A.   When you said later, what do you mean by that?  Do

19  you mean when I met with the employer?

20  Q.   Well, look at Plaintiff's Exhibit 9.

21       Did you conclude that 61 hours does not apply to

22  all the employees?

23  A.   Yes.

24  Q.   And previously the 61 hours was a conclusion you came

25  to based on the information you had at the time?

279

1    A.    Yes.

2    Q.    And at some point you thought that 61 hours might be

3    too low of an estimate.  Is that right?

4    A.    Yes.

5    Q.    But the current estimates you have in Exhibit 9 are

6    the most correct estimates that you have?

7    A.    Yes.  Because on these, on Exhibit 9 I gave him

8    breaks.  I gave him breaks on the vacation.

9           So, you know, these people also said that they

10   took a longer break, so I didn't compute based on that.

11          I gave him a lot of breaks on the -- I gave him

12   a lot of breaks on the break, which they said that they

13   sometimes had to take a longer break, and I also gave him

14   the vacation time.

15   Q.    The vacation time is not going to affect the hours

16   per week.  Right?

17   A.    No.  But the total hours that they worked, sometimes

18   they left a little later; the dishwasher was required to

19   stay later.  As far as they -- during their breaks, if

20   there were customers, they were required to stay working

21   during the breaks, longer hours.

22   Q.    Were there times when the restaurant wasn't busy and

23   they would leave earlier?

24   A.    No.  They were not -- they couldn't leave earlier.

25   Q.    And your original calculations didn't have a vacation

280

1   time.  Correct?

2   A.    Maybe not.  I can't recall.  Maybe not.

3   Q.    You met a couple of times with Luigi Quarta.  Is that

4   right?

5   A.    Yes.

6   Q.    He was never rude to you?

7   A.    No.

8   Q.    Never impolite?

9   A.    No.

10          MR. HENNEFELD:  Objection.  Relevance.

11          THE COURT:  Overruled.

12  BY MR. NARDO:

13  Q.    And as part of your computation, did you ever

14  consider whether Mr. Alfaro Pastor was exempt from the

15  overtime requirements of the Fair Labor Standards Act?

16  A.    During my meeting with Luigi Quarta.  Is that what

17  you're referring to?

18  Q.    No.  At any point when you were making your

19  calculations, did you ever consider that Pastor might be

20  exempt?

21  A.    No, he's not -- he's a nonexempt employee.

22  Q.    Were there ever discussions about that?

23          MR. HENNEFELD:  Objection with respect to any

24  attorney-client discussions.

25          THE COURT:  Sustained.

281

1             Discussions with Mr. Quarta or who?

2             MR. NARDO:  I will withdraw it, judge.

3    BY MR. NARDO:

4    Q.    I would like you to look at Defendant's Exhibit B,

5    which I will get for you.

6             You have to prepare a case file for these cases.

7    Correct?

8    A.    Yes.

9    Q.    And this is a portion of that case file?

10   A.    Can you repeat that?

11   Q.    Is this a portion of your case file?

12   A.    Yes.

13   Q.    And this case file was maintained in the ordinary

14   course of business?

15   A.    What is that?

16   Q.    Did you have a duty to maintain this case file?

17   A.    Yes.

18   Q.    I would like to turn to the page that says Bates

19   stamped, at the bottom, SCA-50.  Can you tell me what that

20   is?

21   A.    These are our case diary entries.

22   Q.    Are these entries you made into the case diary?

23   A.    Yes.

24   Q.    The first entry, it says, *Case registered for*

25   *complaint*.  Right?

Vasquez - for the Plaintiff - Cross/Mr. Nardo

282

1   A.    Yes.

2   Q.    Who made that complaint?

3         MR. HENNEFELD:  Objection.  Relevance.

4         THE COURT:  Sustained.

5   BY MR. NARDO:

6   Q.    How did this case come about?

7         MR. HENNEFELD:  Objection.

8         THE COURT:  Sustained.

9         The stipulation again raises the issue of

10  informant's privilege.  I did allow questioning to the

11  extent that there may have been group meetings, which she

12  testified there were not.  But I'll allow you to question

13  the witness regarding that.

14        But it is completely irrelevant who started the

15  case, so I'm going to sustain the privilege.  It doesn't

16  relate to any issue that I have to consider.

17        MR. NARDO:  If the employee's already testified,

18  judge, doesn't that become public?

19        THE COURT:  I don't think that was testified.

20  They started the investigation.  The employee said, yes, I

21  was the one who started the investigation.

22        MR. NARDO:  No.  I guess what I'm saying is, if

23  the employee who started the investigation has already

24  testified, is it still considered privileged?

25        THE COURT:  I think so because it would disclose

Vasquez - for the Plaintiff - Cross/Mr. Nardo

283

1  who initiated the case, and I don't think there is any

2  need to know which one of them was the first one.

3  BY MR. NARDO:

4  Q.   Okay.  Can you turn to the next page, page 51.

5          Did you have to log the amount of time you spent

6  on the case, also?

7  A.   Yes.

8  Q.   And on these entries it says Total Hours Charged and

9  it will give a date?

10  A.   Yes.

11  Q.   So if we look at August 5, 2008, the entry says:  *Met*

12  *with Luigi Quarta.  Provided him with WH-56.  Will meet*

13  *with his accountant and lawyer to review and will set up a*

14  *meeting.*

15          Do you see where it says that?

16  A.   Yes.

17  Q.   And did that occur on August 5, 2008?

18  A.   I'm sorry.

19  Q.   Did that occur on August 5 of 2008?

20  A.   Yes.

21  Q.   And then it says, *Total Hours Charged on*

22  *August 5, 2008:  4.*

23          Do you see where it says that?

24  A.   Yes.

25  Q.   So does that mean that that meeting was four hours?

284

1   A.    No, not necessarily.

2   Q.    What does the four hours represent, then?

3   A.    Well, you know, I can't remember if the meeting was

4   four hours, but on our notes, that there are times when we

5   have to meet with their representative and then we have to

6   go back and sometimes we have to do other tasks on the

7   case.  So not only did we meet with the employer, we might

8   have to go back and do other tasks.

9   Q.    What is your normal workday with the Department of

10  Labor?  How many hours a day?

11              MR. HENNEFELD:  Objection.  Relevance.

12              THE COURT:  I don't really understand the

13  purpose of this line of questioning.

14              MR. NARDO:  I just want to see if her time

15  entries are accurate for the amount of time she spent on

16  this case.

17              THE COURT:  If they're inaccurate, what does

18  that mean?  It doesn't mean anything about your client's

19  accuracy, right?

20              MR. NARDO:  Well, if they can't keep accurate

21  records of their own time records, are they going to --

22              THE COURT:  If the Department of Labor's records

23  are not accurate doesn't mean Quarta isn't going to have

24  to keep accurate records.

25              MR. NARDO:  Well, they're the ones, judge, who

Case 2:09-cv-02212-JFB-ETB   Document 82   Filed 01/09/13   Page 134 of 200 PageID #: 1612

1  would put together the estimates of the hours worked.

2          THE COURT:  Well, her chart is at least in line

3  with what the employees report to her.  I can do that

4  calculation myself, right?  I can do the math.  She has

5  all the exhibits attached to her chart.  So I don't have

6  to rely upon her math, right?

7          MR. NARDO:  I will leave that up to your Honor.

8          THE COURT:  Yes.  I can do the math by myself,

9  so I don't think we need to get into exploring how

10  accurate her own records are.

11  BY MR. NARDO:

12  Q.   When is the last time you were at Luigi Q's

13  restaurant, Miss Vasquez?

14  A.   Friday.

15  Q.   Were you able to write a statement Friday and have

16  Mr. Anibal or the other employee, Jeffrey Cantos Chavez

17  [sic], sign a statement about what Luigi Quarta or the

18  chef allegedly told him?

19  A.   You mean if I wrote it down for them to sign as to

20  what happened?

21  Q.   Right.

22  A.   No.

23  Q.   You submitted a statement to the court --

24  A.   Oh, you mean if I signed it?

25          I think that is a misunderstanding here.  If I

286

1   signed it?

2   Q.   No.  First I asked if they signed it.

3   A.   Yes.

4   Q.   They didn't sign a statement?

5   A.   No, they didn't sign it.

6   Q.   You submitted a statement stating that Mr. Cantos

7   Chevez said that Enrique said that Luigi Quarta said some

8   threatening statement.

9   A.   Right.

10  Q.   Did you try the get a statement directly from

11  Mr. Cantos Chevez?

12          MR. HENNEFELD:  Objection.  Vague.

13  A.   From Juan Carlos?

14          THE COURT:  Overruled.

15  BY MR. NARDO:

16  Q.   Yes.

17  A.   Juan Carlos?

18  Q.   Yes.

19  A.   Directly from him, personally?

20  Q.   Yes.

21  A.   It was over the phone.

22  Q.   It was over the phone.  Okay.

23          Well, I thought you said you were at the

24  restaurant Friday.

25  A.   Oh, no.  I went to serve the TRO on Friday to

Vasquez - for the Plaintiff - Cross/Mr. Nardo

287

1   Luigi Quarta.

2   Q.   And did you try to get -- on Thursday did you ever

3   try to get a statement from Mr. Acosta in writing, signed

4   by him?

5   A.   In writing?  No.

6   Q.   Are there written guidelines about how you're

7   supposed to keep your case diaries?

8            MR. HENNEFELD:  Objection.  Relevance.

9            THE COURT:  Same ruling.  Sustained.

10  BY MR. NARDO:

11  Q.   At some point you wrote that you observed a Hispanic

12  sweeping the back of the restaurant.  Do you recall that?

13  A.   Yes.

14  Q.   Why did you write that?

15  A.   Because I observed a Hispanic cleaning the back of

16  the restaurant.

17  Q.   How can you tell the person was Hispanic?

18  A.   Because I had already spoken with them in Spanish, so

19  I knew they were Hispanics.

20  Q.   Do you know how many hours you spent on this case in

21  the investigation phase?

22            MR. HENNEFELD:  Objection.  Relevance.

23            THE COURT:  I will let her answer.

24            Do you know?

25            THE WITNESS:  On that particular day?  Or doing

288

1 surveillance?

2 BY MR. NARDO:

3 Q. No. For the entirety of your investigation. Do you

4 know how many, since we're keeping track of the hours, do

5 you know how many you spent on the case?

6 A. You mean since I started in 2008, how many hours so

7 far?

8 Q. Right.

9 A. To the present?

10 Q. Or until you stopped keeping track.

11 A. Oh, I don't know.

12 Q. Okay. Did you ever speak with Mr. Gluszak for your

13 investigation?

14 A. No, I never spoke with Mr. Gluszak.

15 Q. Did you ever ask Pastor if he supervised employees?

16 A. I might have.

17 MR. NARDO: I have nothing further, judge.

18 THE COURT: Any redirect?

19 MR. HENNEFELD: No, your Honor.

20 THE COURT: You can step down. Thank you.

21 (The witness was excused.)

22 THE COURT: Why don't we take our break for the

23 afternoon.

24 What do you have left to do?

25 MR. HENNEFELD: We have no further witnesses,

289

1    your Honor.

2              We have one minor exhibit matter, the

3    defendant's deposition, and then the matter of the

4    preliminary injunction and motion to amend, and that's it

5    for our case.

6              THE COURT:  And then what do you intend to do in

7    your case?

8              MR. NARDO:  Judge, we're going to rest our case,

9    also, except that we're going to put in deposition

10   testimony of Melvin Banegas, which is Exhibit G in our

11   book.

12             THE COURT:  Any objection to that?

13             MR. HENNEFELD:  No.  Your Honor ruled on our one

14   objection to that.

15             THE COURT:  I think I already admitted this,

16   actually, didn't I?  Yes, that is already in. Good.  It's

17   in.

18             You were going to show me there are certain

19   portions on it in reference to your client's deposition?

20             MR. NARDO:  Yes, there very well might be,

21   judge.

22             THE COURT:  Maybe can I review them during the

23   break?

24             MR. NARDO:  Yes.  I can tell you right now.

25             THE COURT:  Give them to my deputy and just show

290

1   me.

2           MR. NARDO:  Judge, it's just one or two pages.

3           THE COURT:  Okay.

4           MR. NARDO:  On Luigi Quarta's deposition, it's

5   actually pages 11 through 13, and I think the objection

6   there is that it is just -- it concerns other employers,

7   judge.

8           THE COURT:  So it is relevance?

9           MR. NARDO:  Yes.

10          Page 37, they have an answer marked -- they just

11  have part of the answer marked.  I would submit that if

12  you are going to mark the answer, you have to mark the

13  full answer.

14          THE COURT:  I will take a look at it.

15          Let's take a 10-minute break.  What we will do

16  then is, we'll address these remaining exhibit issues and

17  then I will give you a chance, if you want, to sum up.

18  You can sum up so we can be done today.

19          MR. HENNEFELD:  And also, the preliminary

20  injunction motion and motion to amend issues.

21          THE COURT:  Yes.

22          MR. NARDO:  And the objection to the plaintiff's

23  portion of Melvin Banegas's testimony.

24          THE COURT:  You have objections?

25          MR. NARDO:  Yes, to their portion.  We both have

291

1   portions of Melvin Banegas.

2          THE COURT:  I thought I ruled on your objections

3   to their portion.

4          MR. NARDO:  Right.  Yes.

5          Very briefly.  Page 41 to 43 concerns his

6   termination from Luigi Q's.  I don't get that it's

7   relevant.

8          And page 47 concerns when customers, you know,

9   when customers come and go from the restaurant.  And I

10  don't think that is relevant.

11         And there is a whole host of pages that have no

12  markings at all, which I assume can come out of -- or,

13  your Honor, can go in normally.

14         THE COURT:  If I get anything not marked, you

15  are going to ignore it, right?

16         MR. HENNEFELD:  Yes, your Honor.  We've provided

17  that deposition in its entirety.  For the court's

18  convenience, we have highlighted the portion we are

19  designating.

20         THE COURT:  I'm only going to read the portions

21  that are highlighted.

22         MR. NARDO:  Thank you, your Honor.

23         THE COURT:  Let's take our break.

24         (Recess taken from 3:50 pm until 4:15 pm.)

25         THE COURT:  I have reviewed the objections.

292

1    Let's start with defendant's deposition.

2           Again, just to make sure, the plaintiff is

3    speaking to admit the highlighted portions of Mr. Quarta's

4    deposition. Correct?

5           MR. HENNEFELD: Yes.

6           THE COURT: There were objections on Page 11,

7    13, on relevance grounds, which I'm going to sustain.

8           It relates to other jobs that Mr. Quarta has had

9    in the restaurant business. I don't think they have any

10   relevance, so I'm going to sustain the objection. So I

11   will not consider pages 11 through 13.

12          Another objection by Mr. Nardo is on page 37. I

13   want to make sure I understood that line 3 is the only

14   line highlighted for the answer, and you want down to 12

15   to be included, line 12?

16          MR. NARDO: The full extent of that answer,

17   judge.

18          THE COURT: Yes. That is granted. So I will

19   consider page 37, the full answer, lines 3 through line

20   12.

21          So with those rulings, the highlighted portions

22   of Exhibit 12 as modified by the court's rulings is

23   admitted.

24          (Plaintiff's Exhibit 12 in evidence.)

25          THE COURT: Then on Exhibit 13, the objection

293

1   was from page 41 to page 43.

2          I'm going to allow in page 41, line 8, to page

3   42, line 8, because that relates to his pay and describes

4   how he had to go back to get his last payment that he was

5   owed.  His one week was withheld.  So I think that is

6   relevant.

7          But I'm going to sustain the objection to the

8   rest of page 42, starting with line 9, to page 43, line 8,

9   because that just goes to why Mr. Quarta was screaming at

10  him.  It doesn't have any relevance to any issues in the

11  case.

12         So I will sustain the objection and not consider

13  page 42, line 9, to page 43, line 8.

14         And page 47, I'm going to overrule that

15  objection because the question is peppered with when

16  clients started to arrive.  The answers reference when he

17  arrived in conjunction with that.  So in explaining when

18  customers begin to arrive, he explains when his breaks

19  were and when he started.

20         I'm going to overrule the objection because I

21  think, although the question might have been focused on

22  when the clients arrived, his answers certainly referenced

23  his arrival time, his break time, so they'd certainly be

24  relevant.

25         So the highlighted portions of Exhibit 13, as

294

1    modified by the court's rulings, is admitted.

2              (Plaintiff's Exhibit 13 in evidence.)

3              THE COURT:  Any other exhibits that the

4    Department of Labor is seeking to admit that I haven't

5    admitted?

6              MR. HENNEFELD:  No, your Honor.

7              THE COURT:  So you rest?

8              MR. NARDO:  Can I just go over what is admitted,

9    judge?

10             THE COURT:  Yes.  You want to go over what

11   exhibits are admitted?

12             MR. NARDO:  Yes.

13             THE COURT:  Okay.  This is what I have.  Tell me

14   if I'm wrong.

15             Exhibit 1, Exhibit 8A, the portions of the

16   deposition transcript I indicated for Exhibit 12.  And

17   Exhibit 13, Exhibit 6, Exhibit 7, Exhibit 7A, Exhibit 10,

18   10A, 11, 5, 2, 9, and then Defendant's Exhibit G.

19             MR. HENNEFELD:  That's what we have, your Honor.

20             MR. NARDO:  I'm sorry.  I didn't hear the

21   defendant's exhibit.

22             THE COURT:  G.  Okay?

23             MR. NARDO:  Okay.

24             THE COURT:  So the Department of Labor rests,

25   then?

295

1          MR. HENNEFELD:  Yes, with the exception of the

2     preliminary injunction and motion to amend.

3

4                    **PLAINTIFF RESTS**

5

6          THE COURT:  Yes.

7          The defendants rest?

8          MR. NARDO:  And move for a directed verdict.

9          THE COURT:  Okay.  That is denied.

10         MR. NARDO:  Okay.  We rest.

11

12                    **DEFENSE RESTS**

13

14         THE COURT:  Again, I will place the ruling on

15    the record that the standard for a directed verdict is

16    that the evidence is construed most favorably to the

17    plaintiff and all reasonable inferences drawn in

18    plaintiff's favor.

19         Certainly, if all of the Department of Labor's

20    witnesses are credited and all reasonable inferences drawn

21    in their favor, certainly there is sufficient evidence to

22    find in favor of the plaintiffs on the claim that they

23    have brought.

24         Based upon the hours that the witnesses

25    testified to that they're working, it would certainly be

296

1    sufficient basis for that violation for both the minimum

2    wage and overtime laws as well the recordkeeping.  And

3    there would be sufficient evidence, as well, on the issue

4    of willfulness.

5            And the defendants have rested?

6            MR. NARDO:  Yes, your Honor.

7            THE COURT:  So let's address this issue

8    regarding the desire to amend the claim of retaliation.

9            What is your position on that?

10            MR. HENNEFELD:  Your Honor, we do seek to amend

11    to add the retaliation claim.

12            If I may first address the issue of the

13    preliminary injunction?

14            THE COURT:  Sure.

15            MR. HENNEFELD:  We renew our motion for a

16    preliminary injunction until such time as a permanent

17    injunction is adjudicated to enjoin the defendants from

18    retaliatory discharge or any other retaliatory or

19    discriminatory act in violation of Rule 15(a)(3) against

20    the two employees questioned or any other employees.

21            And the exhibits -- the evidence that's extended

22    that supports a preliminary injunction is certainly that

23    it's overlapping, it is the same as the evidence that

24    supports our motion to amend, to add a 15(a)(3) claim.

25    And the evidence has certainly shown the initial

297

1   retaliatory conduct by the defendants.

2          It's clear that those employees have no

3   misunderstanding of the threat that was being made against

4   them.  And their testimony also showed that the threats

5   continued after the TRO had been issued and the individual

6   defendant had been personally served with the TRO.

7          So it's clear that the defendant did not learn

8   his lesson from having received the TRO, and has

9   continued, on that Friday night and through the next day,

10  Saturday.  So we don't believe that the defendant now

11  knows how to do right on this issue and we don't want to

12  take his word that everything is copacetic now on this.

13         There's need for a further continuing court

14  order on this issue to protect these workers.  And, as

15  your Honor pointed out that, you know, with the

16  continuing -- the further injunction would simply be an

17  order essentially to obey the law, to obey the law of

18  15(a)(3), which is true and which is, you know, common and

19  appropriate.

20         And actually the action which we seek is

21  injunctive relief enjoining the employer to obey the law.

22  I mean, that's still important here, to have the court's

23  contempt power exerted over the defendant to further

24  protect the employees.

25         THE COURT:  I wasn't suggesting a further

298

1   injunction to obey the law didn't have any meaning.  I

2   understand the contempt power of the court.

3           What I am going to is, in fact I'll hear from

4   Mr. Nardo on the issue before issuing an injunction, but

5   if you are going to amend, you are going to have to file

6   an amended complaint.  He is going to get an opportunity

7   to answer that complaint and he is going to get an

8   opportunity to have discovery then as it relates to that.

9           Obviously, there was testimony regarding this

10  intermediary cook who is translating or conveying

11  directives, is alleged to be relaying directives to the

12  employees.  So you have to have the discovery on that.  If

13  you want to investigate that, take his deposition,

14  whatever you want to do on that, you would be entitled to

15  do that, and then be entitled to have the court reopen the

16  trial record and hear additional testimony on that claim.

17          That would be obviously, I think you would be

18  resting on the testimony that has already been elicited.

19  Correct?

20          MR. HENNEFELD:  Yes, your Honor.

21          THE COURT:  But I would have to reopen the trial

22  to allow him to either recall those two employees, if he

23  wishes to, give him the right to recall them, question

24  them further once he's done further investigation of this

25  claim, and then to put on any evidence that he wants to

299

1    put on.

2              All that would have to take place, which I think

3    certainly would be appropriate because, obviously, no

4    claim in terms of the amendment, the proposed amendment,

5    he brought it to my attention and immediately sought to

6    vindicate himself.  So that is the procedure we'll have to

7    follow.  Okay?

8              MR. HENNEFELD:  Certainly, your Honor.

9              May we reserve right to submit a supplemental

10   briefing on the issue?

11             THE COURT:  On whether you should be able to

12   amend?  I don't need supplemental briefing on that claim.

13   I'm giving you the right to amend, so I don't need any

14   briefing on that, merely on the right to amend.

15             Are you asking for something else?

16             MR. HENNEFELD:  No.  We are seeking to amend, to

17   conform to the evidence.

18             THE COURT:  I know.  I understand that.  You

19   keep saying that.  I understand that.  But I'm just

20   conveying to you, it is not that simple.  You don't say,

21   We amend to conform to the evidence.  Here is our amended

22   complaint.  We rest.  The case is over.  We want you to

23   decide this.  That is not how it's going to happen.

24             You've got a new claim, these facts just arose,

25   and he is entitled to discovery on it and he is entitled

300

1  to a trial on that.

2      So it is not simply -- I'm just not going to

3  simply let you amend to conform to the pleadings and then

4  submit it for the court's determination.  That is not what

5  is going to happen.  I'll allow you to amend but all those

6  other things are going to happen first.

7      Do you understand that?

8      MR. HENNEFELD:  Yes, your Honor.

9      MR. NARDO:  Judge, may I be heard on that?

10      THE COURT:  Yes.

11      MR. NARDO:  Retaliation, antiretaliation, is in

12  the statute.  It is the law.  And that will continue to be

13  the law regardless of what your Honor does.

14      The TRO granted by your Honor made sense to the

15  extent that these employees should not have been prevented

16  from testifying at trial, which is what your Honor was

17  seeking to avoid, the Department of Labor was seeking to

18  avoid, and which was never the intent of Mr. Quarta.  And

19  these employees have shown up.  They've testified.

20      So I submit to you, judge, that the issue is now

21  moot.  They have testified, the TRO is about to expire,

22  and if there is further -- if they think there is

23  retaliation, the employees themselves, or with private

24  counsel, or the United States government can file a

25  complaint in federal court stating that they've been

301

1    retaliated against.

2          But to bootstrap that onto this complaint is

3    entirely unnecessary and just is burdening the record with

4    facts that are irrelevant and are moot since the employees

5    have now testified.

6          I would also submit to you, judge, that this

7    order -- I'm not sure when this order was available on

8    ECF, the conformed order.  This order was never served on

9    my office.  You would think that you would serve the

10   attorney who is representing the client with the order if

11   you are going to serve anybody, if it is necessary.

12         Giving an order to the client, who is running a

13   restaurant, who doesn't speak English as his first

14   language, I think that could be an ethical violation of

15   direct dealing because you're giving it to the client, not

16   the attorney.  And I don't think that served any purpose

17   because you can't expect somebody who doesn't speak

18   English as a first language to understand the specifics of

19   a temporary restraining order.

20         So I submit to you that the fact that he was

21   served with a legal document with handwriting on it on

22   Saturday, or whenever he was served, means absolutely

23   nothing and was not the proper procedure to follow.

24         Now that the case is over, judge, if there is

25   any claim of retaliation, let that be filed in a separate

302

1    lawsuit.

2              THE COURT:  Why should they have to file it in a

3    separate lawsuit?  It arises out of the same factual

4    circumstances that relate to this case.

5              As you know, in a normal discrimination case,

6    the retaliation claim is always tried -- I shouldn't say

7    always; in almost every instance is tried with the

8    underlying discrimination claim and there would be no

9    reason to make them file a separate action on this.

10             MR. NARDO:  Well, I mean, the facts and

11   circumstances of the underlying claim were minimum wage

12   and overtime.  The factual circumstances of the

13   retaliation claim are a completely different statute.  And

14   if there were a discrimination claim that occurred, then

15   they would have to go to the EEOC and let it sit there for

16   180 days before bringing it into federal court.  You can't

17   just automatically bootstrap it by saying there is

18   retaliation when there is an antiretaliation statute.

19             THE COURT:  I know.  But the Department of Labor

20   is entitled to seek -- and it's for the same reason

21   they're entitled to seek correction of private parties --

22   I think there are some cases out there that say private

23   parties cannot seek this type of injunctive relief, but

24   the statute specifically allows for the Department of

25   Labor to seek permanent injunctive relief for the

303

1  violations both to the recordkeeping provision as well as

2  the retaliation provision.

3          They're entitled to do that under the law.  That

4  is what they're seeking to do here.  It is not moot

5  because, to the extent that they wish to seek that, they

6  have a justifiable concern that the employees could be

7  fired as they are seeking to amend their complaint and

8  seek that additional relief.

9          So while they may have avoided any retaliatory

10  discharge for purposes of trial on these claims and for

11  purposes of the preliminary injunction motion, absent some

12  type of continuing injunctive relief the employees could

13  be subject to termination before they can seek their

14  permanent injunctive relief.

15          So it is not moot and they certainly have the

16  right to do it.

17          MR. NARDO:  Well, the employees have testified,

18  and as far as we all know the employees are still working

19  there.  So it is unclear to me what the retaliation is.

20  There has to be an adverse employment action for there to

21  be retaliation.

22          THE COURT:  Well, the threats, themselves, could

23  be sufficient.

24          But in any event, their testimony was that they

25  were told, this is your last day, you are stopping as of

304

1    Saturday.  So in fact if their testimony is credited, they

2    were terminated.  They were told don't come back to work.

3         The only thing that prevented that termination

4    from becoming effective was the fact that I issued an

5    order saying that they could not be terminated.  But they

6    were told, according to their testimony, don't come back

7    on Monday.

8         So I consider that not only a threat of

9    termination, I consider that termination.  They were

10   terminated, according to their testimony.

11        MR. NARDO:  So the TRO expires today, correct?

12        THE COURT:  Yes.  My intention is to convert it

13   to a preliminary injunction today.  And the preliminary

14   injunction will remain in effect until they have time to

15   amend their complaint.

16        You have time to answer it, to do whatever

17   additional discovery you would want, and, if you wish, to

18   reopen the trial on that issue.

19        So the preliminary injunction will remain in

20   effect until that retaliation claim is litigated.

21        Obviously, the language will not be, as you

22   noted earlier, it's not that they cannot be fired for any

23   reason.  It will be limited to they cannot be terminated

24   for -- I'm working on the wording of it.  I don't have the

25   TRO in front of me.

305

1          Do you have a copy of the TRO.

2          MR. HENNEFELD:  I have it right here, judge.

3     (Handing.)

4          THE COURT:  I think I'll continue the language

5     as written.  I would just say until the retaliation claim

6     is litigated and is resolved by the court.

7          MR. NARDO:  Judge, can you have a TRO in a

8     preliminary injunction where there is no claim for a

9     permanent injunction?

10         THE COURT:  There is a claim for a permanent

11    injunction.  You just heard, they have asked to amend

12    their complaint to add a claim for retaliation, seeking a

13    permanent injunction.  I have granted that.

14         They are going to reduce that to writing so that

15    you can answer it, but they have made that motion to

16    amend, which I have granted.  So it is orally granted.

17         That is the situation we are in.  I guess if you

18    are objecting to me entering the preliminary injunction

19    without seeing the language of it, I could extend the TRO

20    for another day for them to formally file an amended

21    complaint, if you prefer that, and then issue the

22    permanent injunction over the written amended complaint.

23         MR. NARDO:  You mean preliminary injunction?

24         THE COURT:  I mean preliminary injunction.  If

25    you want to do that -- would you prefer to do that?

306

1           MR. NARDO:  I would prefer that.

2           MR. HENNEFELD:  Your Honor, if I may, we may

3   need a little more time than that for the amended

4   complaint, just to craft our own relief issues in terms of

5   what we're seeking.

6           THE COURT:  The TRO is good for 14 days from the

7   issue date, would be the maximum period.

8           The flip side, Mr. Nardo, is, just to take your

9   argument and twist it around for a minute.  Your argument

10  is that it's no big deal; it's just an injunction to obey

11  the law.

12          Then your client can obviously consent to it and

13  to pay the money for you to answer it and litigate it, you

14  know, if --

15          MR. NARDO:  He consented when, through his

16  representation, Congress passed an antiretaliation portion

17  of the Fair Labor Standards Act and that was an act of

18  consent.

19          THE COURT:  That was.  Congress also passed a

20  provision that says they're entitled to seek a permanent

21  injunction.  So he can consent to that part of Congress's

22  act as well.

23          MR. NARDO:  I'm just saying seek it as part of a

24  separate case, judge.

25          THE COURT:  Well, that makes no sense because I

1   have already heard testimony in part in this trial as

2   relates to the claims as currently pending.  It makes no

3   sense for them to tell them to file a separate complaint

4   and for me to issue a preliminary injunction in a separate

5   case.  Because certainly if I was going to have to reopen

6   the trial, it would make sense that I reopen it and

7   already consider the evidence I have heard on the other

8   claim in this trial.

9           MR. NARDO:  So if I can just get the procedural

10  aspects of this down.  After the complaint, we put in an

11  answer.

12          What is the ultimate end game?  Then you want a

13  trial on this issue, judge?

14          THE COURT:  That be would up to you.  You would

15  obviously be entitled to discovery of the new claim.  If

16  you wanted any discovery, you would have a period of

17  discovery.  You can take any deposition you want to take

18  of any people you think might have relevant knowledge.

19          If you wanted no discovery, or whenever you

20  completed discovery, you'd then be entitled to a trial on

21  that, at which time they appear to be using the testimony

22  that's already been given by the employees on this.

23          But you would have the right to recall those

24  employees, if you want to ask additional questions of

25  them, and to call any other witnesses on that claim.  And

308

1    you would have the burden of proof obviously at that

2    trial.

3              MR. NARDO:  And the ultimate issue is for you to

4    decide whether or not there is a permanent injunction?

5              THE COURT:  Correct.

6              MR. NARDO:  How long does that last?

7              THE COURT:  That would be permanent.

8              MR. NARDO:  Okay.

9              MR. HENNEFELD:  Your Honor, we're proposing all

10   other appropriate relief, including punitive damages, for

11   that retaliation claim.

12             THE COURT:  So you are seeking punitive damages

13   on the retaliation claim as well?

14             MR. HENNEFELD:  Yes, your Honor.

15             THE COURT:  Okay.  So punitive damages and

16   permanent injunctive relief.

17             MR. NARDO:  How long can a preliminary

18   injunction extend?

19             THE COURT:  That can extend until there is a

20   trial on the merits.  Sort of like a TRO, which is limited

21   in duration.  A preliminary injunction would extend until

22   the court has determined whether or not they have proven

23   their case.  So it would last until the decision on the

24   trial.

25             MR. NARDO:  Okay.  I understand.

309

1          THE COURT:  Okay.  So can you get it in by the

2     end of the week, then?

3          MR. HENNEFELD:  The amended complaint?

4          THE COURT:  Yes.

5          MR. HENNEFELD:  Yes, your Honor.

6          THE COURT:  So the amended complaint will be

7     filed by Friday, April 13.

8          And with that, I would ask that you put in a

9     formal motion for a preliminary injunction.  You made the

10    oral motion, but I would just ask you to put in the actual

11    motion.

12         If you wish to put in anything else on that date

13    as relates to that, you can, but I obviously asked for a

14    preliminary injunction so I'm not requesting any

15    additional briefing.

16         MR. NARDO:  And if we don't want further

17    discovery, your Honor would make a decision on a permanent

18    injunction, punitive damages, and whatever else they

19    request based on the record as it is.

20         THE COURT:  Correct.

21         What I was going to do is hold a telephone

22    conference next week to rule on the preliminary

23    injunction.  But I want to give you a chance, if you want,

24    to put in any papers on that issue before I rule.

25         Do you anticipate putting in anything in writing

310

1    on that?

2            MR. NARDO:  I'm sorry?

3            THE COURT:  Do you anticipate putting anything

4    in writing on the preliminary injunction motion?

5            MR. NARDO:  I can't tell at this time, judge,

6    but I know next week I have a trial down the hall.  It

7    will take all week before Judge Wexler.

8            THE COURT:  I was going to do this by phone, but

9    if you are in the courthouse you can stop on by.

10           MR. NARDO:  It may not be.  I guess it will have

11   to depend upon Judge Wexler's schedule.  I guess at the

12   end of the day, I'll try to.

13           THE COURT:  Either way.  I talk to him every

14   day.  We'll work it out.

15           MR. NARDO:  Okay.

16           MR. HENNEFELD:  Your Honor?

17           THE COURT:  Not every day.  Almost every day.

18           MR. HENNEFELD:  Your Honor, could we have the

19   option to participate by phone next week?

20           THE COURT:  Yes.  I was going to do it with

21   everybody by phone, But if he is going to be down the

22   hall, he can sit here.

23           For what we'll be doing, I don't really

24   anticipate any additional argument.  I would just be

25   placing the court's ruling on the record.  Okay?

311

1        What I will do is, maybe we will schedule that

2   subject to Judge Wexler's trial schedule.

3        Why don't we say 1:15 on Thursday, the 19th.

4   Does that comport with Judge Wexler's schedule?  It won't

5   take more than 15 minutes.  If you want to put anything

6   in, you can put it in by close of business on the 18th,

7   Mr. Nardo, letter or whatever you want to put in.

8        The court is extending the TRO until April 19,

9   at which time the court will rule on the motion for

10  preliminary injunction.  So I want you to advise your

11  client of that, Mr. Nardo.

12       We will issue a written order today which

13  indicates that the TRO is extended until April 19.  But

14  I'm not going to serve it on your client.  I'm just going

15  to have you communicate that to him.  Okay?

16       MR. NARDO:  Yes, your Honor.

17       THE COURT:  And I will briefly hear summations

18  from both sides.  Or, if you want to, come back tomorrow

19  to do this.  I will await the outcome of this other claim,

20  if you want to wait and do that at another time.

21       I was also going to give the Department of Labor

22  tomorrow if you wanted to supplement your proposed

23  findings of facts and conclusions of law to address both

24  the affirmative defense, which you had requested the

25  opportunity to do.

312

1          And while you are doing that, now that you have

2     the testimony of the witnesses, if you wanted to, in your

3     findings of fact you have already submitted, reference the

4     transcript or exhibit that supports that particular

5     finding, just add that to the one you have currently

6     submitted, that will be helpful to the court.

7          MR. HENNEFELD:  Yes, your Honor.

8          THE COURT:  Mr. Nardo, do you want, I'm not

9     requiring it, but if you wanted to do that, you can as

10    well.

11         MR. NARDO:  By when, your Honor?

12         THE COURT:  Well, that's what I was going to

13    address.

14         I'll give you the option, if you want to, to sum

15    up now on these claims and then set a date for those

16    supplemental submissions.  Or we can hold off on

17    summations, prepare those supplemental submissions and you

18    come back and do summations at that point.  That is up to

19    you.

20         MR. NARDO:  My preference would be to sum up

21    now, judge.

22         THE COURT:  Okay?

23         MR. HENNEFELD:  We're fine with that, your

24    Honor.

25         THE COURT:  Okay.  Obviously, the plaintiffs are

313

1    first, the defendant, and then brief rebuttal.

2           MR. HENNEFELD:  Your Honor, subsequent to that,

3    your Honor will set the date for submitting supplemental

4    findings?

5           THE COURT:  Correct.

6           MR. HENNEFELD:  Your Honor, I will keep this as

7    brief as possible.

8

9                 SUMMATION FOR GOVERNMENT

10

11          MR. HENNEFELD:  I will keep it brief, as the

12   overwhelming evidence that we have presented in this case

13   supports the elements of our claims and defendants have

14   presented virtually no defense to our claims.

15          In particular, at the heart of the case, the

16   employees' testimony and other evidence has shown that the

17   employees have worked significant overtime hours in excess

18   of 40 hours per week and have not received overtime

19   premium pay.  Defendants have admitted paying a fixed

20   weekly salary without premium pay.  And the employees have

21   testified to schedules that are well in excess of 40 hours

22   per week.  For some of these employees, the salary they

23   received didn't even meet the minimum wage based on those

24   numbers of hours per week.

25          The recordkeeping violations are also clearly

314

1    established.  The defendants have essentially conceded the

2    violations, and their failure to keep records and the

3    records that they did produce were clearly inaccurate and

4    falsified.

5            Excessive evidence has been presented as to the

6    willfulness of these violations, including the submission

7    of falsified records to the government, just referenced,

8    and certainly exemplified by the continued noncompliance

9    of defendants this long years after the investigation and

10   lawsuit, and compounded by the bad faith exhibited by the

11   defendants, including encouraging employees to lie to the

12   government about their employment and to lie about their

13   hours worked, and most recently issuing retaliatory

14   statements to the employees, threatening to discharge them

15   for testifying, as we have heard, all this is clear

16   evidence of the willfulness of the violations; and, as

17   discussed, also justifies permanent injunction against the

18   defendants.

19           With respect to damages and back wages owed,

20   plaintiff has provided a reasonable estimate of those back

21   wages based on the employees' testimony of hours worked

22   and their pay, as well as the defendant's admissions in

23   discovery about pay and periods of employment.

24           Under FLSA case law in the Mount Clement case,

25   the burden shifts to the defendants, who have failed to

1  keep accurate records to rebut the reasonable inferences

2  from that evidence.  And defendants have certainly failed

3  to do that.

4          The one issue that the defendants contested

5  somewhat vigorously was the executive exemption defense,

6  which we will be submitting further findings and briefings

7  on.  We do intend still to brief the waiver issue.

8          We believe the defendants have waived that

9  defense by failing to raise it until trial.  But even on

10  the merits, the defendants clearly did not meet the

11  required elements to establish the executive exemption.

12  They certainly did not establish that the chef hired and

13  fired employees at the restaurant.  They didn't establish

14  that his duties consisted of regularly directing multiple

15  employees of restaurant.  They did not establish that the

16  chef had management as his primary duty.

17          Based on such factors as the amount of time

18  spent performing his exempt work, it is clear that what

19  the chef was primarily doing was cooking and preparing

20  food, which is not exempt work.

21          So the one defense that the defendants have an

22  affirmative burden to establish, they were not able to

23  establish it.  And on every other issue, there is either

24  no dispute or overwhelming evidence in our favor that the

25  defendants failed to rebut it.

316

1    And, just as I mentioned, in addition there is

2  no dispute that the defendants are employers, no dispute

3  as to employer status, no dispute as to coverage of acts.

4    And once again:  Relief.  We are seeking the

5  back wages, for which we provided a reasonable estimate;

6  and additional equal amount in liquidated damages, which

7  is certainly justified as the defendant did not meet the

8  good-faith provision for liquidated damages in light of

9  the evidence of the willfulness of their violations.

10    And, as discussed, we're also seeking permanent

11  injunction relief against the defendants for, not only the

12  pay violations, but subsequently for the retaliation

13  violations.

14    I would also just note, with respect to

15  injunctive relief on retaliation, for permanent injunctive

16  relief, that even putting aside our amended claim on

17  15(a)(3), it's always within the court's equitable

18  discretion to grant permanent injunctive relief on that

19  issue.

20    And that is all I have, your Honor.  Thank you

21  very much.

22    THE COURT:  Thank you.  Just one second,

23  Mr. Nardo.

24    (There was a pause in the proceedings.)

25    THE COURT:  Go ahead, Mr. Nardo.

317

1    MR. NARDO:  Thank you, your Honor.  I would like

2  to say, it was a pleasure to litigate the case before your

3  Honor.

4    THE COURT:  Thank you.

5    Let me just indicate, given the lateness of the

6  hour and given opening statement, I don't want to hear

7  anything about doesn't the government have anything better

8  to do as your defense.

9    As you know, it is not really relevant.  So

10  let's focus on the claim.  Okay?

11    MR. NARDO:  Let me withdraw that first comment

12  then, judge.

13

14    SUMMATION FOR DEFENSE

15

16    MR. NARDO:  All right.  The first witness you

17  heard from was Mr. Torres, who was recommended by his

18  cousin.  And his cousin had no complaints about the place.

19    Mr. Torres testified, you'll find this in the

20  transcript, it was never past 9 pm that he worked Monday

21  to Wednesday.  And the chef left before him.  All right?

22    You have two issues here, judge:  the hours and

23  the exemption.

24    Another witness you heard from was

25  Richard Gluszak.  If anyone had an axe to grind against

Summation for Defense/Mr. Nardo

318

1   Luigi Quarta, it is somebody who has a $500,000 judgment

2   against him.  He is not a friendly witness to Luigi

3   Quarta.  And that $500,000 judgment came out on

4   cross-examination.  I didn't even bring that out, judge.

5           I submit to you that he told the truth about the

6   hours.  He was there from 2001 to 2007.  2007 is well

7   within the statute of limitations, because his case was

8   filed in 2009.  And that he told the truth about the

9   hours.

10          As far as the exemption, you heard testimony

11  from Juan Cantos Carlos Chevez or Juan Carlos Cantos

12  Chevez, that Pastor was in charge of the kitchen.  Someone

13  has to be in charge of the kitchen.  Luigi Quarta is not

14  in charge of the kitchen, other than in a very vague way,

15  but he is not -- he is in charge of the whole restaurant

16  which includes the kitchen.

17          But as far as directing the terms and conditions

18  of employment and supervising employees in the kitchen,

19  that was the chef.  And I want to read to you from

20  Mr. Banegas' deposition, which is in evidence, and I'll

21  just read quickly from page 38 on.  I won't give the line

22  number, page numbers.

23          *If there was something specific that had to be*

24  *cleaned or something specifically that had to be washed,*

25  *would anyone tell you to do that?*

319

1          *Yes.*

2          *Who?*

3          *Pastor.  And sometimes if there was something*

4     *inside, then the boss would come*, which is Luigi Q.

5          *Was Pastor your direct supervisor?*

6          *In the kitchen he was.*

7          *Did Pastor also supervise Jeffrey?*

8          *Yes.*

9          *Did Pastor also supervise Juan Carlos?*

10         *Correct.*

11         So I submit to you that the testimony of

12    Mr. Chavez and Mr. Banegas established, and the

13    common-sense factors, somebody has to be in charge of the

14    kitchen.  And Pastor said he was the most experienced

15    person there.  And in writing it says that he was in

16    charge of the kitchen.

17         I submit that that establishes that

18    Mr. Alfaro -- the chef, whoever it was -- is exempt from

19    the Fair Labor Standards Act.

20         The testimony of the employees was all over the

21    map, judge.  Interestingly, the only employees who

22    testified that Mr. Quarta was fluent in Spanish or spoke

23    Spanish were the employees who claimed having been

24    threatened by Mr. Quarta.  But the other employees

25    testified that they couldn't even have a conversation with

Summation for Defense/Mr. Nardo

320

1    Mr. Quarta because Mr. Quarta didn't speak the same

2    language as they did.

3            And you would think, after meeting with the

4    Department of Labor, after meeting once, twice, three

5    times, after then, that the employees, knowing that their

6    hours -- that there is a litigation going on about their

7    hours and about minimum wage and overtime, to think that

8    maybe they would at some point keep some written records.

9    Maybe the Department of Labor would then have something to

10   base their calculations on.

11           At no point in time did any of these employees

12   ever keep written records.  I'm not saying that it's their

13   obligation to do so, judge, but knowing the case, knowing

14   the conversations, knowing all this cloak-and-dagger stuff

15   going on in the back of the restaurant, talking with the

16   Department of Labor, at some point you would think that

17   they would memorialize when they're going and when they're

18   leaving.

19           Mr. Chevez also left the restaurant and came

20   back.  So how bad is he being treated if he wound up

21   coming back and is still working there today?

22           As you know, Mr. Quarta has been adjudicated

23   bankrupt.  No prospect of a serious recovery here.  And to

24   the extent -- you have your testimony from Mr. Torres, you

25   have the deposition of Mr. Banegas, you have the testimony

Summation for Defense/Mr. Nardo

321

1   of Pastor, you have the testimony of Miss Vasquez.  It was

2   not my client's idea to drag current employees in a very

3   small business -- he has three employees in the kitchen --

4   into the courtroom.

5           And that is the stuff you don't want to hear.

6           THE COURT:  Exactly.  See, I knew it was in

7   there.

8           MR. NARDO:  It's paid off.

9           It's also a private bar to litigate these

10  matters, judge.  And you see these cases all the time,

11  every day.  And I admit to you that there was some radical

12  decision-making if there was a private party.

13          And I will say, judge, that I think you should

14  take into account, to some extent, the secret, clandestine

15  surveillance and snooping going on in a private workplace

16  behind the employer's back.

17          So I submit to you that you have two issues to

18  decide here:  the exemption and the hours.  Whatever

19  number you come to as far as the hours worked for each of

20  the employees, on behalf of the defendant I ask you to

21  divide by two.

22          Thank you, your Honor.

23          THE COURT:  Okay.

24          MR. HENNEFELD:  Well, your Honor, I'm not sure

25  about where that divided-by-two formula came from.

322

1      THE COURT:  I was going to ask, but I decided

2  just to leave it alone.

3      MR. HENNEFELD:  That might be best, your Honor.

4  I will just very briefly address a few of these issues.

5

6                 REBUTTAL FOR PLAINTIFF

7

8      MR. HENNEFELD:  Mr. Torres clarified his

9  testimony that he did often leave past 9 on the earlier

10  nights of the week and certainly left well past 9 on later

11  nights of the week.

12      Mr. Nardo is talking about Mr. Gluszak, as you

13  know a witness of unimpeachable credibility, who is, you

14  know, one of Mr. Quarta's biggest enemies, would never

15  testify in his favor.

16      Our cross-examination showed his potential bias

17  here:  The half million dollar judgment against him by

18  Mr. Quarta.  That Mr. Quarta has not enforced it against

19  him certainly would ensure a strong mixture of gratitude

20  and/or guilt for that.  Not to mention the fact that

21  Mr. Gluszak admittedly hasn't been at or near the -- at or

22  in the restaurant in five years.

23      As to the exemption issue, Mr. Nardo didn't even

24  mention authority to hire and fire, which defense clearly

25  hasn't shown, and that is a required element to meet the

323

1    exemption.

2            Additionally, even assuming some of what

3    Mr. Nardo's arguing about Pastor having some supervising

4    of kitchen employees, he certainly did not direct the

5    terms and conditions of their employment, as Mr. Nardo

6    states.

7            It is clear that Mr. Quarta was the one in

8    control of terms and conditions of employment, and it is

9    also clear that the supervising and managing of employees

10   was not the chef Pastor's primary duty.

11           Again, the defense raises the issue of the fact

12   that the employees hadn't kept records.  And certainly

13   that is irrelevant.  It is not the employees'

14   responsibility to keep records, in keeping with defendant

15   blaming the DOL for not keeping accurate enough records in

16   its case diary when it was clear that the spotlight and

17   the finger should be pointed at the defendants for failing

18   to keep accurate records of their own, which is clearly

19   required by law.

20           And one of the consequences of failing to do so

21   is that the burden shifts to them in this case to rebut

22   the reasonable inferences from the evidence here.  And the

23   evidence of the hours that the workers have worked and

24   their schedule has been very consistent and clearly shows

25   that they worked well in excess of 40 hours.  And the

324

1   defendant has not been able the rebut that evidence.

2          Thanks.

3          THE COURT:  Thank you.

4          Let me just say on the issue of being compelled

5   to address this issue of the argument that you made,

6   Mr. Nardo, regarding the decision to pursue this case in

7   light of your client's financial circumstances.

8          The enforcement of these laws, as you know, is

9   extremely important.  And it's not a defense to say I'm a

10  struggling restaurant owner, you know, leave me alone.

11         These cases are important.  It's important that

12  everyone comply with these laws whether they are

13  struggling or not, and that is why it is relevant.

14         And I just feel compelled to emphasize that to

15  the defense.  I don't know whether you want to resolve the

16  case.  That is between the parties.  But in terms of the

17  decision to continue to pursue this case, I don't think

18  you can reasonably question why the Department of Labor

19  would pursue these types of cases when violations are

20  occurring.

21         I'm not really asking for your response, as I

22  see you edging up to the microphone.  I think you had your

23  15 minutes in the opening to state your piece.  I felt

24  compelled to at least put that on the record because I

25  think it is important to assign the importance of these

325

1    laws even when you have businessmen or restaurant owners

2    who are facing certain financial circumstances.

3              But in any event, why don't we set a date for

4    the submission of any further proposed findings of fact

5    and conclusions of law based upon the trial testimony.

6              You can get the transcript in about a week or

7    so.  How long do you want to put that out?

8              MR. HENNEFELD:  Can we have three weeks from the

9    transcript, your Honor?

10             THE COURT:  Sure.  30 days from today.  May 10.

11             MR. NARDO:  I'm going to be out of the country,

12   judge, from the 2d to the 8th, so could I just get the

13   following Monday?

14             THE COURT:  May 14.

15             MR. NARDO:  We're not required to submit.

16   Right?

17             THE COURT:  Correct.

18             MR. NARDO:  And I don't know if my client can

19   afford the transcript, so I will have to run that by him.

20             THE COURT:  That is why I'm not requiring you to

21   submit.

22             MR. NARDO:  Can we submit without the

23   transcript?

24             THE COURT:  Sure.

25             MR. NARDO:  Okay.  Because being in the private

326

1   sector, my client might want to conserve his resources,

2   judge, and may not want to spend money.

3            THE COURT:  Fine.  All right.

4            We will have a phone conference next week on the

5   preliminary injunction motion.  I would urge you to try to

6   seek some way to resolve that issue without both sides

7   having to expend additional time and money litigating

8   that, but I'll leave that to you.

9            I do want to compliment both sides.  I

10  appreciate the efforts that were made to try to streamline

11  the case.  We were able to get it done within two days and

12  it was a pleasure to preside over the trial.

13           MR. NARDO:  Thank you, your Honor.

14           THE COURT:  Have a good day.

15           One more thing.  On the record, I did sign an

16  order that extends the TRO until April 19.  My clerk will

17  give you copies of that now.  Okay?

18           Thank you.

19           Just make sure, Mr. Nardo, your client gets a

20  copy of that.

21           MR. NARDO:  I will, your Honor.

22           (Proceedings concluded at 5:00 pm.)

23

24

25

327

I N D E X

**JOSE ANIBAL ACOSTA**
CROSS-EXAMINATION                                161
BY MR. NARDO

**JUAN CARLOS CANTOR CHEVEZ**
DIRECT EXAMINATION                               180
BY MS. GOLDSTEIN
CROSS-EXAMINATION                                203
BY MR. NARDO

**ZORAYDA VASQUEZ**                              215
DIRECT EXAMINATION                               216
BY MR. HENNEFELD

**EVIDENCE FOR DEFENSE**                         233

**RICHARD GLUSZAK**
DIRECT EXAMINATION                               233
BY MR. NARDO
CROSS-EXAMINATION                                237
BY MS. GOLDSTEIN
REDIRECT EXAMINATION                             247
BY MR. NARDO

**EVIDENCE FOR PLAINTIFF**                       248

**ZORAYDA VASQUEZ**
DIRECT EXAMINATION (Continued)                   248
BY MR. HENNEFELD
CROSS-EXAMINATION                                271
BY MR. NARDO

**PLAINTIFF RESTS**                              295
**DEFENSE RESTS**                                295

**SUMMATION FOR GOVERNMENT**                     313
**SUMMATION FOR DEFENSE**                        317
**REBUTTAL FOR PLAINTIFF**                       322


E X H I B I T S

Plaintiff Exhibits 10, 10A, 11 in evidence       215
Plaintiff Exhibit 5 in evidence                  227
Plaintiff Exhibit 2 in evidence                  260
Plaintiff Exhibit 9 in evidence                  271
Plaintiff Exhibit 12 in evidence                 292
Plaintiff Exhibit 13 in evidence                 294

**$**

**$137,206.76** [1] -
262:6
**$30** [2] - 189:2, 189:6
**$400** [8] - 182:4,
182:5, 182:7,
187:23, 187:24,
207:5, 207:7, 207:12
**$420** [3] - 188:9,
188:11, 207:14
**$450** [7] - 188:18,
188:20, 188:22,
188:25, 189:11,
207:7, 207:12
**$500,000** [4] - 240:16,
248:1, 318:1, 318:3
**$550** [5] - 189:16,
189:18, 190:1,
207:7, 207:13
**$6,680** [1] - 271:4
**$7.25** [1] - 269:9

**'**

**'08** [3] - 205:3, 205:4

**0**

**09-CV-2212** [1] - 152:3

**1**

**1** [16] - 223:16, 223:17,
251:23, 251:24,
252:7, 252:11,
252:18, 252:21,
253:1, 253:5, 253:6,
253:13, 253:23,
254:5, 262:1, 294:15
**1/28/10** [2] - 179:11,
179:14
**10** [23] - 152:10,
186:22, 186:23,
187:1, 187:2, 187:4,
215:7, 215:12,
215:14, 216:23,
236:11, 253:24,
254:7, 254:10,
254:12, 254:17,
255:2, 255:3, 255:8,
267:21, 294:17,
325:10, 327:23
**10-minute** [1] - 290:15
**10/06/09** [1] - 266:9
**10/6/08** [1] - 204:19
**10014** [1] - 152:16
**10:30** [14] - 184:5,
184:6, 184:8, 184:9,
191:5, 194:17,
221:12, 221:17,

221:19, 221:25,
222:7, 236:17,
267:5, 267:23
**10A** [12] - 215:7,
215:12, 215:14,
264:1, 264:5, 264:8,
264:11, 264:13,
264:19, 265:5,
294:18, 327:23
**11** [17] - 197:25, 215:8,
215:13, 215:14,
221:12, 221:19,
222:7, 235:3, 246:7,
246:19, 250:11,
267:21, 290:5,
292:6, 292:11,
294:18, 327:23
**11501** [1] - 152:19
**11722** [1] - 152:22
**1180** [1] - 152:22
**11:15** [1] - 235:3
**11:25** [1] - 203:3
**11:30** [2] - 235:7,
246:19
**12** [13] - 194:3, 210:12,
235:8, 255:4,
255:10, 262:8,
292:14, 292:15,
292:20, 292:22,
292:24, 294:16,
327:25
**12/3/08** [3] - 204:22,
210:11, 210:12
**129** [1] - 152:19, 266:9
**12:45** [1] - 231:10
**13** [9] - 290:5, 292:7,
292:11, 292:25,
293:25, 294:2,
294:17, 309:7,
327:25
**14** [2] - 306:6, 325:14
**15** [8] - 216:13, 226:5,
250:3, 255:7,
255:13, 255:16,
311:5, 324:23
**15(a)(3** [5] - 155:2,
296:19, 296:24,
297:18, 316:17
**161** [1] - 327:2
**17** [1] - 270:1
**17-1/2** [1] - 270:4
**180** [2] - 302:16, 327:4
**18th** [1] - 311:6
**19** [3] - 311:8, 311:13,
326:16
**1997** [1] - 216:9
**19th** [1] - 311:3
**1:15** [1] - 311:3
**1:45** [1] - 231:9

**2**

**2** [35] - 225:2, 225:4,
225:9, 249:24,
252:3, 252:7, 252:9,
252:18, 252:22,
253:2, 253:6,
253:13, 253:23,
254:7, 254:9,
254:12, 254:15,
255:6, 255:13,
257:9, 258:4,
258:22, 258:23,
258:25, 259:16,
260:13, 260:19,
265:14, 265:17,
271:8, 277:2, 277:3,
294:18, 327:24
**20** [2] - 216:23, 235:8
**2001** [2] - 234:12,
318:6
**2005** [3] - 182:12,
182:15, 184:12
**2006** [6] - 217:5,
217:6, 217:14,
226:6, 261:22,
262:13
**2007** [7] - 234:12,
234:13, 242:2,
242:3, 244:10, 318:6
**2008** [26] - 204:7,
210:7, 210:14,
210:17, 226:20,
242:20, 243:8,
243:9, 249:11,
250:3, 251:25,
254:5, 255:4, 255:7,
255:9, 255:10,
255:13, 255:16,
255:17, 257:10,
258:6, 283:11,
283:17, 283:19,
283:22, 288:6
**2009** [7] - 182:19,
183:16, 183:22,
226:6, 243:2,
243:11, 318:8
**201** [1] - 152:16
**2010** [3] - 165:12,
243:5, 243:11
**2011** [2] - 243:5,
243:11
**2012** [4] - 152:10,
261:22, 262:14,
262:20
**203** [1] - 327:5
**21** [1] - 226:6
**215** [2] - 327:7, 327:23
**216** [1] - 327:7
**227** [1] - 327:23

**23** [1] - 216:9
**233** [2] - 327:9, 327:10
**237** [1] - 327:11
**24** [3] - 261:22,
262:14, 262:20
**247** [1] - 327:12
**248** [2] - 327:14,
327:15
**25** [3] - 239:5, 261:22,
262:13
**260** [1] - 327:24
**271** [2] - 327:16,
327:24
**29** [3] - 204:6, 205:3,
269:10
**292** [1] - 327:25
**294** [1] - 327:25
**295** [2] - 327:18,
327:18
**2:15** [1] - 232:2
**2:30** [2] - 185:8,
250:14
**2d** [1] - 325:12

**3**

**3** [25] - 184:17, 184:18,
184:21, 185:2,
185:3, 185:6,
185:12, 185:14,
194:20, 205:4,
210:7, 210:13,
210:17, 212:16,
222:21, 222:23,
224:4, 224:5,
224:15, 224:21,
237:15, 267:5,
267:6, 292:13,
292:19
**3/24/12** [1] - 266:9
**30** [1] - 325:10
**313** [1] - 327:19
**317** [1] - 327:20
**322** [1] - 327:20
**33** [1] - 239:5
**34** [1] - 239:6
**37** [3] - 290:10,
292:12, 292:19
**38** [1] - 318:21
**3:30** [1] - 222:21
**3:50** [1] - 291:24

**4**

**4** [1] - 283:22
**40** [10] - 250:20,
253:19, 257:17,
261:16, 270:4,
275:2, 275:4,
313:18, 313:21,

323:25
**400** [1] - 209:25
**403** [2] - 155:13,
165:25
**41** [3] - 291:5, 293:1,
293:2
**42** [3] - 293:3, 293:8,
293:13
**420** [3] - 188:6, 188:7,
188:9
**43** [4] - 291:5, 293:1,
293:8, 293:13
**44** [2] - 258:7, 258:8
**450** [2] - 188:17,
207:14
**47** [2] - 291:8, 293:14
**4:15** [1] - 291:24
**4:30** [5] - 185:17,
212:16, 223:5,
223:7, 267:6

**5**

**5** [30] - 159:21, 225:16,
225:18, 225:22,
225:24, 226:6,
227:10, 227:11,
227:13, 227:14,
227:16, 248:24,
249:2, 249:10,
249:12, 249:24,
250:17, 251:23,
252:6, 253:25,
254:18, 258:10,
269:23, 269:25,
283:11, 283:17,
283:19, 283:22,
294:18, 327:23
**51** [1] - 283:4
**52** [1] - 254:18
**550** [2] - 189:15,
207:15
**57-1/2** [4] - 267:8,
267:10, 267:11,
270:3
**5:00** [1] - 326:22

**6**

**6** [10] - 153:22, 159:21,
205:3, 227:11,
227:13, 239:6,
256:20, 257:10,
258:4, 294:17
**6.96** [3] - 269:5, 269:9,
270:9
**61** [4] - 278:14,
278:21, 278:24,
279:2
**63.44** [1] - 269:23
**631** [1] - 152:23

## 7

**7** [1] - 294:17
**7.25** [6] - 269:9, 269:22, 269:25, 270:6, 270:8, 270:11
**712-6108** [1] - 152:23
**712-6124** [1] - 152:23
**750** [2] - 277:19, 277:21
**7A** [1] - 294:17

## 8

**8** [10] - 235:15, 235:19, 235:24, 245:18, 245:25, 251:25, 293:2, 293:3, 293:8, 293:13
**801(d)(2)** [1] - 200:13
**8:30** [1] - 197:25
**8A** [1] - 294:15
**8th** [1] - 325:12

## 9

**9** [26] - 186:10, 186:11, 186:14, 186:18, 236:6, 236:11, 237:1, 261:19, 261:20, 261:23, 265:6, 265:14, 265:15, 271:12, 271:15, 271:16, 278:20, 279:5, 279:7, 293:8, 293:13, 294:18, 317:20, 322:9, 322:10, 327:24
**9/29/08** [1] - 204:16
**983** [1] - 152:16
**9:45** [2] - 152:10, 236:17
**9s** [1] - 153:17

## A

**ability** [3] - 156:3, 156:5, 157:12
**able** [10] - 177:8, 177:25, 185:14, 212:12, 268:7, 285:15, 299:11, 315:22, 324:1, 326:11
**absent** [1] - 303:11
**absolutely** [2] - 248:7, 301:22
**abundance** [1] - 232:10
**accept** [1] - 229:1

**access** [1] - 241:3
**accommodate** [2] - 235:12, 235:24
**according** [5] - 202:3, 237:3, 258:4, 304:6, 304:10
**account** [1] - 321:14
**accountant** [1] - 283:13
**accounting** [7] - 238:4, 238:11, 238:15, 239:11, 239:12, 239:17, 239:18
**accounting-wise** [6] - 238:4, 238:15, 239:11, 239:12, 239:17, 239:18
**accuracy** [1] - 284:19
**accurate** [16] - 218:20, 225:24, 259:4, 259:10, 261:11, 261:17, 265:2, 265:11, 284:15, 284:20, 284:23, 284:24, 285:10, 315:1, 323:15, 323:18
**accurately** [1] - 260:7
**ACOSTA** [2] - 161:11, 327:2
**Acosta** [12] - 159:23, 161:9, 161:15, 161:25, 162:10, 177:25, 179:16, 180:11, 265:18, 268:16, 271:3, 287:3
**Acosta's** [2] - 265:23, 268:20
**Act** [4] - 156:2, 280:15, 306:17, 319:19
**act** [7] - 156:22, 228:1, 228:4, 228:7, 296:19, 306:17, 306:22
**acting** [1] - 200:11
**action** [1] - 158:6, 297:20, 302:9, 303:20
**activities** [2] - 222:3, 222:6
**acts** [1] - 316:3
**actual** [1] - 309:10
**add** [4] - 231:5, 270:25, 296:11, 296:24, 305:12, 312:5
**added** [3] - 267:7, 267:8, 275:1

**addition** [2] - 155:14, 316:1
**additional** [11] - 157:23, 158:23, 229:8, 298:16, 303:8, 304:17, 307:24, 309:15, 310:24, 316:6, 326:7
**additionally** [1] - 323:2
**address** [8] - 153:10, 290:16, 296:7, 296:12, 311:23, 312:13, 322:4, 324:5
**addressed** [1] - 226:13
**adjudicated** [2] - 296:17, 320:22
**admissible** [3] - 200:14, 200:16, 227:3
**admissions** [1] - 314:22
**admit** [9] - 227:10, 227:18, 259:16, 260:9, 260:13, 271:11, 292:3, 294:4, 321:11
**admitted** [13] - 215:13, 227:15, 249:2, 256:22, 264:3, 271:15, 289:15, 292:23, 294:1, 294:5, 294:8, 294:11, 313:19
**admittedly** [1] - 322:21
**advancing** [1] - 156:23
**adverse** [2] - 158:6, 303:20
**advise** [1] - 311:10
**advisory** [4] - 234:1, 234:10, 237:12, 241:16
**affect** [3] - 218:20, 219:12, 279:15
**afford** [1] - 325:19
**afraid** [3] - 202:20, 202:24, 214:3
**afternoon** [14] - 222:9, 222:12, 222:20, 222:23, 223:1, 223:4, 223:7, 233:13, 237:21, 237:22, 258:20, 271:23, 271:24, 288:23
**ago** [5] - 160:16, 191:10, 198:8,

222:2, 242:4
**agree** [1] - 206:2
**agreed** [2] - 207:5, 215:5
**ahead** [6] - 172:19, 180:21, 192:20, 204:18, 215:25, 316:25
**Alex** [11] - 195:6, 195:8, 200:6, 200:9, 200:11, 200:17, 200:25, 201:2, 201:4, 201:8, 257:4
**Alexander** [3] - 276:21, 276:23, 276:25
**Alfaro** [2] - 280:14, 319:18
**allege** [1] - 159:24
**alleged** [3] - 157:18, 159:24, 298:11
**allegedly** [1] - 285:18
**allow** [22] - 158:23, 161:6, 168:8, 168:12, 174:11, 176:22, 178:18, 202:17, 202:19, 208:4, 208:6, 209:4, 232:12, 234:23, 238:9, 241:16, 272:14, 282:10, 282:12, 293:2, 298:22, 300:5
**allowed** [1] - 160:8
**allows** [2] - 162:4, 302:24
**almost** [6] - 233:23, 234:5, 247:14, 247:18, 302:7, 310:17
**alone** [2] - 322:2, 324:10
**amend** [20] - 158:8, 158:21, 289:4, 290:20, 295:2, 296:8, 296:10, 296:24, 298:5, 299:12, 299:13, 299:14, 299:16, 299:21, 300:3, 300:5, 303:7, 304:15, 305:11, 305:16
**amended** [8] - 298:6, 299:21, 305:20, 305:22, 306:3, 309:3, 309:6, 316:16
**amending** [1] - 158:3
**amendment** [3] - 159:10, 299:4

**Amount** [1] - 270:23
**amount** [10] - 187:25, 188:2, 188:12, 189:12, 262:4, 271:1, 283:5, 284:15, 315:17, 316:6
**Anibal** [8] - 195:6, 195:8, 199:16, 199:18, 200:7, 265:18, 278:5, 285:16
**ANIBAL** [2] - 161:11, 327:2
**answer** [20] - 158:22, 181:10, 239:8, 239:21, 242:10, 259:22, 275:5, 287:23, 290:10, 290:11, 290:12, 290:13, 292:14, 292:16, 292:19, 298:7, 304:16, 305:15, 306:13, 307:11
**answered** [8] - 170:5, 174:3, 174:6, 192:3, 211:11, 217:13, 242:16, 247:15
**answers** [2] - 293:16, 293:22
**anticipate** [4] - 232:15, 309:25, 310:3, 310:24
**antiretaliation** [3] - 300:11, 302:18, 306:16
**anyway** [2] - 231:7, 268:12
**appear** [4] - 180:3, 181:13, 232:16, 307:21
**appearance** [1] - 202:23
**APPEARANCES** [1] - 152:14
**appeared** [1] - 254:14
**applicable** [1] - 232:9
**application** [5] - 153:15, 153:16, 154:5, 158:1, 159:19
**applies** [1] - 229:13
**apply** [1] - 278:21
**appreciate** [1] - 326:10
**approach** [3] - 204:10, 209:21, 223:11
**approached** [1] - 199:11
**appropriate** [3] -

3

297:19, 299:3,
308:10
**April** [5] - 152:10,
309:7, 311:8,
311:13, 326:16
**arguing** [1] - 323:3
**argument** [5] - 256:6,
306:9, 310:24, 324:5
**arises** [1] - 302:3
**arose** [1] - 299:24
**arrival** [2] - 220:10,
293:23
**arrive** [9] - 192:18,
193:20, 194:15,
194:18, 221:13,
221:17, 235:5,
293:16, 293:18
**arrived** [7] - 242:20,
243:2, 243:5, 245:4,
246:21, 293:17,
293:22
**arriving** [5] - 220:22,
220:25, 221:3,
221:11, 221:25
**arrow** [2] - 253:16,
253:17
**aside** [2] - 212:15,
316:16
**aspects** [1] - 307:10
**assign** [1] - 324:25
**assigned** [2] - 217:1,
219:21
**assistance** [1] -
251:19
**assistant** [2] - 234:25,
236:8
**assume** [1] - 291:12
**assuming** [1] - 323:2
**assumption** [1] -
202:17
**ate** [6] - 243:13,
243:16, 243:20,
247:14, 247:18
**attached** [1] - 285:5
**attempt** [3] - 229:1,
230:4, 230:11
**attention** [1] - 299:5
**attest** [1] - 224:5
**attorney** [7] - 233:24,
240:1, 240:5,
240:11, 280:24,
301:10, 301:16
**attorney-client** [4] -
240:1, 240:5,
240:11, 280:24
**attorneys** [1] - 171:6
**August** [8] - 257:10,
258:6, 266:17,
266:18, 283:11,
283:17, 283:19,

283:22
**authority** [1] - 322:24
**automatically** [1] -
302:17
**available** [1] - 301:7
**average** [3] - 265:10,
265:12, 267:23
**avoid** [2] - 300:17,
300:18
**avoided** [1] - 303:9
**await** [1] - 311:19
**award** [1] - 229:10
**aware** [1] - 258:15
**awkward** [1] - 179:16
**axe** [1] - 317:25

# B

**backpay** [3] - 154:1,
154:18, 155:3
**bad** [4] - 218:24,
219:9, 314:10,
320:20
**balance** [1] - 238:11
**Banegas** [6] - 276:20,
276:21, 289:10,
291:1, 319:12,
320:25
**Banegas'** [1] - 318:20
**Banegas's** [1] -
290:23
**Banegas-Zanbrano**
[1] - 276:21
**bankrupt** [1] - 320:23
**bar** [6] - 243:19,
243:21, 244:5,
245:23, 246:17,
321:9
**base** [2] - 264:25,
320:10
**based** [34] - 153:16,
160:15, 196:14,
234:20, 246:9,
255:24, 256:6,
258:5, 262:23,
263:6, 263:7,
263:14, 263:19,
263:20, 263:25,
265:12, 265:25,
267:21, 267:22,
268:17, 268:18,
274:3, 277:18,
277:19, 278:6,
278:10, 278:25,
279:10, 295:24,
309:19, 313:23,
314:21, 315:17,
325:5
**basis** [3] - 160:22,
161:5, 296:1

**Bates** [1] - 281:18
**bathrooms** [1] - 193:3
**bear** [1] - 223:9
**became** [1] - 196:4
**become** [1] - 282:18
**becoming** [1] - 304:4
**BEFORE** [1] - 152:12
**begin** [3] - 217:3,
217:9, 293:18
**beginning** [1] - 178:20
**behalf** [4] - 194:3,
200:6, 200:9, 321:20
**behind** [5] - 220:14,
220:15, 221:5,
249:25, 321:16
**belief** [3] - 158:4,
168:1, 224:7
**believes** [1] - 167:13
**below** [1] - 224:11
**benefit** [1] - 268:13
**best** [4] - 224:6,
232:18, 246:14,
322:3
**better** [1] - 317:7
**between** [11] - 216:23,
221:12, 221:19,
222:7, 222:21,
236:8, 239:9,
239:15, 253:7,
267:21, 324:16
**beyond** [2] - 158:24,
238:5
**BIANCO** [1] - 152:12
**bias** [1] - 322:16
**bicycles** [3] - 220:19,
221:5
**big** [1] - 306:10
**biggest** [1] - 322:14
**bike** [1] - 190:6
**billing** [4] - 246:15,
247:4, 247:8, 247:10
**bills** [1] - 244:11
**binder** [4] - 223:15,
225:17, 256:20,
258:22
**bit** [3] - 169:23, 181:5,
187:25
**blaming** [1] - 323:15
**blue** [2] - 251:9,
252:25
**bold** [1] - 271:3
**book** [1] - 289:11
**bootstrap** [2] - 301:2,
302:17
**boss** [2] - 179:24,
319:4
**bottom** [7] - 176:18,
176:21, 204:25,
224:5, 224:15,
268:19, 281:19

**break** [31] - 164:1,
170:14, 172:5,
184:24, 185:1,
185:14, 185:16,
185:18, 185:22,
194:21, 194:22,
203:2, 212:16,
231:6, 231:8,
250:12, 250:15,
267:4, 267:5, 268:3,
268:8, 268:11,
279:10, 279:12,
279:13, 288:22,
289:23, 290:15,
291:23, 293:23
**breaks** [12] - 185:19,
185:24, 220:11,
268:2, 274:19,
279:8, 279:11,
279:12, 279:19,
279:21, 293:18
**brief** [10] - 159:22,
160:1, 167:23,
214:25, 260:16,
260:17, 313:1,
313:7, 313:11, 315:7
**briefing** [4] - 299:10,
299:12, 299:14,
309:15
**briefings** [1] - 315:6
**briefly** [9] - 214:21,
223:11, 254:17,
258:14, 264:3,
265:15, 291:5,
311:17, 322:4
**bring** [9] - 153:13,
161:9, 163:10,
163:11, 163:16,
206:18, 209:13,
212:12, 318:4
**bringing** [1] - 302:16
**broad** [1] - 158:13
**broke** [1] - 212:11
**brought** [5] - 163:15,
165:21, 270:11,
295:23, 299:5
**building** [1] - 237:8
**burden** [4] - 308:1,
314:25, 315:22,
323:21
**burdening** [1] - 301:3
**busboy** [4] - 249:20,
249:22, 261:1,
276:25
**business** [11] -
158:15, 223:20,
224:17, 244:10,
259:5, 259:11,
281:14, 292:9,
311:6, 321:3

**businessmen** [1] -
325:1
**busy** [1] - 279:22
**BY** [84] - 152:17,
161:24, 162:24,
165:5, 166:4,
166:13, 168:15,
170:8, 172:21,
173:21, 174:7,
174:13, 175:4,
175:13, 176:2,
176:24, 178:8,
178:22, 180:24,
189:10, 190:23,
191:21, 192:6,
194:14, 196:17,
198:18, 200:19,
201:13, 202:6,
203:8, 204:12,
205:8, 207:11,
207:20, 207:25,
208:8, 209:6,
209:23, 211:9,
211:13, 213:1,
216:3, 217:17,
221:21, 223:13,
233:12, 235:4,
237:20, 238:13,
239:19, 240:13,
241:17, 242:12,
242:18, 242:25,
247:2, 247:19,
248:23, 249:8,
251:21, 255:1,
256:18, 256:24,
260:20, 271:22,
272:17, 273:15,
280:12, 281:3,
282:5, 283:3,
285:11, 286:15,
287:10, 288:2,
327:3, 327:5, 327:6,
327:8, 327:11,
327:12, 327:13,
327:16, 327:17

# C

**calculation** [1] - 285:4
**calculations** [3] -
279:25, 280:19,
320:10
**calendar** [2] - 266:11,
266:12
**cannot** [6] - 158:11,
176:13, 212:13,
302:23, 304:22,
304:23
**CANTOR** [2] - 180:16,
327:4
**Cantos** [9] - 159:23,

4

187:9, 275:20,
276:1, 285:16,
286:6, 286:11,
318:11
**capacity** [2] - 237:12,
241:16
**car** [32] - 168:17,
168:19, 168:20,
168:24, 169:9,
169:16, 169:19,
170:1, 170:4,
170:19, 171:1,
171:2, 171:4, 171:7,
171:8, 171:10,
171:14, 171:20,
171:21, 172:1,
172:4, 172:7, 172:9,
172:12, 172:15,
173:8, 174:16,
174:18, 174:19,
212:11, 241:22
**card** [4] - 241:4,
241:6, 241:18,
241:21
**cards** [3] - 213:17,
275:11, 275:18
**CARLOS** [2] - 180:16,
327:4
**Carlos** [10] - 250:5,
252:2, 254:1,
275:20, 276:1,
286:13, 286:17,
318:11, 319:9
**case** [69] - 153:23,
155:22, 157:7,
157:12, 159:12,
159:15, 160:2,
166:24, 167:18,
174:9, 174:14,
194:5, 216:24,
217:1, 218:14,
219:5, 219:11,
219:16, 219:21,
225:14, 226:1,
229:15, 232:8,
237:24, 238:17,
248:14, 264:25,
270:1, 270:12,
281:6, 281:9,
281:11, 281:13,
281:16, 281:21,
281:22, 282:6,
282:15, 283:1,
283:6, 284:7,
284:16, 287:7,
287:20, 288:5,
289:5, 289:7, 289:8,
293:11, 299:22,
301:24, 302:4,
302:5, 306:24,

307:5, 308:23,
313:12, 313:15,
314:24, 317:2,
318:7, 320:13,
323:16, 323:21,
324:6, 324:16,
324:17, 326:11
**Case** [1] - 281:24
**cases** [8] - 156:3,
216:23, 218:19,
281:6, 302:22,
321:10, 324:11,
324:19
**cash** [5] - 187:11,
187:12, 187:15,
245:11, 245:14
**category** [1] - 156:16
**caution** [1] - 232:10
**cell** [1] - 164:5
**Central** [2] - 152:6,
152:22
**cents** [1] - 269:11
**certain** [7] - 163:25,
178:9, 224:23,
245:4, 245:6,
289:18, 325:2
**certainly** [25] - 159:7,
167:24, 227:1,
242:13, 244:21,
260:5, 293:22,
293:23, 295:19,
295:21, 295:25,
296:22, 296:25,
299:3, 299:8,
303:15, 307:5,
314:8, 315:2,
315:12, 316:7,
322:10, 322:19,
323:4, 323:12
**chance** [2] - 290:17,
309:23
**change** [5] - 183:9,
183:11, 184:7,
190:2, 197:4
**changed** [2] - 242:7,
242:14
**charge** [16] - 163:11,
193:18, 206:2,
206:4, 206:6, 206:7,
224:16, 275:21,
276:3, 276:10,
318:12, 318:13,
318:14, 318:15,
319:13, 319:16
**Charged** [2] - 283:8,
283:21
**chart** [2] - 285:2,
285:5
**Chavez** [8] - 181:18,
181:19, 250:5,

252:2, 254:1, 276:2,
285:16, 319:12
**check** [3] - 180:6,
187:15, 277:3
**checks** [1] - 244:15
**chef** [42] - 163:9,
163:14, 190:18,
193:10, 193:12,
193:17, 193:18,
195:3, 196:4,
199:11, 199:14,
199:21, 201:18,
201:22, 201:24,
202:10, 202:14,
206:6, 206:13,
206:17, 206:20,
213:20, 213:25,
225:12, 234:25,
236:8, 249:20,
249:22, 261:1,
277:18, 277:20,
285:18, 315:12,
315:16, 315:19,
317:21, 318:19,
319:18, 323:10
**chef's** [1] - 202:12
**CHEVEZ** [2] - 180:16,
327:4
**Chevez** [14] - 159:23,
180:25, 182:24,
187:10, 203:9,
250:5, 252:2, 254:1,
275:20, 286:7,
286:11, 318:11,
318:12, 320:19
**child** [1] - 216:18
**circumstances** [6] -
158:12, 302:4,
302:11, 302:12,
324:7, 325:2
**claim** [31] - 238:14,
239:10, 239:16,
295:22, 296:8,
296:11, 296:24,
298:16, 298:25,
299:4, 299:12,
299:24, 301:25,
302:6, 302:8,
302:11, 302:13,
302:14, 304:20,
305:5, 305:8,
305:10, 305:12,
307:8, 307:15,
307:25, 308:11,
308:13, 311:19,
316:16, 317:10
**claimed** [2] - 238:3,
319:23
**claims** [5] - 303:10,
307:2, 312:15,

313:13, 313:14
**clandestine** [1] -
321:14
**clarified** [1] - 322:8
**clarify** [10] - 191:19,
201:8, 212:23,
217:7, 229:16,
229:19, 249:1,
253:3, 262:9, 269:17
**cleaned** [1] - 318:24
**cleaning** [4] - 193:3,
193:18, 221:6,
287:15
**clear** [10] - 158:3,
160:15, 160:24,
297:2, 297:7,
314:15, 315:18,
323:7, 323:9, 323:16
**clearly** [8] - 200:14,
200:15, 313:25,
314:3, 315:10,
322:24, 323:18,
323:24
**Clement** [1] - 314:24
**clerk** [1] - 326:16
**client** [15] - 160:21,
227:21, 240:1,
240:5, 240:11,
280:24, 301:10,
301:12, 301:15,
306:12, 311:11,
311:14, 325:18,
326:1, 326:19
**client's** [4] - 284:18,
289:19, 321:2, 324:7
**clients** [3] - 157:6,
293:16, 293:22
**cloak** [1] - 320:14
**cloak-and-dagger** [1]
- 320:14
**clock** [4] - 197:12,
197:14, 275:11,
275:15
**close** [3] - 191:5,
236:23, 311:6
**closed** [1] - 266:16
**CM** [1] - 152:21
**coemployee** [1] -
165:15
**collect** [1] - 238:11
**color** [6] - 249:2,
249:6, 251:5, 251:6,
251:16, 252:23
**coloring** [2] - 252:20,
252:22
**column** [26] - 257:12,
257:16, 258:5,
266:4, 266:7,
266:13, 266:14,
266:22, 266:23,

266:25, 268:15,
268:25, 269:2,
269:6, 269:7,
269:12, 269:14,
269:20, 269:21,
270:15, 270:16,
270:19, 270:20,
270:23, 270:24
**columns** [3] - 265:16,
266:1, 271:8
**comfortable** [1] -
231:2
**coming** [10] - 182:23,
198:13, 200:1,
220:6, 220:16,
220:18, 220:19,
221:4, 246:19,
320:21
**commenced** [1] -
238:10
**comment** [2] - 277:8,
317:11
**commit** [1] - 158:13
**common** [2] - 297:18,
319:13
**common-sense** [1] -
319:13
**communicate** [2] -
189:24, 311:15
**communication** [1] -
164:4
**communications** [1] -
205:9
**compare** [2] - 252:6,
258:8
**compared** [1] - 254:7
**comparing** [3] -
252:14, 252:17,
254:10
**compelled** [3] - 324:4,
324:14, 324:24
**compensation** [7] -
207:5, 207:12,
207:16, 207:22,
208:2, 208:6, 208:10
**compensatory** [1] -
155:3
**competent** [1] -
196:11
**complain** [5] - 208:9,
208:12, 208:17,
208:20, 209:10
**complained** [1] -
208:5
**complaint** [20] - 158:3,
158:21, 159:11,
281:25, 282:2,
298:6, 298:7,
299:22, 300:25,
301:2, 303:7,

304:15, 305:12, 305:21, 305:22, 306:4, 307:3, 307:10, 309:3, 309:6
**complaints** [1] - 317:18
**complete** [2] - 218:19, 223:21
**completed** [2] - 223:23, 307:20
**completely** [2] - 282:14, 302:13
**compliance** [8] - 216:16, 218:6, 218:18, 230:5, 230:8, 230:11, 230:12, 262:19
**compliment** [1] - 326:9
**comply** [2] - 157:13, 324:12
**comport** [1] - 311:4
**compounded** [1] - 314:10
**computation** [4] - 261:21, 263:22, 270:7, 280:13
**computations** [21] - 257:16, 258:2, 261:23, 262:2, 262:13, 262:21, 264:2, 264:4, 264:7, 264:25, 265:4, 265:6, 265:17, 265:21, 265:24, 266:20, 267:25, 268:4, 268:20, 271:9, 277:17
**compute** [4] - 262:16, 262:19, 267:23, 279:10
**computed** [3] - 257:19, 257:20, 262:5
**computer** [1] - 152:25
**computing** [1] - 273:25
**concede** [12] - 227:17, 227:20, 228:8, 228:10, 228:19, 228:22, 229:6, 229:11, 229:21, 230:15, 230:22, 232:7
**conceded** [1] - 314:1
**conceding** [5] - 227:25, 228:4, 228:5, 228:18, 232:5
**concern** [1] - 303:6
**concerns** [3] - 290:6,

291:5, 291:8
**concession** [1] - 232:10
**conclude** [2] - 278:16, 278:21
**concluded** [1] - 326:22
**conclusion** [3] - 210:22, 230:14, 278:24
**conclusions** [2] - 311:23, 325:5
**concrete** [1] - 230:6
**conditions** [3] - 318:17, 323:5, 323:8
**conduct** [3] - 154:3, 216:21, 297:1
**conducted** [1] - 220:1
**conference** [3] - 275:12, 309:22, 326:4
**confers** [1] - 178:21
**confirm** [1] - 220:9
**conform** [3] - 299:17, 299:21, 300:3
**conformed** [1] - 301:8
**confused** [1] - 158:6
**Congress** [2] - 306:16, 306:19
**Congress's** [1] - 306:21
**conjecture** [1] - 251:14
**conjunction** [1] - 293:17
**connect** [1] - 214:21
**consent** [3] - 306:12, 306:18, 306:21
**consented** [1] - 306:15
**consequences** [1] - 323:20
**conserve** [1] - 326:1
**consider** [12] - 158:22, 159:9, 161:2, 280:14, 280:19, 282:16, 292:11, 292:19, 293:12, 304:8, 304:9, 307:7
**considered** [1] - 282:24
**consist** [1] - 261:23
**consisted** [1] - 315:14
**consistent** [2] - 258:12, 323:24
**construed** [1] - 295:16
**contempt** [2] - 297:23, 298:2
**contents** [1] - 167:10
**contested** [1] - 315:4

**continue** [6] - 159:18, 161:2, 232:6, 300:12, 305:4, 324:17
**continued** [5] - 161:13, 248:19, 297:5, 297:9, 314:8
**Continued** [2] - 248:22, 327:15
**continuing** [4] - 153:8, 297:13, 297:16, 303:12
**control** [1] - 323:8
**convenience** [1] - 291:18
**conversation** [16] - 162:10, 162:13, 169:15, 169:18, 169:21, 170:10, 172:24, 173:3, 173:11, 174:22, 191:20, 198:6, 199:7, 204:6, 213:22, 319:25
**conversations** [4] - 162:19, 162:21, 205:2, 320:14
**converse** [2] - 169:9, 205:20
**convert** [1] - 304:12
**conveying** [2] - 298:10, 299:20
**convince** [4] - 200:8, 201:6, 201:8, 230:11
**cook** [4] - 193:5, 213:14, 261:9, 298:10
**cooking** [1] - 315:19
**cooks** [1] - 261:4
**cooperate** [1] - 271:25
**cooperation** [4] - 218:9, 218:21, 219:4, 219:12
**copacetic** [1] - 297:12
**copies** [5] - 226:19, 255:15, 255:17, 259:4, 326:17
**copy** [11] - 225:24, 249:2, 249:5, 249:6, 251:16, 252:23, 253:4, 258:19, 259:11, 305:1, 326:20
**CORP** [1] - 152:7
**Corporation** [1] - 152:8
**Correct** [1] - 243:22
**correct** [92] - 162:8, 162:19, 164:5, 165:12, 166:6,

169:3, 171:14, 173:22, 180:4, 192:8, 193:5, 202:10, 204:25, 208:24, 209:8, 210:5, 211:16, 211:19, 213:23, 214:1, 214:4, 214:7, 215:10, 224:6, 238:1, 238:4, 238:17, 238:21, 239:1, 239:23, 240:3, 240:4, 240:14, 240:17, 240:23, 240:24, 241:2, 241:4, 241:22, 241:23, 241:25, 242:5, 242:7, 242:20, 242:22, 243:5, 243:11, 243:12, 243:14, 243:21, 243:23, 243:25, 244:3, 244:4, 244:7, 244:8, 244:11, 244:12, 244:20, 244:23, 244:24, 245:1, 245:2, 245:4, 245:5, 245:7, 245:9, 245:10, 245:19, 247:13, 253:5, 256:1, 262:14, 263:9, 265:18, 266:2, 272:12, 272:22, 274:2, 274:7, 277:23, 279:6, 280:1, 281:7, 292:4, 298:19, 304:11, 308:5, 309:20, 313:5, 319:10, 325:17
**correction** [3] - 189:5, 191:17, 302:21
**correctly** [4] - 175:15, 175:18, 175:20, 218:8
**counsel** [3] - 210:2, 215:4, 300:24
**country** [1] - 325:11
**couple** [2] - 191:22, 280:3
**course** [3] - 257:21, 257:25, 281:14
**COURT** [229] - 152:1, 153:7, 153:13, 154:5, 154:13, 154:22, 155:18, 156:14, 156:20, 157:5, 157:21, 159:16, 160:10,

161:9, 161:15, 161:19, 162:22, 164:24, 165:3, 165:18, 166:11, 166:22, 166:25, 168:1, 170:6, 172:17, 173:18, 174:4, 174:11, 175:2, 175:12, 176:1, 176:16, 176:20, 178:5, 178:16, 180:9, 180:11, 180:13, 180:21, 189:8, 190:20, 192:4, 194:12, 196:10, 196:13, 198:16, 200:14, 201:11, 202:2, 202:17, 203:1, 203:4, 204:11, 205:7, 207:19, 207:24, 208:4, 209:4, 211:11, 212:23, 214:14, 214:16, 214:19, 214:23, 215:2, 215:6, 215:9, 215:12, 215:18, 215:25, 217:15, 221:20, 223:12, 226:11, 226:17, 226:21, 227:11, 227:14, 227:20, 227:24, 228:3, 228:12, 228:15, 228:17, 229:4, 229:21, 230:1, 230:8, 230:19, 230:22, 231:6, 232:4, 232:24, 233:2, 234:20, 234:23, 237:17, 238:9, 240:9, 240:12, 241:10, 241:14, 242:9, 242:16, 242:22, 246:4, 246:9, 246:22, 247:17, 248:9, 248:11, 248:13, 251:16, 251:18, 254:21, 255:18, 255:23, 256:3, 256:16, 256:23, 259:8, 259:12, 259:15, 259:17, 260:3, 260:9, 260:17, 271:13, 271:15, 271:19, 272:14, 273:14, 280:11, 280:25, 282:4,

282:8, 282:19, 282:25, 284:12, 284:17, 284:22, 285:2, 285:8, 286:14, 287:9, 287:23, 288:18, 288:20, 288:22, 289:6, 289:12, 289:15, 289:22, 289:25, 290:3, 290:8, 290:14, 290:21, 290:24, 291:2, 291:14, 291:20, 291:23, 291:25, 292:6, 292:18, 292:25, 294:3, 294:7, 294:10, 294:13, 294:22, 294:24, 295:6, 295:9, 295:14, 296:7, 296:14, 297:25, 298:21, 299:11, 299:18, 300:10, 302:2, 302:19, 303:22, 304:12, 305:4, 305:10, 305:24, 306:6, 306:19, 306:25, 307:14, 308:5, 308:7, 308:12, 308:15, 308:19, 309:1, 309:4, 309:6, 309:20, 310:3, 310:8, 310:13, 310:17, 310:20, 311:17, 312:8, 312:12, 312:22, 312:25, 313:5, 316:22, 316:25, 317:4, 321:6, 321:23, 322:1, 324:3, 325:10, 325:14, 325:17, 325:20, 325:24, 326:3, 326:14
**court** [35] - 155:11, 156:17, 164:9, 173:23, 173:25, 181:12, 181:14, 192:17, 198:14, 198:23, 199:1, 199:10, 199:12, 199:22, 200:2, 200:8, 201:1, 201:20, 201:21, 202:4, 202:14, 213:23, 238:23, 258:15, 285:23, 297:13, 298:2, 298:15, 300:25,

302:16, 305:6, 308:22, 311:8, 311:9, 312:6
**Court** [2] - 152:21, 153:1
**court's** [7] - 291:17, 292:22, 294:1, 297:22, 300:4, 310:25, 316:17
**courthouse** [1] - 310:9
**Courthouse** [2] - 152:6, 152:21
**courtroom** [2] - 257:3, 321:4
**cousin** [2] - 317:18
**cover** [2] - 250:2, 251:24
**coverage** [1] - 316:3
**covered** [4] - 250:4, 253:25, 254:4, 255:3
**covers** [1] - 251:25
**craft** [1] - 306:4
**credibility** [8] - 165:20, 165:24, 167:5, 168:5, 168:9, 238:8, 241:13, 322:13
**credit** [5] - 241:18, 268:2, 268:10, 268:12, 268:13
**credited** [2] - 295:20, 304:1
**criminal** [1] - 231:7
**CROSS** [8] - 161:23, 203:7, 237:19, 271:21, 327:2, 327:5, 327:11, 327:16
**cross** [4] - 237:17, 271:19, 318:4, 322:16
**CROSS-EXAMINATION** [8] - 161:23, 203:7, 237:19, 271:21, 327:2, 327:5, 327:11, 327:16
**cross-examination** [4] - 237:17, 271:19, 318:4, 322:16
**crucial** [1] - 218:15
**CSR** [1] - 152:21
**current** [8] - 163:13, 179:17, 179:21, 183:18, 193:12, 194:3, 279:5, 321:2
**curved** [1] - 253:18
**customer** [2] - 206:24, 235:18

**customers** [8] - 186:6, 191:6, 213:14, 235:9, 279:20, 291:8, 291:9, 293:18

## D

**d/b/a** [1] - 152:7
**dagger** [1] - 320:14
**daily** [3] - 249:12, 249:21, 258:9
**damage** [1] - 277:17
**damages** [11] - 155:4, 157:2, 229:9, 229:19, 308:10, 308:12, 308:15, 309:18, 314:19, 316:6, 316:8
**DANIEL** [1] - 152:17
**darker** [4] - 252:21, 252:23, 253:4, 253:6
**data** [2] - 223:20, 230:25
**date** [16] - 179:4, 198:7, 199:12, 204:15, 204:21, 210:8, 251:1, 255:6, 257:10, 266:8, 283:9, 306:7, 309:12, 312:15, 313:3, 325:3
**dated** [5] - 179:11, 204:19, 255:8, 255:13, 255:16
**dates** [2] - 264:18, 266:2
**David** [1] - 153:3
**days** [16] - 182:3, 183:23, 184:1, 192:12, 192:16, 197:24, 198:9, 198:12, 198:19, 212:8, 250:6, 250:8, 302:16, 306:6, 325:10, 326:11
**deal** [2] - 232:18, 306:10
**dealing** [1] - 301:15
**debit** [3] - 241:3, 241:6, 241:21
**December** [5] - 205:4, 210:7, 210:13, 210:17, 226:20
**decide** [4] - 245:8, 299:23, 308:4, 321:18
**decided** [2] - 196:23, 322:1
**decision** [9] - 165:23, 189:4, 197:1,

201:20, 308:23, 309:17, 321:12, 324:6, 324:17
**decision-making** [1] - 321:12
**defaulted** [1] - 239:23
**defend** [1] - 239:25
**Defendant** [1] - 152:18
**defendant** [12] - 153:6, 230:2, 258:1, 297:6, 297:7, 297:10, 297:23, 313:1, 316:7, 321:20, 323:14, 324:1
**defendant's** [6] - 215:4, 217:4, 289:3, 292:1, 294:21, 314:22
**Defendant's** [4] - 204:13, 276:7, 281:4, 294:18
**defendants** [24] - 215:5, 225:25, 226:7, 249:3, 258:17, 295:7, 296:5, 296:17, 297:1, 313:13, 314:1, 314:9, 314:11, 314:18, 314:25, 315:2, 315:4, 315:8, 315:10, 315:21, 315:25, 316:2, 316:11, 323:17
**Defendants** [2] - 152:10, 313:19
**DEFENSE** [6] - 233:4, 295:12, 317:14, 327:9, 327:18, 327:20
**defense** [12] - 233:7, 240:2, 311:24, 313:14, 315:5, 315:9, 315:21, 317:8, 322:24, 323:11, 324:9, 324:15
**Deficiency** [4] - 269:13, 269:21, 270:16, 270:19
**deficiency** [8] - 269:18, 269:22, 270:13, 270:14, 270:17, 270:21, 270:25, 271:1
**definitely** [2] - 236:21, 237:2
**demonstrate** [4] -

154:6, 154:15, 155:19, 226:25
**demonstrated** [1] - 251:13
**denied** [2] - 154:5, 295:9
**departed** [1] - 243:11
**Department** [40] - 152:4, 163:19, 165:10, 165:21, 172:25, 173:4, 173:12, 175:6, 176:3, 176:14, 180:2, 197:17, 197:22, 203:12, 205:2, 205:10, 208:23, 209:7, 209:11, 211:1, 216:5, 219:11, 227:1, 230:4, 237:24, 272:1, 273:17, 284:9, 284:22, 294:4, 294:24, 295:19, 300:17, 302:19, 302:24, 311:21, 320:4, 320:9, 320:16, 324:18
**DEPARTMENT** [1] - 152:15
**Department's** [1] - 156:1
**department's** [1] - 156:3
**deposit** [1] - 268:24
**deposition** [16] - 227:13, 238:17, 239:5, 262:25, 289:3, 289:9, 289:19, 290:4, 291:17, 292:1, 292:4, 294:16, 298:13, 307:17, 318:20, 320:25
**deputy** [1] - 289:25
**derived** [1] - 157:19
**describe** [2] - 192:17, 225:10
**described** [4] - 185:18, 192:14, 196:5, 271:7
**describes** [1] - 293:3
**describing** [1] - 267:15
**designating** [1] - 291:19
**desire** [2] - 232:4, 296:8
**dessert** [1] - 192:25
**determination** [2] -

7

227:23, 300:4
**determine** [3] - 160:8, 218:6, 267:1
**determined** [1] - 308:22
**determining** [2] - 168:5, 267:19
**diaries** [1] - 287:7
**diary** [3] - 281:21, 281:22, 323:16
**different** [6] - 194:22, 195:23, 247:6, 247:7, 302:13
**dining** [3] - 243:17, 243:20, 244:5
**dinner** [3] - 212:17, 245:21, 247:20
**DIRECT** [8] - 180:23, 216:2, 233:11, 248:22, 327:4, 327:7, 327:10, 327:15
**direct** [8] - 157:24, 176:10, 178:3, 178:9, 238:6, 301:15, 319:5, 323:4
**directed** [2] - 295:8, 295:15
**directing** [2] - 315:14, 318:17
**direction** [3] - 162:25, 200:11, 200:15
**directions** [1] - 163:4
**directives** [2] - 298:11
**Directly** [1] - 286:19
**directly** [4] - 162:10, 272:22, 273:3, 286:10
**disappearing** [1] - 160:21
**discharge** [3] - 296:18, 303:10, 314:14
**disclose** [1] - 282:25
**disclosed** [2] - 165:2
**discovery** [12] - 167:16, 298:8, 298:12, 299:25, 304:17, 307:15, 307:16, 307:17, 307:19, 307:20, 309:17, 314:23
**discrepancy** [1] - 269:10
**discretion** [1] - 316:18
**discrimination** [3] - 302:5, 302:8, 302:14
**discriminatory** [1] - 296:19
**discuss** [15] - 172:24,

173:15, 173:23, 173:24, 174:1, 174:8, 174:14, 174:24, 179:6, 203:20, 203:23, 203:25, 210:17, 211:6, 275:6
**discussed** [4] - 215:3, 260:4, 314:17, 316:10
**discussing** [1] - 248:24
**discussions** [3] - 280:22, 280:24, 281:1
**dish** [1] - 235:1
**dishwasher** [13] - 182:6, 183:8, 183:13, 188:8, 193:1, 193:5, 195:8, 196:24, 206:15, 206:17, 261:8, 263:20, 279:18
**dishwashers** [1] - 261:7
**dispense** [1] - 228:9
**dispute** [6] - 232:6, 232:17, 315:24, 316:2, 316:3
**District** [1] - 152:21
**district** [1] - 216:6
**DISTRICT** [3] - 152:1, 152:1, 152:13
**divide** [1] - 321:21
**divided** [3] - 269:3, 269:4, 321:25
**divided-by-two** [1] - 321:25
**Division** [2] - 216:6, 216:8
**document** [9] - 176:25, 210:10, 257:1, 257:4, 257:6, 257:15, 258:4, 264:3, 301:21
**documentation** [1] - 263:7
**documents** [8] - 225:18, 227:18, 227:19, 229:15, 230:18, 258:2, 258:24, 259:4
**DOL** [1] - 323:15
**dollar** [1] - 322:17
**dollars** [3] - 240:20, 240:23, 241:1
**Dominick** [1] - 152:21
**DomTursi@email. com** [1] - 152:23
**done** [6] - 158:24,

231:5, 265:4, 290:18, 298:24, 326:11
**door** [17] - 154:4, 155:6, 163:24, 190:25, 220:17, 220:19, 222:18, 233:21, 237:8, 243:25, 244:2, 244:6, 246:12, 272:18, 272:21, 272:23, 275:9
**doors** [2] - 191:5, 236:24
**dotted** [1] - 176:22
**double** [2] - 229:10, 229:12
**doubt** [1] - 268:13
**down** [14] - 180:11, 193:23, 212:11, 214:16, 238:23, 244:22, 244:25, 248:11, 285:19, 288:20, 292:14, 307:10, 310:6, 310:21
**drag** [1] - 321:2
**drawn** [2] - 295:17, 295:20
**dressing** [1] - 206:12
**dressings** [1] - 192:25
**drinks** [1] - 245:20
**driven** [1] - 162:10
**driver's** [3] - 170:22, 171:11, 172:8
**drove** [1] - 169:10
**Due** [1] - 270:23
**duly** [5] - 161:13, 180:17, 215:22, 233:7, 248:19
**duration** [1] - 308:21
**during** [20] - 158:19, 162:13, 167:16, 170:9, 184:24, 185:21, 188:11, 191:11, 217:18, 219:17, 225:14, 225:25, 226:5, 234:14, 257:21, 257:25, 279:19, 279:21, 280:16, 289:22
**duties** [3] - 216:14, 216:15, 315:14
**duty** [3] - 281:16, 315:16, 323:10

# E

**early** [2] - 236:23,

246:15
**earn** [2] - 188:22, 190:1
**earning** [2] - 188:11, 189:11
**easier** [3] - 224:1, 224:3, 257:8
**EASTERN** [1] - 152:1
**eat** [4] - 212:17, 243:23, 247:12, 247:20
**eating** [2] - 244:5, 246:10
**ECF** [1] - 301:8
**edging** [1] - 324:22
**EEOC** [1] - 302:15
**effect** [2] - 304:14, 304:20
**effective** [1] - 304:4
**effectiveness** [1] - 156:1
**effort** [3] - 165:22, 230:10, 230:11
**efforts** [1] - 326:10
**Either** [2] - 235:10, 310:13
**either** [5] - 159:24, 178:12, 201:21, 298:22, 315:23
**element** [1] - 322:25
**elements** [2] - 313:13, 315:11
**ELENA** [1] - 152:17
**Elena** [1] - 153:4, 237:23
**elicit** [1] - 167:12
**elicited** [1] - 298:18
**emphasize** [2] - 256:3, 324:14
**employee** [32] - 168:6, 169:8, 169:12, 170:3, 171:18, 171:24, 172:3, 207:1, 218:9, 218:21, 219:4, 219:12, 219:15, 235:5, 235:7, 262:9, 263:20, 266:10, 266:16, 267:20, 268:22, 271:2, 271:5, 271:25, 272:4, 274:4, 275:5, 275:25, 280:21, 282:20, 282:23, 285:16
**Employee** [1] - 270:24
**employee's** [3] - 153:18, 194:1, 282:17
**employees** [155] -

153:21, 153:24, 155:17, 155:24, 160:3, 165:22, 173:11, 173:16, 174:9, 193:25, 194:4, 194:7, 217:19, 217:22, 217:23, 218:1, 218:16, 218:25, 219:3, 219:25, 220:6, 220:16, 220:18, 220:21, 220:25, 221:2, 221:4, 221:10, 221:13, 221:16, 221:24, 222:3, 222:6, 222:11, 222:17, 222:19, 222:22, 222:25, 223:3, 223:6, 225:10, 226:8, 226:10, 228:7, 234:17, 234:24, 235:25, 236:4, 236:5, 236:12, 236:15, 236:18, 236:19, 237:1, 245:4, 245:12, 245:15, 246:20, 249:13, 249:15, 249:17, 249:18, 250:4, 250:7, 250:13, 250:16, 252:1, 252:3, 253:25, 254:2, 257:22, 258:6, 260:1, 260:2, 260:8, 260:22, 260:24, 261:2, 261:5, 261:7, 261:10, 262:7, 262:8, 262:23, 262:24, 263:3, 263:11, 263:17, 263:22, 264:7, 264:9, 264:11, 264:14, 264:21, 265:11, 267:15, 268:6, 272:12, 272:16, 272:19, 272:22, 273:2, 273:5, 273:6, 273:9, 273:16, 274:3, 274:11, 274:13, 274:15, 274:17, 274:24, 278:14, 278:17, 278:22, 285:3, 288:15, 296:20, 297:2, 297:24, 298:12, 298:22, 300:15, 300:19, 300:23,

301:4, 303:6, 303:12, 303:17, 303:18, 307:22, 307:24, 313:17, 313:20, 313:22, 314:11, 314:14, 315:13, 315:15, 318:18, 319:20, 319:21, 319:23, 319:24, 320:5, 320:11, 321:2, 321:3, 321:20, 323:4, 323:9, 323:12

**employees'** [9] - 218:13, 262:22, 263:6, 263:14, 263:24, 274:21, 313:16, 314:21, 323:13

**employer** [24] - 179:17, 179:21, 211:14, 211:15, 211:22, 216:4, 218:19, 219:1, 219:8, 219:10, 219:25, 223:24, 225:13, 249:21, 257:22, 258:1, 260:7, 261:15, 263:8, 264:6, 278:19, 284:7, 297:21, 316:3

**employer's** [4] - 264:24, 265:1, 272:3, 321:16

**employers** [2] - 290:6, 316:2

**employment** [7] - 264:19, 303:20, 314:12, 314:23, 318:18, 323:5, 323:8

**emptied** [1] - 236:12

**encouraging** [1] - 314:11

**end** [9] - 182:23, 185:16, 186:6, 201:18, 209:19, 266:8, 307:12, 309:2, 310:12

**End** [1] - 266:2

**ended** [1] - 252:25

**ending** [7] - 250:3, 250:15, 251:1, 254:5, 255:4, 255:6, 274:19

**enemies** [1] - 322:14

**enforced** [1] - 322:18

**enforcement** [1] - 324:8

**English** [6] - 181:4,

181:7, 216:20, 276:8, 301:13, 301:18

**enjoin** [1] - 296:17

**enjoining** [1] - 297:21

**Enrique** [7] - 163:13, 193:13, 193:14, 202:13, 213:20, 277:8, 286:7

**ensure** [1] - 322:19

**enter** [1] - 171:1

**entering** [1] - 305:18

**entirely** [1] - 301:3

**entirety** [2] - 288:3, 291:17

**entitled** [13] - 154:1, 156:11, 176:20, 298:14, 298:15, 299:25, 302:20, 302:21, 303:3, 306:20, 307:15, 307:20

**entrance** [2] - 272:25, 273:2

**entries** [4] - 281:21, 281:22, 283:8, 284:15

**entry** [2] - 281:24, 283:11

**equal** [1] - 316:6

**equals** [3] - 269:23, 270:4, 271:1

**equitable** [1] - 316:17

**errand** [1] - 212:11

**especially** [1] - 237:13

**ESQ** [3] - 152:17, 152:17, 152:18

**essentially** [2] - 297:17, 314:1

**establish** [7] - 216:16, 315:11, 315:12, 315:13, 315:15, 315:22, 315:23

**established** [3] - 153:25, 314:1, 319:12

**establishes** [1] - 319:17

**estimate** [7] - 277:16, 278:3, 278:5, 278:17, 279:3, 314:20, 316:5

**estimated** [1] - 277:23

**estimates** [3] - 279:5, 279:6, 285:1

**ethical** [1] - 301:14

**evening** [3] - 170:15, 186:2, 194:25

**event** [3] - 156:10, 231:3, 303:24, 325:3

evidence [35] - 158:24, 215:15, 227:16, 230:25, 260:19, 271:16, 292:24, 294:2, 295:16, 295:21, 296:3, 296:21, 296:23, 296:25, 298:25, 299:17, 299:21, 307:7, 313:12, 313:16, 314:5, 314:16, 315:2, 315:24, 316:9, 318:20, 323:22, 323:23, 324:1, 327:23, 327:23, 327:24, 327:24, 327:25, 327:25

**EVIDENCE** [4] - 233:4, 248:15, 327:9, 327:14

**exact** [7] - 179:4, 186:1, 197:10, 198:7, 199:12, 253:11, 267:13

**exactly** [11] - 158:18, 159:1, 184:6, 187:25, 188:12, 189:12, 190:1, 202:5, 204:8, 206:10, 321:6

**examination** [4] - 237:17, 271:19, 318:4, 322:16

**EXAMINATION** [18] - 161:23, 180:23, 203:7, 216:2, 233:11, 237:19, 247:1, 248:22, 271:21, 327:2, 327:4, 327:5, 327:7, 327:10, 327:11, 327:12, 327:15, 327:16

**examined** [3] - 180:18, 215:23, 233:8

**example** [1] - 267:20

**except** [1] - 289:9

**exception** [1] - 295:1

**excess** [3] - 313:17, 313:21, 323:25

**excessive** [1] - 314:5

**Excluded** [1] - 266:13

**excluded** [4] - 266:15, 266:17, 266:18, 266:24

**excused** [4] - 180:12, 214:17, 248:12,

288:21

**executive** [4] - 190:18, 225:12, 315:5, 315:11

**exemplified** [1] - 314:8

**exempt** [5] - 280:14, 280:20, 315:18, 315:20, 319:18

**exemption** [8] - 190:18, 315:5, 315:11, 317:23, 318:10, 321:18, 322:23, 323:1

**exerted** [2] - 202:18, 297:23

**Exhibit** [77] - 176:7, 176:8, 204:9, 204:13, 215:12, 223:16, 223:17, 225:16, 225:18, 225:22, 225:24, 227:10, 227:13, 227:14, 227:16, 248:24, 249:2, 249:10, 249:12, 249:24, 251:23, 252:6, 253:25, 254:18, 256:20, 257:10, 258:4, 258:10, 258:22, 258:23, 258:25, 259:16, 260:13, 260:19, 261:19, 261:20, 261:23, 264:1, 264:5, 264:8, 264:11, 264:13, 264:19, 265:5, 265:6, 265:14, 265:15, 271:11, 271:15, 271:16, 277:2, 277:3, 278:20, 279:5, 279:7, 281:4, 289:10, 292:22, 292:24, 292:25, 293:25, 294:2, 294:15, 294:16, 294:17, 294:18, 327:23, 327:24, 327:24, 327:25, 327:25

**exhibit** [14] - 223:15, 225:17, 226:16, 249:1, 256:15, 256:20, 256:21, 259:21, 260:16, 277:6, 289:2, 290:16, 294:21, 312:4

**exhibited** [1] - 314:10

**exhibits** [9] - 215:4, 228:23, 229:24, 254:22, 260:21, 285:5, 294:3, 294:11, 296:21

**Exhibits** [3] - 215:7, 215:14, 327:23

**exist** [1] - 226:9

**exit** [1] - 222:17

**exiting** [3] - 222:12, 222:20, 222:22

**expect** [1] - 301:17

**expected** [6] - 262:24, 263:4, 263:16, 267:3, 278:10, 278:11

**expend** [1] - 326:7

**experience** [1] - 219:10

**experienced** [1] - 319:14

**expert** [1] - 256:4

**expire** [1] - 300:21

**expires** [1] - 304:11

**explain** [8] - 169:23, 197:19, 198:23, 200:4, 200:23, 205:22, 220:3, 274:13

**explained** [1] - 274:15

**explaining** [2] - 159:7, 293:17

**explains** [1] - 293:18

**explanation** [1] - 154:25

**explanatory** [1] - 268:16

**explore** [1] - 176:20

**exploring** [1] - 285:9

**express** [1] - 207:21

**extend** [4] - 305:19, 308:18, 308:19, 308:21

**extended** [2] - 296:21, 311:13

**extending** [1] - 311:8

**extends** [1] - 326:16

**extent** [18] - 156:13, 158:7, 164:25, 167:8, 167:12, 168:8, 190:17, 194:6, 227:22, 228:8, 229:13, 273:25, 282:11, 292:16, 300:15, 303:5, 320:24, 321:14

**extra** [1] - 224:22

**extremely** [1] - 324:9

## F

**facing** [1] - 325:2
**fact** [18] - 153:17, 154:8, 156:16, 157:3, 158:19, 160:9, 173:12, 210:18, 211:7, 256:10, 298:3, 301:20, 304:1, 304:4, 312:3, 322:20, 323:11, 325:4
**factors** [2] - 315:17, 319:13
**facts** [4] - 299:24, 301:4, 302:10, 311:23
**factual** [2] - 302:3, 302:12
**failed** [3] - 314:25, 315:2, 315:25
**failing** [3] - 315:9, 323:17, 323:20
**failure** [1] - 314:2
**fair** [4] - 240:19, 240:22, 240:25, 248:3
**Fair** [4] - 156:2, 280:15, 306:17, 319:19
**faith** [2] - 314:10, 316:8
**falling** [1] - 247:24
**false** [3] - 226:25, 227:7, 265:2
**falsification** [1] - 230:19
**falsified** [6] - 219:1, 219:8, 226:13, 230:3, 314:4, 314:7
**familiar** [4] - 233:18, 234:8, 234:14, 273:19
**far** [11] - 154:25, 160:5, 257:12, 258:5, 276:8, 279:19, 288:7, 303:18, 318:10, 318:17, 321:19
**fashion** [1] - 234:24
**favor** [5] - 295:18, 295:21, 295:22, 315:24, 322:15
**favorably** [1] - 295:16
**Fax** [1] - 152:23
**fear** [1] - 157:10
**federal** [4] - 216:16, 218:7, 300:25, 302:16

**Federal** [1] - 152:22
**fees** [1] - 238:11
**felt** [5] - 202:14, 202:20, 202:24, 214:3, 324:23
**few** [3] - 237:5, 260:15, 322:4
**fifth** [1] - 204:14
**figure** [1] - 159:10
**file** [11] - 281:6, 281:9, 281:11, 281:13, 281:16, 298:5, 300:24, 302:2, 302:9, 305:20, 307:3
**filed** [4] - 237:25, 301:25, 309:7, 318:8
**filled** [2] - 241:22, 255:9
**final** [1] - 270:23
**financial** [4] - 229:15, 230:25, 324:7, 325:2
**findings** [6] - 256:10, 311:23, 312:3, 313:4, 315:6, 325:4
**fine** [4] - 208:7, 224:3, 312:23, 326:3
**finger** [1] - 323:17
**finish** [3] - 186:8, 186:21, 186:25
**fire** [2] - 158:11, 322:24
**fired** [5] - 157:14, 158:14, 303:7, 304:22, 315:13
**firing** [2] - 157:6, 160:21
**firms** [1] - 216:15
**first** [51] - 155:1, 155:25, 156:18, 158:4, 164:4, 166:16, 174:20, 180:17, 181:21, 182:11, 183:7, 184:12, 187:9, 187:21, 192:10, 192:18, 192:24, 193:2, 195:2, 198:19, 198:22, 198:25, 203:19, 204:6, 207:4, 207:14, 211:5, 215:22, 216:7, 216:9, 223:21, 233:7, 234:25, 236:8, 236:9, 246:13, 252:10, 254:7, 266:1, 268:23, 276:8, 281:24, 283:2, 286:2, 296:12,

300:6, 301:13, 301:18, 313:1, 317:11, 317:16
**fish** [1] - 193:18
**five** [8] - 197:24, 198:9, 221:1, 242:4, 242:13, 250:8, 322:22
**five-plus** [1] - 221:1
**fixed** [1] - 313:19
**flip** [1] - 306:8
**FLSA** [2] - 229:12, 314:24
**fluent** [2] - 205:25, 319:22
**fluently** [1] - 162:16
**focus** [1] - 317:10
**focused** [1] - 293:21
**folks** [1] - 156:6
**follow** [2] - 299:7, 301:23
**followed** [1] - 235:1
**following** [1] - 325:13
**follows** [5] - 161:14, 180:19, 215:24, 233:9, 248:20
**food** [3] - 195:8, 205:22, 315:20
**foot** [2] - 195:9, 241:24
**FOR** [10] - 233:4, 248:15, 313:9, 317:14, 322:6, 327:9, 327:14, 327:19, 327:20, 327:20
**form** [4] - 205:7, 210:22, 223:20, 223:23
**formal** [1] - 309:9
**formally** [1] - 305:20
**former** [1] - 194:4
**formula** [1] - 321:25
**forth** [1] - 155:15
**forward** [1] - 156:7
**four** [9] - 170:20, 194:3, 234:3, 247:5, 257:18, 257:19, 283:25, 284:2, 284:4
**fourth** [1] - 204:19
**free** [1] - 257:7
**frequently** [2] - 233:23, 243:14
**Friday** [25] - 159:6, 184:2, 184:3, 184:10, 184:23, 185:19, 186:21, 186:23, 193:21, 194:16, 194:22, 200:21, 201:2,

201:5, 234:18, 235:19, 236:2, 258:17, 258:20, 285:14, 285:15, 286:24, 286:25, 297:9, 309:7
**Fridays** [3] - 187:4, 235:13, 236:25
**friend** [2] - 181:18, 248:5
**friendly** [1] - 318:2
**friends** [1] - 185:7
**front** [5] - 170:22, 272:18, 275:9, 304:25
**full** [7] - 156:11, 268:3, 268:7, 268:10, 290:13, 292:16, 292:19

## G

**game** [1] - 307:12
**gears** [1] - 258:14
**generally** [4] - 154:10, 235:2, 235:15, 265:20
**given** [10] - 159:4, 161:5, 164:3, 194:9, 223:21, 232:16, 256:11, 307:22, 317:5, 317:6
**glass** [1] - 221:8
**Gluszak** [12] - 232:22, 233:1, 233:13, 237:21, 238:18, 246:5, 260:1, 288:12, 288:14, 317:25, 322:12, 325:10
**GLUSZAK** [2] - 233:6, 327:10
**Goldstein** [3] - 153:4, 154:23, 237:23
**GOLDSTEIN** [66] - 152:17, 153:4, 154:24, 155:21, 156:17, 162:20, 164:23, 164:25, 165:17, 166:10, 166:21, 166:23, 167:8, 167:22, 170:5, 172:16, 173:17, 174:3, 174:10, 175:1, 175:11, 175:25, 176:12, 178:14, 180:10, 180:24, 189:10, 190:17, 190:23, 191:21, 192:6, 194:2,

194:14, 196:17, 198:18, 199:14, 200:13, 200:19, 201:13, 202:6, 202:25, 205:6, 207:9, 207:23, 208:3, 209:3, 211:8, 212:21, 214:15, 234:19, 237:20, 238:7, 238:13, 239:14, 239:19, 240:13, 241:9, 241:12, 241:17, 242:12, 242:18, 242:25, 246:2, 247:15, 248:10, 327:5, 327:12
**Gonzalez** [2] - 277:25, 278:1
**good-faith** [1] - 316:8
**government** [19] - 153:20, 154:4, 157:12, 158:20, 159:1, 159:9, 160:1, 160:11, 161:2, 167:11, 167:13, 167:22, 214:6, 226:24, 230:12, 300:24, 314:7, 314:12, 317:7
**GOVERNMENT** [2] - 313:9, 327:19
**government's** [1] - 159:21
**grant** [1] - 316:18
**granted** [5] - 292:18, 300:14, 305:13, 305:16
**gratitude** [1] - 322:19
**gray** [1] - 252:25
**greyish** [1] - 252:24
**grind** [1] - 317:25
**Gross** [2] - 268:15, 268:25
**gross** [3] - 268:17, 268:20, 269:4
**ground** [1] - 155:5
**grounds** [5] - 160:12, 164:24, 166:22, 196:10, 292:7
**group** [3] - 165:22, 217:23, 282:11
**guess** [10] - 155:18, 176:9, 230:1, 236:11, 239:10, 239:17, 282:22, 305:17, 310:10, 310:11
**guidelines** [1] - 287:6
**guilt** [1] - 322:20

**guy** [4] - 165:8, 168:25, 169:2, 171:22

## H

**half** [18] - 188:24, 198:8, 240:20, 240:23, 241:1, 257:20, 257:23, 267:21, 267:22, 268:3, 268:8, 268:11, 270:2, 270:6, 270:8, 270:14, 322:17
**hall** [2] - 310:6, 310:22
**handing** [1] - 305:3
**handle** [1] - 231:7
**handwriting** [7] - 250:21, 250:24, 253:12, 253:20, 253:22, 255:14, 301:21
**happy** [2] - 167:23, 228:25
**hard** [1] - 228:17
**harm** [26] - 153:22, 154:7, 154:16, 154:21, 155:8, 155:15, 155:19, 155:22, 156:8, 156:9, 156:24, 157:1, 157:5, 157:8, 157:11, 157:15, 157:19, 159:25, 160:2, 160:7, 160:9, 160:12, 160:18, 160:23, 161:1
**head** [2] - 163:13, 213:25
**hear** [11] - 169:12, 213:8, 242:9, 246:19, 294:20, 298:3, 298:16, 311:17, 317:6, 321:5
**heard** [10] - 155:20, 197:16, 300:9, 305:11, 307:1, 307:7, 314:15, 317:17, 317:24, 318:10
**hearing** [4] - 161:1, 167:3, 267:12, 268:6
**hearsay** [1] - 200:12
**heart** [1] - 313:15
**held** [1] - 216:12
**help** [1] - 154:22
**helpful** [1] - 312:6
**Hennefeld** [5] - 153:3, 215:25, 226:11,

228:12, 260:3
**HENNEFELD** [92] - 152:17, 153:2, 153:12, 159:13, 159:17, 207:18, 214:20, 214:25, 215:3, 215:7, 215:16, 215:19, 216:1, 216:3, 217:17, 221:21, 223:9, 223:13, 226:12, 227:9, 227:12, 228:13, 228:25, 229:16, 230:2, 230:10, 230:21, 231:1, 248:23, 248:25, 249:6, 249:8, 251:17, 251:20, 251:21, 255:1, 256:14, 256:17, 256:18, 256:21, 256:24, 259:16, 260:4, 260:15, 260:18, 260:20, 271:11, 271:17, 272:13, 273:13, 280:10, 280:23, 282:3, 282:7, 284:11, 286:12, 287:8, 287:22, 288:19, 288:25, 289:13, 290:19, 291:16, 292:5, 294:6, 294:19, 295:1, 296:10, 296:15, 298:20, 299:8, 299:16, 300:8, 305:2, 306:2, 308:9, 308:14, 309:3, 309:5, 310:16, 310:18, 312:7, 312:23, 313:2, 313:6, 313:11, 321:24, 322:3, 322:8, 325:8, 327:8, 327:16
**high** [2] - 153:17, 278:16
**highlighted** [6] - 291:18, 291:21, 292:3, 292:14, 292:21, 293:25
**highlighting** [1] - 251:7
**HILDA** [1] - 152:3
**himself** [1] - 299:6
**hire** [2] - 196:20, 322:24
**hired** [4] - 181:21,

181:25, 196:18, 315:12
**Hispanic** [3] - 287:11, 287:15, 287:17
**Hispanics** [1] - 287:19
**hmm** [1] - 277:10
**hold** [2] - 309:21, 312:16
**home** [2] - 170:14, 197:6
**Honestly** [1] - 205:12
**Honor** [87] - 153:12, 154:24, 155:21, 156:18, 159:13, 159:25, 161:8, 161:21, 167:22, 176:12, 178:14, 180:10, 190:17, 194:2, 200:13, 202:25, 214:15, 214:20, 215:11, 216:1, 217:11, 223:10, 226:12, 227:9, 228:13, 229:23, 230:2, 230:24, 231:1, 234:22, 238:7, 241:9, 241:12, 246:3, 246:11, 246:24, 248:10, 248:25, 251:20, 256:14, 260:4, 260:18, 271:17, 271:18, 285:7, 288:19, 289:1, 289:13, 291:13, 291:16, 291:22, 294:6, 294:19, 296:6, 296:10, 297:15, 298:20, 299:8, 300:8, 300:13, 300:14, 300:16, 306:2, 308:9, 308:14, 309:5, 309:17, 310:16, 310:18, 311:16, 312:7, 312:11, 312:24, 313:2, 313:3, 313:6, 316:20, 317:1, 317:3, 321:22, 321:24, 322:3, 325:9, 326:13, 326:14
**HONORABLE** [1] - 152:12
**Horacio** [18] - 166:17, 166:18, 166:19, 168:16, 169:12,

169:15, 169:19, 170:3, 170:16, 170:24, 170:25, 171:1, 171:17, 172:7, 172:15, 172:22, 172:25, 277:22
**Horacio's** [1] - 166:23
**host** [1] - 291:11
**Hour** [3] - 216:6, 216:8, 216:10
**hour** [7] - 247:11, 267:22, 268:3, 268:7, 268:10, 317:6
**hourly** [8] - 257:17, 257:22, 258:2, 269:5, 269:10, 269:15, 269:17, 270:9
**Hourly** [2] - 269:1, 269:6
**hours** [106] - 194:1, 194:8, 197:4, 197:10, 197:23, 203:20, 203:23, 203:25, 204:3, 205:5, 205:11, 205:13, 209:20, 210:2, 210:21, 210:23, 211:3, 211:7, 218:5, 224:23, 226:7, 226:10, 226:23, 227:5, 229:25, 234:15, 242:14, 244:22, 244:25, 247:11, 250:18, 250:20, 251:2, 251:10, 253:19, 257:17, 257:18, 257:19, 258:6, 258:7, 258:8, 258:9, 259:23, 261:16, 262:22, 263:5, 263:6, 263:12, 263:14, 263:17, 265:11, 267:1, 267:7, 267:8, 267:10, 267:11, 267:19, 269:3, 269:4, 269:15, 269:18, 269:23, 270:1, 270:3, 270:4, 270:11, 270:13, 273:25, 275:2, 275:4, 277:11, 277:23, 278:3, 278:14, 278:21, 278:24, 279:2, 279:15, 279:17,

279:21, 283:25, 284:2, 284:4, 284:10, 285:1, 287:20, 288:4, 288:6, 295:24, 313:17, 313:18, 313:21, 313:24, 314:13, 314:21, 317:22, 318:6, 318:9, 320:6, 320:7, 321:18, 321:19, 323:23, 323:25
**Hours** [2] - 266:25, 283:8, 283:21
**housekeeping** [1] - 215:1

## I

**idea** [3] - 242:11, 242:17, 321:2
**identical** [1] - 256:10
**identification** [1] - 176:9
**identify** [2] - 156:15, 253:14
**identities** [2] - 165:1, 165:2
**identity** [2] - 167:13, 167:14
**ignore** [1] - 291:15
**illegally** [1] - 154:14
**immediately** [1] - 299:5
**immigration** [11] - 153:18, 153:20, 153:24, 155:6, 155:9, 155:10, 155:16, 155:19, 160:3, 160:6, 161:4
**impedes** [1] - 156:2
**impolite** [1] - 280:8
**importance** [2] - 218:20, 324:25
**important** [14] - 168:4, 194:5, 194:7, 218:9, 218:11, 218:22, 219:2, 219:4, 219:6, 297:22, 324:9, 324:11, 324:25
**inability** [1] - 160:17
**inaccurate** [4] - 218:25, 260:12, 284:17, 314:3
**include** [4] - 158:8, 249:12, 260:21, 262:25
**included** [7] - 249:15, 249:18, 260:24, 261:2, 261:10,

277:1, 292:15
**includes** [1] - 318:16
**including** [3] - 308:10, 314:6, 314:11
**incorrectly** [1] - 175:24
**increase** [5] - 188:3, 188:5, 188:7, 188:14, 188:16
**independent** [1] - 167:6
**indicate** [2] - 210:13, 317:5
**indicated** [2] - 259:23, 294:16
**indicates** [1] - 311:13
**individual** [10] - 155:16, 166:2, 166:5, 167:13, 167:14, 168:13, 176:13, 176:15, 194:9, 297:5
**individually** [1] - 152:9
**individuals** [4] - 155:9, 156:10, 167:24, 168:11
**inferences** [4] - 295:17, 295:20, 315:1, 323:22
**informant** [3] - 167:17, 167:25, 168:2
**informant's** [1] - 282:10
**informants** [2] - 165:1, 167:21
**information** [27] - 165:21, 166:3, 167:3, 167:7, 168:10, 224:6, 251:2, 251:9, 253:1, 253:2, 253:11, 253:12, 262:21, 263:4, 263:12, 263:23, 264:10, 264:13, 264:16, 264:18, 264:21, 265:12, 265:20, 265:23, 274:3, 274:19, 278:25
**initial** [2] - 275:12, 296:25
**initiated** [1] - 283:1
**injunction** [49] - 154:19, 155:5, 155:23, 158:1, 158:8, 158:10, 158:11, 158:15, 158:16, 158:25,

160:14, 289:4, 290:20, 295:2, 296:13, 296:16, 296:17, 296:22, 297:16, 298:1, 298:4, 303:11, 304:13, 304:14, 304:19, 305:8, 305:9, 305:11, 305:13, 305:18, 305:22, 305:23, 305:24, 306:10, 306:21, 307:4, 308:4, 308:18, 308:21, 309:9, 309:14, 309:18, 309:23, 310:4, 311:10, 314:17, 316:11, 326:5
**injunctive** [9] - 297:21, 302:23, 302:25, 303:12, 303:14, 308:16, 316:15, 316:18
**ink** [2] - 251:9, 255:24
**inquire** [2] - 160:8, 167:9
**inquiry** [1] - 155:10
**inside** [1] - 319:4
**instance** [1] - 302:7
**intend** [4] - 159:2, 162:7, 289:6, 315:7
**intends** [2] - 155:4, 159:2
**intent** [1] - 300:18
**intention** [1] - 304:12
**interestingly** [1] - 319:21
**interferes** [1] - 156:5
**intermediary** [1] - 298:10
**interpreter** [5] - 178:16, 178:21, 181:6, 190:22, 191:19
**INTERPRETER** [4] - 189:5, 190:21, 191:16, 191:19
**Interpreter** [2] - 189:5, 191:16
**interpreters** [3] - 153:9, 161:14, 180:19
**interrogatory** [3] - 263:8, 264:6, 264:15
**interview** [4] - 217:19, 217:23, 218:1, 276:1
**interviewed** [3] - 217:22, 219:25, 274:17

**interviewing** [1] - 175:7
**interviews** [8] - 217:25, 218:13, 218:25, 219:2, 219:15, 274:4, 274:6, 274:9
**intimidating** [1] - 156:4
**intimidation** [4] - 155:25, 156:22, 157:3, 202:18
**investigate** [4] - 156:3, 216:15, 219:22, 298:13
**investigating** [1] - 217:9
**investigation** [20] - 156:2, 177:15, 177:18, 177:22, 197:17, 217:4, 217:18, 219:17, 219:24, 257:21, 257:25, 272:1, 282:20, 282:21, 282:23, 287:21, 288:3, 288:13, 298:24, 314:9
**investigations** [3] - 216:21, 218:2, 218:10
**investigator** [5] - 153:17, 216:11, 216:14, 216:15, 217:1
**inviting** [1] - 164:9
**involved** [2] - 166:2, 237:12
**irrelevant** [4] - 175:11, 282:14, 301:4, 323:13
**irreparable** [26] - 153:22, 154:7, 154:16, 154:20, 155:8, 155:15, 155:19, 155:22, 156:7, 156:9, 156:24, 157:1, 157:2, 157:5, 157:8, 157:11, 157:14, 157:19, 159:25, 160:1, 160:7, 160:9, 160:12, 160:18, 160:23, 161:1
**Island** [1] - 216:6
**Islip** [2] - 152:6, 152:22
**issue** [48] - 154:4, 154:9, 155:7, 155:17, 158:2,

158:24, 160:19, 165:19, 165:20, 166:1, 167:4, 167:23, 194:4, 225:13, 226:12, 226:14, 226:15, 227:2, 227:17, 260:6, 260:10, 282:9, 282:16, 296:3, 296:7, 296:12, 297:11, 297:14, 298:4, 299:10, 300:20, 304:18, 305:21, 306:7, 307:4, 307:13, 308:3, 309:24, 311:12, 315:4, 315:7, 315:23, 316:19, 322:23, 323:11, 324:4, 324:5, 326:6
**issued** [3] - 258:16, 297:5, 304:4
**issues** [10] - 154:25, 166:24, 168:9, 290:16, 290:20, 293:10, 306:4, 317:22, 321:17, 322:4
**issuing** [3] - 160:23, 298:4, 314:13
**ITALIAN** [1] - 152:8
**Italian** [9] - 163:22, 173:5, 173:13, 174:21, 179:17, 181:15, 203:21, 214:10, 234:11
**item** [2] - 163:6, 163:7
**items** [2] - 239:10, 239:16
**itself** [4] - 160:18, 232:6, 275:14, 275:17

---

**J**

**January** [7] - 165:12, 254:5, 255:3, 255:4, 255:9, 255:10, 255:17
**Jeffrey** [10] - 181:18, 181:19, 182:24, 183:3, 213:13, 250:5, 252:2, 254:1, 285:16, 319:7
**Jersey** [1] - 212:11
**job** [21] - 162:6, 179:25, 181:17, 181:22, 181:24, 182:6, 183:9, 183:11, 183:18,

191:4, 195:13, 196:2, 201:24, 201:25, 202:5, 202:15, 202:23, 213:7, 244:19, 244:22, 245:3
**jobs** [3] - 193:7, 195:7, 292:8
**Jorge** [2] - 277:25, 278:1
**Jose** [2] - 265:17, 278:5
**JOSE** [2] - 161:11, 327:2
**JOSEPH** [1] - 152:12
**Juan** [10] - 250:5, 252:2, 254:1, 275:20, 276:1, 286:13, 286:17, 318:11, 319:9
**JUAN** [2] - 180:16, 327:4
**judge** [45] - 154:11, 156:21, 167:15, 176:7, 178:4, 179:9, 193:22, 200:12, 209:22, 221:18, 226:3, 230:13, 238:5, 251:11, 254:19, 255:22, 259:18, 271:14, 281:2, 282:18, 284:25, 288:17, 289:21, 290:7, 292:17, 294:9, 300:9, 300:20, 301:6, 301:24, 305:2, 305:7, 306:24, 307:13, 310:5, 312:21, 317:12, 317:22, 318:4, 319:21, 320:13, 321:10, 321:13, 325:12, 326:2
**JUDGE** [1] - 152:13
**Judge** [8] - 153:14, 232:21, 289:8, 290:2, 310:7, 310:11, 311:2, 311:4
**judgment** [8] - 240:14, 240:16, 240:21, 240:22, 248:1, 318:1, 318:3, 322:17
**June** [6] - 216:9, 216:13, 217:5, 217:6, 217:12, 226:6
**justifiable** [1] - 303:6
**justification** [1] - 156:9

**justified** [2] - 155:13, 316:7
**justifies** [1] - 314:17
**justifying** [1] - 155:23

## K

**keep** [24] - 166:25, 185:3, 185:12, 197:9, 205:4, 205:10, 226:7, 226:23, 227:4, 228:22, 228:24, 236:24, 284:20, 284:24, 287:7, 299:19, 313:6, 313:11, 314:2, 315:1, 320:8, 320:12, 323:14, 323:18
**keeping** [7] - 155:13, 229:14, 229:24, 288:4, 288:10, 323:14, 323:15
**kept** [3] - 218:19, 225:5, 323:12
**key** [1] - 246:14
**keys** [4] - 190:19, 196:8, 196:12, 196:15
**kicked** [1] - 179:25
**kind** [4] - 183:6, 192:23, 193:1, 193:17
**kinds** [1] - 192:17
**kitchen** [37] - 163:9, 193:7, 193:20, 194:8, 194:15, 194:18, 194:21, 194:24, 195:2, 198:3, 200:7, 206:3, 206:4, 207:2, 235:11, 235:17, 236:10, 243:23, 244:2, 244:19, 244:23, 245:1, 249:17, 261:7, 275:21, 276:3, 276:11, 318:12, 318:13, 318:14, 318:16, 318:18, 319:6, 319:14, 319:16, 321:3, 323:4
**knowing** [4] - 320:5, 320:13, 320:14
**knowledge** [12] - 197:9, 224:7, 234:19, 242:19, 242:23, 242:24, 243:1, 243:3, 243:4, 243:7, 243:10,

307:18
**known** [1] - 233:16
**knows** [2] - 159:7, 297:11

## L

**labor** [3] - 216:16, 216:18, 218:7
**Labor** [43] - 152:4, 152:4, 153:3, 156:2, 156:23, 163:19, 165:10, 165:21, 172:25, 173:4, 173:12, 175:6, 176:4, 180:3, 197:22, 203:12, 205:3, 205:10, 208:23, 209:7, 209:11, 211:1, 216:5, 219:11, 227:1, 230:4, 237:24, 272:1, 273:17, 280:15, 284:10, 294:4, 294:24, 300:17, 302:19, 302:25, 306:17, 311:21, 319:19, 320:4, 320:9, 320:16, 324:18
**LABOR** [1] - 152:15
**Labor's** [3] - 197:17, 284:22, 295:19
**language** [9] - 162:19, 181:2, 189:24, 301:14, 301:18, 304:21, 305:4, 305:19, 320:2
**languages** [1] - 216:19
**Last** [1] - 262:11
**last** [20] - 159:20, 166:16, 176:25, 191:22, 193:23, 195:4, 198:12, 198:19, 213:23, 232:11, 235:5, 235:7, 242:13, 262:10, 277:9, 285:12, 293:4, 303:25, 308:6, 308:23
**late** [3] - 185:10, 186:6, 235:17
**lateness** [1] - 317:5
**law** [20] - 158:17, 159:6, 167:1, 218:15, 228:18, 228:19, 228:21, 232:8, 297:17,

297:21, 298:1, 300:12, 300:13, 303:3, 306:11, 311:23, 314:24, 323:19, 325:5
**laws** [6] - 216:16, 218:7, 296:2, 324:8, 324:12, 325:1
**lawsuit** [14] - 173:7, 174:20, 174:24, 175:10, 237:25, 238:4, 238:10, 238:15, 239:23, 239:25, 240:7, 302:1, 302:3, 314:10
**lawyer** [3] - 171:23, 177:6, 283:13
**leading** [2] - 198:15, 201:10
**learn** [2] - 211:4, 297:7
**learned** [1] - 174:20
**least** [6] - 210:14, 226:6, 247:5, 247:23, 285:2, 324:24
**leave** [20] - 186:18, 186:23, 187:2, 187:4, 194:24, 195:4, 235:25, 236:4, 236:9, 236:19, 237:1, 237:12, 267:13, 279:23, 279:24, 285:7, 322:2, 322:9, 324:10, 326:8
**leaves** [1] - 195:2
**leaving** [3] - 236:5, 236:17, 320:18
**left** [24] - 168:22, 170:13, 171:2, 183:16, 197:25, 211:14, 211:15, 236:15, 236:18, 243:8, 244:2, 245:6, 252:10, 254:9, 266:1, 266:5, 267:7, 267:16, 267:20, 279:18, 288:24, 317:21, 320:19, 322:10
**legal** [2] - 154:21, 301:21
**legally** [1] - 154:15
**lesson** [1] - 297:8
**letter** [5] - 181:13, 214:8, 256:5, 256:10, 311:7
**lie** [3] - 179:9, 314:11, 314:12

**lieu** [1] - 230:6
**light** [4] - 232:14, 252:25, 316:8, 324:7
**lighter** [1] - 252:24
**likely** [2] - 153:23, 160:2
**limine** [1] - 155:12
**limitations** [2] - 229:20, 318:7
**limited** [2] - 304:23, 308:20
**line** [17] - 226:4, 239:5, 239:6, 251:11, 284:13, 285:2, 292:13, 292:14, 292:15, 292:19, 293:2, 293:3, 293:8, 293:13, 318:21
**lines** [2] - 268:19, 292:19
**liquidated** [4] - 229:9, 229:19, 316:6, 316:8
**list** [2] - 225:9, 256:9
**listed** [1] - 262:10
**lists** [1] - 256:5
**litigate** [3] - 306:13, 317:2, 321:9
**litigated** [2] - 304:20, 305:6
**litigating** [1] - 326:7
**litigation** [1] - 320:6
**LNU** [1] - 262:10
**loan** [3] - 238:12, 239:9, 239:15
**log** [1] - 283:5
**look** [29] - 178:2, 204:13, 204:14, 209:15, 210:1, 210:3, 223:16, 224:1, 224:2, 224:3, 224:4, 224:5, 249:24, 249:25, 253:17, 254:17, 254:22, 255:12, 256:19, 257:7, 258:22, 264:3, 276:7, 277:1, 278:20, 281:4, 283:11, 290:14
**looked** [8] - 158:5, 252:4, 252:7, 252:10, 252:11, 254:2, 254:7, 258:10
**looking** [8] - 223:14, 224:15, 224:21, 225:2, 225:9, 249:9, 251:22, 257:9
**looks** [2] - 253:4, 253:14

**low** [1] - 279:3
**Luigi** [134] - 162:3, 162:11, 162:14, 162:18, 163:1, 163:17, 163:22, 169:3, 169:8, 171:24, 172:3, 173:4, 173:13, 174:14, 174:20, 174:21, 174:25, 175:9, 179:17, 181:15, 181:23, 181:24, 182:2, 182:9, 182:23, 183:4, 184:14, 187:17, 187:18, 187:21, 189:2, 189:22, 189:24, 190:10, 190:11, 190:24, 196:19, 196:25, 197:1, 197:2, 198:25, 199:2, 199:4, 199:11, 199:25, 200:7, 200:9, 200:15, 200:17, 201:2, 201:4, 201:8, 201:19, 202:8, 202:10, 203:20, 205:11, 205:18, 207:4, 210:18, 211:6, 211:15, 211:19, 211:22, 212:2, 212:6, 212:8, 212:15, 212:19, 213:3, 213:6, 213:8, 213:11, 213:14, 214:9, 214:10, 216:24, 217:2, 217:9, 217:18, 219:21, 223:21, 224:14, 224:20, 225:8, 225:21, 233:13, 233:18, 233:24, 234:6, 234:11, 235:9, 235:10, 236:23, 237:7, 237:13, 237:14, 238:10, 240:14, 243:18, 247:4, 248:5, 259:3, 262:18, 272:6, 272:9, 272:11, 273:5, 273:8, 273:9, 273:10, 273:16, 273:19, 273:23, 274:7, 275:12, 278:14, 280:3, 280:16, 283:12, 285:12, 285:17, 286:7, 287:1, 290:4,

13

291:6, 318:1, 318:2,
318:13, 319:4
**LUIGI** [2] - 152:8,
152:9
**Luigi's** [3] - 189:4,
200:11, 275:10
**lunch** [5] - 231:6,
231:8, 231:10,
247:14, 247:18

**M**

**mail** [4] - 237:7,
237:10, 237:13,
244:17
**mailman** [2] - 237:9,
237:11
**maintain** [1] - 281:16
**maintained** [1] -
281:13
**maker** - 192:23,
193:5
**malfeasance** [2] -
239:11, 239:17
**man** [11] - 166:15,
183:12, 188:8,
188:21, 195:14,
196:3, 197:3, 206:8,
206:11, 261:8
**management** [2] -
272:9, 315:16
**manager** [5] - 191:3,
191:23, 192:7,
192:12, 197:16
**managers** [2] -
191:12, 191:14
**managing** [1] - 323:9
**mandatory** [1] - 272:2
**map** [1] - 319:21
**March** [4] - 261:22,
262:14, 262:16,
262:20
**mark** [2] - 290:12
**marked** [4] - 176:8,
290:10, 290:11,
291:14
**markings** [1] - 291:12
**mas** [2] - 178:13,
178:20
**material** [1] - 155:13
**math** [4] - 211:2,
285:4, 285:6, 285:8
**matter** [4] - 231:7,
272:15, 289:2, 289:3
**matters** [1] - 321:10
**maximum** [1] - 306:7
**meal** [1] - 235:16
**mean** [30] - 154:9,
163:20, 169:23,
174:17, 177:6,

177:19, 179:19,
183:2, 188:9,
218:24, 220:3,
230:8, 262:10,
272:2, 272:16,
278:6, 278:8,
278:18, 278:19,
283:25, 284:18,
284:23, 285:19,
285:24, 288:6,
297:22, 302:10,
305:23, 305:24
**meaning** [1] - 298:1
**means** [3] - 178:23,
178:24, 301:22
**meant** [2] - 240:1,
274:13
**meats** [1] - 193:19
**mechanical** [1] -
152:25
**meet** [9] - 163:25,
234:6, 283:12,
284:5, 284:7,
313:23, 315:10,
316:7, 322:25
**meeting** [10] - 163:21,
165:15, 174:15,
179:1, 280:16,
283:14, 283:25,
284:3, 320:3, 320:4
**meetings** [1] - 282:11
**Melvin** [3] - 289:10,
290:23, 291:1
**memorialize** [1] -
320:17
**memory** [3] - 205:14,
210:9, 211:24
**mention** [2] - 201:2,
322:20, 322:24
**mentioned** [1] - 316:1
**merely** [1] - 299:14
**merits** [2] - 308:20,
315:10
**met** [8] - 168:16,
174:18, 175:10,
219:25, 223:21,
275:12, 278:19,
280:3
**Met** [1] - 283:11
**methodology** [2] -
267:24, 271:7
**methods** [1] - 271:8
**microphone** [1] -
324:22
**middle** [1] - 225:4
**might** [12] - 202:15,
212:23, 234:25,
279:2, 280:19,
284:7, 288:16,
289:20, 293:21,

307:18, 322:3, 326:1
**million** [4] - 240:20,
240:23, 241:1,
322:17
**mind** [1] - 158:4
**Mineola** [1] - 152:19
**Minimum** [3] - 269:6,
269:12, 270:15
**minimum** [17] -
208:21, 216:17,
260:10, 269:8,
269:9, 269:15,
269:17, 269:25,
270:10, 270:11,
270:14, 270:17,
270:25, 296:1,
302:11, 313:23,
320:7
**minor** [1] - 289:2
**minus** [3] - 266:24,
269:9, 270:4
**minute** [2] - 203:1,
306:9
**minutes** [3] - 214:21,
311:5, 324:23
**mischaracterizes** [1] -
162:20
**misconduct** [1] -
158:13
**misread** [1] - 239:13
**misrepresentation** [2]
- 239:11, 239:17
**misrepresented** [2] -
238:3, 238:14
**miss** [8] - 212:8,
249:9, 255:2,
256:19, 256:25,
258:15, 261:19,
262:9
**Miss** [53] - 163:21,
164:4, 164:12,
164:22, 165:16,
166:19, 168:13,
168:16, 168:20,
169:9, 169:10,
169:13, 169:15,
169:18, 169:22,
169:25, 170:4,
170:9, 170:21,
171:7, 171:10,
171:17, 171:20,
172:3, 172:8, 173:3,
173:8, 174:8,
174:15, 174:18,
174:22, 174:24,
175:10, 175:14,
175:17, 176:3,
177:16, 177:20,
178:25, 203:11,
203:25, 216:4,

217:18, 219:17,
223:14, 226:18,
249:24, 251:22,
257:9, 260:21,
271:23, 285:13,
321:1
**missed** [2] - 212:10,
249:5
**misunderstanding** [2]
- 285:25, 297:3
**mixture** [1] - 322:19
**modified** [2] - 292:22,
294:1
**moment** [9] - 160:16,
170:25, 175:16,
222:2, 223:9,
228:14, 271:17,
275:3, 275:13
**Monday** [20] - 184:2,
184:3, 184:10,
184:23, 185:19,
186:8, 186:14,
186:18, 193:21,
194:16, 194:22,
199:3, 199:19,
199:21, 234:18,
235:19, 236:2,
304:7, 317:20,
325:13
**Mondays** [2] - 235:13,
236:25
**monetary** [1] - 157:2
**money** [6] - 176:4,
208:13, 214:10,
306:13, 326:2, 326:7
**month** [5] - 185:11,
186:13, 186:16,
247:3, 247:7
**months** [8] - 182:20,
182:22, 188:22,
190:13, 191:10,
191:22, 193:16,
211:23
**moot** [4] - 300:21,
301:4, 303:4, 303:15
**mopping** [1] - 193:3
**morning** [28] - 153:7,
153:8, 161:25,
162:1, 180:25,
181:1, 184:10,
184:13, 190:12,
192:18, 192:21,
192:24, 193:2,
193:21, 194:16,
194:19, 203:1,
203:9, 203:10,
220:22, 220:25,
221:3, 221:11,
221:17, 221:25,
222:4, 246:7, 250:10

**most** [4] - 279:6,
295:16, 314:13,
319:14
**motion** [15] - 155:12,
289:4, 290:20,
295:2, 296:15,
296:24, 303:11,
305:15, 309:9,
309:10, 309:11,
310:4, 311:9, 326:5
**motive** [1] - 238:8
**Mount** [1] - 314:24
**move** [4] - 204:18,
227:9, 259:16, 295:8
**moves** [1] - 271:11
**MR** [270] - 153:2,
153:6, 153:12,
153:14, 154:11,
154:18, 156:21,
157:16, 159:13,
159:17, 159:18,
161:8, 161:21,
161:24, 162:24,
165:5, 166:4,
166:13, 167:15,
168:15, 170:8,
172:21, 173:21,
174:5, 174:7,
174:13, 175:4,
175:22, 176:2,
176:7, 176:18,
176:24, 178:3,
178:8, 178:19,
178:22, 180:8,
189:7, 190:15,
192:3, 193:22,
196:9, 196:11,
198:15, 200:12,
201:10, 202:1,
202:16, 203:5,
203:8, 204:9,
204:12, 205:8,
207:10, 207:11,
207:18, 207:20,
207:25, 208:7,
208:8, 209:6,
209:21, 209:23,
211:9, 211:13,
212:25, 213:1,
214:13, 214:20,
214:25, 215:3,
215:7, 215:11,
215:16, 215:19,
216:1, 216:3,
217:11, 217:13,
217:17, 221:18,
221:21, 223:9,
223:13, 226:3,
226:12, 227:9,
227:12, 227:17,

227:22, 227:25,
228:6, 228:13,
228:21, 228:25,
229:8, 229:16,
229:23, 230:2,
230:10, 230:13,
230:21, 230:24,
231:1, 232:21,
232:25, 233:12,
235:4, 237:16,
238:5, 239:13,
240:8, 240:10,
241:8, 241:11,
242:15, 246:24,
247:2, 247:19,
248:8, 248:23,
248:25, 249:5,
249:6, 249:7, 249:8,
251:11, 251:17,
251:20, 251:21,
254:19, 255:1,
255:19, 256:14,
256:17, 256:18,
256:21, 256:24,
259:7, 259:9,
259:16, 259:18,
260:4, 260:15,
260:18, 260:20,
271:11, 271:14,
271:17, 271:22,
272:13, 272:17,
273:13, 273:15,
280:10, 280:12,
280:23, 281:2,
281:3, 282:3, 282:5,
282:7, 282:17,
282:22, 283:3,
284:11, 284:14,
284:20, 284:25,
285:7, 285:11,
286:12, 286:15,
287:8, 287:10,
287:22, 288:2,
288:17, 288:19,
288:25, 289:8,
289:13, 289:20,
289:24, 290:2,
290:4, 290:9,
290:19, 290:22,
290:25, 291:4,
291:16, 291:22,
292:5, 292:16,
294:6, 294:8,
294:12, 294:19,
294:20, 294:23,
295:1, 295:8,
295:10, 296:6,
296:10, 296:15,
298:20, 299:8,
299:16, 300:8,
300:9, 300:11,

302:10, 303:17,
304:11, 305:2,
305:7, 305:23,
306:1, 306:2,
306:15, 306:23,
307:9, 308:3, 308:6,
308:8, 308:9,
308:14, 308:17,
308:25, 309:3,
309:5, 309:16,
310:2, 310:5,
310:10, 310:15,
310:16, 310:18,
311:16, 312:7,
312:11, 312:20,
312:23, 313:2,
313:6, 313:11,
317:1, 317:11,
317:16, 321:8,
321:24, 322:3,
322:8, 325:8,
325:11, 325:15,
325:18, 325:22,
325:25, 326:13,
326:21, 327:3,
327:6, 327:8,
327:11, 327:13,
327:16, 327:17
**MS** [65] - 153:4,
154:24, 155:21,
156:17, 162:20,
164:23, 164:25,
165:17, 166:10,
166:21, 166:23,
167:8, 167:22,
170:5, 172:16,
173:17, 174:3,
174:10, 175:1,
175:11, 175:25,
176:12, 178:14,
180:10, 180:24,
189:10, 190:17,
190:23, 191:21,
192:6, 194:2,
194:14, 196:17,
198:18, 200:13,
200:19, 201:13,
202:6, 202:25,
205:6, 207:9,
207:23, 208:3,
209:3, 211:8,
212:21, 214:15,
234:19, 237:20,
238:7, 238:13,
239:14, 239:19,
240:13, 241:9,
241:12, 241:17,
242:12, 242:18,
242:25, 246:2,
247:15, 248:10,
327:5, 327:12

**multiple** [1] - 315:14
**must** [2] - 164:3,
276:4

## N

**Name** [1] - 262:11
**name** [21] - 165:7,
165:15, 166:1,
166:16, 166:17,
169:1, 176:14,
176:18, 177:1,
177:3, 177:5,
178:10, 178:15,
191:14, 193:12,
202:12, 237:23,
276:21, 277:6, 277:9
**named** [3] - 195:10,
195:25, 277:22
**names** [1] - 262:10
**Naranjo** [1] - 195:11
**NARDO** [180] - 152:18,
153:6, 153:14,
154:11, 154:18,
156:21, 157:16,
159:18, 161:8,
161:21, 161:24,
162:24, 165:5,
166:4, 166:13,
167:15, 168:15,
170:8, 172:21,
173:21, 174:5,
174:7, 174:13,
175:4, 175:13,
176:2, 176:7,
176:18, 176:24,
178:3, 178:8,
178:19, 178:22,
180:8, 189:7,
190:15, 192:3,
193:22, 196:9,
196:11, 198:15,
200:12, 201:10,
202:1, 202:16,
203:5, 203:8, 204:9,
204:12, 205:8,
207:10, 207:11,
207:20, 207:25,
208:7, 208:8, 209:6,
209:21, 209:23,
211:9, 211:13,
212:25, 213:1,
214:13, 215:11,
217:11, 217:13,
221:18, 226:3,
227:17, 227:22,
227:25, 228:6,
228:21, 229:8,
229:23, 230:13,
230:24, 232:21,
232:25, 233:12,

235:4, 237:16,
238:5, 239:13,
240:8, 240:10,
241:8, 241:11,
242:15, 246:24,
247:2, 247:19,
248:8, 249:5, 249:7,
251:11, 254:19,
255:19, 259:7,
259:9, 259:18,
271:14, 271:22,
272:17, 273:15,
280:12, 281:2,
281:3, 282:5,
282:17, 282:22,
283:3, 284:14,
284:20, 284:25,
285:7, 285:11,
286:15, 287:10,
288:2, 288:17,
289:8, 289:20,
289:24, 290:2,
290:4, 290:9,
290:22, 290:25,
291:4, 291:22,
292:16, 294:8,
294:12, 294:20,
294:23, 295:8,
295:10, 296:6,
300:9, 300:11,
302:10, 303:17,
304:11, 305:7,
305:23, 306:1,
306:15, 306:23,
307:9, 308:3, 308:6,
308:8, 308:17,
308:25, 309:16,
310:2, 310:5,
310:10, 310:15,
311:16, 312:11,
312:20, 317:1,
317:11, 317:16,
321:8, 325:11,
325:15, 325:18,
325:22, 325:25,
326:13, 326:21,
327:3, 327:6,
327:11, 327:13,
327:17
**Nardo** [23] - 153:6,
159:7, 161:20,
167:9, 167:12,
172:18, 203:4,
212:24, 229:18,
271:24, 292:12,
298:4, 306:8, 311:7,
311:11, 312:8,
316:23, 316:25,
322:12, 322:23,
323:5, 324:6, 326:19
**Nardo's** [2] - 154:25,

323:3
**nature** [1] - 241:14
**near** [5] - 224:15,
224:21, 225:4,
233:20, 322:21
**necessarily** [2] -
243:18, 284:1
**necessary** [2] - 159:4,
301:11
**need** [20] - 153:10,
157:1, 163:6,
185:11, 218:24,
221:22, 230:16,
230:17, 230:18,
236:24, 251:19,
256:6, 260:14,
283:2, 285:9,
297:13, 299:12,
299:13, 306:3
**needed** [6] - 156:17,
182:25, 183:4,
189:2, 205:21, 220:9
**needs** [1] - 163:10
**nervous** [1] - 202:24
**never** [16] - 158:11,
209:1, 223:8,
245:11, 245:14,
273:22, 275:19,
277:11, 277:14,
280:6, 280:8,
288:14, 300:18,
301:8, 317:20,
322:14
**NEW** [1] - 152:1
**new** [3] - 237:11,
299:24, 307:15
**New** [5] - 152:16,
152:19, 152:22,
212:11
**next** [32] - 157:17,
159:23, 163:24,
180:13, 188:16,
210:1, 210:3,
214:19, 214:21,
215:1, 215:16,
233:21, 237:8,
240:12, 246:12,
266:4, 266:13,
266:22, 266:25,
268:15, 268:25,
269:6, 269:12,
269:20, 270:15,
270:19, 283:4,
297:9, 309:22,
310:6, 310:19, 326:4
**night** [2] - 267:13,
297:9
**nights** [2] - 322:10,
322:11
**nine** [3] - 182:22,

15

193:16, 211:23
**noncompliance** [1] - 314:8
**none** [1] - 274:1
**nonexempt** [1] - 280:21
**nontestifying** [1] - 167:25
**normal** [3] - 186:13, 284:9, 302:5
**normally** [2] - 236:9, 291:13
**note** [1] - 316:14
**noted** [2] - 226:22, 304:22
**notes** [2] - 274:9, 284:4
**Nothing** [1] - 271:18
**nothing** [8] - 180:8, 202:25, 214:13, 237:16, 246:2, 248:8, 288:17, 301:23
**notwithstanding** [3] - 226:22, 227:3, 232:4
**November** [5] - 250:3, 251:25, 255:7, 255:13, 255:16
**number** [10] - 164:3, 224:23, 258:5, 258:8, 258:9, 266:11, 267:1, 271:3, 318:22, 321:19
**numbers** [2] - 313:24, 318:22
**numerous** [3] - 155:15, 194:9, 237:10
**NY** [1] - 152:6

## O

**o'clock** [22] - 184:17, 184:18, 185:2, 185:3, 185:6, 186:10, 186:11, 186:14, 186:18, 186:22, 186:23, 187:1, 187:2, 187:4, 194:20, 197:25, 235:3, 235:19, 235:24, 236:6, 236:11, 246:19
**oath** [4] - 161:16, 239:3, 240:5, 240:10
**obey** [5] - 297:17, 297:21, 298:1, 306:10
**object** [2] - 176:14,

226:3
**objecting** [1] - 305:18
**objection** [75] - 162:20, 164:23, 165:17, 166:10, 166:21, 167:11, 170:5, 172:16, 173:17, 174:3, 174:10, 175:1, 175:11, 175:25, 178:14, 189:7, 190:15, 192:3, 193:22, 194:12, 196:9, 198:15, 200:12, 201:10, 202:1, 202:16, 205:6, 207:9, 207:18, 207:23, 208:3, 209:3, 211:8, 212:21, 217:11, 221:18, 226:21, 234:19, 238:5, 239:13, 240:8, 240:9, 241:8, 242:15, 251:11, 254:19, 255:18, 255:19, 259:7, 259:8, 259:17, 259:18, 271:13, 271:14, 272:13, 273:13, 280:10, 280:23, 282:3, 282:7, 284:11, 286:12, 287:8, 287:22, 289:12, 289:14, 290:5, 290:22, 292:10, 292:12, 292:25, 293:7, 293:12, 293:15, 293:20
**Objection** [1] - 247:15
**objections** [5] - 215:5, 290:24, 291:2, 291:25, 292:6
**obligation** [1] - 320:13
**observation** [1] - 196:14
**observations** [8] - 220:12, 234:21, 235:6, 236:14, 237:4, 250:21, 252:14, 274:2
**observe** [22] - 220:16, 220:21, 220:24, 221:10, 221:16, 221:24, 222:11, 222:17, 222:19, 222:22, 222:25, 223:3, 223:6, 235:18, 235:25,

236:14, 250:24, 252:17, 253:7, 253:10, 254:10, 254:13
**observed** [7] - 220:4, 220:6, 221:2, 221:13, 222:14, 287:11, 287:15
**observing** [1] - 222:2
**Obviously** [1] - 298:9
**obviously** [9] - 154:6, 298:17, 299:3, 304:21, 306:12, 307:15, 308:1, 309:13, 312:25
**occasion** [4] - 179:6, 197:21, 203:19, 204:1
**occasions** [1] - 237:10
**occupation** [2] - 263:19, 263:21
**occur** [5] - 175:5, 205:4, 237:3, 283:17, 283:19
**occurred** [3] - 165:12, 235:21, 302:14
**occurring** [1] - 324:20
**occurs** [1] - 167:20
**October** [1] - 205:3
**OF** [3] - 152:1, 152:12, 152:15
**offer** [1] - 226:16
**offered** [2] - 227:6, 227:7
**offering** [1] - 227:8
**Office** [1] - 152:15
**office** [6] - 216:6, 233:20, 233:21, 238:20, 246:12, 301:9
**often** [9] - 187:7, 205:20, 233:22, 234:3, 243:20, 247:3, 247:12, 247:22, 322:9
**Omar** [8] - 191:1, 191:2, 191:7, 191:9, 191:12, 191:25, 192:7, 192:11
**once** [10] - 161:1, 167:17, 167:18, 185:13, 186:15, 186:16, 187:8, 298:24, 316:4, 320:4
**one** [47] - 153:14, 166:5, 167:17, 171:15, 172:19, 174:11, 192:14, 197:21, 202:9,

202:10, 206:6, 206:10, 212:7, 212:10, 223:9, 228:14, 229:16, 232:11, 234:25, 236:9, 239:10, 239:16, 246:13, 252:24, 253:3, 255:24, 256:9, 262:9, 266:16, 266:18, 271:17, 278:13, 282:21, 283:2, 289:2, 289:13, 290:2, 293:5, 312:5, 315:4, 315:21, 316:22, 322:14, 323:7, 323:20, 326:15
**ones** [2] - 170:18, 284:25
**open** [9] - 223:14, 223:15, 234:5, 235:17, 236:16, 236:24, 237:14, 246:16, 246:18
**opened** [4] - 154:4, 154:9, 236:9, 236:10
**opening** [3] - 155:6, 317:6, 324:23
**opens** [1] - 190:8
**operation** [1] - 242:14
**operations** [1] - 234:8
**opinion** [1] - 175:23
**opportunity** [3] - 298:6, 298:8, 311:25
**opposed** [1] - 259:25
**option** [2] - 310:19, 312:14
**oral** [1] - 309:10
**orally** [1] - 305:16
**Order** [1] - 153:1
**order** [20] - 153:19, 154:8, 185:9, 205:21, 230:14, 232:22, 258:16, 258:19, 297:14, 297:17, 301:7, 301:8, 301:10, 301:12, 301:19, 304:5, 311:12, 326:16
**orders** [1] - 191:6
**ordinary** [1] - 281:13
**original** [8] - 252:22, 253:13, 255:12, 255:14, 255:16, 255:24, 279:25
**originally** [1] - 196:3
**outcome** [1] - 311:19
**outweighs** [1] - 166:1

**overheard** [1] - 197:21
**overlapping** [1] - 296:23
**overrule** [2] - 293:14, 293:20
**Overruled** [3] - 190:20, 247:17, 286:14
**overruled** [16] - 162:22, 165:3, 166:11, 170:6, 173:18, 175:2, 189:8, 192:4, 194:12, 198:16, 201:11, 202:2, 217:15, 221:20, 273:14, 280:11
**Overtime** [2] - 269:20, 270:19
**overtime** [42] - 182:9, 208:18, 208:24, 209:2, 209:8, 209:12, 209:20, 210:4, 210:15, 210:19, 210:21, 210:23, 211:3, 211:7, 211:10, 216:17, 218:17, 257:18, 257:20, 258:22, 259:20, 259:23, 269:22, 270:1, 270:4, 270:7, 270:21, 271:1, 274:14, 274:22, 274:25, 275:4, 275:5, 280:15, 296:2, 302:12, 313:17, 313:18, 320:7
**overwhelming** [2] - 313:12, 315:24
**owe** [2] - 240:19, 240:25
**owed** [4] - 271:1, 271:5, 293:5, 314:19
**owes** [1] - 214:10
**own** [8] - 165:23, 167:7, 234:20, 241:20, 284:21, 285:10, 306:4, 323:18
**Owner** [1] - 152:9
**owner** [2] - 200:15, 324:10
**owners** [1] - 325:1

## P

**page** [90] - 153:22, 159:21, 176:9,

176:15, 176:25,
178:2, 204:14,
204:15, 204:18,
204:19, 204:21,
204:24, 209:16,
210:11, 224:4,
224:5, 224:15,
224:21, 225:2,
225:4, 225:9, 250:2,
250:6, 250:22,
250:25, 252:3,
252:7, 252:9,
252:11, 252:18,
252:22, 253:1,
253:2, 253:5, 253:6,
253:13, 253:23,
253:24, 254:7,
254:9, 254:10,
254:12, 254:15,
255:2, 255:3, 255:6,
255:8, 255:13,
256:13, 257:9,
257:13, 258:4,
262:1, 262:12,
265:14, 265:17,
266:1, 271:3, 271:8,
276:8, 276:9,
281:18, 283:4,
290:10, 291:5,
291:8, 292:12,
292:19, 293:1,
293:2, 293:8,
293:13, 293:14,
318:21, 318:22
**Page** [8] - 239:5,
239:6, 249:24,
251:23, 251:24,
252:21, 253:6, 292:6
**Pages** [1] - 254:17
**pages** [13] - 176:11,
252:15, 252:17,
253:8, 254:11,
254:14, 254:20,
254:23, 256:5,
290:2, 290:5,
291:11, 292:11
**paid** [38] - 175:15,
175:18, 175:19,
175:23, 187:9,
187:12, 187:14,
187:18, 187:22,
189:14, 208:18,
208:21, 208:24,
209:2, 209:8,
209:20, 209:25,
210:4, 210:14,
210:18, 218:6,
218:8, 218:16,
218:17, 218:18,
245:8, 247:6,
257:22, 259:21,

260:7, 264:16,
268:23, 274:14,
274:22, 274:24,
275:4, 275:5, 321:8
**paper** [4] - 224:2,
224:3, 225:3, 257:7
**papers** [6] - 153:19,
155:9, 155:14,
160:12, 160:16,
309:24
**paperwork** [1] - 234:7
**paragraph** [1] - 226:5
**park** [1] - 221:5
**parking** [11] - 163:21,
163:23, 168:17,
172:2, 172:6,
174:19, 220:14,
222:16, 272:23,
274:6
**part** [11] - 165:22,
172:2, 178:9,
187:15, 276:2,
280:13, 290:11,
306:21, 306:23,
307:1
**participate** [2] -
219:11, 310:19
**particular** [8] - 154:9,
154:12, 156:5,
159:11, 253:14,
287:25, 312:4,
313:15
**particularly** [3] -
153:23, 160:2, 194:9
**parties** [3] - 302:21,
302:23, 324:16
**party** [1] - 321:12
**passed** [3] - 182:20,
306:16, 306:19
**past** [7] - 185:3, 185:6,
185:12, 186:7,
317:20, 322:9,
322:10
**pasta** [7] - 183:19,
183:20, 193:5,
195:14, 196:3,
206:13, 206:20
**pastas** [2] - 206:21,
206:23
**pastor** [1] - 319:3
**Pastor** [38] - 163:2,
163:4, 163:6,
195:25, 196:5,
196:8, 196:12,
196:15, 197:2,
197:4, 197:6, 206:2,
206:8, 206:15,
206:17, 206:20,
206:23, 207:1,
212:19, 213:6,

213:9, 213:10,
213:12, 213:25,
275:21, 276:3,
276:10, 277:21,
280:14, 280:19,
288:15, 318:12,
319:5, 319:7, 319:9,
319:14, 321:1, 323:3
**Pastor's** [2] - 196:2,
323:10
**patrons** [1] - 237:5
**pause** [3] - 214:24,
228:16, 316:24
**Pay** [2] - 268:15,
268:25
**pay** [29] - 182:4,
182:9, 188:3, 188:5,
188:7, 188:14,
188:16, 188:20,
189:20, 189:23,
211:10, 224:16,
224:22, 224:23,
244:11, 262:4,
263:24, 268:17,
268:20, 269:4,
274:20, 277:14,
293:3, 306:13,
313:19, 313:20,
314:22, 314:23,
316:12
**paying** [2] - 211:7,
313:19
**payment** [1] - 293:4
**payments** [3] -
244:13, 245:11,
245:14
**payroll** [15] - 220:1,
228:1, 228:9,
228:23, 229:24,
259:3, 259:5,
259:22, 260:5,
260:21, 260:24,
261:3, 261:11, 277:1
**pays** [1] - 187:16
**pen** [5] - 251:1, 251:8,
251:9, 252:25
**penalty** [2] - 229:9,
229:13
**pencil** [4] - 251:3,
251:8, 251:10,
252:24
**pending** [1] - 307:2
**penny** [1] - 265:7
**people** [17] - 156:6,
157:6, 157:9,
160:17, 167:1,
167:18, 171:14,
185:9, 192:2,
235:14, 235:15,
245:18, 245:22,

246:6, 264:17,
279:9, 307:18
**peppered** [1] - 293:15
**per** [15] - 187:23,
187:24, 188:9,
188:11, 188:18,
212:5, 212:7,
216:22, 247:3,
258:6, 279:16,
313:18, 313:22,
313:24
**performing** [3] -
222:3, 222:6, 315:18
**perhaps** [1] - 193:25
**period** [18] - 182:15,
189:6, 192:7,
211:18, 211:21,
213:2, 224:23,
226:6, 234:14,
236:21, 250:1,
251:24, 254:4,
255:3, 266:2,
266:17, 306:7,
307:16
**periods** [1] - 314:23
**permanent** [19] -
155:5, 158:8, 158:9,
296:16, 302:25,
303:14, 305:9,
305:10, 305:13,
305:22, 306:20,
308:4, 308:7,
308:16, 309:17,
314:17, 316:10,
316:15, 316:18
**permitted** [1] - 194:7
**person** [8] - 166:8,
167:6, 167:9,
167:10, 169:2,
171:21, 287:17,
319:15
**personal** [12] - 196:14,
234:19, 238:11,
242:19, 242:24,
243:1, 243:3, 243:4,
243:7, 243:10,
274:1, 276:1
**personally** [4] - 235:9,
275:9, 286:19, 297:6
**pertaining** [1] - 216:17
**phase** [1] - 287:21
**phone** [10] - 164:5,
203:14, 212:12,
213:12, 286:21,
286:22, 310:8,
310:19, 310:21,
326:4
**photocopies** [2] -
254:14, 254:24
**photocopy** [5] -

252:18, 253:13,
253:23, 254:12
**piece** [1] - 324:23
**pizzeria** [1] - 163:24
**place** [7] - 157:22,
189:19, 236:4,
236:11, 295:14,
299:2, 317:18
**placed** [1] - 157:10
**placing** [1] - 310:25
**PLAINTIFF** [6] -
248:15, 295:4,
322:6, 327:14,
327:18, 327:20
**Plaintiff** [13] - 152:5,
152:15, 161:12,
180:17, 215:14,
227:16, 271:11,
327:23, 327:23,
327:24, 327:24,
327:25, 327:25
**plaintiff** [7] - 153:2,
153:5, 215:22,
248:18, 292:2,
295:17, 314:20
**plaintiff's** [3] - 248:13,
290:22, 295:18
**Plaintiff's** [19] -
215:12, 223:16,
223:17, 225:16,
227:12, 248:24,
256:19, 258:23,
258:24, 260:13,
260:19, 261:19,
261:20, 264:1,
271:15, 271:16,
278:20, 292:24,
294:2
**plaintiffs** [2] - 295:22,
312:25
**Plaintiffs** [1] - 249:2
**planning** [1] - 198:20
**play** [1] - 160:7
**Plaza** [1] - 152:22
**pleadings** [1] - 300:3
**pleasure** [2] - 317:2,
326:12
**plus** [1] - 221:1
**PM** [1] - 232:2
**pm** [21] - 184:21,
185:12, 185:14,
223:5, 231:10,
235:15, 237:1,
237:15, 245:18,
245:25, 250:14,
250:17, 267:5,
267:6, 267:21,
291:24, 317:20,
326:22
**point** [23] - 159:11,

159:20, 161:3, 171:1, 172:7, 194:11, 203:16, 211:14, 214:3, 233:24, 234:12, 237:7, 247:24, 249:1, 278:13, 279:2, 280:18, 287:11, 312:18, 320:8, 320:11, 320:16
**pointed** [2] - 297:15, 323:17
**policies** [1] - 224:17
**portion** [8] - 178:17, 281:9, 281:11, 290:23, 290:25, 291:3, 291:18, 306:16
**portions** [7] - 289:19, 291:1, 291:20, 292:3, 292:21, 293:25, 294:15
**position** [8] - 161:5, 166:8, 166:14, 216:10, 216:12, 225:11, 278:1, 296:9
**positions** [2] - 194:8, 194:10
**possible** [3] - 194:6, 242:13, 313:7
**post** [1] - 256:10
**posttermination** [1] - 154:1
**posture** [1] - 159:4
**potential** [5] - 158:25, 160:12, 168:9, 241:16, 322:16
**potentially** [1] - 165:23
**power** [2] - 297:23, 298:2
**precise** [1] - 265:6
**prefer** [3] - 305:21, 305:25, 306:1
**preference** [1] - 312:20
**prejudicial** [1] - 155:12
**preliminary** [26] - 158:1, 158:25, 160:13, 289:4, 290:19, 295:2, 296:13, 296:16, 296:22, 303:11, 304:13, 304:19, 305:8, 305:18, 305:23, 305:24, 307:4, 308:17, 308:21, 309:9,

309:14, 309:22, 310:4, 311:10, 326:5
**premium** [2] - 313:19, 313:20
**premiums** [1] - 224:22
**prepare** [2] - 281:6, 312:17
**prepared** [3] - 255:12, 255:20, 255:22
**preparing** [3] - 193:18, 275:25, 315:19
**presence** [1] - 168:14
**present** [7] - 167:17, 168:2, 182:15, 198:4, 257:3, 262:20, 288:9
**presented** [4] - 276:18, 313:12, 313:14, 314:5
**preside** [1] - 326:12
**President** [1] - 224:20
**pressure** [3] - 202:18, 202:20, 214:3
**pretty** [2] - 160:15, 232:9
**prevent** [1] - 157:7
**prevented** [2] - 300:15, 304:3
**prevents** [1] - 157:22
**previous** [1] - 155:12
**previously** [6] - 153:16, 161:12, 196:6, 248:18, 256:25, 278:24
**primarily** [1] - 315:19
**primary** [3] - 181:2, 315:16, 323:10
**private** [7] - 300:23, 302:21, 302:22, 321:9, 321:12, 321:15, 325:25
**privilege** [9] - 167:17, 167:19, 167:23, 240:1, 240:3, 240:6, 240:11, 282:10, 282:15
**privileged** [3] - 166:25, 167:14, 282:24
**privileges** [1] - 167:16
**probative** [2] - 165:25, 194:11
**procedural** [1] - 307:9
**procedure** [2] - 299:6, 301:23
**proceed** [2] - 153:11, 203:4
**proceedings** [3] - 214:24, 228:16,

316:24
**Proceedings** [2] - 152:25, 326:22
**produce** [3] - 219:8, 249:21, 314:3
**produced** [6] - 152:25, 225:25, 226:17, 226:25, 230:3, 249:3
**production** [1] - 226:13
**progression** [1] - 246:20
**projector** [1] - 214:21
**promote** [1] - 197:3
**promoted** [1] - 196:23
**proof** [2] - 232:12, 308:1
**proper** [2] - 240:2, 301:23
**properly** [1] - 259:21
**proposed** [3] - 299:4, 311:22, 325:4
**proposing** [1] - 308:9
**prospect** [1] - 320:23
**protect** [2] - 297:14, 297:24
**prove** [1] - 157:12
**proven** [2] - 260:11, 308:22
**provide** [2] - 225:14, 256:9
**provided** [6] - 168:10, 225:21, 283:12, 291:16, 314:20, 316:5
**providing** [2] - 167:3, 167:6
**provision** [4] - 303:1, 303:2, 306:20, 316:8
**public** [1] - 282:18
**pulled** [1] - 270:10
**punch** [1] - 197:12
**punched** [1] - 197:14
**punitive** [5] - 155:4, 308:10, 308:12, 308:15, 309:18
**purpose** [6] - 157:25, 158:18, 158:25, 247:9, 284:13, 301:16
**purposes** [7] - 154:10, 160:13, 226:16, 226:24, 277:16, 303:10, 303:11
**pursue** [4] - 159:2, 324:6, 324:17, 324:19
**pursuing** [3] - 159:2, 160:13, 190:18
**put** [26] - 154:6, 154:8,

158:21, 158:23, 160:7, 160:11, 167:18, 202:22, 232:12, 240:2, 256:4, 268:24, 285:1, 289:9, 298:25, 299:1, 307:10, 309:8, 309:10, 309:12, 309:24, 311:5, 311:6, 311:7, 324:24, 325:7
**putting** [3] - 309:25, 310:3, 316:16

## Q

**Q's** [34] - 162:3, 163:1, 163:22, 169:3, 169:8, 171:24, 172:3, 173:5, 173:13, 174:20, 179:17, 181:15, 182:23, 187:21, 203:20, 205:11, 207:4, 213:12, 214:10, 216:24, 217:2, 217:10, 217:18, 219:21, 233:18, 234:11, 237:7, 272:6, 273:19, 273:23, 274:7, 278:14, 285:12, 291:6
**qualifications** [1] - 251:14
**qualifies** [1] - 154:2
**QUARTA** [1] - 152:9
**Quarta** [78] - 159:5, 162:11, 162:14, 162:18, 173:13, 174:14, 174:21, 174:25, 175:6, 175:9, 180:3, 201:2, 201:4, 202:8, 202:10, 205:18, 207:21, 208:1, 208:6, 208:9, 208:12, 208:17, 208:20, 209:1, 209:13, 210:18, 211:7, 211:15, 211:19, 211:22, 214:10, 223:21, 224:14, 224:20, 225:10, 225:21, 233:14, 233:24, 235:14, 237:25, 238:3, 238:14, 240:14, 240:19, 240:25, 241:15,

245:17, 245:22, 247:24, 248:3, 248:6, 258:19, 259:3, 259:13, 272:19, 275:7, 280:3, 280:16, 281:1, 283:12, 284:23, 285:17, 286:7, 287:1, 292:8, 293:9, 300:18, 318:1, 318:3, 318:13, 319:22, 319:24, 320:1, 320:22, 322:18, 323:7
**Quarta's** [18] - 212:3, 212:6, 212:8, 212:15, 212:19, 213:3, 234:8, 244:9, 244:25, 245:3, 245:12, 245:15, 247:4, 259:5, 273:20, 290:4, 292:3, 322:14
**questioned** [1] - 296:20
**questioning** [4] - 161:6, 226:4, 282:10, 284:13
**questions** [7] - 170:16, 181:7, 181:9, 259:22, 260:16, 274:18, 307:24
**quickly** [1] - 318:21
**quit** [2] - 212:19, 212:22
**quite** [1] - 248:4
**quitting** [1] - 212:20

## R

**radical** [1] - 321:11
**raise** [8] - 188:25, 189:2, 189:4, 189:6, 207:22, 208:1, 208:15, 315:9
**raised** [1] - 207:17
**raises** [2] - 282:9, 323:11
**range** [2] - 247:11, 267:16
**ranges** [1] - 267:18
**rate** [8] - 257:17, 257:23, 258:2, 269:5, 269:10, 270:6, 270:9, 277:14
**Rate** [1] - 269:1
**rather** [2] - 211:22, 270:8

**rationales** [1] - 155:15
**RAYMOND** [1] - 152:18
**Raymond** [1] - 153:6
**reach** [1] - 156:17
**read** [17] - 176:15, 176:23, 177:8, 177:10, 177:11, 177:12, 177:20, 177:25, 178:10, 178:12, 178:15, 178:17, 178:19, 209:17, 291:20, 318:19, 318:21
**reading** [2] - 177:16, 224:2
**ready** [3] - 161:20, 192:22, 192:25
**really** [7] - 185:9, 251:19, 256:6, 284:12, 310:23, 317:9, 324:21
**rear** [1] - 222:16
**reason** [11] - 156:4, 156:12, 156:15, 157:23, 158:14, 240:6, 240:11, 302:9, 302:20, 304:23
**reasonable** [6] - 295:17, 295:20, 314:20, 315:1, 316:5, 323:22
**reasonably** [1] - 324:18
**reasons** [3] - 155:11, 155:22, 156:18
**rebut** [4] - 315:1, 315:25, 323:21, 324:1
**REBUTTAL** [2] - 322:6, 327:20
**rebuttal** [1] - 313:1
**receive** [8] - 180:6, 187:24, 188:12, 188:25, 189:11, 213:12, 223:23, 237:7
**received** [12] - 162:25, 180:2, 181:13, 187:24, 214:8, 226:19, 259:9, 259:13, 261:15, 297:8, 313:18, 313:23
**receiving** [2] - 189:18, 209:12
**recently** [1] - 314:13
**Recess** [1] - 291:24
**recess** [2] - 203:3,

231:10
**recognize** [3] - 223:17, 225:18, 258:24
**recollect** [1] - 238:16
**recollection** [1] - 238:10
**recommended** [1] - 317:17
**Reconstructed** [1] - 269:1
**reconstructed** [3] - 269:10, 270:9, 270:12
**reconvene** [1] - 231:9
**record** [23] - 158:23, 176:12, 215:1, 226:22, 250:1, 250:4, 250:9, 250:12, 253:3, 253:5, 253:25, 254:2, 255:9, 260:7, 260:21, 295:15, 298:16, 301:3, 309:19, 310:25, 324:24, 326:15
**recorded** [1] - 152:25
**recording** [1] - 201:1
**recordkeeping** [8] - 216:17, 226:15, 230:23, 260:6, 260:11, 296:2, 303:1, 313:25
**records** [72] - 218:20, 218:24, 219:1, 219:8, 219:9, 220:1, 225:5, 225:13, 225:14, 225:21, 225:22, 225:25, 226:7, 226:10, 226:14, 226:17, 226:23, 226:25, 227:4, 227:6, 227:7, 228:1, 228:2, 228:9, 228:10, 228:23, 228:24, 229:25, 230:4, 230:7, 230:20, 230:25, 245:11, 245:14, 249:3, 249:9, 249:12, 249:16, 249:19, 249:21, 250:19, 254:6, 254:13, 258:9, 259:3, 259:5, 260:5, 260:25, 261:3, 261:11, 264:24, 265:1, 265:3, 265:11, 275:13, 284:21, 284:22,

284:24, 285:10, 314:2, 314:3, 314:7, 315:1, 320:8, 320:12, 323:12, 323:14, 323:15, 323:18
**recover** [1] - 176:4
**recovery** [1] - 320:23
**recruited** [1] - 213:11
**redirect** [4] - 180:9, 214:14, 246:23, 288:18
**REDIRECT** [2] - 247:1, 327:12
**redo** [1] - 232:11
**reduce** [1] - 305:14
**reentering** [3] - 222:25, 223:3, 223:6
**refer** [1] - 202:7
**reference** [3] - 289:19, 293:16, 312:3
**referenced** [3] - 153:20, 293:22, 314:7
**referred** [1] - 204:3
**referring** [3] - 199:24, 202:7, 280:17
**reflects** [1] - 176:13
**refused** [1] - 157:13
**regarding** [5] - 256:12, 282:13, 296:8, 298:9, 324:6
**regardless** [2] - 167:20, 300:13
**registered** [1] - 281:24
**regular** [3] - 250:20, 253:19, 257:19
**Regular** [1] - 269:1
**regularly** [1] - 315:14
**reinstatement** [1] - 154:2
**relate** [3] - 165:20, 282:16, 302:4
**related** [1] - 166:1
**relates** [5] - 292:8, 293:3, 298:8, 307:2, 309:13
**relating** [3] - 229:24, 229:25
**relationship** [1] - 241:15
**relaying** [1] - 298:11
**relevance** [17] - 190:15, 207:18, 229:19, 241:10, 259:19, 260:6, 272:13, 273:13, 280:10, 282:3, 284:11, 287:8, 287:22, 290:8,

292:7, 292:10, 293:10
**relevant** [17] - 167:1, 168:2, 190:19, 194:1, 226:14, 229:18, 249:4, 259:25, 260:5, 260:10, 291:7, 291:10, 293:6, 293:24, 307:18, 317:9, 324:13
**reliant** [1] - 274:1
**relief** [18] - 155:3, 156:11, 158:7, 158:9, 297:21, 302:23, 302:25, 303:8, 303:12, 303:14, 306:4, 308:10, 308:16, 316:4, 316:11, 316:15, 316:16, 316:18
**reluctant** [1] - 229:4
**rely** [3] - 155:15, 161:3, 285:6
**relying** [3] - 155:18, 157:23, 157:25
**remain** [2] - 304:14, 304:19
**remaining** [1] - 290:16
**remedies** [2] - 154:19, 155:7
**remember** [15] - 165:7, 165:15, 166:8, 166:16, 169:1, 169:17, 171:5, 177:16, 179:4, 179:5, 198:5, 210:8, 210:9, 275:20, 284:3
**remind** [1] - 161:15
**renew** [1] - 296:15
**reopen** [5] - 158:22, 298:15, 298:21, 304:18, 307:5, 307:6
**repeat** [8] - 160:11, 183:25, 217:8, 221:22, 221:23, 264:12, 265:22, 281:10
**repeated** [1] - 190:21
**repeating** [1] - 167:5
**rephrase** [3] - 269:24, 273:7
**replaced** [1] - 213:25
**report** [2] - 234:17, 285:3
**Reporter** [1] - 152:21
**reporter** [1] - 238:23
**reporting** [1] - 166:2

**represent** [2] - 237:23, 284:2
**representation** [1] - 306:16
**representative** [2] - 194:4, 284:5
**representing** [1] - 301:10
**request** [4] - 176:14, 223:20, 275:13, 309:19
**requested** [2] - 275:19, 311:24
**requesting** [1] - 309:14
**required** [10] - 271:25, 272:2, 272:4, 272:5, 279:18, 279:20, 315:11, 322:25, 323:19, 325:15
**requirements** [1] - 280:15
**requiring** [2] - 312:9, 325:20
**reserve** [1] - 299:9
**resolve** [2] - 324:15, 326:6
**resolved** [1] - 305:6
**resources** [1] - 326:1
**respect** [9] - 155:2, 155:6, 155:8, 167:24, 255:8, 268:2, 280:23, 314:19, 316:14
**respond** [4] - 156:21, 159:14, 167:15, 240:6
**responded** [2] - 225:1, 225:8
**response** [4] - 224:19, 224:25, 225:7, 324:21
**responses** [3] - 263:8, 264:6, 264:15
**responsibility** [1] - 323:14
**rest** [7] - 159:14, 289:8, 293:8, 294:7, 295:7, 295:10, 299:22
**Restaurant** [14] - 163:22, 173:5, 173:13, 174:21, 179:18, 181:15, 203:21, 214:10, 216:25, 217:2, 217:10, 217:19, 234:11, 259:3
**restaurant** [148] - 158:14, 162:7,

165:9, 165:11, 166:6, 166:9, 172:22, 173:11, 181:19, 181:21, 182:11, 182:13, 182:16, 182:18, 182:21, 183:6, 183:18, 183:21, 183:24, 185:22, 187:19, 189:14, 189:21, 190:4, 190:7, 190:12, 190:14, 190:16, 190:19, 190:24, 191:7, 191:9, 191:11, 191:23, 193:8, 193:10, 193:15, 195:5, 195:15, 195:18, 196:8, 196:12, 196:15, 196:18, 196:21, 197:4, 197:9, 197:14, 197:16, 198:10, 198:13, 198:20, 201:14, 213:15, 213:17, 217:4, 217:20, 217:22, 219:18, 219:20, 219:23, 220:7, 220:14, 220:15, 220:16, 220:17, 220:20, 220:21, 220:25, 221:3, 221:6, 221:7, 221:8, 221:9, 221:11, 221:14, 221:16, 221:24, 222:3, 222:6, 222:8, 222:11, 222:12, 222:16, 222:18, 222:20, 222:22, 223:1, 223:4, 223:7, 225:11, 233:18, 233:21, 233:22, 234:1, 234:3, 234:5, 234:15, 234:17, 235:9, 235:19, 236:15, 236:22, 237:6, 237:14, 241:15, 241:20, 241:25, 242:2, 243:13, 243:16, 243:25, 245:18, 245:22, 246:10, 246:16, 246:18, 247:4, 247:9, 247:12, 262:18, 266:16, 272:24, 272:25, 273:23, 274:7, 275:10,

275:14, 275:17, 276:22, 279:22, 285:13, 286:24, 287:12, 287:16, 291:9, 292:9, 301:13, 315:13, 315:15, 318:15, 320:15, 320:19, 322:22, 324:10, 325:1
**RESTAURANT** [2] - 152:7, 152:8
**restaurant's** [8] - 225:10, 241:3, 241:18, 241:21, 242:6, 242:14, 242:20, 249:13
**rested** [1] - 296:5
**resting** [1] - 298:18
**restraining** [3] - 153:19, 258:16, 301:19
**restrict** [1] - 193:25
**rests** [1] - 294:24
**RESTS** [4] - 295:4, 295:12, 327:18, 327:18
**result** [3] - 153:23, 154:7, 160:2
**resume** [1] - 203:2
**retaliate** [2] - 157:4, 158:16
**retaliated** [1] - 301:1
**retaliation** [23] - 154:12, 157:4, 158:9, 158:19, 159:6, 159:25, 296:8, 296:11, 300:23, 301:25, 302:6, 302:13, 302:18, 303:2, 303:19, 303:21, 304:20, 305:5, 305:12, 308:11, 308:13, 316:12, 316:15
**Retaliation** [1] - 300:11
**retaliatory** [6] - 154:3, 296:18, 297:1, 303:9, 314:13
**return** [1] - 230:24
**returned** [3] - 183:22, 189:21, 189:23
**review** [8] - 160:15, 206:23, 252:6, 254:6, 254:13, 257:15, 283:13, 289:22
**reviewed** [5] - 220:1,

225:22, 244:17, 256:25, 291:25
**Richard** [3] - 232:22, 233:1, 317:25
**RICHARD** [2] - 233:6, 327:10
**Rico** [3] - 213:20, 213:22, 213:25
**role** [5] - 216:24, 234:1, 234:10, 244:9, 244:11
**room** [3] - 243:17, 243:20, 244:5
**Room** [1] - 152:16
**roughly** [1] - 267:8
**rude** [1] - 280:6
**rule** [3] - 309:22, 309:24, 311:9
**Rule** [2] - 155:12, 296:19
**ruled** [2] - 289:13, 291:2
**ruling** [4] - 226:21, 287:9, 295:14, 310:25
**rulings** [3] - 292:21, 292:22, 294:1
**run** [2] - 212:10, 325:19
**runner** [1] - 195:9
**running** [2] - 259:11, 301:12
**rush** [1] - 235:16

---

# S

**Salad** [1] - 166:15
**salad** [11] - 183:12, 188:8, 188:21, 192:23, 193:5, 197:3, 206:8, 206:11, 261:7, 261:8
**salads** [4] - 183:14, 183:16, 192:25, 196:24
**salary** [4] - 207:7, 209:25, 313:20, 313:22
**sat** [1] - 243:16
**Saturday** [11] - 184:2, 184:21, 185:24, 199:23, 201:14, 201:17, 201:18, 273:23, 297:10, 301:22, 304:1
**Saturdays** [12] - 184:16, 184:18, 186:25, 187:2, 187:5, 194:19, 236:13, 236:15,

236:16, 236:20, 237:13, 274:1
**sauce** [2] - 163:10
**sauces** [1] - 192:22
**saw** [7] - 172:9, 220:17, 221:4, 222:5, 245:14, 252:3
**SCA** [1] - 152:7
**SCA-50** [1] - 281:19
**schedule** [11] - 185:22, 192:13, 192:14, 195:22, 196:5, 242:6, 310:11, 311:1, 311:2, 311:4, 323:24
**schedules** [2] - 275:1, 313:21
**scope** [1] - 238:5
**screaming** [1] - 293:9
**screen** [11] - 223:15, 224:2, 225:3, 249:25, 251:22, 252:9, 252:10, 252:12, 253:24, 254:9, 257:6
**search** [1] - 167:20
**season** [1] - 237:14
**seasonings** [1] - 192:22
**seat** [4] - 171:11, 172:8, 235:22, 245:20
**seated** [2] - 161:19, 174:15
**seating** [2] - 235:14, 235:15
**seats** [1] - 170:19
**second** [11] - 156:4, 176:10, 178:2, 179:4, 179:6, 204:1, 204:21, 204:24, 209:16, 276:9, 316:22
**secret** [2] - 273:22, 321:14
**Secretary** [6] - 152:3, 153:2, 155:1, 155:4, 156:23, 194:2
**secretary** [1] - 215:19
**Secretary's** [2] - 155:11, 155:14
**secretly** [2] - 272:7, 272:8
**sector** [1] - 326:1
**see** [52] - 153:18, 156:24, 172:7, 176:25, 178:12, 179:10, 179:11, 179:14, 196:20, 197:6, 204:15,

204:19, 204:21, 207:1, 209:16, 209:19, 209:24, 209:25, 210:10, 221:2, 221:6, 224:4, 224:9, 224:15, 224:21, 225:4, 228:1, 229:1, 235:9, 246:20, 251:18, 254:23, 254:24, 255:6, 255:21, 257:12, 259:25, 264:18, 268:19, 275:10, 275:14, 275:17, 276:10, 276:12, 276:13, 277:6, 283:15, 283:23, 284:14, 321:6, 321:10, 324:22
**See** [1] - 253:18
**seeing** [1] - 305:19
**seek** [14] - 155:2, 155:4, 296:10, 297:20, 302:20, 302:21, 302:23, 302:25, 303:5, 303:8, 303:13, 306:20, 306:23, 326:6
**seeking** [14] - 153:17, 154:20, 158:9, 294:4, 299:16, 300:17, 303:4, 303:7, 305:12, 306:5, 308:12, 316:4, 316:10
**seeks** [2] - 167:9, 167:12
**self** [1] - 268:16
**self-explanatory** [1] - 268:16
**send** [1] - 197:6
**sending** [2] - 200:17, 201:19
**sense** [5] - 300:14, 306:25, 307:3, 307:6, 319:13
**sent** [2] - 206:24, 214:6
**sentence** [7] - 177:17, 177:21, 178:3, 178:19, 209:24, 210:1, 210:3
**separate** [6] - 301:25, 302:3, 302:9, 306:24, 307:3, 307:4
**separately** [3] - 168:10, 217:24, 217:25

September [2] - 204:6, 205:3
serious [1] - 320:23
serve [4] - 286:25, 301:9, 301:11, 311:14
served [6] - 258:19, 297:6, 301:8, 301:16, 301:21, 301:22
set [6] - 155:14, 241:24, 283:13, 312:15, 313:3, 325:3
setting [1] - 224:16
Several [1] - 235:20
several [2] - 198:12, 198:19
sheet [2] - 261:21, 262:1
sheets [1] - 275:10
shifting [1] - 258:14
shifts [2] - 314:25, 323:21
show [11] - 176:8, 209:21, 230:4, 230:8, 250:6, 250:9, 250:12, 258:1, 261:14, 289:18, 289:25
showed [3] - 202:4, 297:4, 322:16
showing [3] - 252:9, 253:24, 254:9
shown [7] - 250:15, 250:19, 258:9, 296:25, 300:19, 313:16, 322:25
shows [13] - 250:8, 250:11, 257:17, 257:18, 257:19, 258:7, 259:21, 261:15, 262:12, 264:16, 323:24
sic [1] - 285:17
sick [1] - 212:9
side [6] - 170:23, 252:10, 252:11, 257:12, 266:1, 306:8
sides [3] - 311:18, 326:6, 326:9
sign [13] - 164:19, 166:19, 177:7, 177:12, 203:17, 274:21, 274:23, 276:18, 285:17, 285:19, 286:4, 286:5, 326:15
signature [7] - 176:21, 178:11, 204:24, 224:11, 224:13,

273:19, 273:20
signed [12] - 170:1, 176:17, 177:9, 204:4, 210:5, 274:11, 274:12, 276:2, 285:24, 286:1, 286:2, 287:3
significant [1] - 313:17
signing [2] - 163:18, 275:20
similar [1] - 227:19
similarities [2] - 253:7, 253:10
simple [1] - 299:20
simply [6] - 158:10, 167:5, 173:23, 297:16, 300:2, 300:3
simulate [1] - 230:10
sit [6] - 165:14, 214:9, 243:18, 245:23, 302:15, 310:22
sitting [7] - 168:17, 168:19, 170:21, 170:22, 170:24, 171:11, 246:10
situation [3] - 160:20, 232:19, 305:17
six [1] - 182:3
small [1] - 321:3
smartphone [1] - 205:16
snooping [1] - 321:15
Solicitor [1] - 152:15
SOLIS [1] - 152:3
someday [1] - 232:12
someone [9] - 167:4, 174:1, 195:10, 195:25, 196:20, 198:20, 244:6, 277:22, 318:12
sometimes [21] - 185:5, 185:6, 185:10, 186:5, 186:7, 186:12, 195:1, 197:25, 205:21, 206:25, 234:6, 241:6, 241:18, 241:21, 243:18, 268:7, 279:13, 279:17, 284:6, 319:3
somewhat [1] - 315:5
somewhere [2] - 236:5, 236:10
sorry [14] - 183:25, 210:2, 217:6, 239:14, 242:9, 258:14, 263:9, 267:11, 269:4,

269:24, 283:18, 294:20, 310:2
sort [4] - 159:24, 228:2, 234:10, 308:20
sorts [1] - 228:23
sought [1] - 299:5
sources [1] - 262:21
Spanish [22] - 161:14, 162:14, 162:16, 162:19, 169:6, 169:9, 177:25, 180:19, 181:3, 181:7, 181:10, 189:25, 205:18, 205:20, 205:23, 205:25, 209:17, 216:20, 276:9, 287:18, 319:22, 319:23
speaking [6] - 203:11, 203:14, 235:2, 273:6, 273:10, 292:3
speaks [1] - 205:19
specific [2] - 230:5, 318:23
specifically [4] - 159:21, 204:14, 302:24, 318:24
specifics [1] - 301:18
spell [1] - 176:13
spend [2] - 247:9, 326:2
spent [5] - 283:5, 284:15, 287:20, 288:5, 315:18
spoken [2] - 178:25, 287:18
spotlight [1] - 323:16
spread [1] - 246:16
spreadsheet [1] - 265:16
stamped [1] - 281:19
stand [2] - 167:18, 180:14
standard [1] - 295:15
Standards [4] - 156:2, 280:15, 306:17, 319:19
standing [1] - 168:17
start [18] - 182:11, 183:20, 184:3, 184:6, 184:7, 184:16, 185:1, 189:18, 190:4, 192:21, 197:23, 216:7, 236:5, 236:10, 236:17, 246:19, 266:8, 292:1
Start [1] - 266:2

start/finish [1] - 251:2
start/stop [1] - 251:2
started [21] - 179:7, 183:7, 183:14, 184:12, 184:18, 187:9, 187:21, 195:15, 196:3, 197:24, 207:4, 216:9, 267:5, 277:21, 282:14, 282:20, 282:21, 282:23, 288:6, 293:16, 293:19
starting [6] - 184:14, 246:7, 250:9, 267:4, 274:18, 293:8
state [2] - 181:2, 324:23
statement [41] - 163:18, 164:16, 164:17, 164:19, 166:18, 166:19, 166:23, 167:10, 168:3, 170:1, 176:9, 176:16, 177:8, 177:14, 177:20, 177:21, 178:2, 179:10, 203:16, 204:4, 209:15, 209:16, 209:19, 210:5, 275:21, 275:25, 276:1, 276:2, 276:3, 276:16, 276:18, 285:15, 285:17, 285:23, 286:4, 286:6, 286:8, 286:10, 287:3, 317:6
statements [8] - 167:2, 168:4, 168:13, 220:9, 274:21, 274:22, 274:23, 314:14
states [1] - 323:6
STATES [2] - 152:1, 152:13
States [4] - 152:4, 216:5, 272:1, 300:24
stating [2] - 286:6, 300:25
status [12] - 153:18, 153:20, 153:24, 155:6, 155:9, 155:10, 155:16, 155:19, 160:3, 160:6, 161:4, 316:3
statute [6] - 229:20, 300:12, 302:13, 302:18, 302:24, 318:7

stay [5] - 186:11, 186:14, 225:3, 279:19, 279:20
stayed [1] - 168:22
steady [1] - 234:24
steering [1] - 170:23
stenography [1] - 152:25
step [4] - 180:11, 214:16, 248:11, 288:20
steps [1] - 205:10
sticker [1] - 227:13
still [10] - 161:16, 187:12, 188:21, 262:18, 262:19, 282:24, 297:22, 303:18, 315:7, 320:21
stipulate [2] - 230:3, 230:15
stipulated [3] - 226:5, 226:9, 256:12
stipulating [1] - 231:2
stipulation [7] - 226:22, 227:4, 229:2, 230:17, 232:14, 282:9
stop [6] - 182:18, 186:1, 191:9, 235:14, 235:15, 310:9
stopped [3] - 213:5, 273:17, 288:10
stopping [1] - 303:25
store [1] - 158:14
streamline [4] - 229:1, 232:5, 232:16, 326:10
streamlining [2] - 194:6, 229:15
Street [2] - 152:16, 152:19
strong [1] - 322:19
struggling [2] - 324:10, 324:13
stuff [2] - 320:14, 321:5
subject [2] - 303:13, 311:2
submission [2] - 314:6, 325:4
submissions [2] - 312:16, 312:17
submit [13] - 290:11, 299:9, 300:4, 300:20, 301:6, 301:20, 318:5, 319:11, 319:17, 321:17, 325:15,

325:21, 325:22
**submitted** [4] -
285:23, 286:6,
312:3, 312:6
**submitting** [2] - 313:3,
315:6
**subpoena** [3] - 180:2,
180:6, 214:6
**subpoenas** [1] -
157:13
**subsequent** [2] -
256:20, 313:2
**subsequently** [1] -
316:12
**successfully** [1] -
158:20
**such-and-such** [1] -
163:10
**sufficient** [6] - 156:19,
160:18, 295:21,
296:1, 296:3, 303:23
**suggest** [2] - 159:3,
159:9
**suggesting** [1] -
297:25
**suing** [3] - 173:4,
173:12, 175:6
**suit** [1] - 239:7
**sum** [4] - 290:17,
290:18, 312:14,
312:20
**summary** [3] - 261:21,
262:1, 262:13
**SUMMATION** [4] -
313:9, 317:14,
327:19, 327:20
**summations** [3] -
311:17, 312:17,
312:18
**Sunday** [1] - 234:6
**supermarket** [2] -
241:7, 241:19
**supervise** [6] - 206:8,
206:13, 206:15,
244:19, 319:7, 319:9
**supervised** [1] -
288:15
**supervising** [3] -
318:18, 323:3, 323:9
**supervisor** [1] - 319:5
**supplement** [1] -
311:22
**supplemental** [5] -
299:9, 299:12,
312:16, 312:17,
313:3
**support** [2] - 154:9,
156:7
**supporting** [2] -
156:12, 156:15

**supports** [4] - 296:22,
296:24, 312:4,
313:13
**supposed** [1] - 287:7
**surveillance** [6] -
220:2, 220:3, 222:8,
273:23, 288:1,
321:15
**suspend** [1] - 197:6
**sustain** [5] - 282:15,
292:7, 292:10,
293:7, 293:12
**sustained** [13] -
165:18, 174:4,
175:12, 176:1,
205:7, 207:19,
207:24, 211:11,
242:16, 280:25,
282:4, 282:8, 287:9
**sweeping** [2] - 221:7,
287:12
**switched** [1] - 188:8
**swore** [3] - 239:1,
239:3, 240:5
**sworn/affirmed** [5] -
161:13, 180:18,
215:23, 233:8,
248:19

# T

**talks** [1] - 206:1
**target** [1] - 157:18
**tasks** [2] - 284:6,
284:8
**tax** [1] - 237:13
**telephone** [2] - 164:3,
309:21
**temporary** [4] -
153:19, 154:19,
258:16, 301:19
**ten** [2] - 203:1, 233:17
**ten-minute** [1] - 203:1
**terminated** [5] -
212:22, 304:2,
304:5, 304:10,
304:23
**terminating** [1] -
155:23
**termination** [7] -
154:2, 154:8, 291:6,
303:13, 304:3, 304:9
**terms** [6] - 299:4,
306:4, 318:17,
323:5, 323:8, 324:16
**testified** [36] - 157:16,
161:13, 178:15,
180:18, 193:4,
201:25, 212:22,
213:19, 215:23,

217:6, 222:2, 233:8,
240:10, 243:13,
245:17, 255:2,
257:4, 263:23,
264:8, 264:11,
264:14, 264:22,
266:16, 282:12,
282:17, 282:19,
282:24, 295:25,
300:19, 300:21,
301:5, 303:17,
313:21, 317:19,
319:22, 319:25
**testify** [25] - 156:7,
157:6, 157:9,
157:17, 157:20,
160:17, 161:1,
162:2, 162:7,
167:24, 168:12,
179:16, 180:3,
194:3, 194:7,
198:13, 198:21,
205:13, 259:9,
263:3, 263:4,
263:12, 264:9,
264:17, 322:15
**testifying** [20] -
154:12, 157:7,
157:10, 160:5,
165:14, 171:12,
179:20, 199:9,
200:20, 201:15,
205:14, 211:24,
214:4, 238:8, 248:5,
248:19, 255:24,
263:18, 300:16,
314:15
**testimony** [54] -
158:20, 162:18,
168:8, 171:3,
172:14, 193:24,
194:4, 194:11,
213:23, 226:8,
251:12, 260:1,
262:24, 262:25,
263:7, 263:15,
263:16, 263:25,
265:13, 265:25,
267:3, 267:12,
267:15, 268:6,
268:18, 275:24,
278:6, 278:7,
278:10, 278:11,
289:10, 290:23,
297:4, 298:9,
298:16, 298:18,
303:24, 304:1,
304:6, 304:10,
307:1, 307:21,
312:2, 313:16,
314:21, 318:10,

319:11, 319:20,
320:24, 320:25,
321:1, 322:9, 325:5
**thankful** [1] - 207:16
**THE** [244] - 152:12,
153:7, 153:13,
154:5, 154:13,
154:22, 155:18,
156:14, 156:20,
157:5, 157:21,
159:16, 160:10,
161:9, 161:15,
161:18, 161:19,
162:22, 164:24,
165:3, 165:18,
166:11, 166:22,
166:25, 168:1,
170:6, 172:17,
173:18, 174:4,
174:11, 175:2,
175:12, 176:1,
176:16, 176:20,
178:5, 178:16,
180:9, 180:11,
180:13, 180:21,
189:5, 189:8,
190:20, 190:21,
191:16, 191:19,
192:4, 194:12,
196:10, 196:13,
196:16, 198:16,
200:14, 201:11,
202:2, 202:17,
203:1, 203:4,
204:11, 205:7,
207:19, 207:24,
208:4, 209:4,
211:11, 212:23,
214:14, 214:16,
214:19, 214:23,
215:2, 215:6, 215:9,
215:12, 215:18,
215:25, 217:15,
221:20, 223:12,
226:11, 226:17,
226:19, 226:21,
227:11, 227:14,
227:20, 227:24,
228:3, 228:12,
228:15, 228:17,
229:4, 229:21,
230:1, 230:8,
230:19, 230:22,
231:6, 232:4,
232:24, 233:2,
234:20, 234:22,
234:23, 237:17,
238:9, 240:9,
240:12, 241:10,
241:14, 242:9,
242:11, 242:16,

242:22, 242:24,
246:4, 246:8, 246:9,
246:11, 246:22,
247:17, 248:9,
248:11, 248:13,
251:16, 251:18,
254:21, 255:18,
255:23, 256:2,
256:3, 256:16,
256:23, 259:8,
259:12, 259:14,
259:15, 259:17,
260:3, 260:9,
260:17, 271:13,
271:15, 271:19,
272:14, 273:14,
280:11, 280:25,
282:4, 282:8,
282:19, 282:25,
284:12, 284:17,
284:22, 285:2,
285:8, 286:14,
287:9, 287:23,
287:25, 288:18,
288:20, 288:22,
289:6, 289:12,
289:15, 289:22,
289:25, 290:3,
290:8, 290:14,
290:21, 290:24,
291:2, 291:14,
291:20, 291:23,
291:25, 292:6,
292:18, 292:25,
294:3, 294:7,
294:10, 294:13,
294:22, 294:24,
295:6, 295:9,
295:14, 296:7,
296:14, 297:25,
298:21, 299:11,
299:18, 300:10,
302:2, 302:19,
303:22, 304:12,
305:4, 305:10,
305:24, 306:6,
306:19, 306:25,
307:14, 308:5,
308:7, 308:12,
308:15, 308:19,
309:1, 309:4, 309:6,
309:20, 310:3,
310:8, 310:13,
310:17, 310:20,
311:17, 312:8,
312:12, 312:22,
312:25, 313:5,
316:22, 316:25,
317:4, 321:6,
321:23, 322:1,
324:3, 325:10,

325:14, 325:17, 325:20, 325:24, 326:3, 326:14
**theirs** [1] - 168:23
**themselves** [3] - 229:3, 300:23, 303:22
**thereafter** [1] - 160:6
**therefore** [3] - 154:15, 165:25, 227:3
**they've** [2] - 300:19, 300:25
**thinking** [1] - 158:2
**Third** [1] - 152:19
**third** [4] - 156:9, 171:21, 176:11, 266:4
**threat** [2] - 297:3, 304:8
**threatened** [1] - 319:24
**threatening** [2] - 286:8, 314:14
**threatens** [1] - 219:10
**threats** [2] - 297:4, 303:22
**three** [13] - 155:22, 169:5, 171:3, 171:5, 171:14, 176:9, 192:2, 229:20, 229:21, 247:23, 320:4, 321:3, 325:8
**three-page** [1] - 176:9
**throughout** [4] - 266:20, 267:24, 268:4, 271:9
**Thursday** [9] - 159:6, 186:14, 186:19, 199:5, 199:7, 199:9, 200:2, 287:2, 311:3
**Thursdays** [1] - 186:9
**today** [15] - 160:6, 162:2, 165:14, 181:12, 214:4, 214:7, 214:9, 238:8, 239:3, 290:18, 304:11, 304:13, 311:12, 320:21, 325:10
**together** [7] - 167:2, 168:10, 192:2, 192:5, 217:23, 271:2, 285:1
**tomorrow** [2] - 311:18, 311:22
**took** [10] - 220:10, 267:3, 267:4, 267:5, 267:7, 269:9, 274:9, 274:18, 279:10
**top** [7] - 179:11,

179:12, 204:15, 210:10, 224:21, 257:11, 262:12
**Torres** [5] - 257:4, 317:17, 317:19, 320:24, 322:8
**total** [11] - 250:18, 262:4, 266:10, 266:24, 270:17, 270:21, 270:25, 271:1, 271:5, 279:17
**Total** [7] - 266:5, 266:8, 266:22, 270:15, 270:19, 283:8, 283:21
**towards** [2] - 154:18, 209:19
**track** [5] - 197:9, 205:4, 205:11, 288:4, 288:10
**tradeoff** [2] - 229:14, 229:23
**TRANSCRIPT** [1] - 152:12
**transcript** [8] - 152:25, 294:16, 312:4, 317:20, 325:6, 325:9, 325:19, 325:23
**translate** [1] - 181:6
**translated** [1] - 181:9
**translating** [1] - 298:10
**travel** [1] - 190:4
**traveling** [1] - 220:18
**treat** [1] - 267:18
**treated** [1] - 320:20
**tree** [1] - 172:5
**trial** [28] - 153:8, 154:10, 158:19, 158:23, 160:22, 227:12, 256:5, 256:8, 261:24, 298:16, 298:21, 300:1, 300:16, 303:10, 304:18, 307:1, 307:6, 307:8, 307:13, 307:20, 308:2, 308:20, 308:24, 310:6, 311:2, 315:9, 325:5, 326:12
**Trial** [1] - 227:14
**TRIAL** [1] - 152:12
**tried** [2] - 302:6, 302:7
**TRO** [23] - 154:20, 154:21, 155:3, 155:14, 157:21, 160:19, 160:23, 286:25, 297:5,

297:6, 297:8, 300:14, 300:21, 304:11, 304:25, 305:1, 305:7, 305:19, 306:6, 308:20, 311:8, 311:13, 326:16
**true** [10] - 156:24, 224:6, 225:24, 227:6, 241:1, 241:19, 259:4, 259:10, 273:22, 297:18
**truth** [5] - 167:20, 179:8, 239:1, 318:5, 318:8
**try** [12] - 154:6, 154:14, 157:7, 159:10, 226:24, 232:15, 286:10, 287:2, 287:3, 310:12, 326:5, 326:10
**trying** [2] - 176:4, 232:7
**Tuesday** [3] - 198:22, 198:24, 199:15
**turn** [7] - 156:10, 225:2, 225:16, 261:19, 264:1, 281:18, 283:4
**Tursi** [1] - 152:21
**twice** [6] - 179:2, 185:13, 186:15, 186:16, 217:15, 320:4
**twist** [1] - 306:9
**two** [23] - 153:9, 156:18, 159:22, 171:6, 183:15, 190:13, 191:10, 195:21, 214:21, 229:20, 247:11, 266:1, 266:17, 268:19, 271:2, 290:2, 296:20, 298:22, 317:22, 321:17, 321:21, 321:25, 326:11
**type** [3] - 232:9, 302:23, 303:12
**types** [5] - 249:15, 249:18, 261:2, 261:5, 324:19
**typically** [1] - 218:1

**U**

**ultimate** [2] - 307:12, 308:3
**um-hmm** [1] - 277:10

**unclear** [1] - 303:19
**uncomfortable** [2] - 179:20, 179:22
**under** [11] - 155:12, 158:12, 161:16, 165:25, 167:1, 202:17, 202:20, 240:5, 240:10, 303:3, 314:24
**undercut** [1] - 154:21
**underlying** [3] - 231:3, 302:8, 302:11
**undermines** [2] - 156:1, 156:22
**Understood** [1] - 256:14
**understood** [2] - 260:15, 292:13
**undocumented** [2] - 153:25, 156:11
**unduly** [1] - 155:12
**unimpeachable** [1] - 322:13
**UNITED** [2] - 152:1, 152:13
**United** [4] - 152:4, 216:5, 271:25, 300:24
**Unknown** [1] - 262:11
**unknown** [4] - 153:24, 155:10, 160:3, 277:9
**unlock** [2] - 190:25, 191:5
**unlocked** [2] - 190:14, 190:24
**unlocking** [2] - 190:12, 190:16
**unlocks** [2] - 190:7, 190:19
**unnecessary** [1] - 301:3
**unorthodox** [1] - 232:6
**unusual** [1] - 232:10
**up** [36] - 154:10, 176:7, 180:14, 182:23, 186:7, 188:20, 191:5, 201:20, 202:4, 204:9, 209:13, 231:5, 236:9, 236:10, 241:22, 246:18, 257:6, 262:16, 262:20, 267:7, 267:8, 270:10, 270:25, 275:2, 283:13, 285:7, 290:17, 290:18, 300:19, 307:14, 312:15,

312:18, 312:20, 320:20, 324:22
**upheld** [1] - 155:11
**upset** [3] - 207:1, 208:1, 248:3
**urge** [1] - 326:5
**US** [3] - 152:6, 152:15, 152:21

**V**

**vacation** [6] - 212:2, 212:5, 279:8, 279:14, 279:15, 279:25
**vague** [2] - 286:12, 318:14
**vaguely** [1] - 239:22
**Varick** [1] - 152:16
**vary** [1] - 187:25
**VASQUEZ** [4] - 215:21, 248:17, 327:7, 327:15
**Vasquez** [61] - 163:21, 163:23, 164:4, 164:11, 164:12, 164:22, 165:16, 166:19, 168:13, 168:16, 168:20, 169:9, 169:10, 169:13, 169:15, 169:18, 169:22, 169:25, 170:4, 170:9, 170:21, 171:10, 171:17, 171:20, 172:3, 172:8, 173:3, 173:8, 174:8, 174:15, 174:18, 174:22, 174:24, 175:10, 175:14, 176:3, 177:16, 177:20, 178:25, 203:11, 203:25, 215:19, 216:4, 217:18, 219:17, 223:14, 226:18, 249:9, 249:24, 251:22, 255:2, 256:19, 256:25, 257:9, 258:15, 260:21, 261:19, 262:9, 271:23, 285:13, 321:1
**Vasquez'** [1] - 171:7
**vegetables** [1] - 192:22
**vendors** [1] - 247:6
**verdict** [2] - 295:8, 295:15
**Victoria** [1] - 191:15

23

**Victorio** [3] - 191:16,
191:25, 192:10
**vigorously** [1] - 315:5
**vindicate** [1] - 299:6
**Vinnie** [5] - 191:18,
191:25, 192:10,
197:21, 198:2
**violate** [2] - 158:17,
228:19
**violated** [5] - 227:21,
227:25, 228:4,
228:7, 228:18
**violating** [1] - 240:3
**violation** [20] - 155:2,
226:15, 228:9,
228:21, 229:6,
229:7, 229:12,
229:14, 230:21,
230:23, 231:3,
231:4, 232:6,
232:17, 260:6,
260:11, 262:18,
296:1, 296:19,
301:14
**violations** [10] - 229:3,
303:1, 313:25,
314:2, 314:6,
314:16, 316:9,
316:12, 316:13,
324:19
**virtually** [1] - 313:14
**visit** [2] - 219:18,
219:20

**W**

**wage** [18] - 208:21,
216:17, 261:21,
262:13, 269:8,
269:9, 269:15,
269:17, 269:25,
270:10, 270:11,
270:14, 270:17,
270:25, 296:2,
302:11, 313:23,
320:7
**Wage** [6] - 216:5,
216:7, 216:10,
269:6, 269:12,
270:15
**Wage/Hour** [1] -
238:20
**wages** [10] - 214:11,
260:7, 261:14,
277:23, 278:3,
278:8, 278:10,
314:19, 314:21,
316:5
**wait** [3] - 181:9, 191:6,
311:20

**waiter** [2] - 235:1,
235:11
**waived** [3] - 167:19,
167:23, 315:8
**waiver** [1] - 315:7
**walk** [4] - 172:4,
172:14, 172:22,
272:18
**Walter** [5] - 195:10,
195:15, 195:18,
195:20, 195:22
**Walter's** [1] - 195:13
**wants** [1] - 298:25
**washed** [1] - 318:24
**washer** [1] - 235:1
**watch** [1] - 220:5
**watched** [1] - 220:4
**watching** [2] - 220:13,
222:14
**Wednesday** [3] -
198:1, 253:17,
317:21
**week** [66] - 182:7,
183:23, 184:1,
185:11, 185:13,
186:13, 186:16,
186:17, 187:8,
187:23, 187:24,
187:25, 188:1,
188:9, 188:11,
188:12, 188:18,
188:20, 188:23,
189:1, 189:11,
189:12, 189:16,
189:18, 190:1,
190:2, 192:12,
198:9, 207:5, 207:8,
207:12, 207:13,
212:7, 213:23,
224:23, 247:3,
247:5, 247:7,
247:23, 250:3,
250:7, 250:18,
251:8, 254:5, 255:3,
255:6, 258:6,
266:16, 266:18,
268:23, 279:16,
293:5, 309:2,
309:22, 310:6,
310:7, 310:19,
313:18, 313:22,
313:24, 322:10,
322:11, 325:6, 326:4
**weekday** [1] - 268:3
**weekdays** [3] -
184:23, 185:4,
185:16
**Weekly** [5] - 266:25,
268:15, 268:25,
269:12, 269:20

**weekly** [13] - 267:1,
268:17, 268:20,
269:3, 269:4,
269:15, 269:18,
269:23, 270:3,
270:17, 313:20
**Weeks** [4] - 266:5,
266:8, 266:13,
266:22
**weeks** [13] - 212:5,
266:9, 266:10,
266:11, 266:12,
266:15, 266:17,
266:24, 267:9,
270:18, 270:21,
325:8
**Westbury** [1] - 238:20
**Wexler** [1] - 310:7
**Wexler's** [3] - 310:11,
311:2, 311:4
**WH-56** [1] - 283:12
**wheel** [1] - 170:23
**whichever** [1] - 257:7
**whole** [4] - 158:2,
185:21, 291:11,
318:15
**willful** [2] - 229:6,
232:17
**willfully** [3] - 227:21,
228:5, 228:20
**willfulness** [23] -
226:14, 227:2,
227:18, 227:23,
228:11, 228:22,
229:2, 229:8,
229:13, 229:18,
230:14, 230:16,
230:20, 231:2,
231:3, 232:5, 232:7,
232:13, 296:4,
314:6, 314:16, 316:9
**willing** [4] - 228:8,
228:18, 229:11,
230:15
**wiping** [1] - 221:8
**wise** [6] - 238:4,
238:15, 239:11,
239:12, 239:17,
239:18
**wish** [3] - 303:5,
304:17, 309:12
**wishes** [1] - 298:23
**withdraw** [4] - 207:10,
264:4, 281:2, 317:11
**withdrawn** [4] -
162:13, 162:25,
163:12, 163:17,
164:15, 166:18,
172:1, 177:15,
203:24, 209:10,

213:19, 259:24,
273:8
**withheld** [1] - 293:5
**witness** [35] - 154:12,
155:25, 156:22,
157:3, 157:17,
159:23, 167:18,
168:5, 176:8,
178:21, 180:12,
180:13, 180:14,
191:20, 193:23,
196:11, 204:10,
204:13, 209:21,
212:21, 214:17,
214:19, 214:22,
215:1, 215:17,
223:11, 232:15,
232:20, 248:12,
282:13, 288:21,
317:16, 317:24,
318:2, 322:13
**WITNESS** [11] -
161:18, 196:16,
226:19, 234:22,
242:11, 242:24,
246:8, 246:11,
256:2, 259:14,
287:25
**witness'** [1] - 165:24
**witnesses** [13] -
156:4, 157:13,
157:17, 159:22,
160:21, 167:25,
194:3, 230:17,
288:25, 295:20,
295:24, 307:25,
312:2
**woman** [1] - 177:6
**word** [3] - 200:17,
201:19, 297:12
**wording** [1] - 304:24
**words** [2] - 176:15,
240:1
**workday** [2] - 190:5,
284:9
**worker** [2] - 158:13,
197:7
**workers** [19] - 153:25,
158:12, 193:20,
194:15, 194:18,
194:21, 194:24,
195:4, 196:18,
242:20, 243:8,
243:10, 244:19,
244:23, 245:1,
245:8, 267:12,
297:14, 323:23
**workplace** [5] - 156:6,
235:25, 272:3,
272:6, 321:15

**works** [1] - 193:10
**wound** [1] - 320:20
**write** [6] - 177:3,
177:5, 244:22,
244:25, 285:15,
287:14
**writing** [11] - 205:5,
205:11, 251:6,
251:14, 253:14,
287:3, 287:5,
305:14, 309:25,
310:4, 319:15
**written** [20] - 164:17,
176:18, 176:21,
177:1, 204:4, 226:7,
226:10, 226:23,
227:4, 251:3, 251:8,
251:9, 251:10,
276:4, 287:6, 305:5,
305:22, 311:12,
320:8, 320:12
**wrote** [5] - 238:23,
244:15, 276:15,
285:19, 287:11

**Y**

**year** [7] - 188:24,
198:8, 212:5, 212:7,
216:22, 249:10,
262:17
**year-and-a-half** [2] -
188:24, 198:8
**years** [14] - 183:15,
188:22, 195:21,
216:13, 229:20,
229:22, 233:17,
234:4, 234:10,
241:24, 242:4,
242:14, 314:9,
322:22
**yesterday** [2] - 153:9,
226:13
**YORK** [1] - 152:1
**York** [4] - 152:16,
152:19, 152:22
**yourself** [3] - 164:22,
192:15, 239:25
**yourselves** [1] - 174:2

**Z**

**Zanbrano** [4] - 276:20,
276:21, 276:23,
276:25
**Zanbrano-Banegas**
[1] - 276:20
**zero** [1] - 268:20
**Zorayda** [3] - 168:25,
177:6, 215:19
**ZORAYDA** [4] -

24

215:21, 248:17,
327:7, 327:15