# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

Nº 09-CV-2212 (JFB) (ETB)
_____

HILDA L. SOLIS, SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR,

Plaintiff,

VERSUS

SCA RESTAURANT CORP. D/B/A LUIGI Q ITALIAN RESTAURANT, A CORPORATION AND LUIGI QUARTA, INDIVIDUALLY AND AS OWNER,

Defendants.

_____

**MEMORANDUM AND ORDER**
April 5, 2013

_____

JOSEPH F. BIANCO, District Judge:

Plaintiff Hilda L. Solis, Secretary of Labor, United States Department of Labor ("the Secretary") brings this action against SCA Restaurant Corporation, d/b/a Luigi Q Italian Restaurant ("SCA Restaurant Corp.") and Luigi Quarta ("Quarta") (collectively, "defendants"), asserting claims under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq*. Specifically, the Secretary alleges that defendants violated the following provisions of the FLSA: (1) Sections 6, 7, and 15(a)(2), by failing to pay minimum wage and overtime compensation to the employees of SCA Restaurant Corp.; (2) Sections 11(c) and 15(a)(5), by failing to keep full and accurate records concerning their employees' wages, hours, and conditions of employment; and (3) Section 15(a)(3), by threatening to fire employees who testified against them in this action. 29

U.S.C. §§ 206, 207, 211(c), 215(a)(2), 215(a)(3) 215(a)(5). The Secretary seeks an injunction, pursuant to Section 17 of the FLSA, permanently restraining defendants from violating Sections 7, 11(c), 15(a)(2), 15(a)(3) and 15(a)(5) of the FLSA, and an order, pursuant to Section 16(c) of the FLSA, finding defendant liable for unpaid overtime compensation and an equal amount of liquidated damages. The Secretary also requests compensatory and punitive damages for violations of the anti-retaliation provisions of the FLSA.

A bench trial was held on April 9 and April 10, 2012, as well as on October 4, 2012, to determine defendants' liability, if any. Having held a bench trial, the Court now issues its findings of fact and conclusions of law, as required by Rule 52(a) of the Federal Rules of Civil Procedure, and concludes, after carefully

considering the evidence introduced at trial, the arguments of counsel, and the controlling law on the issues presented, that the Secretary has met her burden of proof on all of her claims. The Court finds that the Secretary has proven that she is entitled to the following relief: (1) $137,867.12 in unpaid wages for violations of the minimum wage and overtime provisions of the FLSA; (2) $137,867.12 in liquidated damages for willful violations of the Act; (3) $2,000 in compensatory damages ($1,000 for Mr. Acosta and $1,000 for Mr. Cantos-Chavez) for emotional distress from the violations of the anti-retaliation provisions; and (4) a prospective injunction restraining the defendants from future violations of the Act.

I. BACKGROUND

On May 26, 2009, the Secretary filed her complaint alleging violations of the FLSA. Defendants answered on October 15, 2009. The parties undertook discovery for much of 2010.

On April 6, 2012, the Court issued a temporary restraining order preventing defendants from discharging or taking discriminatory action against two employees who the defendants threatened to fire due to their involvement in this lawsuit. (*See* Temporary Restraining Order, Apr. 6, 2012, ECF No. 61.) The Court issued a preliminary injunction on April 19, 2012 barring defendants from firing or discriminating against any employees in violation of Section 15(a)(3) of the FLSA until the Court adjudicated this matter. (*See* Preliminary Injunction, Apr. 19, 2012, ECF No. 67.)

The Court held a bench trial on April 9 and April 10, 2012. [1] Employees Alvin

Alexander Torres, Santos Alfaro Pastor, Jose Anibal Acosta, and Juan Carlos Cantos-Chavez testified for the Secretary in her case-in-chief as a representative sample of employees. Department of Labor ("DOL") investigator Zorayda Vasquez also testified for the Secretary. Richard Gluszak testified for the defense. Both sides submitted exhibits to be considered by the Court and the Secretary made a post-trial legal submission.

After the initial trial, the Secretary amended her complaint on April 13, 2012 to add the retaliation claim, and the defendants filed an answer on April 27, 2012. The parties undertook additional discovery regarding the retaliation claim. The Court held a bench trial on October 4, 2012 so that defendants could present any additional evidence with respect to the retaliation claim. [2] Defendant Luigi Quarta was the only witness for defendants on the remaining retaliation claim.

The Court has fully considered all of the evidence presented by the parties, as well as their written submissions. Below are the Court's Findings of Fact and Conclusions of Law.

---

[1] Both sides consented to a bench trial. (*See* Joint Pretrial Order ("PTO"), ECF No. 30, ¶ 5.)

[2] With the consent of both sides, the Secretary was permitted to present her evidence regarding the retaliation claim during the trial on April 9 and 10. However, to avoid any potential prejudice to defendants, the Court required the Secretary to formally amend the complaint to add the retaliation claim in order to give defendants the opportunity to conduct additional discovery on that claim and then present any additional evidence regarding such claim. Thus, the Secretary presented no additional evidence regarding the retaliation claim on October 4, 2012.

## II. FINDINGS OF FACT

The following section constitutes the Court's Findings of Fact[3] pursuant to Federal Rule of Civil Procedure 52(a)(1). These Findings of Fact are drawn from witness testimony at trial and the parties' trial exhibits, including the undisputed facts submitted by the parties in the PTO.

Defendant Luigi Quarta is the sole owner of SCA Restaurant Corp. d/b/a Luigi Q Italian Restaurant in Hicksville, NY ("the restaurant") (PTO, Stip. Facts ¶¶ 5-7.) The annual dollar volume of sales by the corporation for each of the years 2006, 2007, and 2008 exceeded $500,000. (*Id.* ¶¶ 1-3.) Luigi Quarta is in active control and management of SCA Restaurant Corp. (*Id.* ¶ 8.) Defendants' employees are engaged in commerce, including handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce. (*Id.* ¶ 13.)

Quarta has the authority to hire and terminate employees of SCA Restaurant Corp. (*Id.* ¶¶ 9-10.) Quarta has the authority to determine the rates of compensation of such employees, as well as to direct the work activities of the employees. (*Id.* ¶¶ 11-12.) For the defendants' restaurant, Quarta does the following: (1) decides the menu (*id.* at ¶ 16); (2) decides the prices of the menu offerings (*id.* at ¶ 17); (3) selects the suppliers (*id.* at ¶ 18); and (4) negotiates prices with the suppliers (*id.* at ¶ 19).

### A. Hours and Wages of Employees

During the trial, the Secretary offered the testimony of Alexander Torres, Santos Alfaro Pastor, Jose Anibal Acosta, and Juan Carlos Cantos-Chavez. All four individuals were employed by defendants for a period of time during the relevant time period of May 25, 2006 through the trial. The Secretary also submitted excerpts from the deposition of employee Melvin Isidro Banegas. The Secretary offered this testimony as a representative sample for the twelve employees for which violations of the FLSA were alleged. Based upon the evidence at trial – including the credible testimony of the employees, which was corroborated by the credible testimony of DOL investigator Vasquez – the Court makes the following findings regarding the hours of operation for the restaurant, as well as the employees' hours.

The restaurant was open for lunch and dinner Monday through Friday, and for dinner on Saturday, with the exception of certain holidays and other periodic closings. (*Id.* ¶ 14.) Employees worked all six days of the week that the restaurant was open. (*See e.g.,* Apr. Tr. 35, 81, 125, 184.[4]) The employees always began work at 10:30 a.m. Monday through Friday, and at 3:00 p.m. on Saturday. (*See e.g.*, *id.* 35-36, 81-82, 125-126, 184.) On Monday through Friday, the employees had a scheduled break from 3:00 p.m. until 4:30 p.m.[5] (*See, e.g.*, *id.* 36, 82-83, 126-28, 184-85.)

The only variation in the employees' schedules related to the time they finished work in the evening. Mr. Torres, a

---

[3] To the extent that any Finding of Fact reflects a legal conclusion, it shall to that extent be deemed a Conclusion of Law, and vice-versa.

[4] Due to the format of the transcript, the pagination repeats for portion of the trial held on October 4, 2012. Therefore, the transcript for the testimony given on April 9 and April 10, 2012 is referred to as "Apr. Tr." and the transcript for the testimony given on October 4, 2012 is referred to as "Oct. Tr."

[5] Although employees testified that they did not always receive a full hour and a half break (*see, e.g.*, Apr. Tr. 36, 82-83, 126-28, 184-85), the Secretary is not seeking damages related to any minimum wage or overtime violations as a result of these additional hours (*see id.* 268).

dishwasher, credibly testified that he often left work at 9:00 p.m. on Mondays through Wednesdays, though occasionally he finished work later than 10:00 p.m. (*See id.* 37.) On Thursdays he usually left work after 10:30 or 11:00 p.m., and on Fridays and Saturdays he ended work between 11:00 and 11:30 p.m., though he occasionally could leave earlier if the restaurant did not have many customers. (*See id.* 38-39.) Mr. Acosta, also a dishwasher, credibly testified that he usually ended work at 9:20 or 9:30 p.m. on Mondays through Thursdays, although sometimes he stayed until 10:00 p.m. (*See id.* 128.) On Fridays and Saturdays, Mr. Acosta left work after 10:20 p.m., and sometimes he stayed until 10:30 p.m. or 11:30 p.m. (*See id.* 128-29.) Mr. Banegas, a dishwasher who did not testify at the trial but whose deposition was submitted to the Court, credibly testified that he left work between 10:00 and 11:00 p.m. Monday through Friday, but that he worked until between 11:00 and 11:30 p.m. on Saturdays. (*See* Pl.'s Ex. 13, Dep. of Melvin Banegas ("Banegas Dep."), at 15-16, 23-24.)

Mr. Pastor Alfaro, who was employed by defendants as a cook, credibly testified that he frequently left work at exactly 9:00 p.m. on Monday through Thursday, but that he finished working between 10:00 and 10:30 p.m. on Fridays and Saturdays. (*See* Apr. Tr. 84-85.)

Mr. Cantos-Chavez, who prepared the salads, credibly testified that he usually finished work at 9:00 p.m. Monday through Thursday, though he left later than that one or two days per week. (*See id.* 186.) He finished work at 10:00 p.m. on Fridays and Saturdays, although he stayed at work later than that approximately once per week. (*See id.* 186-87.)

DOL investigator Zorayda Vasquez observed the employees on at least five days

and confirmed some of their representations. (*See id.* 221.) Ms. Vasquez credibly testified that, during the week, the employees arrived at 10:30 a.m., and that they never left the restaurant for their afternoon break for longer than an hour and a half. (*See id.* 222-23.) Ms. Vazquez did not testify regarding the time employees left in the evening, nor did she observe the restaurant on a Saturday. (*See id.* 274.)

Richard Gluszak, defendants' former attorney and advisor, was the sole witness offered by defendants to rebut the aforementioned testimony regarding the hours of employees. Mr. Gluszak testified that he was at Luigi Q Italian Restaurant almost every day from 2001 until some point in 2007. (*See id.* 234.) He observed that employees would usually not arrive until 11:00 or 11:15 a.m., and that the last employee would arrive around 11:30 or 11:40 a.m. (*See id.* 235.) He testified that, on Monday through Friday, employees would begin leaving work at 9:00 p.m., and that all employees would end work by 10:00 p.m. (*See id.* 236.) He also testified that, on Saturdays, some finished work at 9:45 p.m., and that no employees worked later than 10:30 p.m. (*See id.*) However, Mr. Gluszak admitted that not only had he not been to the restaurant since 2007, but that he would not have been able to observe the back door from where he sat in the restaurant, and therefore could not have seen if employees were leaving through the back door. (*See id.* 242-44.)

As noted above, the Court finds the testimony of all of the Secretary's witnesses to be fully credible.[6] Therefore, based on the hours that the employees testified that they

---

[6] To the extent that Mr. Gluszak's testimony as to the hours worked by employees differed from the testimony of the employees, the Court finds the employees to be credible.

worked, the Court finds that all of the employees worked more than forty hours per week. Thus, during the relevant time period, defendants' employees regularly worked between 51 and 62 hours per week at the restaurant. (*See, e.g.*, *id.* 35-39, 81-85, 125-29, 184-87.)

Despite working more than forty hours per week, all of the employees credibly testified that they were paid a flat weekly wage which did not vary based on the number of hours they worked. (*See, e.g.*, *id.* 42, 89-90, 129-130, 187-90.) The employees also testified that they had never been told about overtime. (*See, e.g.*, *id.* 43, 78-79, 125, 182.) Defendant Quarta admitted during his deposition that he always paid the employees of SCA Restaurant Corp. a "fixed weekly rate." (Pl.'s Ex. 12, Dep. of Luigi Quarta ("Quarta Dep.") at 36-37.) Therefore, the Court finds that defendants did not compensate their employees for the hours worked in excess of forty per week.

## B. Records of Employees' Hours and Wages

Defendants stipulated that they did not maintain written records of the hours worked by their employees from June 5, 2006 through at least May 21, 2009. (PTO, Stip. Facts ¶ 15.) In addition, Quarta acknowledged in June 2008 to the DOL that SCA Restaurant Corp. did not keep daily time records or schedules. (*See* Pl.'s Ex. 1, Request for Business Data, at 2.) Although defendants only stipulated that they did not maintain records until May 21, 2009, defendants did not submit any time-keeping records to the Court for the period from May 21, 2009 until the trial on April 9, 2012. In addition, during the relevant time period, defendants paid some of their employees partly by check and partly in cash (Pl.'s Ex. 12, Quarta Dep., at 65; Apr Tr. 88-89, 187), and paid some of their employees in cash

only (*see* Pl.'s Ex. 12, Quarta Dep., at 108, 128-29; Apr. Tr. 41-42, 129). Defendants failed to make, keep, and preserve any records of wages paid to their employees in cash. (*See* Pl.'s Ex. 12, Quarta Dep., at 46-47, 67-68, 108, 121, 129.) Moreover, although defendants made records of payments by check to their employees, those records are inaccurate and incomplete because they do not reflect the additional cash payments that were made to the employees. (*Id.* at 67-68; Apr. Tr. 260-61.) Therefore, based upon the evidence at trial, the Court finds that defendants failed to make, keep, and preserve accurate records of the wages paid to and hours worked by their employees, including the number of hours worked each day, the total number of hours worked each work week, the regular rate of pay, the basis upon which wages were paid, the total straight-time earnings for each work week, and the total overtime compensation paid for each work week.

The Secretary also introduced credible evidence that defendants submitted false time-keeping records to the DOL. The Secretary submitted exhibits of "Daily Time Records" from January 12, 2008 through November 8, 2008, and employee time sheets for August and September 2008 which had been given to the DOL by SCA Restaurant Corp. (*See* Pl.'s Ex. 5; Pl.'s Ex. 6.) The "Daily Time Records" state that employees worked exactly forty hours per week (*see* Pl.'s Ex. 5), while the timesheets show that employees worked forty-four hours per week (*see* Pl.'s Ex. 6). These two records directly contradict each other for employees Jeffrey Chavez and Juan Carlos Cantos-Chavez for August and September 2008. (*See* Pl.'s Ex. 5, at 40-47; Pl.'s Ex. 6, at 1-2.) The timesheets also state that defendants compensated employees for hours worked in excess of forty per week (*see* Pl.'s Ex. 6, at 1-2), while Quarta admitted during his deposition that he paid

his employees a fixed weekly salary (Pl.'s Ex. 12, Quarta Dep., at 36-37). The pages of the "Daily Time Records" were actually photocopies of the first page, with some of the information on the subsequent pages being added in pencil. (*See* Apr. Tr. 250-256.)

Defendants also prepared a fake schedule that was hung in Quarta's office. This schedule falsely claimed that employees worked fewer hours and days than those employees, in fact, worked. (Pl.'s Ex. 7; Apr. Tr. 101-06.) In addition, during DOL's investigation of the defendants, Quarta told employees to tell the DOL investigator that they only worked five days per week and did not start work until 2:00 p.m., even though that information was false. (Apr. Tr. 106-07.)

Not only do the records contradict the testimony of defendants' employees whom the Court find credible, they contradict each other. In addition, these records are supposedly from 2008, although defendants stipulated that in 2008 they "did not keep written records of the hours worked by their employees." (PTO, Stip. Facts ¶ 15.)

In sum, based upon the evidence at trial, the Court finds that defendants clearly created false records in an attempt to convince the DOL that they complied with the FLSA.

## C. Retaliation Against Employees

The Secretary presented credible testimony at trial from Mr. Acosta and Mr. Cantos-Chavez that Quarta attempted to intimate employees from testifying.

Mr. Acosta testified that, on Thursday, April 5, 2012 (just days before the trial was set to commence on April 9, 2012), Quarta asked Mr. Acosta whether he intended to testify in court. (Apr. Tr. 142-43.) When Mr. Acosta answered in the affirmative, Quarta told him that, if he testified, "then there's no more work for you." (*Id.* 142.) Mr. Acosta also stated that an employee of the restaurant told him that Quarta said if Mr. Acosta appeared in court that "he would look for other workers." (*Id.* 145.) After being told that he would lose his job if he testified, Mr. Acosta felt afraid. (*Id.* 147.)

Mr. Cantos-Chavez also testified that, several days prior to the commencement of the trial, Quarta told the employees, using another employee as a translator, that if they came to court they "would only have work there until Saturday" (*id.* 199), and "if [they] showed up in court then [they] . . . would not have a job anymore," (*id.* 202.) Quarta also told the employees that it was their decision whether to come to court, because they could "either come to court or [could] go to work." (*Id.* 201.) Following these conversations, Mr. Chavez felt pressure not to testify and questioned whether he would testify in court, and was afraid and nervous. (*Id.* 202, 214.)

At the continuation of the bench trial on October 4, 2012, Quarta testified that when he told Mr. Acosta and Mr. Cantos-Chavez not to come to work if they testified, he meant that they did not need to show up because he would have either closed the restaurant for the day or gotten temporary replacements. (Oct. Tr. 2, 5-7.)

The Court finds the testimony of Mr. Acosta and Mr. Cantos-Chavez credible, and the testimony of Quarta not credible. It is clear from the evidence, including an evaluation of the credibility of the witnesses, that there was no misunderstanding by the employees of the substance of Quarta's statements. Quarta clearly intended to communicate, and did communicate, his intention to terminate these employees if

they testified, in an attempt to retaliate against them and dissuade them from doing so. Therefore, the Court finds that defendants attempted to intimidate employees from cooperating with the DOL and testifying at the trial.

### D. Economic Losses for Pay Violations

During the relevant period, defendants failed to pay 12 employees a total of $137,867.12 in FLSA overtime premium pay. This figure contained in the Secretary's back wage computations, which is Plaintiff's Exhibit 9 (as revised on May 14, 2012, reflecting back wages accrued through April 8, 2012). The Court finds the Secretary's computation to be accurate based upon the credible evidence adduced at trial.

In the absence of accurate and complete contemporaneous employer records of employees' hours worked and wages received, the Secretary reconstructed the weekly numbers of hours worked by employees and their weekly salaries received during the relevant time period. (Apr. Tr. 262-65.) The Secretary generally reconstructed these figures by relying upon the deposition testimony and trial testimony of defendants' current and former employees. In addition, for some employees, the Secretary relied upon defendants' deposition testimony and discovery responses to reconstruct the employees' weekly salaries. (*Id.*) In order to compute the amount of defendants' back wage liability, the Secretary had to first compute each employee's regular straight-time hourly rate of pay, which was done by dividing the amount of the weekly salary that defendants paid each employee by the approximate number of hours the employee worked each week. Having computed the regular straight-time rate of pay for all hours of work in the work week, the Secretary then computed the amount of overtime

compensation owed for the overtime hours worked by multiplying half of the regular straight-time hourly rate by the number of overtime hours worked (*i.e.*, hours worked in excess of 40 hours each week). Where the state or federal minimum wage exceeded an employee's regular straight time hourly rate of pay as computed above, the Secretary used the applicable minimum wage rate to determine the total wages, regular and overtime, that defendants should have paid each employee for each week. In order to determine the total amount of back wages that defendants owe, the Secretary then subtracted the weekly amount that defendants actually paid to each employee from the amount the employee should have received. (*Id.* 266-71.)

### E. Additional Evidence Regarding Willfulness

As discussed in the Conclusions of Law, the Court finds that the defendants' acts and omissions in committing overtime pay and record-keeping violations were not in good faith; rather, such violations were willful. Summarized below are some additional factual findings by the Court from the trial relating to the willfulness issue.

Since at least 2005, Quarta was aware of state and federal requirements that (1) employees must be paid a minimum wage; (2) any overtime hours worked, in excess of 40 hours in a week, must be paid at one and one-half times the employees' regular hourly wage; and (3) employers must keep records of employee wages and hours. (Pl.'s Ex. 12, Quarta Dep., at 192-94, 196.) In 2003, the New York State Department of Labor issued a Notice of Labor Law Violation to the defendants that included a violation for failure to keep true and accurate records of employee wages and hours worked. (Pl.'s Ex. 8a.)

As noted *supra*, defendants submitted to the U.S. Department of Labor falsified "Daily Time Records" (Pl.'s Ex. 5), and other timesheets (Pl.'s Ex. 6), which were created after the U.S. Department of Labor had initiated its investigation of the defendants. In addition, as noted *supra*, defendants prepared a fake schedule (Pl.'s Ex. 7), which falsely claimed that employees worked fewer hours and days than they worked in fact, and that schedule was hung in Quarta's office (Apr. Tr. 101-06).

Moreover, during the DOL investigation of defendants, Quarta told his employees to tell the DOL investigator that they only worked five days per week and did not start work until 2:00 p.m., even though that information was false. (*Id.* 106-07.) Defendants' manager/maître d' Omar told defendants' employee Mr. Acosta that, with respect to the DOL, Mr. Acosta "only worked 40 hours" per week and "only worked for five days." (*Id.* 141.)

Finally, after the Secretary notified defendants of their violative practices, and after the commencement of the instant lawsuit, defendants failed to come in to compliance with the pay and record-keeping requirements of the Act. (Pl.'s Ex. 12, Quarta Dep., at 212; Apr. Tr. 262.) Instead, defendants continued to pay their employees a weekly salary without paying the employees one and one-half times their regular straight time hourly rate for those hours worked in excess of 40 per week, and also continued to fail to make, keep, maintain, or preserve accurate records of employee hours worked. (Pl.'s Ex. 12, Quarta Dep., at 212; Apr. Tr. 35-39, 81-85, 125-29, 184-87, 262.)

## F. Santos Pastor Alfaro

The Court finds that Santos Pastor Alfaro worked as chef, not as an executive.

As discussed in the Conclusions of Law, this factual finding relates to the affirmative exemption defense asserted by defendants.

Defendants employed Mr. Pastor Alfaro as a chef at defendants' restaurant from at least May 25, 2006 through approximately July 1, 2010. (Apr. Tr. 77.) Mr. Alfaro spent the vast majority of his time at the restaurant preparing and cooking food for the restaurant, including the fish and meat dishes, as well as daily specials and sauces. (*Id.* 91-92, 136-37.) Mr. Pastor Alfaro did not hire or fire employees and did not have the authority to do so. (*Id.* 93-95, 137.) Mr. Alfaro did not make suggestions or recommendations as to the hiring, firing, or promotion of employees of the restaurant. (*Id.* 93-95.) Mr. Pastor Alfaro had no role in interviewing prospective employees of the restaurant, never disciplined defendants' employees, and did not have the authority to discipline. (*Id.* 93-95, 138, 197.) Mr. Pastor Alfaro had no role in determining the salaries or work schedules of defendants' employees. (*Id.* 92-94, 126, 128, 137, 197.) Mr. Pastor Alfaro's work schedule at the restaurant was set by Quarta, not by Mr. Pastor Alfaro. (*Id.* 78, 92.) Mr. Pastor Alfaro did not have keys to the restaurant. (*Id.* 91, 131, 196.) Mr. Pastor Alfaro did not make or keep records for the restaurant. (*Id.* 100-01.) Mr. Pastor Alfaro did not select suppliers for the restaurant, and did not negotiate prices or place orders with the suppliers for the restaurant. (*Id.* 92-93.) Mr. Pastor Alfaro's primary duty at the restaurant was not management, and he did not customarily and regularly direct the work of other employees at the restaurant. (*Id.* 80, 108, 111, 163.)

During the time period relevant to Mr. Pastor Alfaro (namely May 25, 2006 through July 1, 2010), the following credible facts were established: (1) Quarta was generally present at the restaurant for most of the work day each day that the restaurant

was open (Apr. Tr. 48, 80, 138); (2) Quarta made all decisions for the restaurant regarding employee hiring, firing, promotion, pay, and work schedules (*Id.* 93-95, 118, 125, 129-30, 181, 183-84, 189, 196-97); (3) Quarta regularly directed Mr. Pastor Alfaro regarding how to prepare dishes that Mr. Alfaro cooked for the restaurant (*Id.* 79, 111); (4) Quarta and the manager/maître d' had keys to the restaurant (*Id.* 91, 130-31); (5) the manager/maître d' was responsible for opening the restaurant each morning (*Id.* 48, 91, 131, 190-91); (6) the manager/maître d' was generally present at the restaurant throughout the work day every day that the restaurant was open (*Id.* 48, 81, 131); (7) on the few days when Quarta was not at the restaurant, the manager/maître d' was in charge of the restaurant (*Id.* 80-81); (8) Quarta supervised, directed and monitored the work of defendants' employees at the restaurant, including Mr. Pastor Alfaro (*Id.* 79, 92, 111, 138, 197); and (9) the manager/maître d' also supervised, directed, and monitored the work of defendants' employees at the restaurant (*Id.* 40, 80-81, 141).[7]

## III. Burden of Proof

The Secretary bears the burden of proof in this case on each and every claim, as well as on the issue of damages. She must prove by a preponderance of the evidence that defendants did not adequately compensate employees as required by the FLSA. *See Reich v. S. New England Telecomm. Corp.*, 121 F.3d 58, 67 (2d Cir. 1997) ("[The Secretary] must produce sufficient evidence to establish that the employees have in fact performed work for which they were improperly compensated and produce sufficient evidence to show the amount and extent of that work 'as a matter of just and reasonable inference.'" (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946))). The Secretary must also prove by a preponderance of the evidence that defendants violated the recordkeeping and anti-retaliation provisions of the FLSA. Finally, the Secretary must prove the amount of damages by a preponderance of the evidence.

## IV. Conclusions of Law

### A. FLSA Claims

The Secretary asserts that defendants' employees have not been fully compensated for their overtime wages under the FLSA, and that many of their employees were not paid in accordance with the minimum wage requirement. She also alleges that defendants failed to maintain adequate and accurate records as required by the FLSA. In addition, the Secretary asserts that defendants retaliated against two employees for cooperating with this litigation. For the reasons set forth below, the Court finds that the Secretary has proved by a preponderance of the evidence that defendants have violated the overtime, minimum wage, record keeping, and anti-retaliation provisions of the FLSA.

As a threshold matter, the Court concludes that jurisdiction over this action exists pursuant to Section 17 of the Fair Labor Standards Act, 29 U.S.C. § 217, and 28 U.S.C. §§ 1331 and 1345. Moreover, the Court concludes that (1) the business activities of the SCA Restaurant Corporation constitute an enterprise within the meaning of Section 3(r) of the Act, and (2) SCA Restaurant Corporation is an enterprise engaged in commerce within the meaning of Sections 3(s)(1)(A) of the Act and,

---

[7] Prior to approximately late 2008, the manager/maitre d' at the restaurant was Vinnie Salluzzi. (Apr. Tr. 80, 190-92.) After approximately late 2008, the manager/maitre d' was Omar Ortega. (*Id.* 81, 191-92.)

9

therefore, is covered by the Act. In addition, the Court concludes that, at all relevant times, (1) SCA Restaurant Corporation has been an employer of employees of the defendants' restaurant within the meaning of Section 3(d) of the Fair Labor Standards Act, 29 U.S.C. § 203(d) (PTO, Stip. Law ¶ 2), (2) Luigi Quarta has been an employer of the employees of the defendants' restaurant within the meaning of Section 3(d) of the Fair Labor Standards Act, 29 U.S.C. § 203(d)[8] (PTO, Stip. Law ¶ 3); and (3) each defendant is jointly and severally liable for all back wages and liquidated damages owed under the Act.

---

[8] With respect to this conclusion, the Court has applied the standard set forth in *Herman v. RSR Security Services, Ltd.*, 172 F.3d 132 (2d Cir. 1999), which states that "the overarching concern [in determining whether an individual is an employer] is whether the alleged employer possessed the power to control the workers in question, with an eye to the 'economic reality' presented by the facts of each case." *Id.* at 139 (internal citations omitted); *see also Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 71 (2d Cir. 2003) (determining whether an entity is an employer "is to be based on the circumstances of the whole activity, viewed in light of 'economic reality'" (internal citation and quotation marks omitted)). Four non-exclusive factors that a court should consider in determining whether an individual is an employer are: "'whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.'" *Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253, 308 (S.D.N.Y. 2011) (quoting *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984)). After considering the *Carter* factors, as well as all of the evidence in the record, there is no question that under the *Herman* standard that Quarta has ownership and operational control of the restaurant in every respect and has the power to control the employees of the restaurant. Therefore, Quarta is an employer for purposes of the FLSA and is jointly and severally liable for all damages under the Act.

## 1. Statute of Limitations

A suit under the FLSA must be commenced within two years after the cause of action has accrued, unless a plaintiff can show that a defendant's violation of the Act was willful, in which case a three-year statute of limitation applies. 29 U.S.C. § 255(a). For an employer's actions to be willful, the employer must have "either [known] or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA]." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133, (1988). Courts in this Circuit have generally left the question of willfulness to the trier of fact. *See, e.g.*, *Kaur v. Royal Arcadia Palace, Inc.*, 643 F. Supp. 2d 276, 294-95 (E.D.N.Y. 2007) (denying summary judgment as to willfulness where plaintiffs had complained to defendants about their pay); *Damassia v. Duane Reade, Inc.*, No. 04 Civ. 8819, 2005 WL 1214337, at *2-3 (S.D.N.Y. May 20, 2005) (denying motion to dismiss as to willfulness where plaintiffs alleged defendants knew the requirements of FLSA and deliberately misclassified them as executives); *Vaicaitiene v. Partners in Care Inc.*, No. 04 Civ. 9125, 2005 WL 1593053, at *7 (S.D.N.Y. July 6, 2005) (finding willfulness to be a question for the trier of fact); *Davis v. Lenox Hill Hosp.*, No. 03 Civ. 3746, 2004 WL 1926086, at *7 (S.D.N.Y. Aug. 31, 2004) (same). Plaintiff bears the burden of proof as to an employer's willfulness. *See Herman*, 172 F.3d at 141.

The Court finds, based on all of the evidence, that the Secretary has met her burden in proving that defendants willfully violated the Act. Quarta admitted during his deposition that he has been aware of minimum wage requirements since 1999, and learned of the overtime requirements when he owned a previous restaurant. (*See* Pl.'s Ex. 12, Quarta Dep., at 192-94.) He also admitted that he did not change his

practices even after the DOL began their investigation. (*See id.* at 212.) Instead, he created false records and told employees to lie to the DOL about the amount of days and hours they worked. (*See* Apr. Tr. 106-07, 141.)

Courts have held that similar conduct constituted a willful violation of the FLSA. *See, e.g., Chao v. Vidtape, Inc.*, 196 F. Supp. 2d 281, 295-96 (E.D.N.Y. 2002) (finding that defendants acted willfully when they admitted to knowledge of the minimum wage and overtime laws and told their employees to lie to DOL investigators); *Moon v. Kwon*, 248 F. Supp. 2d 201, 231 (S.D.N.Y. 2002) (finding willful violations where the evidence was "clear that the defendants [] flagrantly violated basic recordkeeping requirements"). Since defendants' violation of the Act was willful, a three-year statute of limitations applies and the Secretary may seek damages from May 21, 2006, three years before the complaint was filed in this action, until April 8, 2012, the day before the trial began.

### 2. Unpaid Wages Claim

Under the FLSA, employers engaged in interstate commerce must pay overtime pay to an employee working more than forty hours per week "at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). The regular, minimum rates at which employees must be paid are established by Section 6 of the FLSA. *Id.* § 206(a). In addition, the FLSA sets forth a broad civil enforcement scheme, pursuant to which "[a]ny employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." *Id.*

§ 216(b). In an action to recover unpaid overtime wages under the FLSA, a plaintiff must show that: "(1) he was an employee who was eligible for overtime ([*i.e.,*] not exempt from the Act's overtime pay requirements); and (2) that he actually worked overtime hours for which he was not compensated." *Hosking v. New World Mortg., Inc.*, 602 F. Supp. 2d 441, 447 (E.D.N.Y. 2009).

The FLSA grants the Secretary of Labor the right "to bring an action by or on behalf of any employee" to recover unpaid minimum wages or overtime compensation. 29 U.S.C. § 216(c).

The Secretary alleges that the employees worked between 53.5 and 61.5 hours per week, and that they were not compensated for overtime work. The Secretary also alleges that four of defendants' employees were not paid the minimum wage as required by federal and New York law.

Although a plaintiff normally "has the burden of proving that he performed work for which he was not properly compensated," when an employer has "inaccurate or inadequate" records, the plaintiff "has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Mt. Clemens*, 328 U.S. at 687. Sufficient evidence may be established by "recollection alone." *Doo Nam Yang v. ACBL Corp.*, 427 F. Supp. 2d 327, 335 (S.D.N.Y. 2005); *see also Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 362 (2d Cir. 2011) ("It is well settled among the district courts of this Circuit, and we agree, that it is possible for a plaintiff to meet this burden through estimates based on his own recollection."). "The burden then shifts to

the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Mt. Clemens*, 328 U.S. at 687-88.

Because, as discussed *supra*, the Court has found that defendants did not maintain accurate records, the Secretary must only put forth sufficient evidence that employees were not compensated as required by the FLSA, and must produce sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The Court finds that the Secretary has met that burden. As previously stated, the Court finds the testimony of the employees to be credible, and therefore, finds that they worked more than forty hours per week at a fixed rate. Quarta also admitted during a deposition that he paid his employees based on a fixed weekly rate. As discussed more fully *infra*, the amount and extent of the work has been proven by the Secretary through the credible testimony of the witnesses.

Defendants have not presented evidence of the precise amount of work performed or evidence to negate the inference drawn from the Secretary's evidence. Defendants only presented one witness regarding the hours of the employees, and that witness admitted that he not only could not see the back door that employees frequently used, but that he was not present at the restaurant for the vast majority of the time period covered by this suit. In short, defendants' evidence does not, in any way, undermine the credible testimony of the Secretary's witnesses and the exhibits offered into evidence.

Therefore, the Court finds that defendants have violated the minimum wage and overtime provisions of the FLSA. 29 U.S.C. §§ 206, 207, 215(a)(2). Specifically,

the Court finds the following: (1) during the relevant time period, defendants violated Sections 7 and 15(a)(2) of the Act because defendants paid their employees a fixed weekly salary for working more than 40 hours per week without paying them the statutory overtime premium of one and one-half times the regular straight time hourly rate for the hours worked in excess of 40 per week; (2) during the relevant time period, defendants further violated Sections 7 and 15(a)(2) of the Act for the work weeks when defendants paid certain employees at a reconstructed regular hourly rate lower than the then-applicable New York State and federal minimum wage rate, *see* 29 C.F.R. §§ 778.5, 778.315; and (3) that defendants are, therefore, liable for the difference between the amount that employees were paid and the amount that employees would have earned if they had received (a) hourly pay at the higher of their regular rate of pay or the applicable minimum wage, plus (b) time and a half their regular rate of pay (or the applicable minimum wage rate, if higher) in overtime compensation for all hours worked in excess of forty. *See, e.g., Rodriguez v. Queens Convenience Deli Corp.*, No. 09-CV-1089, 2011 WL 4962397, at *2 (E.D.N.Y. Oct. 18, 2011); *Cao v. Chandara Corp.*, No. 00 Civ. 8057, 2001 WL 34366628, at *6 (S.D.N.Y. July 25, 2001).

### a. Classification of Santos Pastor Alfaro as an Exempt Employee

Defendants attempted to prove at trial that Santos Pastor Alfaro was exempt from the overtime pay requirements because he was "employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). After considering the evidence presented at trial, the Court finds that Mr. Pastor Alfaro is not exempt from the overtime provisions of the FLSA.

i. Legal Standard

Not all workers are covered by the overtime provisions of the FLSA. For example, "any employee employed in a bona fide executive, administrative, or professional capacity" is exempt from the overtime pay requirements. 29 U.S.C. § 213(a)(1). FLSA exemptions such as this one are to be "narrowly construed." *Martin v. Malcolm Pirnie, Inc.*, 949 F.2d 611, 614 (2d Cir. 1991). Moreover, the "employer bears the burden of proving that its employees fall within an exempted category of the [FLSA]." *Id.* "[I]t is a strict question of law whether the activities and responsibilities of the employee, once established, exempt him or her from the FLSA's overtime requirements." *Alberti v. Cnty. of Nassau*, 393 F. Supp. 2d 151, 174 (E.D.N.Y. 2005) (citing *Tomney v. Int'l Ctr. for Disabled*, 357 F. Supp. 2d 721, 739-40 (S.D.N.Y. 2005)).

The DOL has enacted regulations that clarify whether an employee is exempt as "employed in a bona fide executive, administrative, or professional capacity" under Section 213(a)(1). [9] Under the first prong, the employees must be paid on a "salary basis" at least $455 per week. 29 C.F.R. § 541.100(a)(1). An employee is considered to be paid on a "salary basis" if the employee "regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount" that is not subject to deductions based on the "quality or quantity of the work performed." 29 C.F.R. § 541.602(a). Subject to certain exceptions,

the employee must receive "the full salary for any week in which the employee performs any work without regard to the number of days or hours worked." *Id.*

The employee must also: (1) have "management" as her "primary duty"; (2) "customarily and regularly direct[] the work of two or more other employees"; and (3) have either "the authority to hire or fire other employees" or whose suggestions on "hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." 29 C.F.R. §§ 541.100(a)(2-4). A defendant must prove that the employee satisfies all four prongs of the regulation to be classified as exempt. *See Perez v. Radioshack Corp.*, 552 F. Supp. 2d 731, 736 (N.D. Ill. 2005).

The regulations further explain that "management" may include, but is not limited to, activities such as:

> interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; . . . appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; . . . providing for the safety and security of the employees or the property; planning and controlling the budget; . . . .

29 C.F.R. § 541.102.

---

[9] The regulations that are promulgated by the Secretary of Labor pursuant to an express grant of authority from Congress under the FLSA have the force and effect of law. They are to be given controlling weight unless they are found to be arbitrary, capricious, or manifestly contrary to the statute. *See Freeman v. Nat'l Broad. Co.*, 80 F.3d 78, 82 (2d Cir. 1996).

The regulations state that "'primary duty' means the principal, main, major or most important duty that the employee performs." *Id.* § 541.700(a). When determining the primary duty of an employee, the factors to be considered include, but are not limited to, "the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." *Id*. Although the amount of time spent is only a "useful guide" and not dispositive, "employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement." *Id.* § 541.700(b).

ii. Application

As to the "salary" prong of the test, Mr. Pastor Alfaro's salary ranged from $850 to $1000 per week during the relevant time period. (*See* Apr. Tr. 89-90.) This salary well exceeds the minimum of $455 per week required for an employee to fall within the Section 213(a) exemption. There is no indication that Mr. Pastor Alfaro's payments were "subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.602(a). Accordingly, Mr. Pastor Alfaro satisfies the "salary" prong of the test for an exemption under Section 213(a)(1).

However, after considering all of the evidence, the Court finds that management was not Mr. Pastor Alfaro's primary duty. Some testimony was presented that he would direct which salads and dressings to make (*see* Apr. Tr. 206), or which dishes to clean (*see* Pl.'s Ex 13, Banegas Dep., at 38-39). However, he spent the vast majority of

his day cooking food. (*See, e.g.*, Apr. Tr. 91-92, 136-37.) He did not have keys to the restaurant, interview prospective employees, or determine the salaries or schedules of other employees in the kitchen. (*See id.* 91-95.) Although the amount of time that Mr. Pastor Alfaro spent cooking is not dispositive, defendants have not introduced sufficient evidence that his "primary duty" was, in fact, management.

Even if defendants had satisfied their burden on that prong, they have introduced no evidence that Mr. Pastor Alfaro had the authority to hire and fire employees, or that his suggestions were given particular weight. Mr. Pastor Alfaro credibly testified that he did not have the responsibility to hire or fire employees, and Mr. Acosta confirmed that fact. (*See id.* 93-95, 137-38.) The only suggestion otherwise is that a former dishwasher stated during a deposition that he quit his job at the restaurant because he did not get along with Mr. Pastor Alfaro, but he did not state that Mr. Pastor Alfaro fired him or suggested to Quarta that he be fired. (Pl.'s Ex. 13, Banegas Dep., at 10.)

In sum, the Court concludes that, when Mr. Pastor Alfaro was employed by defendants, he did not have the authority to hire or fire other employees, did not have management as his "primary duty," and did not "customarily and regularly direct the work of two or more other employees." Therefore, the Court finds that Mr. Pastor Alfaro was not an "employee employed in a bona fide executive capacity" within the meaning of Section 13(a)(1) of the Act, as well as 29 C.F.R. Part 541. Accordingly, Mr. Pastor Alfaro was not an exempt employee under the FLSA, and the Secretary may recover unpaid overtime wages on his behalf. *Compare Garcia v. Panco Villa's of Huntington Vill., Inc.*, No. 09-CV-486, 2011 WL 1431978, at *3

(E.D.N.Y. Apr. 14, 2011) (finding that employee was not exempt under FLSA when his primary duty was cooking and there was no evidence that he had management duties or had the authority to hire and fire employees) *with Coberly v. Christus Health*, 829 F. Supp. 2d 521, 529-30 (N.D. Tex. 2011) (holding that senior chef was an exempt employee when he procured food supplies and kitchen equipment, planned meals, directed and supervised the operation of kitchen staff, and interviewed and recommended the hiring of food service workers).

### 3. Record-Keeping Claim

Under the FLSA, employers engaged in interstate commerce must "make, keep, and preserve" records of the wages and hours of their employees. 29 U.S.C. § 211(c); *see also Mt. Clemens*, 328 U.S. at 687 (stating that employers have a "duty under § 11(c) of the Act to keep proper records of wages, hours and other conditions and practices of employment").

The DOL has enacted regulations that detail the precise records an employer must keep on every employee. An employer is required to state, among other things, "the time of day and day of week on which the employee's workweek begins," "hourly rate of pay for any workweek in which overtime compensation is due," "the monetary amount paid on a per hour, per day, [or] per week . . . basis," the "hours worked each workday and total hours worked each workweek," "total daily or weekly straight-time earnings or wages due for hours worked . . . exclusive of premium overtime compensation" and "total premium pay for overtime hours." 29 C.F.R. § 516.2(a).

As described in the Findings of Fact, defendants did not maintain records of the hours and wages that their employees worked. Defendants even stipulated that they did not maintain records from June 5, 2006 through at least May 21, 2009. The Court also found that any records that defendants did maintain were inaccurate.

In sum, the Court concludes that defendants violated the record-keeping provisions of the FLSA. 29 U.S.C. §§ 211(c), 215(a)(5). *See, e.g., Herman v. Task Force Sec. & Investigations, Inc.*, No. 93-CV-5726, 1999 WL 486535, at *6 (E.D.N.Y. Jul. 7, 1999) (finding after a bench trial that defendants violated the record-keeping provisions of the FLSA when they did not record the number of hours employees worked in a week and falsified the pay employees received). In particular, during the relevant time period, defendants failed to make, keep, and preserve adequate and accurate records of their employees and of the wages, hours, and other conditions of employment which they maintained as prescribed by the Regulations issued and found at 29 C.F.R. Part 516, and such failures constituted a *per se* violation of the Act. Moreover, the insufficient records that defendants did produce failed to show adequately and accurately, among other things, the hours worked each workday, the total hours worked each workweek, the regulate rate of pay, the basis upon which wages were paid, the total straight-time earnings for each workweek, and/or the total overtime compensation for each workweek, with respect to defendants' employees.

### 4. Retaliation Claim

The anti-retaliation provision of the FLSA provides that it shall be unlawful for any person:

> to discharge or in any other manner discriminate against any employee because such employee has filed any

complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee.

29 U.S.C. § 215(a)(3). To establish a *prima facie* case of retaliation, a plaintiff must show "participation in protected activity known to the defendant, an employment action disadvantaging the person engaged in the protected activity, and a causal connection between the protected activity and the adverse employment action." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000) (citation and internal quotation marks omitted); *see also Hyunmi Son v. Reina Bijoux, Inc.*, 823 F. Supp. 2d 238, 242 (S.D.N.Y. 2011). "Once the plaintiff establishes a prima facie case of FLSA retaliation, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment action." *Mullins v. City of N.Y.*, 626 F.3d 47, 53 (2d Cir. 2010) (citation and internal quotation marks omitted). "If the defendant meets this burden, the plaintiff must produce sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." *Id.* at 53-54.

In this case, there is no question that testifying at the request of the DOL against an employer is a "protected activity." *See Lambert v. Genesee Hosp.*, 10 F.3d 46, 55 (2d Cir. 1993), *abrogated on other grounds by Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325 (2011). Mr. Acosta and Mr. Cantos-Chavez also suffered an adverse employment action. Although they were not actually fired by defendants,

the Secretary can satisfy the standard if she shows that the action would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (citation and internal quotation marks omitted). The adverse action must be "material" and not "trivial." *Id.* The Second Circuit has held that there is "little doubt" that an action by an employer that carries the "possibility of termination" is a disadvantageous action. *Mullins*, 626 F.3d at 54. Thus, the Court concludes that the threatened termination was adverse and would dissuade a reasonable worker from making or supporting FLSA claims. The causal connection is also clear since the Court found the testimony of the employees credible that Quarta specifically linked their appearance in court with the termination of their employment. The Secretary has, therefore, established a *prima facie* case of retaliation.

Although defendants attempted to articulate a legitimate, non-retaliatory explanation for the conversations – namely, that Quarta was only referring to scheduling at the restaurant during the trial, not termination – the Court finds that explanation not credible. It is abundantly clear from the credible testimony of Mr. Acosta and Mr. Cantos-Chavez that Quarta intended to communicate, and did communicate, to these employees that they would be terminated if they testified at the trial. Thus, Quarta retaliated against the employees by telling them they would be terminated.

In sum, the evidence established that Quarta intentionally attempted to prevent two of his current employees from testifying, including threatening those employees with discharge if they testified, and that his conduct was calculated to

dissuade a reasonable worker from testifying at the proceeding. Therefore, the Court concludes, based upon Quarta's actions (including the threatening statements), that the Secretary has demonstrated a violation of the anti-retaliation provisions of the FLSA.

### B. Damages

The Secretary seeks (1) $137,867.12 in unpaid wages for violations of the minimum wage and overtime provisions of the FLSA; (2) $137,867.12 in liquidated damages for willful violations of the Act; (3) $4,000 in compensatory damages for emotional distress for violations of the anti-retaliation provisions of the Act; and (4) $15,000 in punitive damages for violations of the anti-retaliation provisions of the Act. The Secretary also seeks an injunction restraining defendants from future violations of the FLSA. 29 U.S.C. § 217. In addition, the Secretary requests that defendants be required to pay their costs. 29 U.S.C. § 216(b).

### 1.  Damages for Undocumented Workers

In their pre-trial brief, defendants argue that many of defendants' employees are not entitled to liquidated damages because they are not legally permitted to work in the United States. (Defs.' Proposed Findings of Facts/Conclusions of Law, Sept. 8, 2011, at 2-3.) As an initial matter, the Court must determine whether the Supreme Court's decision in *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137 (2002), forecloses the possibility of any backpay or liquidated damages for employees who may not have been permitted to work in the United States.

In *Hoffman*, the National Labor Relations Board awarded backpay to an employee who had been illegally fired from his job for supporting a union-organizing campaign. After the Board had found against the employer, it was discovered that the employee was not legally allowed to work in the United States and had procured the job through false documentation. *See id.* at 140-42. The Supreme Court held that this relief could not be awarded by the Board because it contradicted federal immigration policy as expressed in the Immigration Reform and Control Act of 1986 (IRCA). *See id.* at 140. Specifically, the Court stated that the Board did not have the authority to "award backpay to an illegal alien for years of work not performed, for wages that could not lawfully have been earned, and for a job obtained in the first instance by a criminal fraud." *Id.* at 149.

Defendants argue that the Court's decision in *Hoffman* should be extended to foreclose relief under the FLSA to those who cannot legally work in this country. This argument has been presented in district courts both within this Circuit and across the country, and has failed in every circumstance except one. *See Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 243 (2d Cir. 2006) (collecting cases and stating that "a number of district courts have concluded, even after *Hoffman Plastic,* that IRCA does not preclude such FLSA awards").

District courts that have declined to extend *Hoffman* have done so for a variety of reasons. Many courts have stated that the holding in *Hoffman* is limited to precluding relief for work not yet performed, as opposed to work already performed. *See Solis v. Cindy's Total Care, Inc.*, No. 10-CV-7242, 2011 WL 6013844, at *2 (S.D.N.Y. 2011); *Galdames v. N & D Inv. Corp.*, No. 08-CV-20472, 2008 WL 4372889, at *2 (S.D. Fl. Sept. 24, 2008);

*Zavala v. Wal-Mart Stores, Inc.*, 393 F. Supp. 2d 295, 322 (D. N.J. 2005).

These courts have argued that this distinction between work already performed and work not yet performed means that the policies of IRCA are "not implicated [] in the same respect." *Zavala*, 393 F. Supp. 2d at 322. Some courts have stated that application of the FLSA to illegal aliens actually supports IRCA because "[i]f the FLSA did not cover such workers, employers would have an incentive to hire them." *Villareal v. El Chile, Inc.*, 266 F.R.D. 207, 214 (N.D. Ill. 2010) (citation and internal quotation marks omitted); *see also Flores v. Amigon*, 233 F. Supp. 2d 462, 464 (E.D.N.Y. 2002) ("If employers know that they will not only be subject to civil penalties . . . and criminal prosecution . . . when they hire illegal aliens, but they will also be required to pay them at the same rates as legal workers for work actually performed, there are virtually no incentives left for an employer to hire an undocumented alien in the first instance."); *Singh v. Jutla & C.D. & R's Oil, Inc.*, 214 F. Supp. 2d 1056, 1062 (N.D. Cal. 2002) (stating that the FLSA "discourages employers from hiring [illegal immigrants] because it eliminates employers' ability to pay them less than minimum wage or otherwise take advantage of their status.").

Courts have also discussed how "employee" is defined by the FLSA as "any individual employed by an employer." 29 U.S.C. § 203(e). "Because undocumented workers are not among the groups of workers specifically exempted in the statute, they plainly come within the broad statutory definition of 'employee.'" *Villareal*, 266 F.R.D. at 212-213; *see also In re Reyes*, 814 F.2d 168, 170 (5th Cir. 1987) ("[I]t is well established that the protections of the Fair Labor Standards Act are applicable to

citizens and aliens alike and whether the alien is documented or undocumented is irrelevant.").

At least one court has also granted deference to the DOL's interpretation that the FLSA covers undocumented workers. *See Zavala*, 393 F. Supp. 2d at 324 ("The fact that the Department of Labor, which is charged with enforcing the FLSA, construes the statute to protect undocumented workers, even after *Hoffman*, further convinces this Court that Plaintiffs' undocumented status should not bar them from seeking relief under the Act.").

In *Jin-Ming Lin v. Chinatown Restaurant Corp.*, 771 F. Supp. 2d 185 (D. Mass. 2011), the court rejected all of these arguments as to why *Hoffman* should not be extended to the FLSA. However, the court still found *Hoffman* inapplicable because "[a]wards for back pay under the NLRA, at issue in *Hoffman* are discretionary" while "[c]ourts do not have discretion to deny the award of FLSA damages when they have been proved." *Id.* at 189-90. The court stated that while the "tension" between the policies underlying the FLSA and IRCA exist, "[i]n *Hoffman* the Court was able to find a resolution by giving priority to the statutory policy of the IRCA over the administrative discretion of the NLRB. That resolution is not possible where both poles of the conflict are statutory directives. A court entertaining an FLSA suit lacks the authority or discretion to resolve the tension." *Id.* at 190; *see also Cindy's Total Care*, 2011 WL 6013844, at *3 (distinguishing *Hoffman* because it arose in the context of judicial review of administrative action).

It appears that only one district court decision has denied backpay to an undocumented worker post-*Hoffman*. *See Renteria v. Italia Foods, Inc.*, No. 02-C-495,

2003 WL 21995190 (N.D. Ill. Aug. 21, 2003). The court reasoned that "the Supreme Court has made it clear that awarding back pay to undocumented aliens contravenes the policies embodied in [IRCA]." *Id.* at *6.

Although district courts have directly confronted the application of *Hoffman* to the FLSA, the Eleventh Circuit held pre-*Hoffman* that undocumented workers could receive compensation under the Act. They stated that the FLSA should cover these workers because the Supreme Court "has adopted an expansive definition of the term 'employee' under the [FLSA] . . . [and] has consistently refused to exempt from coverage employees not within a specific exemption." *Patel v. Quality Inn S.*, 846 F.2d 700, 702 (11th Cir. 1988). The court also stated that the "FLSA's coverage of undocumented aliens goes hand in hand with the policies behind IRCA." *Id.* at 704.[10]

For all of the foregoing reasons, the Court finds the overwhelming weight of authority persuasive and holds that *Hoffman* does not preclude an award of backpay to undocumented workers.[11] Therefore, even if

the Court had proof that the employees were not authorized to work in the United States, which it does not, the Secretary would still be entitled to damages for backpay on their behalf.

The Court also holds that the Secretary would be entitled to liquidated damages even if the employees were undocumented workers. At first blush, it may appear that liquidated damages are a penalty, similar to the award for work not actually performed in *Hoffman*. However, liquidated damages "are not a penalty exacted by the law, but rather compensation to the employee occasioned by the delay in receiving wages due caused by the employer's violation of the FLSA." *Herman*, 172 F.3d at 142; *see also Reich*, 121 F.3d at 71 ("Liquidated damages under the FLSA are considered compensatory rather than punitive in nature.").

Since liquidated damages are a form of compensation similar to backpay, and are not damages for work not performed, the Court finds that *Hoffman* would not preclude the Secretary from receiving liquidated damages even if the employees were not legally entitled to work in the United States. *See Ulin v. Lovell's Antique Gallery*, C-09-3160, 2010 WL 3768012, at *7-9 (N.D. Cal. Sept. 22, 2010) (holding that *Hoffman* does not prevent a plaintiff who used false documents to secure employment from receiving liquidated damages under the FLSA).

### 2. Backpay

The Secretary seeks $137,867.12 in unpaid wages for violations of the minimum wage and overtime provisions of the FLSA.

---

[10] The Eleventh Circuit recently held that *Patel* is still binding precedent within that Circuit post-*Hoffman*, but did not analyze the *Hoffman* decision and how it could apply to the FLSA. The panel simply stated that "[w]hile an intervening decision of the Supreme Court can overrule the decision of a prior panel of our court, the Supreme Court decision must be clearly on point" and that *Hoffman* was not "clearly on point." *Galdames v. N & D Inv. Corp.*, 432 F'Appx. 801, 803-804 (11th Cir. 2011) (citation and internal quotation marks omitted).

[11] During the trial, because the immigration status was irrelevant to issues in the case and not probative on the issue of the credibility of the witnesses in this case, the Court did not allow defendants to question the employees regarding their immigration status. *See, e.g., Widjaja v. Kang Yue USA Corp.*, 09-CV-2089, 2010 WL 2132068, at *1-2 (E.D.N.Y. May 20, 2010) (denying discovery of plaintiffs' immigration status in FLSA case); *Zeng Liu v. Donna Karan Int'l,*

*Inc.*, 207 F. Supp. 2d 191, 192-193 (S.D.N.Y. 2002) (same).

29 U.S.C. § 216(b or c). (*See* Pl.'s Revised Trial Ex. 9, at 1.)

Because the Secretary did not have records of the exact times employees worked each day, the DOL arrived at this figure using approximations based on the credible testimony presented at trial and during depositions. If an employee did not testify, the DOL approximated their hours and wages based on the testimony of an employee with their same or similar responsibilities. (*See* Apr. Tr. 265-271); *see also Reich*, 121 F.3d at 67 (stating that "it is well-established that the Secretary may present the testimony of a representative sample of employees").

The Court finds the damage calculations by the DOL to be a reasonable estimate of the amount due to the employees based upon the evidence in the record, and further finds that the Secretary has met her burden of proof on this issue. In FLSA cases, the damages need not be precise. *See Mt. Clemens*, 328 U.S. at 688. ("[T]he court may [] award damages to the employee, even though the result be only approximate.") Once a plaintiff has proven a *prima facie* case, "the burden shifts to the employer, and if the employer fails to produce evidence of the 'precise amount of work performed' or evidence to 'negative the reasonableness of the inference to be drawn from the employee's evidence,'" then approximate damages may be awarded. *Reich*, 121 F.3d at 67 (quoting *Mt. Clemens*, 328 U.S. at 687-88). In particular, the Secretary did establish a *prima facie* case and the Secretary has met her burden, through the testimony of a representative sample of employees, of establishing a pattern and practice of defendants' FLSA violations, including overtime pay violations. This methodology, which is supported by the credible testimony at trial (including the sample of employees)

and reasonable inferences from their testimony, is reflected in Exhibit 9 as revised May 14, 2012, which calculates back wages accrued through April 8, 2012. The DOL's methodology for computing defendants' unpaid overtime liability is fair and reasonable in light of defendants' failure to have contemporaneously and accurately recorded the employees' hourly rates of pay and numbers of hours worked. *See Brock v. Norman's Country Market, Inc.*, 835 F.2d 823, 828 (11th Cir. 1988). Defendants have not produced any credible evidence of the precise hours the employees worked, or any evidence to negate the reasonableness of the inference to be drawn from the Secretary's evidence. In sum, the Secretary has met her burden of demonstrating the appropriate amount of damages for unpaid wages is $137,867.12.[12]

### 3.   Liquidated damages

The Secretary seeks $137,867.12 in liquidated damages for willful violations of the FLSA. Under the FLSA, employers who violate the Act are liable not only for unpaid wages but for "an additional equal amount as liquidated damages." 29 U.S.C. § 216(c). The Portal-to-Portal Act modified the FLSA by allowing courts, in their discretion, to reduce the amount awarded in liquidated damages or to eliminate them entirely if an employer proves that its actions were "in good faith and that [it] had reasonable grounds for believing that [its] act or omission was not a violation" of the FLSA." 29 U.S.C. § 260. "[T]he employer bears the

---

[12] In connection with those damages, as reflected in revised Exhibit 9, the Court concludes that, of the total unpaid overtime pay and liquidated damages judgment to which the Secretary is entitled, $10,739.73 in unpaid overtime pay, and an equal amount in liquidated damages, discussed *infra*, for a combined subtotal of $21,479.46, is owed for the period of September 15, 2011 (when defendant Quarta filed for bankruptcy) through April 8, 2012.

20

burden of establishing, by plain and substantial evidence, subjective good faith and objective reasonableness." *Reich*, 121 F.3d at 71 (citation and internal quotation marks omitted). "The burden . . . is a difficult one to meet, however, and double damages are the norm, single damages the exception." *Id.* (alteration, citation and internal quotation marks omitted).

In holding that the statute of limitations in this case should be three years, the Court found that the Secretary had met her burden in proving that defendants' actions were willful. Quarta admitted in his deposition that he knew of the minimum wage and overtime provisions of the law, and yet he continued to violate the law. Defendants also attempted to cover-up their violations by creating false records, telling employees to lie to the DOL, and threatening them with termination. Therefore, the Court concludes that defendants' actions were not in good faith, and that they had no reasonable grounds for so acting. Accordingly, the Court finds that the Secretary is entitled to a judgment in the amount of $137,867.12 in liquidated damages. *See Brock v. Wilamowsky*, 833 F.2d 11, 20 (2d Cir. 1987) ("The [FLSA] does not authorize the court to decline to award liquidated damages, in whole or in part, unless the employer has established its good-faith, reasonable-basis defense.").

#### 4. Retaliation

The Secretary also requests $4,000 in compensatory damages for emotional distress for violations of the anti-retaliation provisions of the FLSA ($2,000 each for Mr. Acosta and Mr. Cantos-Chavez), and $15,000 in punitive damages for violations of the anti-retaliation provisions of the Act ($7,500 each for Mr. Acosta and Mr. Cantos-Chavez). In 1977, Congress amended the FLSA to allow plaintiffs to be

awarded "such legal or equitable relief as may be appropriate to effectuate the purposes" of the anti-retaliation provisions. 29 U.S.C. § 216(b); Fair Labor Standards Amendments of 1977, Pub. L. No. 95-151, 91 Stat. 1245 (1977). Courts have held that compensatory damages for emotional distress and punitive damages are both appropriate remedies under Section 216(b). *See Travis v. Gary Cmty. Mental Health Ctr., Inc.*, 921 F.2d 108, 111-112 (7th Cir. 1990); *Sines v. Serv. Corp Int'l*, No. 03-CV-5465, 2006 WL 3247663, at *1-3 (S.D.N.Y. Nov. 8, 2006) (finding that punitive damages are available); *Lai v. Eastpoint Int'l, Inc.*, No. 99-CV-2095, 2002 WL 265148, at *1 (S.D.N.Y. Feb. 22, 2002) (adopting Report and Recommendation) (awarding damages for emotional distress).

The Court hereby awards the Secretary $2,000 in compensatory damages for emotional distress ($1,000 each for Mr. Acosta and Mr. Cantos-Chavez). Mr. Acosta and Mr. Cantos-Chavez did not testify that they exhibited any physical symptoms from their emotional distress. Mr. Acosta said he "kind of felt afraid" (Apr. Tr. 147), and Mr. Cantos-Chavez testified that he "felt afraid, nervous" (*id.* 202). They did not elaborate further on any emotional distress. Therefore, the Court concludes that $1,000 per employee for compensatory damages has been proven by the Secretary in this case and awards that amount.

However, the Court declines to award punitive damages. Punitive damages are discretionary and may be awarded "to punish the defendant for his outrageous conduct and to deter him and others like him from similar conduct in the future." *Smith v. Wade*, 461 U.S. 30, 54 (1983) (alteration, citations and internal quotation marks omitted). Given that Mr. Acosta and Mr. Cantos-Chavez were not actually terminated from their employment, and given the

amount of compensatory damages already assessed, as well as the imposition of an injunction (discussed *infra*), the Court does not believe that punitive damages should be assessed in this case.

### 5. Injunction

In addition, the Secretary seeks a prospective injunction restraining the defendants from future violations of the Act. Under the FLSA, district courts have the jurisdiction to "restrain violations" of the Act. 29 U.S.C. § 217. "Prospective injunctions are essential because the cost of noncompliance is placed on the employer, which lessens the responsibility of the [DOL] in investigating instances of noncompliance." *Martin v. Funtime, Inc.*, 963 F.2d 110, 114 (6th Cir. 1992) (internal citation omitted). "The imposition of an injunction is not punitive, nor does it impose a hardship on the employer since it requires him to do what the Act requires anyway – to comply with the law." *Id.* (citation and internal quotation marks omitted).

In *Dunlop v. Davis*, 524 F.2d 1278 (5th Cir. 1975), the Fifth Circuit held that the two factors to be considered in determining whether a prospective injunction should be granted are the "previous conduct of the employer and the dependability of his promises for future compliance." *Id.* at 1281; *see also Brock v. Wackenhut Corp.*, 662 F. Supp. 1482, 1488 (S.D.N.Y. 1987) (citing the *Dunlop* standard). Defendants willfully violated the Act, including creating false records and requesting employees lie once the DOL began their investigation. Thus, an injunction is necessary because defendants willfully continued to violate the Act after being notified by DOL of their non-compliance, deliberately falsified records of hours worked, and engaged in retaliatory conduct against employees for their participation in this lawsuit. In short,

the Court finds that the *Dunlop* factors weigh in favor of the Secretary, and a prospective injunction restraining defendants from future violations of the FLSA will be issued. *Compare Dunlop*, 524 F.2d at 1281 (finding that a prospective injunction is warranted in part because an employer falsified records) *and Marshall v. Sam Dell's Dodge Corp.*, 451 F. Supp. 294, 306 (N.D.N.Y. 1978) (finding that an injunction is necessary due to defendants' willful violations of the Act including the falsification of time records) *with Brock*, 662 F. Supp. at 1489 (declining to issue an injunction in a "close" case when defendant was found to have committed willful violations but the Court found that the violations were not deliberate and defendant had remedied the violation by installing a sophisticated computer system to track employee's hours).

### 6. Costs

The Secretary also requests that defendants be required to pay her costs in this action. 29 U.S.C. § 216(b). The FLSA states that the "court . . . shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." *Id.* Thus, the Court intends to award attorneys' fees and costs under the FLSA. However, the Secretary did not submit her costs. Thus, an additional submission on this issue will be required.

### V. CONCLUSION

For the foregoing reasons, the Court concludes, after carefully considering the evidence introduced at trial, the arguments of counsel, and the controlling law on the issues presented, that the Secretary has shown by a preponderance of the evidence that defendants violated the minimum wage,

overtime, record-keeping, and anti-retaliation provisions of the FLSA. The Court hereby enters judgment in the amount of $277,734.24 against defendants, consisting of $137,867.12 of unpaid damages, $137,867.12 in liquidated damages, and $2,000 in retaliatory damages. [13] A prospective injunction restraining defendants from future violations of the FLSA is also imposed. The Clerk of the Court shall enter judgment accordingly.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: April 5, 2013
        Central Islip, NY

* * *

Plaintiff is represented by Daniel M. Hennefeld and Elena S. Goldstein, U.S. Department of Labor, Office of the Solicitor, 201 Varick Street, Room 983, New York, N.Y. 10014. Defendant is represented by Raymond Nardo, 129 Third Street, Mineola, N.Y. 11501.

---

[13] The Court agrees with the Secretary's October 15, 2012 letter to the Court that Quarta's bankruptcy discharge has no effect on the ability of this Court to enter a judgment against both defendants. In particular, the Court has already held that the police and regulatory powers exemption applies. Moreover, the Court has the authority to issue a money judgment against both defendants for conduct arising from pre-petition and post-petition conduct. *See, e.g., SEC v. Brennan*, 230 F.3d 65, 71 (2d Cir. 2000) (exemption "permits the *entry* of a money judgment against a debtor"); *Martin v. Safety Elec. Const. Co.*, 151 B.R 637, 639 (D. Conn. 1993) (the Secretary's FLSA enforcement proceeding could continue, but "[a]ctual collection" of money damages would "proceed according to normal bankruptcy procedures"); *see also In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 488 F.3d 112, 133 (2d Cir. 2007) (explaining that the government's "actions seeking money damages for past conduct" are not subject to the bankruptcy stay, but that enforcement of judgment are subject to bankruptcy proceedings.) Thus, the money judgment would "simply fix the amount of the government's unsecured claim against the debtors." *United States ex rel. Fullington v. Parkway Hosp. Inc.*, 351 B.R. 280, 283 (E.D.N.Y. 2006) (citation and internal quotation marks omitted). In short, Quarta's bankruptcy, including the bankruptcy discharge, have no legal impact on the Court's ability to render a money judgment against Quarta, or to enter a prospective injunction restraining him from future violations of the Act.